# TAB
# "N"

Tab "N" - ***Cases re: Ocwen Violation of Discharge Injunction***

1.  ***In re McKain***, 2009 Bankr. LEXIS 2519 (Bankr. E.D. La. May 1, 2009).

2.  ***In re Batiste***, 2009 Bankr. LEXIS 2518 (Bankr. E.D. La. July 14, 2009).

3.  ***In re Adams***, 2011 U.S. Dist. LEXIS 158090 (E.D.N.C. Jan. 24, 2011).

4.  ***Phillips v. Deutsche Nat'l Trust (In re Phillips)***, 2011 Bankr. LEXIS 3780 (Bankr. N.D. Ohio Sept. 29, 2011); subsequent history at 2012 Bankr. LEXIS 1042 (Bankr. N.D. Ohio Mar. 9, 2012).

5.  ***Fegadel v. Ocwen Loan Servicing, LLC***, 2016 U.S. Dist. LEXIS 81449 (M.D. Fla. June 22, 2016); subsequent history on Plaintiff's Motion to Compel Discovery at 2016 U.S. Dist. LEXIS 162311 (M.D. Fla. Nov. 23, 2016).

6.  ***Garfield v. Ocwen Loan Servicing, LLC***, 811 F.3d 86 (2d Cir. N.Y. Jan. 4, 2016).

7.  ***Freeman v. Ocwen Loan Servicing, Inc.***, 2016 U.S. Dist. LEXIS 82751 (N.D. Ill. June 27, 2016).

8.  ***In re Todt***, 567 B.R. 667 (Bankr. D.N.H. May 17, 2017).



**User Name:** John Mickalovski1
**Date and Time:** Tuesday, July 18, 2017 2:57:00 PM CDT
**Job Number:** 50653947

## Document (1)

1. *In re McKain, 2009 Bankr. LEXIS 2519*

   **Client/Matter:** -None-
   **Search Terms:** "McKain" and "ocwen"
   **Search Type:** Terms and Connectors
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |


# In re McKain

United States Bankruptcy Court for the Eastern District of Louisiana

May 1, 2009, Decided

CASE NO. 08-10411 SECTION A, CHAPTER 13

**Reporter**
2009 Bankr. LEXIS 2519 *; 2009 WL 2848988

IN RE: CORY **MCKAIN** AND REGINA **MCKAIN**, Debtors

## Core Terms

postpetition, charges, sanctions, parties, proof of claim, injunction, collection, notice, expenditures, bankruptcy court, fees and costs, property taxes, cases, foreclosure, Servicing, amounts, reasons, accounting procedures, claims process, costs, injunctive relief, set forth, installment, asserting, accrued, escrow, files

## Case Summary

### Procedural Posture

Debtors filed a motion to enforce the automatic stay against a loan servicer. The parties reached a settlement, but the court also addressed whether further relief measures were warranted with respect to the loan servicer.

### Overview

The debtors contended that the loan servicer sent monthly billing statements that violated the automatic stay imposed by *11 U.S.C.S. § 362*. The parties eventually reached a settlement as to their specific dispute. However, the court noted that the same loan servicer had appeared numerous times before the court for improperly administering a loan or attempting to collect fees and costs to which it was not entitled. While monetary sanctions had previously been assessed against the loan servicer, the court stated that it did not believe that the servicer had taken the steps necessary or appropriate to eliminate or correct its pattern of error. As a result, discharged debtors continued to incur the threat of foreclosure and collection of debts that had been discharged or disallowed. Finding that the servicer

had repeatedly abused the claims process and failed to honor the discharge injunction, under its broad authority pursuant to *11 U.S.C.S. § 105(a)*, the court ordered the servicer to institute certain detailed accounting procedures that would, among other things, allow debtors and their counsel notice of incurred postpetition fees or costs.

### Outcome

The court ordered the loan servicer to institute certain detailed accounting procedures that would, among other things, allow debtors and their counsel notice of incurred postpetition fees or costs.

## LexisNexis® Headnotes

Bankruptcy Law > Claims > General Overview

**HN1**[] **Bankruptcy Law, Claims**
Chapter 13 bankruptcy is a vehicle for the honest but unfortunate debtor to discharge certain debts through the completion of a payment plan under the protection and supervision of the bankruptcy court. In order to receive distribution under a debtor's payment plan, the creditor must file a written statement setting forth its claim. *Fed. R. Bankr. P. 3001* and *3002*. Except for limited circumstances, the claim shall be limited to those debts that are due as of the filing date of the bankruptcy petition. *11 U.S.C.S. §§ 101(10)*, *501*, and *502(b)*.

Bankruptcy Law > Claims > General Overview

Bankruptcy Law > Administrative Powers > Automatic Stay > General Overview

**HN2**[] **Bankruptcy Law, Claims**

John Mickalovski1

The petition date institutes the automatic stay under *11 U.S.C.S. § 362*, but it also creates a bright line for determining the amounts that may be collected through a plan of reorganization. This serves a number of important goals. First, it eliminates any possible confusion as to what may be included in a claim. Second, it helps ensure a fair distribution of a debtor's assets. The claims process helps streamline the administration of a bankruptcy by allowing creditors a prima facie claim if they comply with the requirements of *Fed. R. Bankr. P. 3001*. This policy serves two important functions: first it relieves a creditor from proving its claim, eliminating unnecessary expense and time; and second, it provides debtors, interested parties, and the Court with a clear and simple method for determining the claims against the bankruptcy estate. The primary purpose of chapter 13 is to provide a debtor, after completion of his or her plan, with a discharge of any remaining obligations.

Governments > Courts > Authority to Adjudicate

**HN3**[↓] **Courts, Authority to Adjudicate**
It is well established that a federal court may consider collateral issues after an action is no longer pending.

Bankruptcy Law > ... > Bankruptcy > Case Administration > Bankruptcy Court Powers

**HN4**[↓] **Case Administration, Bankruptcy Court Powers**
The authority of bankruptcy courts to issue civil sanctions has been clearly settled. The source of that authority comes from the court's inherent authority and from Bankruptcy Code itself, specifically *11 U.S.C.S. § 105*. One of the key functions of *§ 105(a)* is to prevent an abuse of process. Abuse of process is not defined by the Bankruptcy Code. The Restatement (Second) of Torts defines it as one who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process. Some bankruptcy courts have simply stated that abuse of process consists of maneuvers or schemes which would have the effect of undermining the integrity of the bankruptcy system.

Bankruptcy Law > ... > Bankruptcy > Case

Administration > Bankruptcy Court Powers

**HN5**[↓] **Case Administration, Bankruptcy Court Powers**
See *11 U.S.C.S. § 105(a)*.

Bankruptcy Law > ... > Bankruptcy > Case Administration > Bankruptcy Court Powers

Governments > Courts > General Overview

**HN6**[↓] **Case Administration, Bankruptcy Court Powers**
Bankruptcy courts have an inherent authority to sanction parties and control their courts, beyond that set forth by *11 U.S.C.S. § 105(a)*. It is well-settled that a federal court, acting under its inherent authority, may impose sanctions against litigants or lawyers appearing before the court so long as the court makes a specific finding that they engaged in bad faith conduct. It is also established that courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum in their presence and submission to their lawful mandates. This inherent power is governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Judgments

**HN7**[↓] **Adversary Proceedings, Judgments**
A federal bankruptcy court has the authority to issue an injunction.

Civil Procedure > Remedies > Injunctions > General Overview

**HN8**[↓] **Remedies, Injunctions**
Several opinions from the United States Court of Appeals for the Fifth Circuit hold that the traditional standards for injunctive relief (i.e. irreparable injury and inadequate remedy at law) are inapplicable to injunctions issued to protect a court's inherent jurisdiction and to control its docket. Where monetary sanctions are ineffective in deterring vexatious filings, injunctions are appropriate. The court's power to enter such orders flows not only from various statutes and

rules relating to sanctions, but the inherent power of the court to protect its jurisdiction, its judgments, and to control its docket.

> Civil Procedure > Remedies > Injunctions > General Overview

> Civil Procedure > Sanctions > General Overview

*HN9*[🔼] **Remedies, Injunctions**
In determining the propriety of a sanction in the form of injunctive relief, a court considers the party's history of litigation, whether or not it has a good faith basis for pursuing the litigation, the extent of the burden on the court and other parties resulting from the party's filings, and the adequacy of alternative sanctions.

**Counsel:** **[*1]** For Cory *McKain*, Regina *McKain*, Debtors: Elisabeth D. Harrington, Harrington & Myers, Metairie, LA.

Trustee: S. J. Beaulieu, Jr., Metairie, LA.

**Judges:** Hon. Elizabeth W. Magner, U.S. Bankruptcy Judge.

**Opinion by:** Elizabeth W. Magner

# Opinion

**REASONS FOR ORDER REQUIRING ACCOUNTING PROCEDURES**

This matter came before the Court on Cory and Regina *McKain*'s ("Debtors") Motion to Enforce Automatic Stay ("Motion to Enforce") (P-10) filed against *Ocwen* Loan Servicing, LLC ("*Ocwen*"). The parties have reported a settlement of the Motion to Enforce, however, for the reasons set forth below, this Court will require *Ocwen* to perform some additional relief measures.

**JURISDICTION**

This Court has jurisdiction pursuant to *28 U.S.C. §§ 157(b)(2)(A), (C), & (O), 1334*, and *11 U.S.C. § 362*.

**BACKGROUND**

To purchase a residence located at 424 Holmes Drive, Slidell, Louisiana, Debtors obtained a $ 136,000 loan from First NLC Financial Services, LLC, d/b/a the

Lending Center ("First NLC"). Debtors signed a promissory note, which was secured by a mortgage on the property.

Debtors fell behind in their payments to First NLC, and after a foreclosure was commenced, filed a petition for relief under chapter 13 of the Bankruptcy Code on February 29, 2008. **[*2]** Their plan was confirmed on May 19, 2008. Debtors filed a Motion to Enforce on March 31, 2008, asserting that *Ocwen*, the servicer of the First NLC loan, [1] sent a monthly billing statement ("Statement") that violated *section 362*. The Statement contained the following paragraph:

> Our records indicate that you have filed a Chapter 13 bankruptcy and your loan is in foreclosure. Accordingly, this statement may be for informational purposes only. If this statement does not reflect the terms of your bankruptcy plan, please continue to pay your loan as provided in your plan and contact an *Ocwen* representative at 888-554-6599 to update our records. Payments received are to be applied in accordance with your mortgage note. Payments will be first applied to bring your loan contractually current. Any additional funds will be applied to outstanding fees and advances prior to being applied to principal.

Debtors complain that the Statement implies that the prepetition foreclosure action filed by *Ocwen* is active and directs Debtors to contact *Ocwen* despite the fact they **[*3]** are represented by counsel. The Statement also advises Debtors that *Ocwen* will apply their plan payments according to its own terms, disregarding the terms of the plan and bankruptcy procedure. Debtors requested sanctions as part of the relief sought.

*Ocwen* filed a proof of claim, signed by Michele Rice, Bankruptcy Supervisor, on April 3, 2008, asserting a secured claim in the amount of $ 148,100.74. The note and mortgage granting a security interest to First NLC were attached to the claim; however there was no evidence that the note and mortgage were ever assigned to *Ocwen* or any other entity.

Debtors' Motion to Enforce was initially heard April 22, 2008. *Ocwen* failed to appear. The Court continued the hearing to May 27, 2008, and issued a Rule to Appear against Michele Rice. By agreement, Debtors and

---

[1] The loan servicing was assigned to Green Tree Servicing LLC shortly after *Ocwen* sent the billing statement to which Debtors now object.

*Ocwen* continued the hearing to July 22, 2008. *Ocwen* filed its Objection to the Motion to Enforce on July 14, 2008, and notified the Court that Michele Rice no longer worked at *Ocwen*.

At the July 22 hearing, counsel for Debtors objected to the Statement's language and argued that it mislead Debtors into thinking that *Ocwen* was proceeding with the foreclosure against their home. They also [*4] complained that *Ocwen* was impermissibly attempting to collect fees and costs in derogation of their plan and the Bankruptcy Code; specifically fees and costs, such as sheriff's commissions, 2 legal fees for postpetition work that the Court had not approved, "contact charges," and "click charge" fees. 3 The Court continued the hearing to August 26, 2008, to allow *Ocwen* time to address the Court's concerns. On August 26, the hearing was further continued without date to allow *Ocwen* additional time to obtain the necessary information.

*Ocwen* filed a Response on October 10, 2008. The Court set a hearing for December 4, 2008, however that hearing was further continued to January 7, 2009, at the request of the parties. [*5] The hearing was continued one additional time before the parties appeared before the Court on January 27, 2009, to report that they were negotiating a settlement. The Court continued the hearing to February 17, 2009, to allow the parties time to finalize the terms of the settlement.

The parties appeared on February 17, 2009, after almost a year of hearings and discovery, and reported that they had settled Debtors' Motion to Enforce.

### *Ocwen*'s History

This is not the first time *Ocwen* has appeared before the Court for improperly administering a loan or attempting to collect fees and costs to which it was not entitled. The Court has been involved with six other cases 4 in the last four years where *Ocwen* either

---

2 *Ocwen* frequently includes sheriff commissions on proofs of claim, despite the fact that such commissions are not owed until a property is actually sold by a sheriff's department.

3 The contact charge fees were later revealed to be charged for "drive by" inspections, while the click charge fees are charged to creditor's counsel for electronically accessing the creditor's loan documents. *Ocwen* Loan Servicing, LLC's Response to Memorandum to Record, p.9 and Exhibit 4 (October 10, 2008).

included improper fees in its claim; attempted to collect, post-discharge, fees and costs that were undisclosed but assessed during a bankruptcy; or attempted to foreclose on disallowed or discharged debt. The cases are briefly described:

02-10630 Mary Wills - The debtor filed a Motion for Sanctions complaining that *Ocwen* was improperly attempting to collect postpetition arrears that the debtor placed into her plan *via* a *Mendoza* modification. The Court granted the Motion and ruled that [*6] the debtor's account was postpetition current. The debtor received a discharge on July 6, 2006. Post-discharge, *Ocwen* again attempted to collect the *Mendoza* payments as well as additional bankruptcy fees and charges. The Court ordered *Ocwen* to correct the debtor's account to reflect that she was current, struck the improper fees, and awarded sanctions. Despite this Court's rulings, *Ocwen* persisted in its attempt to collect the disallowed amounts. Debtor filed a Motion for Contempt, and on November 5, 2007, the parties entered into a stipulation resolving the matter.

03-10398 Jada Taylor Batiste - The debtor received a discharge on July 2, 2008; after *Ocwen* was paid the full amount reflected on its proof of claim. Shortly after receiving her discharge, *Ocwen* resumed collection activity for the amounts paid during the debtor's case. Debtor filed a Motion for Sanctions, alleging that *Ocwen* applied postpetition payments to fees and costs that were assessed during the bankruptcy but not disclosed to the debtor. The parties settled this matter, and the debtor withdrew the Motion for Sanctions on April 28, 2009.

03-18525 Sharon Wise Sam - On July 12, 2007, the debtor filed an Objection to *Ocwen*'s [*7] proof of claim contesting unapproved, unitemized, and previously undisclosed postpetition charges. The Court sustained the Objection and entered an Order reducing *Ocwen*'s claim by $ 2,882.55.

04-19370 Irma B. Curtis - The debtor filed an Objection to *Ocwen*'s proof of claim on March 1, 2005, asserting that a recent account statement indicated that her arrearage was $ 5,220.90 less than the amount listed in *Ocwen*'s proof of claim.

---

4 It is likely that there are many additional cases where this activity has occurred, but not all debtors' counsel carefully monitor creditors' proofs of claim.

The parties settled the matter on May 17, 2005, and *Ocwen* amended its claim to remove a claim for $ 5,179.72 in "Securitized Interest Arrearage" and a $ 150.00 "POC Fee."

07-11978 Warren K. Barlow and Lisa G. Barlow - The debtors were current with *Ocwen* on the petition date, however *Ocwen* filed a proof of claim asserting a $ 2,543.47 arrearage. The debtors objected to *Ocwen*'s claim on May 13, 2008, and the parties submitted a Consent Order requiring *Ocwen* to amend its claim to reflect that the debtors were current.

08-10068 Gary A. LaMonte and Sabrina Marie LaMonte - The debtors filed an Objection to *Ocwen*'s proof of claim on April 9, 2008, questioning *Ocwen*'s calculations and alleging that *Ocwen* improperly added fees and costs to the debtors' account. It took **[*8]** *Ocwen* ten months to supply a legible accounting. The debtors eventually withdrew their Objection after *Ocwen* removed bankruptcy attorney fees and property inspection fees. The Court awarded the debtors' counsel $ 1,500 as sanctions for *Ocwen*'s delay in addressing the Objection.

Between the dates of January 1, 2002, and February 17, 2009, *Ocwen* participated in approximately forty-two Section A cases. The six cases described above, plus the instant case, reflect an error rate of approximately 17%, or one in every six files. It is probable that the above files are not an exhaustive list of cases where *Ocwen* has inappropriately administered loans, as not all debtor's counsel carefully monitor claims. In each case, the Court required *Ocwen* to remove fees and correct its payment history. In several of the itemized cases *Ocwen* continued to demand payment or continued with a foreclosure despite prior payment or court ordered disallowance. In light of this history, *Ocwen*'s statement that the foreclosure case remains active and that the **[*9]** application of payments received will be at its discretion, despite a plan and bankruptcy law to the contrary, is troubling to say the least. The Court does not believe that *Ocwen* has taken the steps necessary or appropriate to eliminate or correct its pattern of error.

## DISCUSSION

HN1[↑] Chapter 13 bankruptcy is a vehicle for the honest but unfortunate debtor to discharge certain debts through the completion of a payment plan under the protection and supervision of the bankruptcy court. [5] In order to receive distribution under a debtor's payment plan, the creditor must file a written statement setting forth its claim. [6] Except for limited circumstances not applicable here, the claim shall be limited to those debts that are due as of the filing date of the bankruptcy petition. [7]

HN2[↑] The petition date institutes the automatic stay under *section 362*, but it also creates a bright line for determining the amounts that may be collected through a plan of reorganization. [8] This serves a number of important goals. First, it eliminates any **[*10]** possible confusion as to what may be included in a claim. Second, it helps ensure a fair distribution of a debtor's assets.

The claims process helps streamline the administration of a bankruptcy by allowing creditors a *prima facie* claim if they comply with the requirements of *Bankruptcy Rule 3001*. This policy serves two important functions: first it relieves a creditor from "proving" its claim, eliminating unnecessary expense and time; and second, it provides debtors, interested parties, and the Court with a clear and simple method for determining the claims against the bankruptcy estate. The primary purpose of chapter 13 is to provide a debtor, after completion of his or her plan, with a discharge of any remaining obligations.

*Ocwen* has consistently shown an inability or refusal to comply with these basic statutory tenets. As a result, discharged debtors have continued to incur the threat of foreclosure and **[*11]** collection of debts that have been discharged or disallowed. *Ocwen* has failed to disclose the assessment of postpetition charges to others, misleading them into a false sense that a fresh start was theirs to enjoy. The question currently facing the Court is how can it ensure that *Ocwen* properly identifies and calculates the prepetition debt owed, properly applies the payments it receives, and, postpetition, properly

[5] *Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365, 367, 127 S.Ct. 1105, 1107, 166 L. Ed. 2d 956 (2007)*.

[6] *See, F.R.Bankr.P. 3001* and **3002**.

[7] *See, 11 U.S.C. §§ 101(10), 501*, and **502(b)**.

[8] While a creditor is generally prohibited from collecting postpetition fees and costs through the plan, it may be entitled to recover such fees and costs if it files an application, as required by *Bankruptcy Rule 2016*. *See also, In re Jones 366 B.R. 584, 594 (Bankr. E.D.La. 2007)*.

notifies debtors of any subsequent attorneys fees or charges **_Ocwen_** alleges are due?

<u>Authority of Court to Issue Sanctions</u>

The parties agreed to a settlement that resolved the issues raised by Debtors' Motion to Enforce and addressed Debtors' concerns over the amounts claimed on **_Ocwen_**'s proof of claim. This does not, however, preclude the Court from considering sanctions for **_Ocwen_**'s systematic abuse of the claims process and bankruptcy system. _HN3_[↑] "It is well established that a federal court may consider collateral issues after an action is no longer pending . . .." [9]

_HN4_[↑] ] The authority of bankruptcy courts to issue civil sanctions has been clearly settled. [10] The source of that authority comes from the court's inherent authority [11] and from Bankruptcy Code itself, specifically _section 105_. [12]

One of the key functions of _§ 105(a)_ is to "prevent an abuse of process." [13] "Abuse of process" is not defined

---

[9] _Ratliff v. Stewart, 508 F.3d 225, 230 (5th Cir. 2007)_, quoting _Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 395, 110 S.Ct. 2447, 2456, 110 L. Ed. 2d 359_, L.Ed.2d 359 (1990); _see also Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 451 31 S. Ct. 492, 502, 55 L. Ed. 797 (1911)_(noting [*12] that court had power to punish for contempt after parties completely settled all matters involved in the case).

[10] _Matter of Terrebonne Fuel & Lube, Inc., 108 F.3d 609 (5th Cir. 1997)_; _see also, In re Hardy, 97 F.3d 1384 (11th Cir. 1996)_; _In re Rainbow Magazine, Inc., 77 F.3d 278 (9th Cir. 1996)_; _In re Power Recovery Systems, Inc., 950 F.2d 798 (1st Cir. 1991)_; _In re Skinner, 917 F.2d 444 (10th Cir. 1990)_; _In re Walters, 868 F.2d 665 (4th Cir. 1989)_; and _In re Sanchez, 372 B.R. 289 (Bankr. S.D.Tex. 2007)_.

[11] _See, e.g., In re Yorkshire LLC, 540 F.3d 328 (5th Cir. 2008)_(affirming the inherent authority of the bankruptcy court).

[12] _Terrebonne, 108 F.3d at 613_.

[13] **Section 105(a)** provides that:

> _HN5_[↑] ] The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

---

by the Bankruptcy Code. The Restatement (Second) of Torts defines it as "[o]ne who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, [*13] is subject to liability to the other for harm caused by the abuse of process." [14] Some bankruptcy courts have simply stated that abuse of process consists of "maneuvers or schemes which would have the effect of undermining the integrity of the bankruptcy system." [15]

_HN6_[↑] ] Bankruptcy courts also have an inherent authority to sanction parties and control their courts, beyond that set forth by _§ 105(a)_. [16] "It is well-settled that [*14] a federal court, acting under its inherent authority, may impose sanctions against litigants or lawyers appearing before the court so long as the court makes a specific finding that they engaged in bad faith conduct." [17] It is also established that "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum in their presence and submission to their lawful mandates." [18] This inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." [19]

Sanctions against **_Ocwen_** are appropriate for a number of reasons. As demonstrated above, **_Ocwen_** has repeatedly abused the claims process and failed to honor the discharge injunction by attempting to collect from debtors and their bankruptcy estate disallowed or undisclosed debts. The Court finds that this practice is in bad faith and requires greater regulation of **_Ocwen_**'s behavior [*15] to curtail further abuse of the bankruptcy system. The record reflects that this is an ongoing pattern that imposes a burden on debtors and the Court

---

[14] _Restatement (Second) of Torts § 682_ (1977).

[15] _In re Eagle-Picher Industries, Inc., 169 B.R. 135, 138 n.1 (Bankr. S.D.Ohio 1994)_; _see also In re Burrell, 148 B.R. 820, 824 (Bankr. E.D.Va. 1992)_ (defining abuse of process as situation where inaction by the court "would undermine the integrity of the bankruptcy system.").

[16] _See, e.g., In re Yorkshire LLC, 540 F.3d 328 (5th Cir. 2008)_.

[17] _Id. at 332_.

[18] _Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L. Ed. 2d 27 (1991)_(citations omitted).

[19] _Id._

to monitor **_Ocwen_**'s claims and pleadings. The Court has repeatedly struck improper charges and has issued monetary sanctions against **_Ocwen_**. **_Ocwen_**'s continuing disregard for bankruptcy law and procedure is a clear indication that monetary sanctions are simply ineffective. For these reasons, the Court will require **_Ocwen_** to institute the following accounting procedures:

1. Upon the filing of a chapter 13 bankruptcy petition, the amounts outstanding on a debtor's loan will be divided into two new, internal administrative accounts. The first account will contain the sums to be paid under debtor's plan by the Chapter 13 Trustee; typically the prepetition past due amounts including past due interest, costs, charges, and fees ("Account One"). [20] The opening balance on Account One should directly correlate to the amounts reflected on **_Ocwen_**'s proof of claim. Account One will also include any amounts added by subsequent court order to the plan for payment by the Trustee during the case's administration. All payments made by the Trustee will be applied [*16] to the reduction of the amounts owed on Account One.

The second account will reflect the principal amount due on the petition date [21] ("Account Two"). No other sums should be owed on Account Two at the start of the case. Account Two will include postpetition interest accrual, postpetition property insurance or property tax expenditures, and other court authorized postpetition charges as provided in paragraph 2 below. [22] A debtor's regular monthly note payments will be posted to this account, reducing postpetition interest accrual, postpetition property and tax expenditures, and principal. The account's first posting will typically be the first installment payment due on the loan following the petition date.

**_Ocwen_** may maintain, postpetition, its customary records on the loan provided that the two new internal accounts shall control the loan's administration during the pendency of the case.

2. With the exception of postpetition property taxes and property insurance expenditures, **_Ocwen_** may provisionally accrue, but not assess or collect, any postpetition charges, fees, costs, etc. [23] allowed by the note, security agreement and state law. Postpetition property tax and insurance expenditures [*17] may be assessed against debtor's account and collected after the delivery of a ten day written notice to debtor, debtor's counsel, and the Trustee. The assessment and collection of expenditures for postpetition property insurance and taxes will not require approval of the bankruptcy court unless a written objection is filed within 10 days of the notice of assessment and collection. If authorized by **_Ocwen_**'s note, security agreement, and state law, the collection of amounts necessary to pay postpetition insurance and property tax expenditures may be made in advance through the use of escrow accounts. If escrows are utilized, **_Ocwen_** must give a written accounting of the amounts collected at the time it seeks to apply the escrowed funds to payment of the insurance or property tax expenditures.

As to postpetition charges, annually, between January 1 and February 28 of each year during a case's administration, **_Ocwen_** shall file with the Court and serve upon the debtor, debtor's counsel, and the Trustee, notice of any postpetition charges (which do not include property taxes or insurance), accrued in the preceding calendar year. The notice shall contain an itemization describing the charge, [*18] amount provisionally incurred, the date incurred, and if relevant, the name of the third party to whom the charge was paid. The notice will also provide a direct reference to the provisions of the note, security agreement, or state law under which

---

[20] Account One should not contain any estimated charges, for example, unpaid escrow charges on past due monthly installments. It should only contain actual deficiencies in payment. **_Ocwen_** may elect to carry a positive escrow balance existing on the petition date in Account Two rather than Account [*20] One in order to assist debtor's with the amortization of future property tax and insurance expenditures. If this practice is elected, it shall be noted on the proof of claim filed by **_Ocwen_**.

[21] If the proof of claim includes all past due installment payments, the principal amount reflected in Account Two must be adjusted downward to accommodate the anticipated principal payments being made through the plan. Alternatively, the past due installments reflected in the proof of claim can be adjusted to eliminate principal. If this opinion is chosen, disclosure as to how this will affect the future amortization of debtor's loan must be provided.

[22] The posting of postpetition charges is constrained by the provisions of paragraph 2 which follows.

[23] Court approved postpetition charges other than postpetition interest, property tax or insurance expenditures will hereafter be referred to as "Postpetition Charges."

**Ocwen** asserts its authority to assess each type of charge.

The notice shall contain a statement to the effect that debtor may elect to add the charges to his plan with approval of the bankruptcy court, satisfy the charges directly outside the plan, or defer repayment until the conclusion of his case.

Thirty days after giving notice of the postpetition charges, **Ocwen** may request, by *ex parte* order, authority to assess the postpetition charges set forth in its notice. However, **Ocwen** may not collect on any Postpetition Charges unless the debtor voluntarily delivers payment separate and above from that due as a regular monthly installment or obtains approval of the court to modify the plan and satisfy the amounts due through periodic payments by the Trustee. If the Postpetition Charges are to be paid through the modified plan, they will be added to Account One and satisfied by the Trustee. If to be paid by the debtor, they may be added to Account [*19] Two.

If no provision for payment is made by a debtor, the collection of the Postpetition Charges must be deferred until the close of the case or relief from the stay is obtained.

3. If **Ocwen** does not issue a notice of postpetition charges, in accordance with paragraph 2, for any given year of the case's administration, then **Ocwen** shall be prohibited from collecting or assessing any charges accrued against the debtor for that year and shall treat the debtor as fully current at the time of discharge.

4. Upon the issuance of a discharge, **Ocwen** shall adjust its permanent records to reflect the current nature of debtor's account. Provided however, that if debtor elected to defer the payment of approved Postpetition Charges until the conclusion of the case's administration, then **Ocwen** shall be authorized to collect said sums in accordance with the provisions of its note, security instrument, and state law.

The accounting procedures ordered by this Court serve a number of functions. First, they ensure that **Ocwen** is not abusing the claims process. Second, they allow debtors and their counsel notice of incurred postpetition fees or costs. Third, the audits are narrowly tailored to regulate only [*21] the claims process. As such, they are designed to effect the least severe means available

to quell the offensive behavior. [24] Finally, they are rehabilitative and educational in character because they will expose defects in the claims on file and provide **Ocwen** with the opportunity to correct its own errors.

Injunctive Relief

The sanctions issued against **Ocwen** constitute injunctive relief because they direct **Ocwen** to take certain actions. [25] It is clear that *HN7*[↑] this Court has the authority to issue an injunction; [26] therefore, the remaining issue is whether such relief should be implemented against **Ocwen**.

*HN8*[↑] ] Several Fifth Circuit opinions hold that the traditional standards for injunctive relief (*i.e.* irreparable injury and inadequate remedy at law) are inapplicable [*22] to injunctions issued to protect a court's inherent jurisdiction and to control its docket. [27] Where monetary sanctions are ineffective in deterring vexatious filings, injunctions are appropriate. The court's power to enter such orders flows not only from various statutes and rules relating to sanctions, but the inherent power of the court to protect its jurisdiction, its judgments, and to control its docket. [28]

*HN9*[↑] ] In determining the propriety of a sanction in the form of injunctive relief, a Court considers the party's history of litigation, whether or not it has a good faith basis for pursuing the litigation, the extent of the burden on the court and other parties resulting from the party's

---

[24] *See, Natural Gas Pipeline Co. of America v. Energy Gathering Inc., 86 F.3d 464, 467 (5th Cir. 1996)* and *Thomas v. Capital Sec. Services, Inc., 836 F2d 866, 877 (5th Cir. 1988).*

[25] *Wells Fargo v. Jones, 391 B.R. 577, 609 (E.D.La. 2008).*

[26] *Wells Fargo v. Jones, 391 B.R. 577, 609 (E.D.La. 2008),* citing *Continental Illinois Nat. Bank & Trust Co. of Chicago v. Chicago R.I. & P. Ry. Co., 294 U.S. 648, 675, 55 S. Ct. 595, 79 L. Ed. 1110 (1935).*

[27] *Baum v. Blue Moon Ventures, L.L.C., 513 F.3d 181 (5th Cir. 2008); Ferguson v. MBank Houston, N.A., 808 F.2d 358, 359 (5th Cir. 1986).*

[28] *Ferguson, 808 F.2d at 359.* The Fifth Circuit confirmed that this inherent power also resides with bankruptcy courts for bad faith conduct occurring in proceedings before them. *Citizens Bank & Trust Co. v. Case, 937 F.2d 1014 (5th Cir. 1991).*

filings, and the adequacy of alternative sanctions. [29] As explained above, **Ocwen** has consistently failed to properly apply **[*23]** payments received in a case's administration, failed to honor the automatic stay or discharge injunction, and failed to notify debtors of accrued postpetition debts. This practice has increased the burden on the Court and debtors. The Court has previously sanctioned **Ocwen** for its behavior and does not believe that further monetary sanctions will inspire **Ocwen** to change its practices. As such, the Court does not believe that there is any other adequate legal remedy.

Because an appeal is now pending in a related case based on application of the appropriate standard for the form of relief, the Court will also apply the traditional four part test, which requires a party establish: [30]

> (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. [31]

The **[*24]** above factors are typically applied when one party is requesting injunctive relief against another party and do not easily translate where it is the court that is seeking to prevent harm. Nevertheless, for the sake of completeness, the Court will address each factor below.

Success on the Merits. For the reasons set forth above, the Court finds that the injunction is an appropriate remedy and that it is unlikely that an appellate court would overturn this Court's ruling.

Irreparable Injury. The Court finds that failure to institute the accounting procedures will result in **Ocwen** continuing to pursue claims ate incorrect, disallowed, or discharged. Despite multiple warnings, the Court continues to receive complaints against **Ocwen** on a regular basis for egregious breaches of the automatic stay or discharge injunction. No adequate remedy exists at law to stop this abuse.

Damage to **Ocwen**. The burden on **Ocwen** to comply with the annual accounting procedures is minimal, and is clearly eclipsed by the injury that a debtor would suffer if his or her residence were improperly foreclosed upon. In fact, the burden of issuing an annual accounting is less than what would ordinarily be required of **Ocwen** **[*25]** under _Bankruptcy Rule 2016_.

Public Interest. The accounting procedures serve the public interest because they require **Ocwen** to disclose postpetition fees and costs that have accrued against debtors' accounts. This gives debtors the opportunity to ascertain whether the fees or costs are justified. Additionally, once apprised that they are incurring postpetition charges, debtors will be encouraged to make timely payments to prevent the assessment of future charges. Finally, once apprised of any postpetition fees, debtors may pay the charges to ensure that they are current upon discharge.

**CONCLUSION**

**Ocwen** has a clear pattern of abusing the claims process by ignoring the discharge injunction or attempting to collect undisclosed debts. This Court has repeatedly stricken **Ocwen**'s fees and costs, and has imposed sanctions. **Ocwen**'s continuing violations and disregard for bankruptcy procedure makes it clear that additional action by the Court is necessary. It is for these reasons that the Court will require **Ocwen** to institute the accounting procedures set forth above. An Order consistent with these reasons will be rendered separately.

New Orleans, Louisiana, May 1, 2009.

/s/ Elizabeth W. Magner

Hon. **[*26]** Elizabeth W. Magner

U.S. Bankruptcy Judge

_End of Document_

---

29 _Blue Moon Ventures, 513 F.3d at 189_.

30 The Court does not however, as stated in _In re Stewart, 2008 Bankr. LEXIS 3226, 2008 WL 5096011 (Bankr. E.D.La. 2008)_, believe that this test is appropriate.

31 _Jones v. Wells Fargo 391 B.R. at 609_, quoting _VRC LLC v. City of Dallas, 460 F.3d 607, 611 (5th Cir. 2006)_.



**User Name:** John Mickalovski1
**Date and Time:** Monday, July 17, 2017 2:08:00 PM CDT
**Job Number:** 50581244

## Document (1)

1. _In re Batiste, 2009 Bankr. LEXIS 2518_

   **Client/Matter:** -None-
   **Search Terms:** "discharge" and "violation" and "Ocwen"
   **Search Type:** Terms and Connectors
   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |


# *In re Batiste*

United States Bankruptcy Court for the Eastern District of Louisiana

July 14, 2009, Decided

CASE NO. 03-10398 SECTION A, CHAPTER 13

**Reporter**

2009 Bankr. LEXIS 2518 *; 2009 WL 2849077

IN RE: JADA TAYLOR BATISTE, DEBTOR

## Core Terms

sanctions, foreclosure, injunction, post-***discharge***, parties, reasons, notify, show cause, discharged, costs, injunctive relief, bankruptcy court, set forth, postpetition, procedures, arrearage, notice, requires, charges, default, serves

## Case Summary

### Procedural Posture

The debtor moved for sanctions against a loan servicer. The debtor withdrew her motion for sanctions after settling with the servicer, but the court's order against the servicer to appear and show cause why sanctions should not be imposed remained.

### Overview

The debtor moved for sanctions after the loan servicer attempted to collect on a loan in ***violation*** of the automatic stay and the ***discharge***. While the parties settled their dispute, the court noted that the loan servicer was a repeat offender who had abused the bankruptcy process. The court therefore concluded that sanctions against the servicer were appropriate to try to stop the servicer from repeatedly abusing the claims process and failing to honor the ***discharge*** injunction by attempting to collect from debtors and their bankruptcy estate disallowed or undisclosed debts immediately following ***discharge***. Finding that previous monetary sanctions had proved ineffective, the court issued an order pursuant to its authority under *11 U.S.C.S. § 105* requiring the servicer to institute certain procedures once a debtor had received a ***discharge*** under *11*

*U.S.C.S. § 1328*. Included was a requirement that the servicer immediately dismiss any pending foreclosure action upon the filing of a Chapter 13 bankruptcy.

### Outcome

The court issued an order requiring the loan servicer to immediately dismiss any pending foreclosure upon the filing of a bankruptcy in the district and to deliver post-***discharge*** statements to debtors, their counsel, and the Chapter 13 Trustee.

## LexisNexis® Headnotes

Bankruptcy Law > Claims > General Overview

Bankruptcy Law > Individuals With Regular Income > General Overview

**HN1**[ ] **Bankruptcy Law, Claims**

Chapter 13 bankruptcy is a vehicle for the honest but unfortunate debtor to ***discharge*** certain debts through the completion of a payment plan under the protection and supervision of the bankruptcy court. In order to receive distributions under a debtor's plan, the creditor must file a written statement setting forth its claim. *Fed. R. Bankr. P. 3001* and *3002*. Except for limited circumstances, the claim is limited to debts due as of the filing date of the bankruptcy petition. *11 U.S.C.S. §§ 101(10)*, *501*, and *502(b)*.

Bankruptcy Law > Administrative Powers > Automatic Stay > General Overview

**HN2**[ ] **Administrative Powers, Automatic Stay**

The petition date institutes the automatic stay under *11 U.S.C.S. § 362*, but it also creates a bright line for

determining the amounts that may be collected through a plan of reorganization. This serves a number of important goals. First, it eliminates any possible confusion as to what may be included in a claim. Second, it helps ensure a fair distribution of a debtor's assets.

Bankruptcy Law > Claims > General Overview

**HN3[**⬇**]** **Bankruptcy** **Law,** **Claims**
The claims process helps streamline the administration of a bankruptcy by allowing creditors a prima facie claim if they comply with the requirements of *Bankruptcy Rule 3001*. This policy serves two important functions: first it relieves a creditor from the burden of initially "proving" its claim, eliminating unnecessary expense and time; and second, it provides debtors, interested parties, and the Court with a clear and simple method for determining what claims exist against a bankruptcy estate.

Governments > Courts > Authority to Adjudicate

**HN4[**⬇**]** **Courts,** **Authority** **to** **Adjudicate**
It is well established that a federal court may consider collateral issues after an action is no longer pending.

Bankruptcy Law > ... > Bankruptcy > Case Administration > Bankruptcy Court Powers

**HN5[**⬇**]** **Case Administration, Bankruptcy Court Powers**
The authority of bankruptcy courts to issue civil sanctions has been clearly settled. The source of that authority comes from the court's inherent authority and from Bankruptcy Code itself, specifically *11 U.S.C.S. § 105*.

Bankruptcy Law > ... > Bankruptcy > Case Administration > Bankruptcy Court Powers

**HN6[**⬇**]** **Case Administration, Bankruptcy Court Powers**
One of the key functions of *11 U.S.C.S. § 105(a)* is to prevent an abuse of process. Abuse of process is not defined by the Bankruptcy Code. However, the Restatement (Second) of Torts defines it as one who

uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process. Some bankruptcy courts have simply stated that abuse of process consists of maneuvers or schemes which would have the effect of undermining the integrity of the bankruptcy system.

Bankruptcy Law > ... > Bankruptcy > Case Administration > Bankruptcy Court Powers

**HN7[**⬇**]** **Case Administration, Bankruptcy Court Powers**
See *11 U.S.C.S. § 105(a)*.

Bankruptcy Law > ... > Bankruptcy > Case Administration > Bankruptcy Court Powers

**HN8[**⬇**]** **Case Administration, Bankruptcy Court Powers**
Bankruptcy courts have an inherent authority to sanction parties and control their courts, beyond that set forth by *11 U.S.C.S. § 105(a)*. It is well-settled that a federal court, acting under its inherent authority, may impose sanctions against litigants or lawyers appearing before the court so long as the court makes a specific finding that they engaged in bad faith conduct. It is also established that courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum in their presence and submission to their lawful mandates. This inherent power is governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.

Bankruptcy Law > ... > Bankruptcy > Case Administration > Bankruptcy Court Powers

Civil Procedure > Remedies > Injunctions > General Overview

**HN9[**⬇**]** **Case Administration, Bankruptcy Court Powers**
A bankruptcy court has the authority to issue an injunction.

Civil Procedure > Remedies > Injunctions > General Overview

Governments > Courts > Authority to Adjudicate

HN10[⬇️] **Remedies, Injunctions** Several opinions from the United States Court of Appeals for the Fifth Circuit hold that the traditional standards for injunctive relief (i.e. irreparable injury and inadequate remedy at law) are inapplicable to injunctions issued to protect a court's inherent jurisdiction and to control its docket. Where monetary sanctions are ineffective in deterring vexatious filings, injunctions are appropriate. The court's power to enter such orders flows not only from various statutes and rules relating to sanctions, but the inherent power of the court to protect its jurisdiction, its judgments, and to control its docket.

Civil Procedure > Remedies > Injunctions > General Overview

Civil Procedure > Sanctions > General Overview

HN11[⬇️] **Remedies, Injunctions** In determining the propriety of a sanction in the form of injunctive relief, a court considers the party's history of litigation, whether or not it has a good faith basis for pursuing the litigation, the extent of the burden on the court and other parties resulting from the party's filings, and the adequacy of alternative sanctions.

**Counsel:** [*1] For Jada Taylor Batiste aka Jada L. Taylor, Debtor: Phillip D. Rubins, Metairie, LA.

Trustee: S. J. Beaulieu, Jr., Metairie, LA.

For Office of the U.S. Trustee, U.S. Trustee: Mary S. Langston, Office of the U.S. Trustee, New Orleans, LA.

**Judges:** Hon. Elizabeth W. Magner, U.S. Bankruptcy Judge.

**Opinion by:** Elizabeth W. Magner

# Opinion

## REASONS FOR ORDER

This matter came before the Court on Jada Taylor Batiste's ("Debtor") Motion for Sanctions (P-97) and this

Court's Order to Appear and Show Cause (P-102) entered against **Ocwen** Loan Servicing LLC ("**Ocwen**"). Debtor has withdrawn her Motion for Sanctions, however, this Court's Order to Appear and Show Cause why Sanctions Should not be Imposed remains. For the reasons set forth below, the Court will require **Ocwen** to immediately dismiss any pending foreclosure upon the filing of a bankruptcy in this District and to deliver post-**discharge** statements to debtors, their counsel, and the Chapter 13 Trustee ("Trustee") as further sanctions for its behavior.

## FACTS

Debtor obtained a loan from New Century Mortgage Corp. on August 6, 1999, in order to purchase the property located at 1708 N. Sugar Ridge, LaPlace, Louisiana. Debtor signed a promissory note, which is secured by a mortgage [*2] on the property.

Debtor filed a petition for relief under chapter 13 of the Bankruptcy Code on January 1, 2003. U.S. Bank, N.A., as Trustee, successor by merger to Firstar Bank, N.A., successor in interest to Firstar Bank Milwaukee, N.A., as Trustee for New Century Home Equity Loan Trustee, Series 1999-NCB ("U.S. Bank") filed a proof of claim on July 3, 2003, asserting a total claim in the amount of $ 51,152.01, with $ 2,258.17 in arrearages.

**Ocwen** filed a Motion for Relief on June 27, 2003, [1] which was resolved by consent of the parties and a *Mendoza* modification of Debtor's plan. **Ocwen** filed a claim on September 9, 2003, amending the U.S. Bank claim to change the name of the creditor to **Ocwen** Financial Corporation and increasing the arrearage to $ 4,679.73, as a result of the *Mendoza* modification. It is unclear how **Ocwen** came to own Debtor's loan.

Debtor received a **discharge** on July 2, 2008, and the Trustee's final report shows that **Ocwen** was paid the entire amount of its $ 4,679.73 arrearage. On August 7, 2008, **Ocwen** sent Debtor [*3] an Account Statement showing that she owed the following charges and fees:

🔲 Go to table1

Eleven days later, on August 18, 2008, **Ocwen** sent Debtor a Notice of Default, informing her that her mortgage payments were past due and that **Ocwen**

---

[1] This Motion for Relief was filed a week before U.S. Bank filed its proof of claim for the same debt; creating some mystery about the ownership of the loan.

would foreclose upon her property if she did not submit $ 1,760.62 within 30 days. [2] It is not clear why the amounts claimed were due. **Ocwen** did not file any Motions for enforcement of its rights following the *Mendoza* modification or request any additional fees or costs other than those contained in its proof of claim.

On September 8, 2008, Debtor filed a Motion for Sanctions complaining that the Account Statement and Notice of [*4] Default were improper attempts to collect fees and costs already satisfied. On October 7, 2005, the Court conducted a hearing on Debtor's Motion on October 7, 2008; **Ocwen** did not appear at the hearing, nor did it file a response to the Motion. The Court ordered **Ocwen** to correct its records to show that Debtor was current on her loan. The Court also entered an Order to Show Cause, requiring **Ocwen** to appear on November 12, 2008, to confirm that it corrected its accounting, and to show cause why it should not be sanctioned.

**Ocwen**'s local counsel, Claude Lightfoot; its national litigation counsel, Bryan Balogh; and a senior account executive, Gena Johnson, appeared at the November 12, 2008, hearing on the Order to Show Cause. The parties reported that they settled the Debtor's Motion for Sanctions, which left the Court's Order to Show Cause as the remaining issue. The Court expressed its concern that the problems in case were not unique and that **Ocwen** was exhibiting a pattern of attempting to collect discharged debts. In an effort to ensure **Ocwen**'s records are properly updated on completion of a case, the Court asked **Ocwen** to voluntarily send a standard form letter acknowledging that: 1) [*5] the past arrearage was satisfied, and 2) the account was current as of the *discharge* date. Mr. Balogh asked for a 30 day continuance to discuss the request with **Ocwen**, and the Court continued the hearing to December 9, 2008.

On December 9, 2008, **Ocwen** notified the Court that it was attempting an industry-wide response to the problems raised in this and other cases. While the Court appreciated **Ocwen**'s attempts to achieve national consensus, it noted that in all likelihood such a consensus would require extensive delays. The Court

found this unacceptable in light of the problems experienced. The Court issued a further continuance to January 27, 2009, for **Ocwen** to draft a post-*discharge* statement.

At the January 27, 2009, hearing, **Ocwen** notified the Court that, in early January, it had met with a number of chapter 13 trustees, the group was meeting again in February, and was working on a nationwide solution. Once again, the Court expressed concern over the amount of time it could take to achieve national resolution of the issue and asked **Ocwen** to draft a post-*discharge* statement that could be used until a broader solution was reached. The Court continued the hearing until March 10, 2009, [*6] to allow **Ocwen** to draft the statement.

At **Ocwen**'s request, the Court continued the March hearing to April 21, 2009, and then continued it again to May 13, 2009, at which time **Ocwen** appeared and notified the Court that it had not, and would not, cooperate with the Court in drafting a post-*discharge* statement to debtors. The Court took the matter under advisement. For the reasons that follow, the Court finds that a post-*discharge* statement is warranted and necessary. The Court is also requiring **Ocwen** to dismiss any pending foreclosure as soon as a debtor files a petition for relief under chapter 13 of the Bankruptcy Code in this District as a means of limiting **Ocwen**'s post-*discharge* collection efforts.

**Ocwen**'s History Before the Court

On May 1, 2009, this Court issued sanctions against **Ocwen** in *In re McKain*. [3] There, the Court determined that a postpetition billing statement forwarded by **Ocwen** improperly implied that it was proceeding with foreclosure (in derogation of the stay) and it intended to apply debtors' payments according to its own terms (ignoring the terms of the plan and bankruptcy procedure). The Court also discovered that **Ocwen** was attempting to collect Sheriff's commissions [*7] that were not ripe as well as unapproved fees and charges.

The Court detailed **Ocwen**'s pattern of abuse in *McKain* by describing six cases, all handled by this Court, where **Ocwen** attempted to collect a discharged debt or where it attempted to collect improper fees and charges through a debtor's proof of claim. [4] It is apparent that

---

[2] Debtor continued to make monthly payments to **Ocwen** throughout her case and following *discharge*. For example, on July 3, 2008, and August 7, 2008, Debtor forwarded her monthly installments of $ 427.75, which were cashed by **Ocwen** and applied to her loan. Inexplicably, on August 14, 2008, **Ocwen** reversed these payments and issued its default letter on August 18, 2009.

[3] Case No. 08-10411

[4] See *In re McKain*, pgs. 4-5.

*Ocwen*'s actions in *McKain* and this case are not isolated incidents. The Court issued injunctive relief in *McKain*, however after considering the facts of this case, the Court is convinced that additional relief is necessary. The Court incorporates and adopts the findings of *McKain* in this Reasons for Order.

## DISCUSSION

HN1[⬆] Chapter 13 bankruptcy is a vehicle for the honest but unfortunate debtor to *discharge* certain debts through the completion of a payment plan under the protection and supervision of the bankruptcy court. [5] In order to receive distributions under a debtor's plan, the creditor must file a written statement setting forth its claim. [6] Except for limited circumstances not applicable here, the claim is limited to debts due as of the filing date of the bankruptcy petition. [7]

HN2[⬆] The petition date institutes the automatic stay under *section 362*, but it also creates a bright line for determining the amounts that may be collected through a plan of reorganization. [8] This serves a number of important goals. First, it eliminates any possible confusion as to what may be included in a claim. Second, it helps ensure a fair distribution of a debtor's assets.

HN3[⬆] The claims process helps streamline the administration of a bankruptcy by allowing creditors a *prima facie* claim if they comply with the requirements of *Bankruptcy Rule 3001*. This policy serves two important functions: first it relieves a creditor from the burden of initially "proving" its claim, eliminating unnecessary expense and time; and second, it provides debtors, interested parties, and the Court with a clear and simple method for determining what claims exist [*9] against a bankruptcy estate.

*Ocwen* has consistently shown an inability or refusal to

---

[5] *Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365, 367, 127 S.Ct. 1105, 1107, 166 L. Ed. 2d 956 (2007)*.

[6] *See,* [*8] *F.R.Bankr.P. 3001* and *3002*.

[7] *See,* **11 U.S.C. §§ 101(10)**, *501*, and *502(b)*.

[8] While a creditor is generally prohibited from collecting postpetition fees and costs through the plan, it may be entitled to recover such fees and costs if it files an application, as required by *Bankruptcy Rule 2016*. *See also, In re Jones 366 B.R. 584, 594 (Bankr. E.D.La. 2007)*.

comply with these basic statutory tenets. As a result, discharged debtors have continued to incur the threat of foreclosure and collection of debts that have been discharged or disallowed. *Ocwen* has failed to disclose the assessment of postpetition charges to others, misleading them into a false sense that a fresh start was theirs to enjoy. The question currently facing the Court is how can it ensure that *Ocwen* does not immediately place a debtor back into foreclosure after he or she has successfully completed a chapter 13 plan of reorganization?

Authority of Court to Issue Sanctions

The parties have settled Debtor's Motion for Sanctions. This does not, however, preclude the Court from considering sanctions for *Ocwen*'s systematic abuse of the claims process and bankruptcy system. HN4[⬆] "It is well established that a federal court may consider collateral issues after an action is no longer pending . . .." [9]

HN5[⬆] The authority of bankruptcy courts to issue civil sanctions has been clearly settled. [10] The source of that authority comes from the court's inherent authority [11] and from Bankruptcy Code itself, specifically *section 105*. [12]

HN6[⬆] One of the key functions of *§ 105(a)* is to "prevent an abuse of process." [13] "Abuse of process" is

---

[9] *Ratliff v. Stewart, 508 F.3d 225, 230 (5th Cir. 2007)*, *quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 395, 110 S.Ct. 2447, 2456, 110 L. Ed. 2d 359*, (1990); *see also Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 451 31 S.Ct. 492, 502, 55 L.Ed. 797 (1911)*(noting [*10] that court had power to punish for contempt after parties completely settled all matters involved in the case).

[10] *Matter of Terrebonne Fuel & Lube, Inc., 108 F.3d 609 (5th Cir. 1997)*; *see also, In re Hardy, 97 F.3d 1384 (11th Cir. 1996)*; *In re Rainbow Magazine, Inc., 77 F.3d 278 (9th Cir. 1996)*; *In re Power Recovery Systems, Inc., 950 F.2d 798 (1st Cir. 1991)*; *In re Skinner, 917 F.2d 444 (10th Cir. 1990)*; *In re Walters, 868 F.2d 665 (4th Cir. 1989)*; and *In re Sanchez, 372 B.R. 289 (Bankr. S.D.Tex. 2007)*.

[11] *See, e.g., In re Yorkshire LLC, 540 F.3d 328 (5th Cir. 2008)*(affirming the inherent authority of the bankruptcy court).

[12] *Terrebonne, 108 F.3d at 613*.

[13] *Section 105(a)* provides that:

HN7[⬆] The court may issue any order, process or

not defined by the Bankruptcy Code. The Restatement (Second) of Torts defines it as "[o]ne who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, [*11] is subject to liability to the other for harm caused by the abuse of process." [14] Some bankruptcy courts have simply stated that abuse of process consists of "maneuvers or schemes which would have the effect of undermining the integrity of the bankruptcy system." [15]

HN8[↑] Bankruptcy courts also have an inherent authority to sanction parties and control their courts, beyond that set forth by *§ 105(a).* [16] "It is well-settled that [*12] a federal court, acting under its inherent authority, may impose sanctions against litigants or lawyers appearing before the court so long as the court makes a specific finding that they engaged in bad faith conduct." [17] It is also established that "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum in their presence and submission to their lawful mandates." [18] This inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." [19]

Sanctions against *Ocwen* are appropriate for a number of reasons. As demonstrated above, *Ocwen* has

---

judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

[14] *Restatement (Second) of Torts § 682* (1977).

[15] *In re Eagle-Picher Industries, Inc., 169 B.R. 135, 138 n.1 (Bankr. S.D.Ohio 1994)*; *see also In re Burrell, 148 B.R. 820, 824 (Bankr. E.D.Va. 1992)* (defining abuse of process as situation where inaction by the court "would undermine the integrity of the bankruptcy system.").

[16] *See, e.g., In re Yorkshire LLC, 540 F.3d 328 (5th Cir. 2008)*.

[17] *Id. at 332.*

[18] *Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L. Ed. 2d 27 (1991)*(citations omitted).

[19] *Id.*

---

repeatedly abused the claims process and failed to honor the *discharge* injunction by attempting to collect from debtors and their bankruptcy estate disallowed or undisclosed debts immediately following *discharge*. The Court finds that this practice is in bad faith and requires greater [*13] regulation of *Ocwen's* behavior to curtail further abuse of the bankruptcy system. The record reflects that this is an ongoing pattern that imposes a burden on debtors and the Court to monitor *Ocwen's* claims and pleadings. The Court has repeatedly struck improper charges and has issued monetary sanctions against *Ocwen*. *Ocwen's* continuing disregard for bankruptcy law and procedure is a clear indication that monetary sanctions are simply ineffective. For these reasons, the Court will require *Ocwen* to institute the following procedures once a debtor has received a *discharge* under *11 U.S.C. § 1328*:

> Within thirty days of the entry of the Order Discharging a debtor, *Ocwen* shall send a post-*discharge* statement ("Statement") to the debtor, debtor's counsel, and the Trustee. The Statement shall contain the following language:
>
> "This is to confirm that the proof of claim, in the amount of __, has been satisfied. Your account has been adjusted to show that you are current through __ and that your next payment in the amount of __ is due on __."

If the claim was not satisfied, or if there are post-petition fees or costs that were properly noticed through the annual accounting procedure set forth [*14] in *McKain*, the letter shall so notify the debtor and attach a detailed payment history in a form similar to that in *In re Jones*. [20]

The Statement ordered by this Court serves a number of functions. First, it requires a human to actually look at a debtor's account to ascertain the status of the loan. Second, it will notify debtors and their counsel if, according to *Ocwen*, the account is not current. This will give them the opportunity to address the arrearage before *Ocwen* initiates a foreclosure proceeding. Third, the Statement is narrowly tailored to notify a debtor of his or her account status at the time of *discharge*. As such, it is designed to effect the least severe means available to quell the offensive behavior. [21] When

---

[20] *366 B.R. 584 (Bankr. E.D.La. 2007)*.

[21] *See, Natural Gas Pipeline Co. of America v. Energy*

combined with the accounting procedures required in *McKain*, the Court is confident that the interests of debtors and **Ocwen** will be adequately protected. If **Ocwen** fails or refuses to comply with the above procedures, the Court may file an Order to Show Cause to consider imposing further sanctions.

Second, **[*15]** because **Ocwen** has abused the state foreclosure process by reactivating prepetition foreclosure actions on discharged debt, [22] upon the filing of a chapter 13 proceeding in this district, **Ocwen** will be required to immediately dismiss any pending foreclosure action against the debtor. Typically, the Court has allowed lenders to place a foreclosure action on hold during the pendency of a bankruptcy. **Ocwen**'s pattern of abuse warrants the revocation of this privilege, which will require **Ocwen** to institute a new foreclosure and properly serve the borrowers postpetition, should a default exist. This adds an additional safeguard protecting debtors from the potential loss of their home with an unjustified and hasty foreclosure.

Injunctive Relief

The sanctions issued against **Ocwen** constitute injunctive relief because they direct **Ocwen** to take certain actions. [23] It is clear that *HN9*[⬆] this Court has the authority to issue an injunction; **[*16]** [24] therefore, the remaining issue is whether such relief should be implemented against **Ocwen**. *Continental Illinois Nat'l Bank & Trust Co. of Chicago v. Chicago R.I. & P. Ry. Co., 294 U.S. 648, 675, 55 S.Ct. 595, 79 L.Ed. 110 (1935)*.

*HN10*[⬆] Several Fifth Circuit opinions hold that the traditional standards for injunctive relief (*i.e.* irreparable injury and inadequate remedy at law) are inapplicable to injunctions issued to protect a court's inherent

jurisdiction and to control its docket. [25] Where monetary sanctions are ineffective in deterring vexatious filings, injunctions are appropriate. The court's power to enter such orders flows not only from various statutes and rules relating to sanctions, but the inherent power of the court to protect its jurisdiction, its judgments, and to control its docket. [26]

*HN11*[⬆] ] In determining the propriety of a sanction in the form of injunctive relief, a Court considers the party's history of litigation, whether or not it has a good faith basis for pursuing the litigation, the extent of the burden on the court and other parties resulting from the party's filings, and the adequacy of alternative sanctions. [27] As explained above, **Ocwen** has consistently failed to properly apply payments received in a case's administration, failed to honor the automatic stay or **discharge** injunction, and failed to notify debtors of accrued postpetition debts. This practice has increased the burden on the Court and debtors. The Court has previously sanctioned **Ocwen** for its behavior and does not believe that further monetary sanctions will inspire **Ocwen** to change its practices. Furthermore, the Court does not believe that the accounting procedures ordered in *McKain* are adequate to ensure that debtors will receive the full benefit of a chapter 13 **discharge**. As such, the Court does not believe that there is any other adequate legal remedy.

Because **[*18]** an appeal is now pending in a related case based on application of the appropriate standard for the form of relief, the Court will also apply the traditional four part test, which requires a party establish: [28]

> (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that

---

*Gathering Inc., 86 F.3d 464, 467 (5th Cir. 1996)* and *Thomas v. Capital Sec. Services, Inc., 836 F2d 866, 877 (5th Cir. 1988)*.

[22] **Ocwen** has shown a pattern of reactivating long-stayed foreclosure proceedings without amending or updating its petitions to reflect the default or debt due. As a result, it avoids service of process on the debtor and can simply reset the sale with thirty days notice.

[23] *Wells Fargo v. Jones, 391 B.R. 577, 609 (E.D.La. 2008)*.

[24] *Wells Fargo v. Jones, 391 B.R. 577, 609 (E.D.La. 2008)*, *citing Continental Illinois Nat. Bank*

[25] *Baum v. Blue Moon Ventures, L.L.C., 513 F.3d 181 (5th Cir. 2008)*; *Ferguson v. MBank Houston, N.A., 808 F.2d 358, 359 (5th Cir. 1986)*.

[26] *Ferguson, 808 F.2d at 359*. The Fifth Circuit confirmed that this inherent power also resides with bankruptcy courts for bad faith conduct **[*17]** occurring in proceedings before them. *Citizens Bank & Trust Co. v. Case, 937 F.2d 1014 (5th Cir. 1991)*.

[27] *Blue Moon Ventures, 513 F.3d at 189*.

[28] The Court does not however, as stated in *In re Stewart, 2008 Bankr. LEXIS 3226, 2008 WL 5096011 (Bankr. E.D.La. 2008)*, believe that this test is appropriate.

said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. [29]

The above factors are typically applied when one party is requesting injunctive relief against another party and do not easily translate where it is the court that is seeking to prevent harm. Nevertheless, for the sake of completeness, the Court will address each factor below.

Success on the Merits. For the reasons set forth above, the Court finds that the injunction is an appropriate remedy and that it is unlikely that an appellate court would overturn this Court's ruling.

Irreparable [*19] Injury. The Court finds that failure to send the Statement will result in *Ocwen* continuing to pursue discharged claims. Additionally, if *Ocwen* is allowed to place a foreclosure on hold pending a bankruptcy, it may be able to proceed to sale once a *discharge* is granted, with minimal notice to the debtor. Despite multiple warnings, the Court continues to receive complaints against *Ocwen* on a regular basis for egregious breaches of the *discharge* injunction. No adequate remedy exists at law to stop this abuse.

Damage to *Ocwen*. The burden on *Ocwen* to send the Statement is minimal, and is clearly eclipsed by the injury that a debtor would suffer if his or her residence were improperly foreclosed upon. Additionally, the burden on *Ocwen* to dismiss a foreclosure is minimal as it may simply file a new foreclosure, if justified.

Public Interest. The Statement serves the public interest because it requires *Ocwen* to notify debtors of their account status immediately after *discharge*. This will either notify them that the chapter 13 was successful or give them the opportunity to address the arrearage before *Ocwen* initiates foreclosure proceedings and before any additional fees or costs are incurred. [*20] Requiring *Ocwen* to dismiss any foreclosure also serves the public interest because it ensures that debtors will receive fill and adequate notice that a foreclosure has been initiated post-*discharge*.

**CONCLUSION**

*Ocwen* has a clear pattern of abusing the claims process by ignoring the *discharge* injunction or

attempting to collect undisclosed debts. This Court has repeatedly stricken *Ocwen*'s fees and costs, and has imposed sanctions. *Ocwen*'s continuing violations and disregard for bankruptcy procedure makes it clear that additional action by the Court is necessary. While the accounting procedures set forth in *McKain* are a start, the Court is not confident that they are sufficient to protect debtors post-*discharge*. It is for these reasons that the Court will require *Ocwen* to immediately dismiss any pending foreclosure action upon the filing of a chapter 13 bankruptcy and to institute the post-*discharge* statement procedures set forth above. An Order consistent with these reasons will be rendered separately.

New Orleans, Louisiana, July 14, 2009.

/s/ Elizabeth W. Magner

Hon. Elizabeth W. Magner

U.S.                    Bankruptcy                    Judge

[29] *Jones v. Wells Fargo 391 B.R. at 609*, quoting *VRC LLC v. City of Dallas, 460 F.3d 607, 611 (5th Cir. 2006)*.

**Table1 (***Return to related document text***)**

| | |
|---|---|
| Late Charge - Alt Payment Plan | $ 64.17 |
| Attorney Fee & Collection Cost | $ 190.00 |
| Bankruptcy Expense | $ 225.00 |
| Bankruptcy Fee | $ 750.00 |
| Foreclosure Fee | $ 388.25 |
| Property Valuation Expense | $ 200.33 |

**Table1 (***Return to related document text***)**

---

**End of Document**



**User Name:** John Mickalovski1

**Date and Time:** Monday, July 17, 2017 2:14:00 PM CDT

**Job Number:** 50581819

## Document (1)

1. _In re Adams, 2011 U.S. Dist. LEXIS 158090_

   **Client/Matter:** -None-

   **Search Terms:** "discharge" and "violation" and "Ocwen"

   **Search Type:** Terms and Connectors

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |


# *In re Adams*

United States District Court for the Eastern District of North Carolina, Western Division

January 24, 2011, Decided; January 24, 2011, Filed

NO: 5:10-CV-340-BR

**Reporter**
2011 U.S. Dist. LEXIS 158090 *

IN RE CRAIG L. ADAMS and MONICA L. ADAMS

**Prior History:** *In re Adams, 2010 Bankr. LEXIS 2207 (Bankr. E.D.N.C., July 7, 2010)*

## Core Terms

bankruptcy court, injunction, sanctions, punitive damages, mortgage, contempt, punitive, modified, modification, discharged, award of punitive damages, interest rate, reporting, mortgage lender, ratio, contempt sanction, criminal contempt, impermissible, compensatory damages, residential mortgage, civil contempt, show cause, circumstances, confirmation, inaccurate, contends, coerce, court order, violations, orders

## Counsel

**Counsel:** **[*1]** For *Ocwen* Loan Servicing, LLC, Appellant: Jason K. Purser, LEAD ATTORNEY, Kimberly A. Sheek, Shapiro & Ingle, LLP, Charlotte, NC.

For Craig L. Adams, Monica L. Adams, Appellees: Douglas Q. Wickham, Hatch Little & Bunn, LLP, Raleigh, NC.

**Judges:** W. Earl Britt, Senior U.S. District Judge.

**Opinion by:** W. Earl Britt

## Opinion

### ORDER

Before this court is an appeal by creditor-appellant *Ocwen* Loan Servicing, LLC ("*Ocwen*") from the 7 July 2010 order of United States Bankruptcy Judge Stephani Humrickhouse. In that order, Judge Humrickhouse found *Ocwen* in contempt of the *discharge* injunction and the bankruptcy court's 23 May 2008 order. For the

reasons set forth below, the bankruptcy court's decision is affirmed.

### I. BACKGROUND [1]

On 26 October 2004, debtors filed a chapter 13 petition. (DE #2-1.) By order dated 25 April 2008, the bankruptcy court granted debtors *discharge*. (DE #3-2.) On 29 April 2008, debtors filed a motion for a declaration that they were current on their residential mortgage payments to *Ocwen*, their mortgage servicer. (DE #3-1.) *Ocwen* did not respond **[*2]** to the motion. On 23 May 2008, the bankruptcy court issued an order declaring debtors' indebtedness to *Ocwen* current and providing that any attempt to collect the "discharged principal payments, interest, fees or expenses . . . shall be deemed to be a willful *violation* of the *discharge* injunction and contempt of the orders of this Court; and that such action shall give the right to the Debtors to pursue a proceeding before this Court for contempt and appropriate sanctions." (DE #1-1.)

In the summer of 2008, debtors sought to refinance their mortgage, but were turned down after *Ocwen* transmitted an inaccurate payoff statement and loan history to the proposed new lender. *Ocwen*'s documents reported that the loan on debtors' residence was in foreclosure, even though the loan has never been in foreclosure. Debtors, individually and through their attorney, repeatedly notified *Ocwen* of this error, but *Ocwen* failed to rectify its mistake. Debtors filed motions to reopen their bankruptcy case and to show cause why *Ocwen* should not be held in contempt on 12 September 2008. (DE #3-5, 3-6.) The bankruptcy court allowed the motion to reopen. (DE #3-7.) *Ocwen* subsequently filed a brief response to **[*3]** the show cause motion, requesting that the "matter be set for

---

[1] The facts are taken primarily from the bankruptcy court's 7 July 2010 order. Where appropriate, the court cites to the record on appeal, by docket entry ("DE # ").

hearing while it investigates the claims made by the Debtors." (DE #4-1.) The bankruptcy court set the matter for hearing in November 2008; however, the hearing was continued a number of times on the parties' representations that they were attempting to resolve the matter without court intervention. (See DE ##4-3 to 4-13.) The bankruptcy court ultimately held the show cause hearing in May 2010. At the hearing's conclusion, the court found **Ocwen** in contempt of the **discharge** injunction [2] and its 23 May 2008 order and took the issue of damages under advisement. (DE #1-2.)

On 7 July 2010, the bankruptcy court issued a written order memorializing its finding **Ocwen** in contempt and assessing compensatory damages in the amount of $2500, plus attorneys' fees of $2250. (Id.) The court lowered the mortgage's interest rate to [*4] 6%, which it determined was a reasonable market rate for the period after the 23 May 2008 order. (Id.) Applying the modified interest rate, the court set the balance owing on the mortgage as of 1 July 2010 at $65,373.12. (Id.) Additionally, the court imposed punitive damages in the amount of $66,300, representing $100 per day from 12 September 2008, the date on which **Ocwen** was served with debtors' motion to show cause, until the date of entry of the contempt order. (Id.)

## II. DISCUSSION

The court reviews the bankruptcy court's findings of fact for clear error and its legal conclusions de novo. See In re Meredith, 527 F.3d 372, 375 (4th Cir. 2008). A court reviewing an order of civil contempt applies the abuse of discretion standard. JTH Tax, Inc. v. H & R Block Eastern Tax Servcs., Inc., 359 F.3d 699, 705 (4th Cir. 2004).

**Ocwen** contends that Judge Humrickhouse erred in a number of respects. It argues that (1) the bankruptcy court lacked the authority to modify the terms of debtors' residential mortgage; (2) the bankruptcy court lacked the authority to order a contempt sanction for violations of the **discharge** injunction; (3) the punitive damages award constitutes an impermissible criminal [*5] contempt sanction; and (4) the amount of the punitive damages award is constitutionally excessive.

(Appellant's Br. at 2-4.) The court addresses these arguments in turn.

A. Residential Loan Modification Exception

**Ocwen** first contends that the bankruptcy court is prohibited from modifying terms of debtors' mortgage pursuant to 11 U.S.C. § 1322(b)(2). Under that statute, "[a] debtor's Chapter 13 plan may 'modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence.'" In re Ennis, 558 F.3d 343, 345 (4th Cir. 2009) (quoting 11 U.S.C. § 1322(b)(2)) (emphasis added). The statute's mortgage anti-modification clause was enacted "to encourage the flow of capital into the home lending market." Nobelman v. American Sav. Bank, 508 U.S. 324, 332, 113 S. Ct. 2106, 124 L. Ed. 2d 228 (1993) (Stevens, J., concurring).

In examining what constitutes impermissible modification of a residential mortgage under § 1322(b)(2), the Fourth Circuit explains:

> The bankruptcy courts have consistently interpreted the no-modification provision of § 1322(b)(2) to prohibit any fundamental alteration in a debtor's obligations, e.g., lowering monthly payments, [*6] converting a variable interest rate to a fixed interest rate, or extending the repayment term of a note. See, e.g., In re Schum, 112 B.R. 159, 161-62 (Bankr. N.D. Tex. 1990) (concluding that plan was impermissible modification because it proposed to reduce monthly payments and secured valuation). In In re Gwinn, 34 B.R. 936, 944-45 (Bankr. S.D. Ohio 1983), the court approved a plan as a permissible cure under § 1322(b)(5), because the plan did not propose to lower monthly payments, extend the repayment period, or make the obligation conditional. It instead sought only to reinstate the original contract with a minor delay in payment. Id.; see also In re Cooper, 98 B.R. 294 (Bankr. W.D. Mich. 1989) (finding impermissible modification where plan proposed new payment schedule). Along similar lines, another bankruptcy court concluded that confirmation of a Chapter 13 plan would have constituted an impermissible modification because the plan proposed to alter fundamental aspects of the debtor's obligations, i.e., the nature and rate of interest, and the maturity features of the loan. In re Coffey, 52 B.R. 54, 55 (Bankr. D.N.H. 1985). As these decisions have emphasized, § 1322(b)(2) prohibits

---

[2] A **discharge** in bankruptcy "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such [discharged] debt as a personal liability of the debtor, whether or not **discharge** of such debt is waived." 11 U.S.C. § 524(a)(2).

[*7] modifications that would alter at least one fundamental aspect of a claim.

*In re Litton, 330 F.3d 636, 643-44 (4th Cir. 2003).*

Significant here is *§ 1322(b)(2)*'s prohibition against a *plan* that modifies a fundamental aspect of a residential mortgage creditor's secured claim. The bankruptcy court confirmed debtors' Chapter 13 plan on 14 March 2005. (DE #2-3.) No one contends that the confirmed plan modified debtors' obligations to *Ocwen*. As such, no *violation* of *§ 1322(b)(2)* has occurred.

*Ocwen*'s argument suggests that the bankruptcy court can never modify a debtor's residential mortgage, even where the creditor has violated the Bankruptcy Code or a court order, to the detriment of a debtor. Such a result is contrary to the plain language of *§ 1322(b)(2)* and the "fresh start" that the Bankruptcy Code envisions a debtor receives upon emerging from bankruptcy. In analyzing whether *§ 1322(b)(2)* forecloses a Chapter 13 debtors' claim against the mortgage lender for allegedly attempting to collect fees and costs post-*discharge*, another bankruptcy court's observations are particularly instructive:

Essentially, [the mortgage lender] reads too much into *§ 1322(b)(2)*. *Section 1322(b)(2)* prevents [*8] a chapter 13 plan from modifying a mortgage lender's contract rights. A chapter 13 debtor may not modify principal or interest payments or *discharge* fees and expenses allowed by the mortgage contract. But *§ 1322(b)(2)*'s protections do not place mortgage lenders outside the court's purview.

*Section 1322(b)(2)* prevents a plan from modifying a mortgage lender's substantive contract rights, but *§ 1322(b)(2)* does not allow a mortgage lender to ignore the procedural limits imposed by the Bankruptcy Code and Rules that govern how those rights are exercised. A mortgage lender must exercise its contract rights in the manner allowed by the Bankruptcy Code, Bankruptcy Rules, and court orders. *Bankruptcy Rule 2016* requires mortgage lenders to disclose any fees and costs the mortgage lender intends to collect from the debtor. Enforcement of *Rule 2016* is necessary to enforce the rights and obligations imposed by specific Code provisions. Failure to enforce Bankruptcy Code and Rule requirements would allow mortgage lenders to deny debtors the promised fresh start, despite their diligent compliance with all that the Code and the court asked of them.

*In re Cano, 410 B.R. 506, 521 (Bankr. S.D. Tex. 2009).*

Here, [*9] the bankruptcy court's modifications of the subject mortgage constitute contempt sanctions, assessed independently of debtors' plan. The court modified the mortgage as a result of *Ocwen*'s *violation* of the *discharge* injunction and the court's order and to thereby compensate debtors for losses incurred. A modification of a residential mortgage under these circumstances is not subject to any limitations imposed by *§ 1322(b)(2)*.[3]

B. Sanctions Under *Section 105*

*Ocwen* next argues that the bankruptcy court did not have the authority under *11 U.S.C. § 105* to impose sanctions under the circumstances here. This statute empowers the bankruptcy court to hold parties in civil contempt for violating the Bankruptcy Code as well as its orders. See *11 U.S.C. § 105(a)* ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *In re Walters, 868 F.2d 665, 669 (4th Cir. 1989).* While recognizing that the bankruptcy court possesses such authority, *Ocwen* contends a predicate *violation* of neither the Bankruptcy Code nor a court order occurred here. (Appellant's Br. at 2-3, 10-11.) Specifically, *Ocwen* claims that its "mere delay" in updating its accounts to reflect the *discharge* does not constitute an act to collect, [*11] recover or offset a discharged debt in *violation* of the *discharge* injunction nor an attempt to collect the discharged principal payments, interest, fees,

---

[3] In a footnote, *Ocwen* asserts that there is no factual basis for the bankruptcy court's determination that 6% is a reasonable market rate debtors could have obtained had they refinanced in 2008. (Appellant's Br. at 9 n.4.) At the hearing on the motion to show cause, as possible sanctions against *Ocwen*, debtors' counsel suggested a modified interest rate on the subject mortgage of 6% through 2008, of 5.5% for the first six months in 2009, and 5% thereafter. (DE #11 at 13.) When the court subsequently questioned *Ocwen*'s counsel about this "creative solution," *Ocwen*'s counsel pointed out that 5% is below the current market rate. (Id. at 24.) She acknowledged "six percent through 2008 is most probably accurate. As is the 5.5 percent for 2009." (Id. at 25.) She stated [*10] the current market rate, for creditors with "pristine credit," is "right around 5.45 to 5.5 percent." (Id.) The bankruptcy court's determination that 6% was an appropriate interest rate by which to sanction *Ocwen* was not an abuse of discretion (or clearly erroneous, if one characterizes the determination of the interest rate a finding of fact).

or expenses in **_violation_** of the court's 23 May 2008 order.

**_Ocwen_** points to many cases which recognize that a creditor's reporting of inaccurate credit information about the debtor, without evidence of intent to coerce payment of the discharged debt, does not violate the **_discharge_** injunction. Another bankruptcy court summarizes the law in this regard.

> [C]ourts have frequently held that acts which by their nature constitute efforts to collect discharged debts– such as filing suit against the debtor, sending dunning notices, or attaching the debtor's property– are not excused simply because they were mistakenly pursued. However, a distinction must be made between acts which have as their direct and natural purpose the collection of debts and acts which have some other lawful purpose but could also be used (or, more accurately, misused) to coerce payment of a debt. The reporting of a delinquent debt to a credit reporting agency is not inherently an act to collect a debt but rather to share information relevant to credit granting decisions. **[*12]** A creditor reports both performing and delinquent accounts in the expectation that other credit grantors will do the same, enhancing each creditor's ability to evaluate proposed credit transactions and to avoid extending credit or making loans to poor credit risks.
>
> This is not to say that the reporting of a discharged debt as delinquent rather than discharged would not, at least in some circumstances, place pressure on a debtor to pay the debt. And the court does not doubt that there are at least some creditors who report discharged debts without an indication of their bankruptcy status in the hope that debtors will be pressured into paying them as a condition of obtaining future credit. But where the action complained of does not on its face constitute an act to collect a debt, the burden is on the debtor to show that the creditor took the challenged action for the specific purpose of collecting a discharged debt.
> . . . .
>
> Of course there will be circumstances in which an improper motive may be inferred, thereby shifting the burden to the creditor of showing otherwise. For example, if a creditor, having been informed of the problem, inexplicably fails to take corrective action, a debt **[*13]** collection motive may be inferred (particularly where the creditor fails to respond to the motion to reopen alleging such a motive). In

those circumstances, reopening the case to award injunctive relief and attorneys fees might well be appropriate, even in the absence of other provable damages. . . .

_In re Jones, 367 B.R. 564, 569-70 (Bankr. E.D. Va. 2007)_ (citations and footnote omitted).

This case falls within that latter situation the _Jones_ court identifies. The evidence shows **_Ocwen_** did more than delay updating its accounts. It transmitted an inaccurate payoff quote and loan history to debtors' potential mortgagee; assessed discharged principal, fees, and costs; reported inaccurate information to credit reporting agencies; and, most importantly, after the inaccurate information had been brought to its attention a number of times, failed to correct the information, at least as of the date of the bankruptcy court's hearing. **_Ocwen_** never presented any evidence to the contrary. The court agrees with the bankruptcy court that **_Ocwen_** willfully violated the **_discharge_** injunction and the bankruptcy court's 23 May 2008 order. As such, the bankruptcy court had the authority pursuant to _11 U.S.C. § 105_ **[*14]** to sanction **_Ocwen_** for these violations.

C. Punitive Damages

**_Ocwen_** next argues that even if the bankruptcy court had the authority to hold it in civil contempt under _§ 105_, the punitive damages award constitutes an impermissible criminal contempt sanction.[4] **_Ocwen_** correctly recognizes that how a court labels a contempt sanction is not dispositive. Rather,

> the critical features for determining whether a contempt remedy is civil or criminal are the substance of the proceeding and the character of the relief that the proceeding will afford. When the nature of the relief and the purpose for which the contempt sanction is imposed is remedial and intended to coerce the contemnor into compliance with court orders or to compensate the complainant for losses sustained, the contempt is civil; if, on the other hand, the relief seeks to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct, the contempt is criminal. For these reasons, putatively

---

[4] Notably, **_Ocwen_** does not argue that its conduct does not meet the standard the bankruptcy court applied to assess punitive damages, i.e., "'egregious conduct,' 'malevolent intent,' or 'clear disregard of the bankruptcy laws,'" (DE #1-2 at 11).

civil contempt sanctions will be held to be criminal sanctions in cases when the fines were not conditioned on compliance with a court order, not tailored to compensate the complaining party, but instead **[*15]** initiated to vindicate the authority of the court and to punish the actions of the alleged contemnor.

*Cromer v. Kraft Foods N. Am., Inc., 390 F.3d 812, 821-22 (4th Cir. 2004)* (citations, alteration, and quotations omitted). If the contempt sanction is in fact criminal, certain due process protections must be provided and procedures followed prior to its imposition. See *id. at 820*.

A number of courts recognize that punitive damages may be awarded as a contempt sanction under *§ 105* for *violation* of the *discharge* injunction. See, e.g., *In re Workman, 392 B.R. 189, 195, 196 (Bankr. D.S.C. 2007)* (awarding plaintiffs/debtors punitive damages of $100 per day, from time mortgagee sent plaintiffs/debtors letter inaccurately notifying them they were past due on mortgage and responsible for fees through entry of contempt order, for violating confirmation and *discharge* orders as "appropriate to coerce compliance with the orders"); *In re Mooney, 340 B.R. 351, 361-62 (Bankr. E.D. Tx. 2006)* **[*16]** (finding a punitive damages award of $40,000 for *violation* of the *discharge* injunction as "'necessary and appropriate to carry out the provisions of the Bankruptcy Code'" where creditor continued with its course of conduct even after having been informed of its violations of the *discharge* injunction); *In re Cherry, 247 B.R. 176, 187, 189-90 (Bankr. E.D. Va. 2000)* (although ultimately concluding punitive damages were not warranted, recognizing most courts allow punitive damages for *violation* of the *discharge* injunction). But see *In re Dyer, 322 F.3d 1178, 1195 (9th Cir. 2003)* ("[W]hen a bankruptcy court exercises the contempt authority of *§ 105(a)*, it may not impose serious punitive sanctions.").

The imposition of punitive damages as a contempt sanction does not necessarily constitute a criminal contempt sanction. As a bankruptcy court has noted,

> [t]he imposition of punitive damages under the authority granted under *§ 105* in this context does not carry this court into the realm of criminal contempt as contemplated by *18 U.S.C. § 401*[, the criminal contempt statute,] and *Griffith v. Oles (In re Hipp), 895 F.2d 1503, 1515 (5th Cir. 1990)*[, where the Fifth Circuit held that bankruptcy courts **[*17]** do not have jurisdiction to try for criminal contempt].

Clearly every assessment of punitive damages does not occur within that forbidden realm. The assertion that all criminal contempt sanctions are punitive in nature does not render all punitive sanctions criminal in nature. This Court is not assessing these punitive sanctions for contempt of this Court's authority. It is assessing these sanctions, as requested by the debtor, for the *violation* of the statutory protections provided to her under *§ 524* and to which she is entitled as the *quid pro quo* for properly disclosing and surrendering all of her non-exempt property to the trustee for the benefit of her creditors. The vindication of these statutory protections is critical to the proper restructuring of the debtor-creditor relationship and is an integral part of the bankruptcy case, not separate and independent from it. Issuing reasonable sanctions of this type under the proper circumstances is clearly "necessary and appropriate" to insure that the bankruptcy system actually works. Although language utilized in some jurisprudence has unfortunately blurred the lines in this area, [the creditor] committed no crime here, nor is it **[*18]** being punished for one.

*Mooney, 340 B.R. at 362 n.29.*

In this case, the court finds that the bankruptcy court's $66,300 punitive sanction was a proper civil contempt sanction. It is clear from the record that the bankruptcy court was most concerned about *Ocwen*'s failure to correct its reports or the information it reports to credit reporting agencies, despite having been repeatedly notified of such failure and in the face of the motion to show cause and hearing thereon. (See DE #1-2 at 7 (recognizing at the hearing that the court was presented with no evidence that *Ocwen* had taken any corrective action to date), 8 ("That *Ocwen* still *proposes* to correct its reporting, and has not *yet* given proof of having done so, is mind-boggling." (emphases in original)), 9 ("The fact that *Ocwen* is unwilling to acknowledge the seriousness of this matter even today carries significant weight with the court."); DE #11 at 54 ("I find most egregious here, although . . . *violation* of an order of this court is egregious in and of itself, is the continued reporting of this loan in the fashion, almost to date. I find that most egregious and if I, in fact, do award punitive damages, it will be based in large **[*19]** part upon that.").) Specifically with reference to punitive damages, Judge Humrickhouse stated, "*Ocwen* has given every indication that it is and will remain indifferent to the statutory significance of the *discharge* injunction and to the express terms of the May 23, 2008 order, unless it is

compelled to take note." (DE #1-2 at 11 (citing *Cherry, 247 B.R. 176, 189-90*).) These statements evidence the judge's belief that **Ocwen** would not take any action on its records without a punitive sanction being imposed. Thus, the punitive sanction was intended to coerce **Ocwen** into correcting its records and the information it was disseminating about debtors' accounts and thereby coercing **Ocwen** to comply with the **discharge** injunction and the court's 23 May 2008 order. Ultimately, an award of this type is necessary and appropriate to carry out the "fresh start" provisions of the Bankruptcy Code and is a proper civil contempt sanction under the facts here.

D. Constitutionality of Punitive Sanctions

Finally, **Ocwen** contends that the bankruptcy court's punitive damages award is unconstitutionally excessive. In evaluating the reasonableness of a punitive damage award, courts consider (1) the degree of reprehensibility **[*20]** of the wrongdoer's conduct; (2) the ratio of the punitive damages award to compensatory damages; and (3) punitive damage awards or sanctions for comparable misconduct. See *BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 574-84, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)*. The court examines each of these in turn.

Evaluation of reprehensibility is based on five factors:

> (1) whether the harm done was physical as opposed to economic; (2) whether the conduct involved indifference to the health or safety of others; (3) whether the victim was financially vulnerable; (4) whether the conduct involved repeated actions or was isolated; and (5) whether the harm suffered by the plaintiff resulted from conduct that was known or suspected to be unlawful.

*EEOC v. Federal Express Corp., 513 F.3d 360, 376-77 (4th Cir. 2008)* (citing *BMW, 517 U.S. at 576-77*). Considering these factors, **Ocwen**'s conduct was, indeed, reprehensible. Its gross misrepresentation of the status of debtors' mortgage debt was not an isolated incident. In fact, it continued over a period of many months, despite debtors' and their attorney's repeated requests that **Ocwen** rectify its error and their filing of a motion to show cause. Such persistent misconduct can only be characterized **[*21]** as willful and intentional. Furthermore, as previously recognized, debtors depended upon **Ocwen**'s accurate reporting to take full advantage of the "fresh start" offered by the bankruptcy system. **Ocwen**'s conduct is particularly worthy of

punitive sanctions, given debtors' financial vulnerability. See *BMW, 517 U.S. at 576* ("To be sure, infliction of economic injury, especially when done intentionally through affirmative acts of misconduct or when the target is financially vulnerable, can warrant substantial penalty." (citation omitted)).

Turning to the ratio of punitive damages to the compensatory award, **Ocwen** contends that the amount of the punitive award is impermissibly excessive because it represents a 14-to-1 ratio. It is true that awards exceeding a single-digit ratio will generally be deemed unconstitutionally excessive. See *Exxon Shipping Co. v. Baker, 554 U.S. 471, 501, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008)* ("[W]e have determined that 'few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process'. . . ." (citation omitted)). However, **Ocwen**'s argument fails to consider the previously-determined permissible loan balance modification in its **[*22]** ratio calculation. Including the value of loan balance modification, the ratio between the punitive and compensatory damages awards is, in fact, 4-to-1, and falls squarely within the confines of due process.[5]

Finally, the punitive damages award is consistent with damage awards in comparable cases. See *Workman, 392 B.R. at 196-97* ($100.00 per day for each day mortgagee violated the confirmation and **discharge** orders (relying on *A.H Robins Co., Inc., 197 B.R. 561 (E.D. Va. 1994)* (sanctioning an attorney $100.00 per day for each day that he was in **violation** of a confirmation order)).

In sum, the court finds that the punitive damages award does not exceed constitutional limitations.

III. **[*23]** CONCLUSION

The 7 July 2010 Order of the Bankruptcy Court of the Eastern District of North Carolina is AFFIRMED.

This 24 January 2011.

---

[5] The value of the loan modification is the difference in the amount **Ocwen** claimed as the principal owing as of 23 May 2008 ($76,426.43) and the amount the bankruptcy court set as the balance remaining as of 1 July 2010 ($65,373.12). (See DE #1-2 at 11.) This calculation does not take into account the effect of the new 6% interest rate over the remaining life of the loan, which would presumably result in an even higher compensatory damage figure and thus a lower ratio of punitive damages to compensatory damages.

/s/ W. Earl Britt

W. Earl Britt

Senior U.S. District Judge

---

**End of Document**



**User Name:** John Mickalovski1

**Date and Time:** Tuesday, July 18, 2017 11:46:00 AM CDT

**Job Number:** 50633379

## Document (1)

1. *Phillips v. Deutsche Nat'l Trust (In re Phillips), 2011 Bankr. LEXIS 3780*

   **Client/Matter:** -None-

   **Search Terms:** "Ocwen" w/25 "discharge" w/10 "violation"

   **Search Type:** Terms and Connectors

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

 Neutral
As of: July 18, 2017 4:46 PM Z

## Phillips v. Deutsche Nat'l Trust (In re Phillips)

United States Bankruptcy Court for the Northern District of Ohio, Eastern Division

September 29, 2011, Filed, Entered

CHAPTER 13, CASE NO. 02-66299, ADV. NO. 09-6109

**Reporter**
2011 Bankr. LEXIS 3780 *

IN RE: TIMOTHY N. PHILLIPS AND CINDY L. PHILLIPS, Debtors.TIMOTHY N. PHILLIPS, SR. AND CINDY L. PHILLIPS, Plaintiffs, v. DEUTSCHE NATIONAL TRUST, et al., Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Findings of fact/conclusions of law at, Costs and fees proceeding at *Phillips v. Deutsche Nat'l Trust (In re Phillips), 2012 Bankr. LEXIS 1042 (Bankr. N.D. Ohio, Mar. 9, 2012)*

**Prior History:** *Phillips v. Deutsche Nat'l Trust (In re Phillips), 2010 Bankr. LEXIS 1819 (Bankr. N.D. Ohio, June 7, 2010)*

## Core Terms

mortgage, arrearage, default, principal balance, cure, injunction, amortization, post-petition, delinquent, no default, mortgage company, contempt, exhibits, accrued, unpaid, summary judgment motion, set forth, reinstated

## Case Summary

### Procedural Posture

Plaintiff debtors filed an adversary proceeding against defendants, a trust company, a loan servicing company, and a partnership, seeking an order pursuant to *Fed. R. Bankr. P. 9020* which held defendants in contempt for violating the discharge injunction that was imposed pursuant to *11 U.S.C.S. § 524* when the debtors received a discharge under Chapter 13 of the Bankruptcy Code. The debtors filed a motion for summary judgment.

### Overview

The debtors declared Chapter 13 bankruptcy in December 2002, and they proposed a plan for repaying their creditors which required them to make postpetition payments on a mortgage but allowed them to pay pre-petition arrearages over the life of the plan. The debtors made payments they owed and received a discharge in June 2007. However, they claimed that a company that serviced their mortgage did not properly credit payments they made and that they were injured because the company submitted negative credit reports to credit agencies. The court found that the debtors were entitled to summary judgment on their claim. Although *11 U.S.C.S. § 524(i)* did not govern resolution of the debtors' claim because it was added to the Bankruptcy Code after the debtors declared bankruptcy, the parties entered into an agreed order in June 2008 which stated that the debtors' mortgage was current as of June 30, 2007, and the company violated the injunction when it failed to correctly post payments the debtors made on their mortgage and submitted negative reports to credit agencies.

### Outcome
The court granted the debtors' motion for summary judgment.

## LexisNexis® Headnotes

Bankruptcy Law > Procedural Matters > Adversary Proceedings > Judgments

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

**HN1[↧]** **Adversary Proceedings, Judgments**
A bankruptcy court is to award summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Bankr. P. 7056*.

Bankruptcy Law > General Overview

Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

**HN2[↧]** **Bankruptcy Law**
*11 U.S.C.S. § 524(i)* was added to the Bankruptcy Code with the enactment of § 202 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8. Section 1406 of the BAPCPA provides that the amendments made by the BAPCPA apply only with respect to cases commenced under Title 11 of the United States Code "on or after the date of the enactment of this Act." Section 1501(a) of the BAPCPA provides that the BAPCPA became effective 180 days after enactment and established a general rule that BAPCPA amendments do not apply to bankruptcy cases commenced before the effective date of the BAPCPA.

Bankruptcy Law > Individuals With Regular Income > Plans > Payments Under Plan

Real Property Law > Bankruptcy > Discharge & Dischargeability

**HN3[↧]** **Plans, Payments Under Plan**
When a debtor intends to cure an arrearage, split accounting is required to track the regular monthly postpetition payments and payments on the arrearage claim. Each regular monthly postpetition payments marginally reduce the principal balance.

Bankruptcy Law > Individuals With Regular Income > Plans > Plan Contents

**HN4[↧]** **Plans, Plan Contents**
It is unnecessary to have provisions in a bankruptcy plan restate and rehash the same principal to make it clear. It is sufficient to say what is meant.

Bankruptcy Law > Individuals With Regular Income > Plans > Plan Contents

Real Property Law > Bankruptcy > Discharge & Dischargeability

Real Property Law > Financing > Foreclosures > General Overview

**HN5[↧]** **Plans, Plan Contents**
"Curing a default" commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. Any other understanding would treat a symptom instead of the disease. To accomplish a full cure, a creditor's arrearage claim should represent the sum of all pre-petition funds that should have been paid. An arrearage is nothing more than a numerical representation of what is required under the parties' lending agreement to return them to their pre-default contractual status. Under *11 U.S.C.S. § 1322(e)*, the amount necessary to cure a default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

Bankruptcy Law > Individuals With Regular Income > Plans > Plan Contents

Real Property Law > Bankruptcy > Discharge & Dischargeability

Real Property Law > Financing > Foreclosures > General Overview

**HN6[↧]** **Plans, Plan Contents**
Cure-and-maintain Chapter 13 bankruptcy plans operate to deaccelerate a default.

Bankruptcy Law > Individuals With Regular Income > Plans > Payments Under Plan

Real Property Law > Bankruptcy > Discharge & Dischargeability

**HN7[↧]** **Plans, Payments Under Plan**
The United States Bankruptcy Court for the Northern District of Ohio's decision in In re Boday and other cases establish that a mortgage creditor must use a split

accounting system under a cure-and-maintain Chapter 13 bankruptcy plan to account for two streams of payments: the postpetition mortgage maintenance payments and the pre-petition arrearage payments.

Bankruptcy Law > Individuals With Regular Income > Plans > Payments Under Plan

Real Property Law > Bankruptcy > Discharge & Dischargeability

Bankruptcy Law > Individuals With Regular Income > Plans > Plan Contents

*HN8*[⬇]  **Plans, Payments Under Plan**
A Chapter 13 bankruptcy plan may provide for payment of ongoing, postpetition installments as they become due under a mortgage contract, and those installments are to be treated and applied as if there were no default and no arrears. A Chapter 13 bankruptcy plan may also provide for the cure of pre-petition arrearages by spreading the payments over a reasonable time, which is usually the life of the plan. The former payments will be applied to both principal and interest, so each time a payment is made, some reduction of principal occurs.

**Counsel:**  **[*1]** For Timothy N. Phillips, Sr., aka Tim Phillips, Cindy L. Phillips (02-66299), Debtors: Robert Goldberger, Mansfield, OH.

Trustee (02-66299): Toby L Rosen, Canton, OH.

For Timothy N. Phillips, Sr., Cindy L. Phillips (09-06109), Plaintiffs: Robert Goldberger, LEAD ATTORNEY, Mansfield, OH.

For Deutsche National Trust, Ocwen Loan Servicing LLC, MTGLQ Investors LP (09-06109), Defendants: Christian E. Niklas, Shapiro, Van Ess, Phillips & Barragate, Norwood, OH.

GSAMP Trust 2005 Sea 1, Mortgage Pass Through Certificates, Series 2005 Sea-1 (09-06109), Defendant, Pro se.

**Judges:** Russ Kendig, United States Bankruptcy Judge.

**Opinion by:** Russ Kendig

# Opinion

**MEMORANDUM OF OPINION**

Now before the court is Plaintiff-debtors second motion for summary judgment, filed on July 14, 2011. Relying on *11 U.S.C. § 524(i)* [1] and *Federal Rule of Bankruptcy Procedure 9020*, Debtors seek a contempt finding against their mortgage company for violating the discharge injunction. Deutsche Bank National Trust Company, as Trustee for the registered holders of GSAMP Trust 2005-SEA1, Mortgage Pass-Through Certifications, Series 2005-SEA1 ("Deutsche Bank"), Ocwen Loan Servicing, LLC ("Ocwen"), and MTGLQ Investors LP ("MTGLQ") (collectively "Defendants"), filed  **[*2]** a response to the motion.

The court has jurisdiction of this proceeding pursuant to *28 U.S.C. § 1334* and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to *28 U.S.C. § 1409*. This adversary is a core proceeding under *28 U.S.C. § 157(b)(2)*. The following constitutes the court's findings of facts and conclusions of law under *Federal Rule of Bankruptcy Procedure 7052*.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the Court.

**BACKGROUND**[2]

Debtors filed a chapter 13 case on December 30, 2002 and, following completion of payments under their plan, obtained a discharge on June 21, 2007. Through the plan, Debtors cured an $18,000+ mortgage arrearage while maintaining their postpetition monthly mortgage payments.

After the case closed, a dispute arose concerning the status of the mortgage. According to Debtors, their mortgage company contended they  **[*3]** were not current. Debtors reopened the case and filed a motion determine the status of the mortgage. During the interim period, Debtors withheld payments on the mortgage until the matter was resolved and remitted all the payments upon reaching an agreement. On June 20, 2008, the parties entered into an agreed order that stated the mortgage was current as of June 30, 2007.

The order did not resolve the dispute between Debtors and the mortgage company. On September 4, 2009,

---

[1] Debtors actually cite section 528(i), clearly an error.

[2] The court fully incorporates the factual background laid out in its opinion dated December 1, 2010.

Debtors again reopened their case, alleging the mortgage company still did not show them current. Debtors filed a complaint to hold the mortgage company and related entities in contempt for violating the discharge injunction.

## ANALYSIS

Debtors' motion for summary judgment is founded on *Federal Rule of Bankruptcy Procedure 7056*, incorporating *Federal Rule of Civil Procedure 56* into bankruptcy practice. *HN1*[↑] The court is to award summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Bankr. P. 7056*. The court will not reiterate the standard for a motion for summary judgment set forth in its previous opinion.

*HN2*[↑] *11 U.S.C. § 524(i)* [*4] was added to the bankruptcy code with the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") section 202. Pub.L. No. 109-8. Section 1406 of BAPCPA provides that "the amendments made by this title shall apply only with respect to cases commenced under title 11 of the United States Code on or after the date of the enactment of this Act." Section 1501(a) of the Act provided that BAPCPA became effective one hundred and eighty days after enactment and established a general rule that BAPCPA amendments did not apply to bankruptcy cases commenced before the effective date of the Act. Since Debtors' case was filed in December 2002, well before enactment of BAPCPA, *§ 524(i)* does not apply to this case.

Notwithstanding the inapplicability of *§ 524(i)*, Debtors also seek contempt under *Federal Rule of Bankruptcy Procedure 9020* for an alleged violation of the discharge injunction. Debtors contend that the mortgage company has consistently held Debtors to be in default under the mortgage note, even after entry of the agreed order finding the mortgage current. In support of their position, Debtors attached an affidavit from Debtor Timothy Phillips which contains [*5] several exhibits from Ocwen. Debtors make two arguments: first, that Ocwen repeatedly showed them one to two months behind on payments; second, that Ocwen failed to correctly calculate the principal balance on the mortgage as payments were made.

The agreed order finding the mortgage current was entered on June 20, 2008. It stated the mortgage was current as of June 30, 2007. The court must determine the import of that finding.

Bank One, the original lender, filed a proof of claim for $170,731.62 at 9.99% from the date of default. Included in the balance was an arrearage of $18,016.20, representing ten payments, foreclosure costs, late charges, and other expenses. Under the amortization schedule provided by Debtors, if no default had occurred and all payments had been timely made, the principal balance on the note, after the December 2002 payment was posted, would have been $146,834.57.

Debtors' position is that payment of the arrearage should have restored them to the balances set forth in the amortization schedule. Basic addition demonstrates a flaw in this logic. If Debtors paid $18,000.00 of the principal balance, without factoring in interest, the balance would have only been reduced [*6] to $152,000.00, short of the $146,834.57 under the amortization schedule. Defendants argue Debtors' position is incorrect because they fail to consider the impact of the accumulation of simple interest on the balance.

The problem may lie in the fact that the arrearage claim did not include the additionally-accrued but unpaid interest which Defendants added to the principal balance. The ten missed payments included in the arrearage accounted only for the interest which would have accrued if the mortgage was current. Debtors, however, had missed ten payments. When the loan was in default, not only did the interest continue to accrue, but neither principal or interest were being reduced because no payments were made. The additional interest that accrued during the default appears unaccounted for in the arrearage claim, but it is included in the proof of claim's principal balance. The question is whether it should have been included in the arrearage and, if so, whether declaring the mortgage current prevents Defendants from now collecting it.

Debtors cite a factually similar case from a sister court in this district, *In re Boday, 397 B.R. 846 (Bankr. N.D. Ohio 2008)*. In *Boday*, the debtors [*7] borrowed $155,125.00 from Bank One in October 1999. [3] *Id. at 848*. Under the terms of the note, payments were applied first to outstanding interest, then to principal. Id. The Bodays defaulted on the note and later filed a chapter 13 case. Id. The proof of claim set forth an

---

[3] Debtors in this case borrowed $155,000.00 from Bank One in February 2000.

arrearage of more than $17,000.00. Id. The Bodays' plan was confirmed and, after a slight hiccup in post-petition payments, they completed their plan and obtained a discharge. Id. At the conclusion of their plan, the Bodays realized that Bank One had never adjusted the principal balance on their loan throughout the plan period and it had remained steady at $154,718.85. Id. They filed an action alleging a violation of the discharge injunction. Id. at 849.

The Boday case is separated from this case by one fact. The Bodays' confirmed chapter 13 plan contained the following provision:

> [U]pon successful completion of the plan, (1) all defaults would be deemed to be fully cured, (2) creditors holding mortgages were required to adjust their records to indicate that all arrearages had been paid, (3) any balance due on a mortgage loan had to be adjusted [*8] so as to reflect the balance due in the original amortization schedule, and (4) that any amounts owed in excess of said amortization schedules were deemed to be discharged.

Id. at 848. It is clear that if the mortgage arrearage did not include accrued interest which was not included in the delinquent payments, it would not be collectible. The plan provision in Boday specifically reinstated the mortgage as if no default had ever occurred in the payment stream from the debtors, restoring them to the position they should have been in under the original amortization schedule. To accomplish this, the arrearage had to include any unpaid interest which had been added to principal.

The Boday court, relying on Rake v. Wade, 508 U.S. 464, 113 S. Ct. 2187, 124 L. Ed. 2d 424 (1993) and 11 U.S.C. § 1322(e), determined that the lender failed to utilize accounting procedures appropriate for a chapter 13 situation. HN3[↑] When a debtor intends to cure an arrearage, split accounting is required to track the regular monthly post-petition payments and payments on the arrearage claim. Each regular monthly post-petition payment marginally reduces the principal balance. The lender's failure to reduce the principal balance throughout the life of the [*9] plan was indicative of a failure to properly account for chapter 13 payments, resulting in a post-plan delinquency that violated the terms of the discharge injunction.

It is not entirely evident the same result applies to the instant case because this court does not use an identical chapter 13 form plan. At the time this case was filed, the court's form plan contained the following provision:

> The rights of holders of claims secured by a lien or mortgage on real property of the debtor shall be modified only to the extent of curing the default and shall result in reinstatement of the mortgage according to its original terms, with no default in scheduled payments. Any exception must be set forth with specificity in Special Provisions and may require additional motions or adversary proceedings.

The terms of this court's form plan were not as redundant as those outlined in Boday, [4] so the question is whether they have the same effect. For the reasons that follow, the court finds that the plan provision has the same import. When the arrearage was cured, Debtors were deemed to have caught up all past payments and to have been restored to their position under the original amortization schedule. [*10] HN4[↑] It is unnecessary to have plan provisions restate and rehash the same principal to make it "clear." It is sufficient to say what is meant — the default is cured; the mortgage is reinstated as though there had been no default.

First, this understanding fully appreciates the concept of curing a mortgage default. 11 U.S.C. § 1322(b)(5). In their plan, Debtors proposed to cure the mortgage default and maintain all post-petition payments. The intent is to restore a debtor to the place he would [*11] have been if no default occurred. See, e.g., In re Collins, 2007 Bankr. LEXIS 2487, 2007 WL 2116416 (Bankr. E.D. Tenn. 2007) (citations omitted). HN5[↑] "'Curing a default' [commonly] means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified.' In re Christian, 35

---

4 These provisions are not uncommon. For example, a bankruptcy court in the Southern District of Ohio uses the following:

> IMPORTANT NOTICE . . . Assuming all payments are made . . . your claim(s) should be paid in such a way as to put all parties in the same position they would have been under the original amortization schedule. This assumes that part of any arrearage claim filed will also include unpaid principal. . . Any mortgage loan for which disbursements are made in this plan . . . shall be deemed current and the mortgage loan balance shall be properly adjusted to reflect the balance as delineated in the original amortization schedule.

In re Passavant, 444 B.R. 378, 381-82 (Bankr. S.D. Ohio 2010).

*B.R. 229 (Bankr. Ga. 1983)* (citing *In re Taddeo, 685 F.2d 24, 26-27 (2nd Cir. 1982))*; *see also Litton v. Wachovia Bank (In re Litton), 330 F.3d 636 (4th Cir. 2003)*. Any other understanding would treat a symptom instead of the disease.

To accomplish full cure, a creditor's arrearage claim should represent "the sum of all prepetition funds that should have been paid...." *Epps v. Lomas Mortg. USA, Inc. (In re Epps), 110 B.R. 691, 707 (E.D. Pa. 1990)* (citation omitted). An "arrearage is nothing more than a numerical representation of what is required under the parties' lending agreement to return them to their pre-default contractual status." *In re Stiller, 323 B.R. 199, 212 n. 20 (Bankr. W.D. Mich. 2005)*. Under *§ 1322(e)*, "the amount necessary to cure [a] default[] shall be determined in accordance with the underlying agreement and applicable non-bankruptcy law."

The promissory note signed by Debtors **[*12]** in this case contains the following: "[u]pon default, or if this Note is not paid at final maturity, Lender at its option, may add any unpaid accrued interest to principal and such sum will bear interest therefrom until paid, at the rate provided in this Note but in no event at an effective total interest rate on this Note greater than the rate permitted by applicable law." (Attachment to Proof of Claim 14). This is a type of acceleration clause. *Accord In re Hence, 358 B.R. 294 (Bankr. S.D. Tex. 2006)*. **HN6**[↑] ] Cure-and-maintain chapter 13 plans operate to de-accelerate a default. *See generally Fed. Land Bank of Louisville v. Glenn (In re Glenn), 760 F.2d 1428 (6th Cir. 1985)*. In accordance with the note, upon default, it appears Defendants added the unpaid interest to the principal balance. When Debtors filed a cure-and-maintain plan, thereby de-accelerating the default, Defendants should have included any amounts due as a result of the de-acceleration in the arrearage. *Cf. Tolbert v. SN Servicing Corp. (In re Tolbert), 458 B.R. 633, 2011 Bankr. LEXIS 3250, 2011 WL 3734240 (Bankr. M.D. Ga. 2011)*.

Defendants' failure to include the unpaid accrued interest in the arrearage is fatal to their ability to now collect the amount. Defendants **[*13]** affirmatively stated the mortgage was current as of June 30, 2007 in an agreed order. By stating the mortgage was current, Defendants represented that Debtors complied with the terms of the plan and cured the arrearage. Through the agreed order, Defendants have waived any right to now assert a larger arrearage or make a contrary argument to this understanding. Debtors' confirmed plan was completed and Debtors obtained a discharge. As

outlined above, their mortgage was reinstated as if no default had occurred. Permitting Defendants to make an argument to the contrary is inequitable.

With this understanding of what an arrearage is and the import of curing an arrearage, the court now turns to the facts of the case to determine if Defendants should be held in contempt for violating the discharge injunction.

## I. Payment delinquency

Debtors contend contempt is warranted because Defendants consistently showed a default in payments. Although Defendants deny this, their exhibits support Debtors' position. A Detail Transaction History is attached to Defendants' response. (Doc. 61-4). As of May 24, 2007, the transaction history shows Debtors owing for the April 24, 2007 payment. On June 30, 2008, **[*14]** after entry of the agreed order and receipt of thirteen additional payments, Defendants still show Debtors owe for the May 24, 2008 payment. By the court's calculations, the payment received on June 16, 2008 paid the July 2008 payment. Consequently, the court agrees with Debtors' position that Defendants showed them two months delinquent. The court is convinced that Defendants failed to bring the account current as of June 30, 2007. This perpetuated the delinquency.

If the mortgage was current through June 30, 2007, the next payment would have been due July 2007. The transaction history shows that, including the July 16, 2008 payment, Debtors had paid fourteen mortgage payments. By the court's calculations, this means Debtors were paying the mortgage in advance of payments that were due. It is not until the November 2010, well into litigation of this adversary, that the transaction history shows that Debtors are current on their mortgage.

Debtors' affidavit and exhibits also prove that Ocwen considered the loan to be delinquent. Statements dated August 14, 2007, December 26, 2009, and June 16, 2010 all indicate the loan was either delinquent or in default. Howard Handville's affidavit **[*15]** states that "Ocwen submitted a request to delete the delinquent reporting and report the loan as paid for the period June 2007 through October 2010." (Defendants' Resp. to M. Summ. Judg., Doc. 61-4, ¶ 11). This clearly demonstrates that the account was not current and corrective action was not taken until well after Debtors filed an adversary complaint.

Defendants summarily challenge the admissibility of

Debtors' exhibits regarding the default. (Response to M. Summ. J. ¶ 3, p. 2.) The court rejects this argument for two reasons. First, as stated above, Defendants' exhibit supports Debtors' position. Second, the court is not convinced of the inadmissibility of Debtors' exhibits. *See, e.g., Johnson v. Memphis City Schools, 2010 U.S. Dist. LEXIS 47515, 2010 WL 1957267 (W.D. Tenn. 2010).* Debtor Timothy Phillips' affidavit attests to personal knowledge and receipt of the exhibits from Ocwen.

Debtors demonstrated that Ocwen failed to credit payments received under the plan. If payments were properly credited, Debtors' mortgage would have been current through June 30, 2007. The transaction history clearly shows a failure to treat the account as current through June 20, 2007. The problem persisted until late 2010, well **[*16]** after the order was entered. No genuine issue of material fact exists on these points. It is unquestioned that Ocwen was aware of, or should have known, that the discharge injunction was effective. Ocwen was a participant in the chapter 13 plan. The agreed order finding the mortgage current was signed by counsel on behalf of Ocwen. Ocwen's failure to properly credit the plan payments violated the discharge injunction. Further, its actions persisted even after the agreed order was signed and through the filing of the complaint by Debtors.

Debtors have demonstrated injury in the form of negative credit reporting. From August 2008 through August 2010, Ocwen showed Debtors 30-59 days late on their account. The fact that Ocwen requested remediation does not alter the fact that the negative reporting was injurious. While remediation may go to damages, the harm was done.

## II. The Principal Balance

Debtors also contend that Defendants violated the discharge injunction by not appropriately posting payments, resulting in overstatement of the principal balance on the mortgage note. The court agrees.

*HN7*] *Boday* and other cases establish that a mortgage creditor must use a split accounting system under a **[*17]** cure-and-maintain chapter 13 plan to account for two streams of payments: the post-petition mortgage maintenance payments and the prepetition arrearage payments. *See Boday, 397 B.R. 846; In re Carlton, 437 B.R. 412 (Bankr. N.D. Ala. 2010); In re Bagne, 219 B.R. 272 (Bankr. E.D. Cal. 1998).* As *Carlton* explains,

First, *HN8*] the plan may provide for payment of the on-going, post-petition installments as they become due under the mortgage contract, and those installments are to be treated and applied as if there were no default and no arrears. Second, the plan may provide for the cure of the prepetition arrears by spreading their payment over a reasonable time, which is usually the life of the plan.

*437 B.R. 412, 418.* The former payments will be applied to both principal and interest, so each time a payment is made, some reduction of principal occurs. It is evident in this case, as in *Boday*, Defendants' failed to accurately account for payments. Between May 30, 2004 [5] and August 9, 2006, the principal balance never decreased. Debtors, however, were making their post-petition mortgage payments by conduit and therefore some reduction in principal should have occurred with each post-petition regular **[*18]** monthly payment. Since it did not, Debtors have shown an accounting problem that violates the discharge injunction.

Debtors received a discharge on June 21, 2007. Their mortgage account was declared current as of June 30, 2007. Under the original amortization schedule, Debtors' principal balance would have been $127,570.45 after the June 2007 payment. The Detail Transaction History shows a balance of $141,655.24 after the final plan payments were entered on May 24, 2007. Clearly, there is an accounting problem. The principal balance had not been reduced during the plan term, nor did it reflect full reinstatement of the mortgage upon completion of plan payments. For these reasons, Debtors' motion for contempt has merit.

## CONCLUSION

Debtors have established Defendants' *violation* of the *discharge* injunction. Although their mortgage account was deemed current as of June 30, 2007, *Ocwen* failed to properly credit payments to achieve a current status. As a result, the account was delinquent and in default, resulting **[*19]** in injury to Debtors. Debtors were harmed by the negative credit reporting and by Defendants' failure to correctly post plan payments, resulting in overstatement of the principal balance. Debtors' motion for summary judgment is granted.

---

[5] This is the first date noted in the Detail Transaction History. Defendant does not offer an explanation as to why the history does not start from the filing of Debtors' chapter 13 plan.

An order will be entered immediately.

**/s/ Russ Kendig**

**Russ Kendig**

**United States Bankruptcy Judge**

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND SCHEDULING FURTHER PRETRIAL CONFERENCE**

On July 14, 2011, Debtors filed their second motion for summary judgment, opposed by Defendants. As set forth in the corresponding Memorandum of Opinion, the court **GRANTS** the motion.

A further pretrial conference is scheduled for **October 19, 2011** at **9:00 a.m.** in the chambers of Judge Russ Kendig, United States Bankruptcy Court, 401 McKinley Ave., S.W., Canton, Ohio. Parties may participate telephonically by contacting the court no less than twenty-four hours prior to the conference to provide a non-cellular telephone number.

It is so ordered.

**/s/ Russ Kendig**

**Russ Kendig**

**United States Bankruptcy Judge**



**User Name:** John Mickalovski1

**Date and Time:** Tuesday, July 18, 2017 3:21:00 PM CDT

**Job Number:** 50656718

## Document (1)

1. *Phillips v. Deutsche Nat'l Trust (In re Phillips), 2012 Bankr. LEXIS 1042*

   **Client/Matter:** -None-

   **Search Terms:** Phillips v. Deutsche Nat'l Trust (In re Phillips), 2011 Bankr. LEXIS 3780

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |


# Phillips v. Deutsche Nat'l Trust (In re Phillips)

United States Bankruptcy Court for the Northern District of Ohio, Eastern Division

March 9, 2012, Decided; March 9, 2012, Filed

CHAPTER 7 CASE NO. 02-66299; ADV. NO. 09-6109

**Reporter**
2012 Bankr. LEXIS 1042 *; 2012 WL 830517

In re: TIMOTHY N. PHILLIPS and CINDY L. PHILLIPS, Debtors. TIMOTHY N. PHILLIPS, SR. and CINDY L. PHILLIPS, Plaintiffs, v. DEUTSCHE NATIONAL TRUST, et al., Defendants.

**Prior History:** *Phillips v. Deutsche Nat'l Trust (In re Phillips), 2011 Bankr. LEXIS 3780 (Bankr. N.D. Ohio, Sept. 29, 2011)*

## Core Terms

punitive damages, damages, injunction, emotional distress, attorney's fees, courts, parties, medical testimony, automatic stay, actual damage, higher interest rate, memorandum

## Case Summary

**Procedural Posture**
An evidentiary hearing was held to determine plaintiff debtors' damages following a grant of summary judgment in their favor finding that defendant creditors violated the discharge injunction. The parties stipulated to an award of attorney's fees to the debtors.

**Overview**
In order for the debtors to be allowed damages for violation of the discharge injunction in the Northern District of Ohio, they were required to establish actual injury. The court was not convinced that they incurred any actual damages as a result of the creditors' reports to credit reporting agencies. Although they alleged that they had to pay higher interest rates on a student loan for their daughter, they failed to show any causal relationship, except by speculation, between the creditors' actions and the higher interest rates. The debtors failed to prove that the creditors caused mental or emotional distress to the extent necessary to receive damages in the absence of corroborating medical testimony. Although the court was not convinced that the debtors were substantially injured by the creditors' conduct, the court was bothered by that conduct nonetheless. The creditors had no excuse for continually harassing the debtors and refusing to look up an order that they requested from the debtors on an electronic filing system. Their actions constituted a complete and utter disrespect for the bankruptcy laws and warranted an award of punitive damages.

**Outcome**
The court awarded the debtors punitive damages in the amount of $10,000.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

*HN1*[⬇] **Effect of Discharge, Protection of Debtors**
When a creditor is found to be in violation of the discharge injunction, it is subject to sanctions at a court's discretion. The sanctions may be either paid to the complainant as compensation for damages caused by the contemnor, i.e. compensatory damages, or payable to the court with the caveat that the contemnor can avoid payment by performing the act required by the court's order.

Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

*HN2*[⬇] **Effect of Discharge, Protection of Debtors**
In the Northern District of Ohio, bankruptcy courts typically allow damages for violations of the discharge injunction when a debtor has established actual injury.

> Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

> Evidence > Burdens of Proof > Preponderance of Evidence

*HN3*[⬇] **Effect of Discharge, Protection of Debtors**
A debtor bears the burden to prove actual injury for a violation of the discharge injunction by a preponderance of the evidence. The debtor must support his claim of actual injury by establishing adequate proof and cannot rely on speculation.

> Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

*HN4*[⬇] **Effect of Discharge, Protection of Debtors**
In some instances, courts have found actual injury in the form of mental/emotional distress resulting from a creditor's violation of the discharge injunction. To establish such injury absent any demonstrable monetary losses, a debtor must have clearly suffered some appreciable emotional/mental harm and the creditor's actions must have been severe in nature. Such a burden of proof can be met through actual medical testimony, but is not required. Rather, courts have found that the greater the extent of the creditor's violation, the less corroborating evidence, including medical testimony, is required to establish mental/emotional distress. The converse is also true.

> Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

*HN5*[⬇] **Effect of Discharge, Protection of Debtors**
Absent corroborating medical testimony, simple stress and frustration are not sufficient to support an award of damages for mental/emotional distress for a violation of the discharge injunction.

> Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

*HN6*[⬇] **Effect of Discharge, Protection of Debtors**
Punitive damages are meant to punish for wrongful conduct and serve as a deterrent of further wrongful conduct. While there is a question of whether bankruptcy courts have the authority to punish parties for violations of the discharge injunction through punitive damages, courts in the Northern District of Ohio have awarded punitive damages.

> Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

*HN7*[⬇] **Effect of Discharge, Protection of Debtors**
Punitive damages are only appropriate where there is some sort of nefarious or otherwise malevolent conduct. For violations of the discharge injunction, courts have awarded punitive damages only where there exists a complete and utter disrespect for the bankruptcy laws.

> Civil Procedure > Remedies > Damages > Compensatory Damages

> Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > General Overview

> Civil Procedure > Remedies > Damages > Punitive Damages

*HN8*[⬇] **Damages, Compensatory Damages**
Typically, punitive damages are only appropriate when an award of compensatory or actual damages is appropriate. In situations where a court does not award compensatory or actual damages, but awards attorneys' fees, attorneys' fees have been found to constitute actual damages.

**Counsel: [*1]** For Timothy N. Phillips, Sr., aka Tim Phillips, Cindy L. Phillips (02-66299-rk), Debtors: Robert Goldberger, Mansfield, OH.

For Timothy N. Phillips, Sr., Cindy L. Phillips (09-06109-rk), Plaintiffs: Robert Goldberger, LEAD ATTORNEY, Mansfield, OH.

For Deutsche National Trust (09-06109-rk), Defendant: Christian E. Niklas, Shapiro, Van Ess, Phillips & Barragate, Norwood, OH; Steven M. Palmer, Shapiro, Van Ess, Phillips & Barragate, Cleveland, OH.

For Ocwen Loan Servicing LLC, MTGLQ Investors LP (09-06109-rk), Defendants: Christian E. Niklas, Shapiro, Van Ess, Phillips & Barragate, Norwood, OH; Phillip C Barragate, Cleveland, OH; Steven M. Palmer, Shapiro, Van Ess, Phillips & Barragate, Cleveland, OH.

For GSAMP Trust 2005 Sea 1, Mortgage Pass Through Certificates, Series 2005 Sea-1 (09-06109-rk), Denfendant: Steven M. Palmer, Shapiro, Van Ess, Phillips & Barragate, Cleveland, OH.

**Judges:** Russ Kendig, United States Bankruptcy Judge.

**Opinion by:** Russ Kendig

# Opinion

### MEMORANDUM OF OPINION (NOT FOR PUBLICATION)

Now before the court is the determination of damages following the court's granting Plaintiffs' second motion for summary judgment on September 29, 2011 and the evidentiary hearing on damages held on January 9, 2012.

The **[*2]** court has jurisdiction over this case pursuant to *28 U.S.C. § 1334* and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to *28 U.S.C. § 1409*. This proceeding is a core proceeding under *28 U.S.C. § 157(b)(2)(O).*

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

### FACTS

On July 14, 2011, Plaintiffs filed a second motion for summary judgment ("motion") seeking a finding of contempt against Defendants for violation of the discharge injunction. Defendants filed a response to Plaintiffs' motion on August 12, 2011. On September 29, 2011, the court entered a memorandum of opinion and corresponding order that granted Plaintiffs' second motion for summary judgment, finding that Defendants violated the discharge injunction.

On January 9, 2012, the court held an evidentiary hearing to determine damages recoverable for Defendants' violation of the discharge injunction. Robert Goldberger, on behalf of Plaintiffs, and Phillip C. Barragate and Steven M. Palmer, on behalf of Defendants, appeared personally **[*3]** at the evidentiary hearing. Both Debtors testified on their own behalf and Gina Johnson, Senior Loan Analyst, testified on behalf of Defendants.

Prior to the hearing, on January 4, 2012, Debtors filed a witness list and their proposed findings of fact and conclusions of law. In these pleadings, Debtors requested damages of $50.00 per day from June 30, 2007 through September 29, 2011, for a total of $58,300.00. Defendants also filed witness and exhibit lists and proposed findings of fact and conclusions of law on January 4, 2012.

Following the evidentiary hearing, the court entered a scheduling order on January 10, 2012 to provide the parties an opportunity to brief the issue of damages. On January 17, 2012, Defendants filed a brief in support of its position and, on January 27, 2012, Debtors filed a brief in support of their position.

On February 3, 2012, the court entered an order that provided Debtors fourteen days to file a statement of attorney's fees and expenses for this matter. Additionally, it provided Defendants an opportunity to respond to the statement of attorney's fees and expenses and provided both parties an opportunity to request further hearing on attorney's fees and **[*4]** expenses. On February 16, 2012, Debtors' attorney filed an application for attorney's fees seeking $4,125.00 for 27.5 hours at the rate of $150.00 per hour. On March 2, 2012, the court entered an order wherein both parties stipulated to attorney's fees in the total amount of $3,750.00.

### LAW AND ARGUMENT

The court previously found Defendants in violation of the discharge injunction in its memorandum of opinion entered on September 29, 2011. The court incorporates the findings contained in its September 29, 2011 memorandum opinion as if set forth herein.

*HN1*[⬆] When a creditor is found to be in violation of the discharge injunction, it is subject to sanctions at the court's discretion. *In re Perviz, 302 B.R. 357, 370 (Bankr. N.D. Ohio 2003)* (citing *Arruda v. Sears,*

*Roebuck & Co., 273 B.R. 332, 345 (D.R.I. 2002))*. The sanctions may be either paid to the complainant as compensation for damages caused by the contemnor, i.e. compensatory damages, or payable to the court with the caveat that the contemnor can avoid payment by performing the act required by the court's order. *United States v. Bayshore Assocs., Inc., 934 F.2d 1391, 1400-01 (6th Cir. 1991)*; *In re Lohmeyer, 365 B.R. 746, 752 (Bankr. N.D. Ohio 2007)*. **[*5]** Here, Debtors requested damages in the total amount of $58,300.00.

*A. Actual Damages*

*HN2*[↑] In the Northern District of Ohio, bankruptcy courts typically allow damages for violations of the discharge injunction when a debtor has established actual injury. *In re McCool, 446 B.R. 819, 823 (Bankr. N.D. Ohio 2010)* (citing *Archer v. Macomb Cnty. Bank, 853 F.2d 497, 500 (6th Cir. 1988))*; *Lohmeyer, 365 B.R. at 752*; *In re Mayer, 254 B.R. 396, 397-98 (Bankr. N.D. Ohio 2000)*. *HN3*[↑] The debtor bears the burden to prove actual injury by a preponderance of the evidence. *McCool, 446 B.R. at 823-24*. The debtor must support his claim of actual injury by establishing "adequate proof" and cannot rely on speculation. *Id. at 824* (quoting *Archer, 853 F.2d at 499-500*).

1. Inability to Borrow Money

Debtors assert that during the period of June 20, 2008 through October 31, 2010, Defendants reported Debtors delinquent to credit reporting agencies. As a result, Debtors had to pay higher interest rates to borrow money than they would have if Defendants reported the correct information to the credit reporting agencies.

Debtors specifically describe being denied a student loan for their daughter from the U.S. Department of Education. **[*6]** Instead, Debtors obtained a loan from a private lender with an interest rate of 12%. At the hearing, Debtor, Cindy Phillips, testified that they were denied by two lenders before obtaining the student loan from a third lender. In another instance, Mrs. Phillips testified that she attempted to obtain a refinance with other mortgage companies to get away from Defendants but was denied on the basis that Debtors were behind on their payments with Defendants.

The court is not convinced that Debtors incurred any actual damages as a result of Defendants' reports to credit reporting agencies. Debtors failed to provide any proof that they actually paid higher interest rates due to Defendants' actions. Debtors testified about being

unable to obtain certain loans and, instead, having to borrow money at higher interest rates. However, Debtors failed to show any causal relationship, except by speculation, between Defendants' actions and the higher interest rates.

Debtors could have submitted copies of their credit report showing Defendants' entries to illustrate the potential harm that these entries caused to their credit score. Additionally, Debtors could have submitted evidence that potential creditors **[*7]** denied Debtors credit for a specific reason. Debtors failed to submit any documentation of these types. It is possible, and to some degree likely, that Debtors had to pay a higher interest rate and were denied credit because of their bankruptcy filing. Without any definitive showing by Debtors that Defendants' actions caused their inability to borrow money at lower interest rates, the court cannot find any actual damages to Debtors based upon mere speculation alone.

2. Mental/Emotional Distress

*HN4*[↑] In some instances, courts have found actual injury in the form of mental/emotional distress resulting from a creditor's violation of the discharge injunction. To establish such injury absent any demonstrable monetary losses, the debtor must have "clearly suffered some appreciable emotional/mental harm" and the creditor's actions must have been severe in nature. *Perviz, 302 B.R. at 371*. Such a burden of proof can be met through actual medical testimony, but is not required. Id. Rather, courts have found that "the greater the extent of the creditor's violation, the less corroborating evidence, including medical testimony," is required to establish mental/emotional distress. Id. The converse is also **[*8]** true. Id.

Debtors assert, in their post-hearing brief, that they are entitled to damages for mental/emotional distress as a result of Defendants' actions. They premise this assertion on the fact that nearly five years after discharge, they are still involved in litigation with Defendants. Further, Mrs. Phillips testified about the volume and frequency of the calls received from Defendants, as well as the long period of time during which these calls were made.

Debtors provided no actual medical testimony to assert mental/emotional harm. Thus, the court must look solely at Defendants' violation, which must be severe in nature, to establish mental/emotional distress in the absence of corroborating medical testimony. In Perviz,

the court awarded damages for mental/emotional distress without hearing medical testimony. *302 B.R. at 371-72*. However, debtors presented evidence to show that the creditor made a significant volume of calls to debtors, up to eight times per day. *Id. at 371*. In addition, the creditor also sent a large volume of correspondence to debtors. *Id. at 372*.

Debtors have not established that Defendants caused mental/emotional distress to the extent necessary to receive damages. **[\*9]** The court does not question whether Defendants' phone calls and correspondence caused Debtors stress and frustration. Mrs. Phillips testified that Defendants telephoned her house two times per day and sent notices of foreclosure. The court recognizes that this is a significant volume of telephone calls to receive from a creditor attempting to collect money. That said, Debtors did not represent any adverse effects from Defendants' phone calls or correspondence except stress and frustration. **HN5[↑]** Absent corroborating medical testimony, simple stress and frustration are not sufficient to support an award of damages for mental/emotional distress. *See In re Baker, 140 B.R. 88 (D. Vt. 1992)* (awarding no damages for emotional distress on basis that "susceptibility to nausea, shakes and headaches from ... stress was insufficient"). Thus, the court finds that Debtors are not entitled to damages for mental/emotional distress.

### 3. Attorney's Fees

As discussed above, On March 2, 2012, the court entered an order wherein both parties stipulated to attorney's fees in the total amount of $3,750.00.

### B. Punitive Damages

**HN6[↑]** ] Punitive damages are meant to punish for wrongful conduct and serve as a deterrent of further **[\*10]** wrongful conduct. *Perviz, 302 B.R. at 372*. While there is a question of whether bankruptcy courts have the authority to punish parties for violations of the discharge injunction through punitive damages, courts in the Northern District of Ohio have awarded punitive damages. *See* id. ("bankruptcy courts have the inherent power to punish parties for their contemptuous violation of the discharge injunction through the imposition of punitive damages"); *In re Latanowich, 207 B.R. 326 (Bankr. D. Mass. 1997)*. *Contra Lohmeyer, 365 B.R. at 750* ("weight of authority is that bankruptcy courts lack authority to punish and impose sanctions" for violation of discharge injunction); *Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1192-95 (9th Cir. 2003)*.

**HN7[↑]** ] Punitive damages are only appropriate "where there is some sort of nefarious or otherwise malevolent conduct." *Perviz, 302 B.R. at 372* (citing *Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 307, 106 S. Ct. 2537, 91 L. Ed. 2d 249 (1986))*. For violations of the discharge injunction, courts have awarded punitive damages only "where there exists a complete and utter disrespect for the bankruptcy laws." *Perviz, 302 B.R. at 372* (citing *In re Arnold, 206 B.R. 560, 568 (Bankr. N.D. Ala. 1997))*.

The **[\*11]** court must determine whether Defendants' actions constitute a complete and utter disrespect for the bankruptcy laws. As discussed above, the court is not convinced that Debtors were substantially injured by Defendants' conduct. But the court is bothered by Defendants' conduct nonetheless. Ms. Johnson testified that, during telephone calls between Defendants and Debtors, Defendants requested a copy of the order deeming the mortgage current [1] from Debtors, but never received a copy from Debtors. [2] Ms. Johnson also testified that Defendants had access to PACER [3] and could have looked up the order on PACER. She also stated that Defendants' standard procedure is to request a copy of the order from debtors and Defendants did not deviate from this procedure to look up the order itself.

The court believes that Defendants **[\*12]** have no excuse for continually harassing Debtors and refusing to look up the order on PACER. Whether Defendants ever received a copy of the order from Debtors is irrelevant because Defendants had actual knowledge of the order and should have obtained a copy of it from PACER. First, Defendants were a party to the order with its counsel, Martha Spanner, signing the order on its behalf and received service of the order from the court. Defendants never explained why the order was not in its records since its counsel agreed to the order on its behalf and it received service of the order from the court. Second, Debtors continually advised Defendants of the order and Defendants cannot now claim ignorance of it. Defendants' failure to find the order after Debtors continually advised Defendants of its contents constitutes a complete and utter disrespect for the

---

[1] The court refers to the June 20, 2008 order that deemed the mortgage was current as of June 30, 2007.

[2] Mrs. Phillips testified that she faxed the requested order to Defendants on at least one occasion, if not multiple times.

[3] PACER, an acronym for Public Access to Court Electronic Records, is a site commonly used by creditors to obtain information about specific bankruptcy cases.

bankruptcy laws. As such, punitive damages are appropriate.

The court must now determine the amount of punitive damages appropriate in this matter. In Perviz, the court awarded $8,000.00 in punitive damages for the creditor's overall conduct in the matter. *302 B.R. at 373*. The creditor made hundreds of harassing telephone calls and sent **[*13]** numerous letters to the debtors. Id. Even more egregiously, the creditor's actions became more aggressive as time went on and the debtors attempted to stop the creditor's harassment. Id. The court found the creditor had knowledge of the discharge and chose to ignore it. Id.

In Baker, the district court affirmed the bankruptcy court's award of $10,000.00 in punitive damages for violation of the automatic stay. *140 B.R. 88*. While the creditor argued that it had no knowledge of the automatic stay, both the debtor and her attorney spoke with the creditor several times to inform it of the debtor's bankruptcy. Id. Baker found that the "only explanation for the bank's violation of the automatic stay can be malice or bad faith." Id.; *accord In re Bishop, 296 B.R. 890, 899 (Bankr. S.D. Ga. 2003)* (awarding punitive damages of $50,000.00 for violation of automatic stay); *In re Ocasio, 272 B.R. 815, 827 (B.A.P. 1st Cir. 2002)* (affirming award of $9,000.00 in punitive damages for violation of automatic stay); *In re McCormack, 203 B.R. 521 (Bankr. D.N.H. 1996)* (awarding punitive damages of $10,000.00 for violation of automatic stay).

In the instant matter, the court finds that punitive damages in **[*14]** the amount of $10,000.00 are appropriate based upon Defendants' egregious conduct. Defendants' conduct expressed a repeated attitude of "we don't care." The court notes that the Baker case was in 1992. The value of the dollar has dropped since 1992, according to calculations based on the Consumer Price Index, such that it would take $1.64 in 2012 to equal the value of one dollar in 1992. *See* Inflation Calculator, *http://www.dollartimes.com/calculators/inflation.htm* (last visited Mar. 8, 2012).

*HN8*[⬆] Typically, punitive damages are only appropriate when an award of compensatory or actual damages is appropriate. In situations where a court does not award compensatory or actual damages, but awards attorneys' fees, attorneys' fees have been found to constitute actual damages. *See In re Prusan, No. 09-49716-CEC, 2010 Bankr. LEXIS 699, at *9 n.4 (Bankr. E.D.N.Y. Mar. 2, 2010)*; *Baker, 140 B.R. 88*.

In the instant matter, both parties stipulated to an award of attorney's fees in the total amount of $3,750.00 by order entered on March 2, 2012. Thus, the court is able to award punitive damages despite its denial of actual or compensatory damages, except for attorney's fees, as discussed above.

## CONCLUSION

Accordingly, **[*15]** the court awards punitive damages in the amount of $10,000.00 to Debtors. An order will be entered contemporaneously with this memorandum of opinion.

**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its**

/s/ Russ Kendig

**Russ Kendig**

**United States Bankruptcy Judge**

**Dated: 02:52 PM March 9, 2012**

John Mickalovski1



**User Name:** John Mickalovski1
**Date and Time:** Tuesday, July 18, 2017 12:35:00 PM CDT
**Job Number:** 50638016

## Document (1)

1. *Fegadel v. Ocwen Loan Servicing, LLC, 2016 U.S. Dist. LEXIS 81449*

   **Client/Matter:** -None-
   **Search Terms:** "Fegadel" and "ocwen"
   **Search Type:** Terms and Connectors
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

 Neutral

As of: July 18, 2017 5:35 PM Z

## *Fegadel v. Ocwen Loan Servicing, LLC*

United States District Court for the Middle District of Florida, Tampa Division

June 22, 2016, Decided; June 22, 2016, Filed

Case No. 8:15-cv-2228-T-17JSS

**Reporter**

2016 U.S. Dist. LEXIS 81449 *

LYNN **FEGADEL**, Plaintiff, v. **OCWEN** LOAN SERVICING, LLC, Defendant.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part *Fegadel v. Ocwen Loan Servicing, LLC, 2016 U.S. Dist. LEXIS 162311 (M.D. Fla., Nov. 23, 2016)*

## Core Terms

injunction, alleges, communications, motion to dismiss, district court, requirements, violations, consumer, purposes, reasons

**Counsel:** **[*1]** For Lynn **Fegadel**, Plaintiff: Brian Lucas Shrader, Gus M. Centrone, LEAD ATTORNEYS, Centrone & Shrader, PLLC, Tampa, FL; Katherine Earle Yanes, LEAD ATTORNEY, Kynes, Markman & Felman, PA, Tampa, FL.

For **Ocwen** Loan Servicing, LLC, Defendant: Joseph Culleiton, LEAD ATTORNEY, PRO HAC VICE, Blank Rome, LLP, Pittsburgh, PA; Paul James Sodhi, LEAD ATTORNEY, Blank Rome, LLP, Boca Raton, FL.

**Judges:** ELIZABETH A. KOVACHEVICH, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ELIZABETH A. KOVACHEVICH

## Opinion

### ORDER DENYING DEFENDANT'S MOTION TO DISMISS

This cause came before the Court pursuant to a *Motion to Dismiss Plaintiff's Class Action Complaint* ("**Motion to Dismiss**") filed by Defendant **Ocwen** Loan Servicing,

LLC (the "**Defendant**") (Doc. 16) and a *Response to Defendant's Motion to Dismiss* (the "**Response**") filed by Plaintiff Lynn **Fegadel** (the "**Plaintiff**") on her own behalf and on behalf of others similarly situated as a class action suit. For the reasons set forth below, Defendant's Motion to Dismiss is **DENIED**.

### I. Introduction

The issues raised by the Motion to Dismiss and the Complaint are whether the Plaintiff has wrongfully asserted jurisdiction in this Court, whether the Plaintiff's claims fail as a matter of law for both wrongfully **[*2]** alleging that communications by Defendant were sent for the purposes of collecting a debt and in violation of the Florida Consumer Collections Practices Act ("**FCCPA**") and for alleging that Plaintiff's debt is classified as a consumer debt under the requirements of the FCCPA, and finally, whether Plaintiff's violation of discharge injunction claim fails as a matter of law. Upon review, the Court answers all questions in the negative for the following reasons.

First, binding precedent allows for this Court to have jurisdiction in this type of case. Second, the communications are alleged by the Plaintiff to have been for the purpose of collecting a debt through terms of payment and deadlines, thus we must take the Plaintiff's allegations as true during this pleading stage. Also, the Plaintiff alleges she identified on her bankruptcy petition that she intended to surrender her property in Dunedin, Florida as part of her bankruptcy and moved out of the house. A household is considered a consumer debt under the FCCPA. Lastly, the Plaintiff is seeking sanctions and damages for the Defendant's violation of the discharge injunction, not a successive injunction or an enforcement of the injunction. **[*3]** Therefore, dismissing this case would deny the Plaintiff a fair opportunity to have her case heard and consequently, unjustly prejudice the Plaintiff. For those reasons, the Motion must be denied.

## II. BACKGROUND

On or about February 11, 2015, Plaintiff filed a voluntary petition for bankruptcy under Chapter 7 of Title 11 of the United States Code (the "**Bankruptcy Code**") and identified that Plaintiff intended to surrender the property as part of her bankruptcy discharge. Previously, Defendant had serviced a first mortgage lien securing a promissory note (the "**Debt**") on the real property owned by Plaintiff, which is now surrendered in Dunedin, Florida. Plaintiff moved out of the house during the course of her bankruptcy. The Debt was discharged on May 20, 2015, in the Plaintiff's bankruptcy case. Plaintiff alleges that Defendant received notice of the Plaintiff's bankruptcy filing as well as the discharge by the Bankruptcy Court on or about May 22, 2015, but proceeded in attempting to collect the Debt from Plaintiff, thus, ignoring the discharge and allegedly violating the FCCPA.

Defendant continued to send Plaintiff written communications that Plaintiff alleges were for the purposes to [*4] collect the Debt. The Billing Statements indicate the Plaintiff is "Past Due," has a "Total Amount Due," and includes a small disclaimer near the bottom of the statement. Additionally, on or about September 11, 2015, Plaintiff alleges Defendant sent a Request for Mortgage Assistance / Hardship Affidavit to encourage Plaintiff to request a loan modification on the discharged debt.

On September 24, 2015, Plaintiff filed the instant action against Defendant for an alleged violation of *Fla. Stat. § 559.55* of the FCCPA for allegedly communicating with Plaintiff to collect a debt after the debt was discharged. Plaintiff seeks actual damages, statutory damages, and reasonable attorney's fees and costs for the aforementioned violation. Further, Plaintiff seeks sanctions for the discharge injunction violations by Defendant.

## III. Legal Standard

Pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, this Court must accept all of the alleged facts as true and resolve them in a light most favorable to the non-moving party. *Fed. R. Civ. P. 12*. *Timson v. Sampson, 518 F.3d 870, 872 (11th Cir. 2008)*. To survive a motion to dismiss, a plaintiff's complaint requires more than bare legal conclusions. Legal conclusions, as opposed to well-pled factual allegations, "are not entitled to the assumption of the truth." *Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

Plaintiff's complaint [*5] must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. *Twombly's* plausibility standard requires that the allegations be more than merely conceivable. *Id*. A plaintiff's complaint should be dismissed if the plaintiff has not "nudged their claims across the line from conceivable to plausible." *Id. at 555*.

## IV. Legal Analysis

Jurisdiction is proper under diversity jurisdiction pursuant to *28 U.S.C. § 1332(a)*as the matter in controversy exceeds $75,000 and is between citizens of different states (Doc. 1). Plaintiff resides in Pinellas County, Florida, whereas Defendant is a Delaware corporation that does business in Florida. Jurisdiction is also proper under federal question jurisdiction for the following reasons.

According to *28 U.S.C. § 1331 (2016)*, district courts have original jurisdiction of "all civil actions arising under the Constitution, laws, or treaties of the United States." Additionally, the district courts have original jurisdiction over all cases under Title 11, as stated by *28 U.S.C. § 1334 (2016)*. "The explicit *§ 1334* grant of original jurisdiction over Title 11 cases clearly forecloses a conclusion that the district court lack[s] subject matter jurisdiction over this case." *Justice Cometh, Ltd. V. Lambert, 426 F.3d 1342 (11th Cir. 2005)*. On this point, the Middle District [*6] of Florida recently ruled that a class action claim involving violations of FCCPA and discharge injunctions could be litigated as a class action in either district or bankruptcy court. *Lapointe v. Bank of Am., N.A., No. 8:15-cv-1402-T-26EAJ, 2015 U.S. Dist. LEXIS 175868 (M.D. Fla. Aug. 26, 2015)*.

Here, Defendant argues this Court lacks jurisdiction over Plaintiff's claims because both claims are premised upon the bankruptcy court's discharge order, and Defendant argues this case should instead proceed before the bankruptcy court (Doc. 16). The Court disagrees for the following reasons.

Based on the authorities cited above, the case may proceed here in District Court. This case was filed under Chapter 7 of Title 11 of the United States Code. Because precedent allows for Title 11 cases to be litigated in federal district court, as well as class action claims for violations of FCCPA and discharge injunctions to be litigated in either bankruptcy or district court, jurisdiction is proper here in the Middle District and the Motion to Dismiss must be denied.

Second, *Fla. Stat. § 559.72* prohibits a person from communicating with the debtor to harass them, attempt to enforce a debt when such person knows the debt is not legitimate, and communicate with the debtor if **[*7]** the person knows the debtor is represented by an attorney. The Eleventh Circuit held that "a communication that makes an implicit demand for payment by stating the amount of the debt, describing how the debt could be paid, and informing the debtor how the debtor can tender payment is an attempt to collect a debt." *Pinson v. Albertelli Law Partners LLC, 618 Fed. App'x 551, 554 (11th Cir. 2015)*. In the present case, the Defendant alleges Plaintiff's FCCPA claim fails as a matter of law because the alleged communications were informational rather than attempts to collect a debt (Doc. 16).

Taking the Plaintiff's allegations in the complaint as true, the billing statements sent by Defendant to Plaintiff indicated that the Plaintiff was "Past Due" in her payment, that the Plaintiff has a "Total Amount Due" of hundreds of thousands of dollars, and the billing statements contained a payment coupon to be sent to the Defendant with payment (Doc.1). The court in *Parker v. Midland Credit Management, Inc., 874 F.Supp. 2d 1353 (M.D. Fla. 2012)* found that although the balance of the debt was stated, the letter in that case did not include terms of payment or deadlines; therefore, the court did not find that the alleged communication was to collect a debt. In contrast to *Parker*, the Plaintiff here alleges that there was a deadline, **[*8]** which was "Due Now" (Doc. 1). This Court must resolve the alleged facts in a light most favorable to the non-moving party. Therefore, the Court finds that the Motion to Dismiss must be denied because the communications were alleged to be for the purposes of collecting a debt from the Plaintiff rather than for informational purposes.

The FCCPA defines "consumer debt" to include obligations incurred "primarily for personal, family, or household purposes. . . ." *Fla. Stat. 559.55(1)*. The Defendant argues that the Plaintiff's Complaint is devoid of any allegations that the mortgage debt qualifies as "consumer debt" under the FCCPA and therefore fails to meet the basic minimum pleading requirements for a proper FCCPA claim (Doc. 16). This Court disagrees. Accepting the Plaintiff's facts as true, the Complaint alleges that the Plaintiff intended to surrender the specified property as part of her bankruptcy. "*Fegadel* actually moved out of the house during the course of her bankruptcy" (Doc. 1 at ¶ 36). Here, the Plaintiff is alleging that this property is for a personal household use, which directly corresponds with the FCCPA's pleading standard. Thus, the Motion must be denied because the Plaintiff does not **[*9]** fail to meets the FCCPA's pleading requirements.

Finally, a party seeking to enforce an injunction cannot obtain a successive injunction ordering compliance with an existing injunction. *Alderwoods Group, Inc. v. Garcia, 682 F.3d 958 (11th Cir. 2012)*. Defendant argues the Complaint is an attempt to enforce the bankruptcy court's discharge injunction. However, the Plaintiff in this case is not seeking to enforce an injunction. As stated in the Complaint, the Plaintiff is seeking damages arising from the Defendant's alleged violations of the various sections of the FCCPA (Doc. 1). Thus, the Defendant's argument is moot and the Motion to Dismiss must be denied.

**V. Conclusion**

Accordingly, it is

**ORDERED** that Defendant's Motion to Dismiss (Doc. 16) is **DENIED**. The Defendants have **ten days** from this date to answer the complaint.

**DONE AND ORDERED** in Chambers at Tampa, Florida, this 22ND day of June, 2016.

/s/ Elizabeth A. Kovachevich

ELIZABETH A. KOVACHEVICH

UNITED STATES DISTRICT JUDGE

John Mickalovski1



**User Name:** John Mickalovski1

**Date and Time:** Tuesday, July 18, 2017 4:14:00 PM CDT

**Job Number:** 50662522

## Document (1)

1. *Fegadel v. Ocwen Loan Servicing, LLC, 2016 U.S. Dist. LEXIS 162311*

   **Client/Matter:** -None-

   **Search Terms:** Fegadel v. Ocwen Loan Servicing, LLC, 2016 U.S. Dist. LEXIS 81449

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |


## *Fegadel v. Ocwen Loan Servicing, LLC*

United States District Court for the Middle District of Florida, Tampa Division

November 23, 2016, Decided; November 23, 2016, Filed

8:15cv2228

**Reporter**

2016 U.S. Dist. LEXIS 162311 *

LYNN FEGADEL, Plaintiff, v. OCWEN LOAN SERVICING, LLC, Defendant.

**Prior History:** *Fegadel v. Ocwen Loan Servicing, LLC, 2016 U.S. Dist. LEXIS 81449 (M.D. Fla., June 22, 2016)*

## Core Terms

Interrogatory, discovery, requests, documents, individuals, collection, bankruptcy discharge, allegations, communications, responsive, collect a debt, procedures, consumer, billing, class certification, practices, contends, policies, overly broad, parties, argues, discovery request, class member, discharged, violations, defenses, training, policies and procedures, discharge order, objected

**Counsel: [*1]** For Lynn Fegadel, Plaintiff: Brian Lucas Shrader, Gus M. Centrone, LEAD ATTORNEYS, Centrone & Shrader, PLLC, Tampa, FL; Katherine Earle Yanes, LEAD ATTORNEY, Kynes, Markman & Felman, PA, Tampa, FL.

For Ocwen Loan Servicing, LLC, Defendant: Joseph E. Culleiton, LEAD ATTORNEY, PRO HAC VICE, Blank Rome, LLP, Pittsburgh, PA; Paul James Sodhi, LEAD ATTORNEY, Blank Rome, LLP, Ft. Lauderdale, FL.

**Judges:** JULIE S. SNEED, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** JULIE S. SNEED

## Opinion

### ORDER ON PLAINTIFF'S MOTION TO COMPEL DISCOVERY

THIS MATTER is before the Court on Plaintiff's Motion to Compel Discovery ("Motion"). (Dkt. 33.) Defendant opposes the Motion. (Dkt. 36.) For the reasons that follow, the Motion is granted in part and denied in part.

### BACKGROUND

In September 2015, Plaintiff filed a class action complaint against Defendant, alleging that Defendant violated the Florida Consumer Collections Practices Act ("FCCPA") and a bankruptcy court discharge order by continuing to attempt to collect a debt from Plaintiff despite having knowledge that the debt was discharged in Plaintiff's bankruptcy. (Dkt. 1.) Plaintiff brings the class action "on her own behalf and on behalf of all other similarly-situated consumers who received **[*2]** a discharge in bankruptcy within the United States Bankruptcy Court for the Middle District of Florida who have been subjected to Defendant's practices . . . within two (2) years of the date of Plaintiff's complaint, together with their successors in interest" ("Proposed Class"). (Dkt. 1 ¶ 13.)

In Count I, Plaintiff alleges that Defendant violated certain sections of the FCCPA by (1) willfully communicating with Plaintiff with such frequency or in other ways that can reasonably be expected to be harassing or abusive, (2) attempting to collect a debt from Plaintiff that Defendant knows is not legitimate or assert a legal right against Plaintiff that Defendant knows does not exist, and (3) communicating with Plaintiff when Defendant knew she was represented by an attorney. (Dkt. 1 ¶¶ 61-69.) In Count II, Plaintiff alleges that the discharge order entered by the bankruptcy court in Plaintiff's bankruptcy included a discharge of Plaintiff's *in personam* liability for Plaintiff's debt to Defendant and, despite Defendant's knowledge of this order, Defendant attempted to collect the discharged debt from Plaintiff. (Dkt. 1 ¶¶ 70-78.) In its answer, Defendant raised several affirmative

defenses, **[\*3]** including that its communications with Plaintiff were not attempts to collect a debt and that its "alleged conduct was the result of a bona fide error despite established procedures that it has in place to avoid such errors." (Dkt. 29.)

## APPLICABLE STANDARDS

Courts maintain great discretion to regulate discovery. *Patterson v. U.S. Postal Serv., 901 F.2d 927, 929 (11th Cir. 1990).* The court has broad discretion to compel or deny discovery. *Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1306 (11th Cir. 2011).* Through discovery, parties may obtain materials that are within the scope of discovery, meaning they are nonprivileged, relevant to any party's claim or defense, and "proportional to the needs of the case." *Fed. R. Civ. P. 26(b)(1).* Courts consider the following factors when evaluating whether requested discovery is proportional to the needs of the case: (1) "the importance of the issues at stake in the action," (2) "the amount in controversy," (3) "the parties' relative access to relevant information," (4) "the parties' resources," (5) "the importance of the discovery in resolving the issues," and (6) "whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

Regarding class actions, "*Rule 23* establishes the legal roadmap courts must follow when determining whether class certification is appropriate." *Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181, 1187 (11th Cir. 2003).* Pursuant **[\*4]** to *Rule 23(a)*, a class may be certified only if (1) the class is so numerous that joinder of all members would be impracticable; (2) there are questions of fact and law common to the class; (3) the claims or defenses of the representatives are typical of the claims and defenses of the unnamed members; and (4) the named representatives will be able to represent the interests of the class adequately and fairly. *Fed. R. Civ. P. 23(a).*

In cases in which a plaintiff seeks to bring claims on behalf of a class of claimants, "[t]o make early class determination practicable and to best serve the ends of fairness and efficiency, courts may allow classwide discovery on the certification issue." *Washington v. Brown & Williamson Tobacco Corp., 959 F.2d 1566, 1570-71 (11th Cir. 1992).* Permitting class certification discovery is within the broad discretion of the court. *Stewart v. Winter, 669 F.2d 328, 331 (5th Cir. 1982)* (internal quotations omitted) (explaining that "a certain amount of discovery is essential in order to determine the class action issue and the proper scope of a class

action").

## ANALYSIS

In this case, the deadline for class certification discovery was June 1, 2016, and the deadline for discovery on the merits is April 3, 2017. (Dkt. 21.) Plaintiff's motion for class certification is due by December 20, 2016. (Dkt. 31.) The discovery requests at issue in **[\*5]** the Motion are Plaintiff's requests related to Plaintiff's class certification and other allegations that Plaintiff served on Defendant in December 2015. (Dkt. 33-1.) Defendant served objections and responses to Plaintiff's discovery requests. (Dkts. 33-2, 33-3.) Thereafter, Defendant produced some responsive documents, but did not provide a privilege log identifying the documents it withheld on the assertion of a privilege. (Dkt. 33 ¶ 7; Dkt. 33-4.)

In the Motion, Plaintiff contends that the documents Defendant produced "relate to the Plaintiff individually and do not address any class claim issues" and, thus, Plaintiff contends that it has "no usable discovery from Defendant to support a motion for class certification." (Dkt. 33 ¶¶ 7-9.) Therefore, Plaintiff seeks an order compelling Defendant to provide responses to certain of its requests for production and interrogatories, specifically Requests for Production numbers 2, 3, 7, 8, 9, and 19, and Interrogatories 4 through 16 and 21. (Dkt. 33.)

In response, Defendant argues that the Motion "is premature" because the parties have and continue to confer in good faith attempts to resolve the discovery disputes raised in the Motion. (Dkt. **[\*6]** 36.) Specifically, Defendant states that it is "in the process" of producing documents responsive to Plaintiff's discovery requests, including Defendant's "policies and procedures" relevant to Plaintiff's allegations and a list of loans it services in the Middle District that "are identified within [Defendant's] systems as the loans that may have received post-Chapter 7 bankruptcy discharge communications," which is relevant to Plaintiff's class allegations. (Dkt. 36 at 2.) However, Defendant contends that its "records are not maintained in a way that the details of any and all post-discharge communications, if any were sent, could be reviewed and analyzed, short of performing a complete review of each Chapter 7 bankruptcy loan file." (Dkt. 36 at 2.) This discovery, Defendant argues, is based on the facts and circumstances of each debtor and, thus, "[s]uch individualized discovery is premature prior to a decision on class certification." (Dkt. 36 at 2.)

## A. Production Requests 2, 7, 8, and 9 and Interrogatories 4 through 9

Production Requests 2, 7, 8, and 9, and Interrogatories 4 through 9 seek discovery related to Defendant's policies, procedures, and training regarding the lawful collection [*7] of debt. (Dkt. 33-1.)

Specifically, Production Request 2 seeks "all documents" relating to Defendant's policies and procedures regarding (2) attempted collection of debts, (2) contact with people in attempts to collect debt, and (3) receipt and processing of incoming mail; Production Request 7 seeks "all documents" relating to Defendant's creation and maintenance of procedures regarding avoiding violations of the Fair Debt Collection Practices Act ("FDCPA"), the FCCPA, federal bankruptcy laws, and any state or federal law regulating consumer debt collection practices; Production Request 8 seeks "all documents" used by Defendant in its debt collection efforts, e.g., memoranda, manuals, instructions, and guides; and Production Request 9 seeks "all documents" used by Defendant to train employees regarding the FDCPA, the FCCPA, federal bankruptcy laws, and any state or federal law regulating consumer debt collection practices. (Dkt. 33-1.)

Similarly, Interrogatory 4 seeks a description of Defendant's procedures to avoid violations of the FDCPA, the FCCPA, federal bankruptcy laws, and any state or federal laws regulating consumer debt collection practices; Interrogatory 5 seeks a description [*8] of Defendant's policies and procedures for when a debtor files bankruptcy or obtains a bankruptcy discharge, including Defendant's policies of continuing to contact the debtor post-bankruptcy or discharge; Interrogatory 6 seeks a description of the training of persons involved in the collection of alleged debts, "all documents and audio or visual materials" used in such training, and a list of each person involved in such training; Interrogatory 7 seeks a description of any system(s) Defendant maintains to track communications with debtors in connection with the collection of consumers' accounts, including Defendant's policies for operating such a system; Interrogatory 8 requests Defendant to identify documents used to track Defendant's methods used in collecting debt and all internal codes, abbreviations, etc., used to memorialize communications with debtors as kept in Defendant's records; and Interrogatory 9 requests Defendant to identify individuals responsible for establishing a system that Defendant uses to identify debtors who have filed for bankruptcy and/or obtained a bankruptcy discharge. (Dkt. 33-1.)

These discovery requests are relevant to Plaintiff's allegations that Defendant [*9] violated the FCCPA and the bankruptcy discharge order by continuing to attempt to collect a debt from Plaintiff despite having knowledge of Plaintiff's bankruptcy discharge as well as Plaintiff's allegations that Defendant failed to implement effective policies to ensure compliance with the FCCPA and bankruptcy laws. (Dkt. 1 ¶¶ 57-78.) The requests are also relevant to Defendant's affirmative defense that Defendant's "alleged conduct was the result of a bona fide error despite established procedures that it has in place to avoid such errors" (Dkt. 29 at 14). *See Drossin v. Nat'l Action Fin. Servs., Inc., No. 07-61873-CIV, 2008 U.S. Dist. LEXIS 110635, 2008 WL 5381815, at *6 (S.D. Fla. Dec. 19, 2008)* (ordering, in a case alleging violations of the FDCPA and FCCPA, the production of "any written documentation of its policies and procedures to be used by employees of Defendant with respect to collecting debts"). Further, the policies, procedures, and training Defendant provides to its employees and agents are relevant to Plaintiff's allegations of Defendant's, through its employees and agents, "willful" or "knowing" violations of the FCCPA and the discharge order (Dkt. 1 ¶¶ 64-65, 73-76). *See Edeh v. Midland Credit Mgmt., Inc., 748 F. Supp. 2d 1030, 1044-45 (D. Minn. 2010)* (holding that "information about what [defendant's] procedures required it [*10] to do to avoid violating the TCPA is relevant to whether [defendant's] TCPA violation was knowing or reckless").

However, as Defendant argues, Production Requests 7, 8, and 9 and Interrogatories 4 and 6 are overly broad because, although they request documents relating to Defendant's procedures regarding avoiding violations of the FCCPA, they also request Defendant's procedures regarding the FDCPA and any federal or state consumer collection laws. (Dkt. 36 at 6.) Plaintiff's claims, however, are that Defendant violated the FCCPA and a bankruptcy court's discharge order. (Dkt. 1.) Plaintiff argues, however, that "entities like Defendant typically do not have a separate set of collection policies for compliance with each individual state law," but instead "have a general set of policies and typically refer to the FDCPA in a generic sense to refer to all their collection policies." (Dkt. 33 at 13.)

Accordingly, the Motion is granted as to Production Requests 2, 7, 8, and 9, and Interrogatories 4 through 9, except as limited in the three following ways. First, the Court limits Defendant's production in response to Production Requests 7, 8, and 9 and responses to Interrogatories 4 and 6 to [*11] discovery regarding Defendant's policies, procedures, and training materials

regarding the collection of debt in relation to its collection practices in the state of Florida, the FCCPA, and the federal bankruptcy laws. Second, the Court limits Defendant's response in response to Interrogatory 5 to a description of Defendant's policies and procedures for when a debtor obtains a discharge of debt. This is because, as Defendant contends (Dkt. 33-1), Plaintiff alleges that Defendant attempted to collect a debt after Plaintiff received a bankruptcy discharge, but does not bring suit based on Defendant's alleged attempts to collect a debt after Plaintiff filed bankruptcy. (Dkt. 1.) Thus, the request in Interrogatory 5 for Defendant's policies and procedures for when a debtor files for bankruptcy protection is irrelevant to Plaintiff's claims and, thus, outside the scope of discovery. Finally, the Court limits Defendant's production and responses to materials created and/or in effect within two years of the date Plaintiff filed the complaint, which was September 24, 2015, because that is the time scope of the Proposed Class. (Dkt. 1 ¶ 13.)

To the extent Defendant raised objections as to the [*12] confidential or proprietary nature of this discovery, Plaintiff states that the parties have entered into a confidentiality agreement governing the use of such discovery. (Dkt. 33 at 10.) Further, to the extent Defendant withholds any responsive materials on the basis of the attorney-client privilege or work production protection, Defendant shall serve a privilege log "describ[ing] the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." *Fed. R. Civ. P. 26(b)(5)(A)(ii)*; M.D. Discovery Handbook § VI.A.1.

**B. Interrogatories 10 through 13, 15, and 16**

Plaintiff argues that Interrogatories 10 through 13 are relevant and "crucial" to Plaintiff's determining the size of the Proposed Class and identifying class members. (Dkt. 33 at 21.) Interrogatory 10 requests that Defendant identify all individuals in the Middle District of Florida who Defendant "identifies as having filed bankruptcy naming Defendant or Defendant's principal as a creditor" within six years of Plaintiff's filing the complaint. (Dkt. 33-1.) Interrogatory 11 is identical to Interrogatory 10, except [*13] it adds that the individual received a bankruptcy discharge. Further, Interrogatory 13 is identical to Interrogatory 11, except that it adds that the individual "received any communication from Defendant after having obtained said bankruptcy discharge." (Dkt. 33-1.)

Defendant argues that Interrogatory 10 is overly broad and seeks irrelevant information because it is not limited to individuals who received a bankruptcy discharge (Dkt. 33-3; Dkt. 36 at 7) and objects to Interrogatory 11 as overly broad and unduly burdensome. The Court agrees with Defendant as to Interrogatories 10 and 11. Plaintiff's alleges that Defendant improperly continued to attempt to collect a debt from Plaintiff despite Defendant's knowledge that the debt was discharged in bankruptcy and the Proposed Class is comprised of "similarly-situated consumers who received a discharge in bankruptcy . . . who have been subjected to Defendant's practices." (Dkt. 1 ¶¶ 13, 72-76.) Unlike Interrogatories 10 and 11, Interrogatory 13 matches Plaintiff's allegations in the Complaint, in that it requests Defendant to identify individuals within the Middle District who filed bankruptcy, named Defendant as a creditor, obtained a [*14] bankruptcy discharge, and, thereafter, received communications from Defendant. (Dkt. 33-1.)

The Motion is therefore denied as to Interrogatories 10 and 11 as these overly broad requests serve little "importance . . . in resolving the issues" and the burden imposed on Defendant in responding to Interrogatories 10 and 11 outweighs any likely benefit of such discovery. *See Fed. R. Civ. P. 26(b)(1)*. The Motion is granted as to Interrogatory 13, but with the following limitations. First, the Court limits the time period for which Defendant must respond to Interrogatory 13 to the scope of the Proposed Class, which is within two years of Plaintiff's filing the complaint. (Dkt. 1 ¶ 13.) Second, due to potential privacy concerns in identifying individuals responsive to Interrogatory 13 at this early pre-certification stage in the litigation, Defendant shall redact the individuals' names (and any other personal information, such as contact information and personal banking information).

Interrogatory 12 requests Defendant to identify all individuals within the Middle District who filed for bankruptcy, named Defendant as a creditor, obtained a discharge, and were represented by an attorney. (Dkt. 33-1.) Interrogatory 12 [*15] is relevant to Count I of Plaintiff's complaint, in which Plaintiff alleges that Defendant violated *Section 559.72(18)* of the FCCPA by communicating with Plaintiff despite Defendant's knowledge that Plaintiff was "represented by an attorney with respect to such debt." *§ 559.72(18), Fla. Stat.* (2016). However, Interrogatory 12 is not limited to such individuals who received communications from Defendant despite Defendant's knowledge of them being represented by an attorney. Thus, like

Interrogatories 10 and 11, the Court finds that the burden imposed on Defendant in responding to Interrogatory 12 outweighs any likely benefit of such discovery, *See Fed. R. Civ. P. 26(b)(1)*, because the responses would include individuals who Defendant knew to be represented who did not receive communications from Defendant. Accordingly, the Motion is denied as to Interrogatory 12.

Interrogatory 15 requests that Defendant calculate the amount it collected from individuals after the individuals received a bankruptcy discharge in the Middle District. (Dkt. 33-1.) Defendant objected to Interrogatory 15 on the basis that it is overly broad because it does not address individuals who reaffirmed their debt in bankruptcy or continued to voluntarily repay their debt despite a discharge. [*16] (Dkt. 33-3.) Further, Defendant contends that responding to it would require an analysis that would be unduly burdensome. (Dkt. 33-3.)

The Court finds that Interrogatory 15 is relevant to Plaintiff's claims for actual damages in the complaint, specifically, Plaintiff's claim for actual damages for Defendant's alleged violations of the FCCPA, *§ 559.72, Fla. Stat.* (2016), and for Plaintiff's claim for "any and all damages" for Defendant's alleged violation of the discharge injunction. (Dkt. 1 ¶¶ 69, 78.) However, this request goes beyond discovery relevant to and necessary for class certification and instead goes to damages, which would be more appropriate post-class certification. *See Valley, 350 F.3d at 1188, n.15* (explaining that, at the class certification stage, the "trial court should not determine the merits of the plaintiffs' claim" other than "to the degree necessary to determine whether the requirements of *Rule 23* will be satisfied."). Thus, the Motion is denied as to Interrogatory 15.

Interrogatory 16 requests that Defendant identify the *number* of members Defendant contends is in the Proposed Class, which Plaintiff defines as "all individuals within the Middle District of Florida who received any communications, whether written or [*17] oral, including but not limited to billing statements, from Defendant attempting to collect a debt after such individual obtained a bankruptcy discharge." (Dkt. 33-1 ¶ J; Dkt. 1 ¶¶ 13-23.) Defendant answered that "there would be zero members of any Proposed Class," contending that the Proposed Class cannot be certified. (Dkt. 33-3.)

The request, in Interrogatory 16, for Defendant's "conten[tion]" about the number of members of the

Proposed Class is not improper because "[a]n interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact . . . ." *Fed. R. Civ. P. 33(a)(2)*. Further, Interrogatory 16 is similar to Interrogatory 13, which requests that Defendant *identifies* all individuals in the Proposed Class, meaning individuals in the Middle District of Florida that filed bankruptcy, identified Defendant as a creditor, obtained a discharged, and received any communication from Defendant after receiving the discharge. (Dkt. 33-1.) Thus, in Interrogatory 13, Plaintiff seeks the *list* of individuals who comprise the *number* sought in Interrogatory 16. The Court has compelled Defendant to answer Interrogatory 13, except that Defendant's answers shall be [*18] limited to the time scope of the Proposed Class and, Defendant shall redact the individuals' names (and other personal information, such as contact and banking information). Accordingly, the Motion is granted as to Interrogatory 16.

**C. Production Request 3 and Interrogatory 14**

In Production Request 3, Plaintiff requests "all documents, including but not limited to, all changes made over time to all versions of the statements attached to the Complaint as Exhibit B," which are billing statements from Defendant to Plaintiff sent after Plaintiff's bankruptcy discharge that state an amount due from Plaintiff to Defendant. (Dkts. 33-1, 4-2). In her complaint, Plaintiff alleges that these billing statements constitute attempts to collect a debt despite Defendant's knowledge that Plaintiff's debt to Defendant was discharged in Plaintiff's bankruptcy, that Plaintiff was represented by counsel with regard to the debt, and that the debt was illegitimate or that Defendant asserted a non-existent legal right. (Dkt. 1 ¶¶ 39-43, 54, 63-64, 74-76.) Further, Plaintiff alleges, in her class allegations, that the Proposed Class "received the same or substantially similar communications from Defendant." [*19] (Dkt. 1 ¶ 15.)

In the Motion, Plaintiff argues that the documents sought in Production Request 3 are relevant because the different versions of the billing statements "will demonstrate Defendant's prior compliance or non-compliance with the law" and could show that Defendant "has become more aggressive in its collection efforts regarding discharged debts." (Dkt. 33 at 12.) Defendant objected to Production Request 3 on the basis that it seeks discovery irrelevant to the claims or defenses in the case and protected from discovery by the attorney-client privilege and work product doctrine, but states that

it will produce non-privileged, responsive documents, if any such documents exist. (Dkt. 33-2.) Further, Defendant states that it has provided Plaintiff with Plaintiff's loan file for the period following Plaintiff's bankruptcy discharge. (Dkt. 36 at 8.)

The Court agrees with Defendant that Production Request 3 seeks discovery irrelevant to the parties' claims and defenses. *See Fed. R. Civ. P. 26(b)(1)*. Plaintiff claims that Defendant's sending Plaintiff billing statements (Dkt. 4-2) after her bankruptcy discharge violated the FCCPA and the discharge order. Production Request 3, however, requests all versions **[*20]** of the billing statements "over time," without regard as to whether those versions were actually sent to Plaintiff or a Proposed Class member. If never sent, there could be no violation of the FCCPA or the discharge order. Also, Plaintiff has not shown how discovery that could demonstrate Defendant's trends in collection, e.g. Defendant becoming "more aggressive," is relevant to any of its claims or Defendant's defenses. Finally, Defendant states that it has produced Plaintiff's loan file, which includes the billing statements sent to Plaintiff post-discharge. Accordingly, the Motion is denied as to Production Request 3.

Interrogatory 14 requests that Defendant identify "the beginning and end dates for the period during which Defendant sent out statements to consumers other than Plaintiff in substantially the same form" as the billing statements referred to as Exhibit B in Plaintiff's complaint. (Dkt. 33-1.) Defendant objected to Interrogatory 14 on the basis that it is overly broad and unduly burdensome because it is not limited in time by the relevant statute of limitations and is not limited to recipients of the billing statements that fall within the parameters of the Proposed Class. **[*21]** (Dkt. 33-3.) Plaintiff argues that this request seeks relevant information because it aids in "determin[ing] the scope of [Defendant's] culpability." (Dkt. 33 at 25.) Although the time period in which Defendant sent the allegedly violative billing statements to consumers may be relevant to Plaintiff's class allegations (although the time period would be limited to the two years preceding Plaintiff's filing the complaint, as that is the time scope of the Proposed Class), the Court finds that this discovery is not important to the resolution of the issues in this case and the burden imposed on Defendant will outweigh any benefit from such discovery. *See Fed. R. Civ. P. 26(b)(1)*. Accordingly, the Motion is denied as to Interrogatory 14.

**D. Production Request 19 and Interrogatory 21**

Interrogatory 21 requests that Defendant identify any litigation or complaints made by a debtor, or on a debtor's behalf, relating to Defendant's collection of a debt after a debtor's bankruptcy discharge. (Dkt. 33-1.) Production Request 19 requests Defendant to produce "all documents" on the same subject as Interrogatory 21, i.e., all documents related to litigation or complaints made by debtors, or on a debtor's behalf, relating to Defendant's **[*22]** collection of a debt after a debtor's bankruptcy discharge. (Dkt. 33-1.) In response to Interrogatory 21, Defendant objected on the basis that it sought discovery irrelevant to the claims and defenses in the case and that it was overly broad as it is "not limited in time or scope." (Dkt. 33-3.) Similarly, Defendant objected to Production Request 19 on the grounds that the request seeks irrelevant discovery and discovery protected by the attorney-client privilege. (Dkt. 33-2.) Also, Defendant states that it has already answered these discovery requests in its Notice of Pendency of Other Actions. (Dkts. 32, 36 at 9.) However, Defendant's Notice of Pendency of Other Actions includes only cases pending before a court or administrative agency, *See M.D. Fla. Local R. 1.04(d)*, and thus would not include other types of complaints from debtors, such as situations in which the debtor did not file a complaint or petition with a governmental body or cases that are no longer pending before a court or administrative agency.

Plaintiff contends that the discovery sought by these requests are relevant to (1) establishing Defendant's knowledge about complaints stemming from its attempts to collect a discharged debt, **[*23]** (2) determining the size of Plaintiff's Proposed Class, and (3) determining whether members of the Proposed Class have already "taken formal action against Defendant" for Defendant's alleged conduct. (Dkt. 33 at 16.) The Court finds that these discovery requests seek discovery relevant to identifying members of the Proposed Class. The Court, however, rejects Plaintiff's argument that the requests seek discovery relevant to establishing Defendant's knowledge (Dkt. 33 at 16), because the Defendant's knowledge that is relevant to Plaintiff's allegations is Defendant's knowledge—*prior* to attempting to collect a debt—of (1) the discharge of such debt in bankruptcy, (2) the illegitimacy of such debt or the non-existence of the legal right asserted, and (3) Plaintiff and Proposed Class members being represented by an attorney. (Dkt. 1 ¶¶ 37-39, 56, 64, 72-76.) Thus, Defendant's knowledge of a debtor's complaints about the alleged conduct *after* it occurred is not relevant to Plaintiff's claims.

Although relevant to class allegations, Production Request 19 is overly broad in two respects. First, it is unlimited in its time scope. Second, as Defendant contends (Dkt. 36 at 9), its request for **[\*24]** "all documents" is not tailored to determining class members. Instead, the request seeks "all documents," which could include, without limitation, communications with debtors or debtors' counsel and Defendant's internal documents regarding complaints received from debtors, which would identify class members, but would include a broad swath of information irrelevant to Plaintiff's claims that Defendant attempted to collect a debt from Proposed Class members in violation of the FCCPA and bankruptcy discharge orders. Interrogatory 21, on the other hand, will provide Plaintiff with Defendant's identification of potential class members. It must, however, be limited to the time scope of the Proposed Class, which is within two years of Plaintiff's filing the complaint. For these reasons, the Motion is denied as to Production Request 19 and granted as to Interrogatory 21.

Accordingly it is

**ORDERED**:

1. The Motion to Compel Discovery (Dkt. 33) is **GRANTED** in part as to Production Requests 2, 7, 8, and 9, and Interrogatories 4, 5, 6, 7, 8, 9, 13, 16, and 21, and **DENIED** in part as to Production Requests 3 and 19, and Interrogatories 10, 11, 12, 14, and 15.

2. Within ten (10) days of entry of this order, **[\*25]** Defendant is directed to serve discovery responsive to Production Requests 2, 7, 8, and 9, and Interrogatories 4, 5, 6, 7, 8, 9, 13, 16, and 21, and, to the extent applicable, Defendant shall serve a privilege log identifying any discovery it withholds on the basis of a privilege.

**DONE** and **ORDERED** in Tampa, Florida on November 23, 2016.

/s/ Julie S. Sneed

JULIE S. SNEED

UNITED STATES MAGISTRATE JUDGE

---

John Mickalovski1



**User Name:** John Mickalovski1

**Date and Time:** Tuesday, July 18, 2017 10:26:00 AM CDT

**Job Number:** 50625377

## Document (1)

1.  *Garfield v. Ocwen Loan Servicing, LLC, 811 F.3d 86*

    **Client/Matter:** -None-

    **Search Terms:** "Ocwen" and "discharge" and "violation" and "Chapter 13"

    **Search Type:** Terms and Connectors

    **Narrowed by:**

    | Content Type | Narrowed by |
    |---|---|
    | Cases | Timeline: Dec 01, 2011 to Dec 31, 2017 |

 Positive

As of: July 18, 2017 3:26 PM Z

# *Garfield v. Ocwen Loan Servicing, LLC*

United States Court of Appeals for the Second Circuit

October 20, 2015, Argued; January 4, 2016, Decided

Docket No. 15-527

**Reporter**

811 F.3d 86 *; 2016 U.S. App. LEXIS 3 **; 61 Bankr. Ct. Dec. 260

DONNA GARFIELD, Plaintiff-Appellant, v. ***OCWEN*** LOAN SERVICING, LLC, Defendant-Appellee.

**Prior History: [**1]** Appeal from the January 26, 2015, judgment of the United States District Court for the Western District of New York (Elizabeth A. Wolford, District Judge), dismissing claims brought under the Fair Debt Collection Practices Act for seeking to collect a debt discharged in bankruptcy, and requiring the plaintiff to seek relief in the bankruptcy court.

*Garfield v. **Ocwen** Loan Servicing, LLC, 526 B.R. 471, 2015 U.S. Dist. LEXIS 8503 (W.D.N.Y., 2015)*

**Disposition:** Judgment reversed and case remanded with instructions to reinstate the FDCPA claims.

## Core Terms

injunction, provisions, discharged, district court, repeal, violates, bankruptcy court, bankruptcy proceeding, warning, notice, mortgage loan, collection, invoked, monthly payment, debt collector, implied repeal, provides, statutes, alleges, mini, irreconcilable, post-***discharge***, automatic, Services, consumer, mortgage, pendency, remedies

## Case Summary

### Overview

ISSUE: Whether a debtor who received a claim on a debt that was discharged in a bankruptcy proceeding was able to sue the claimant in a district court under the Fair Debt Collection Practices Act (FDCPA) or had to seek relief in the bankruptcy court. HOLDINGS: [1]-The

Bankruptcy Code did not broadly repeal the FDCPA for purposes of FDCPA claims based on alleged conduct that violated the ***discharge*** injunction under *11 U.S.C.S. § 524*. No irreconcilable conflict existed between the post-***discharge*** remedies of the Bankruptcy Code and the FDCPA; [2]-None of the debtor's individual FDCPA claims conflicted with the ***discharge*** injunction under the Bankruptcy Code; [3]-The debtor was entitled to pursue her FDCPA claims in a district court.

### Outcome

Judgment reversed, and case remanded with instructions to reinstate claims.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Evidence > Inferences & Presumptions > Presumptions > Creation

Evidence > ... > Presumptions > Particular Presumptions > Regularity

***HN1***[⬇] **Motions to Dismiss, Failure to State Claim**
Facts alleged in a complaint are assumed to be true on an appeal from dismissal for failure to state a claim on which relief can be granted.

Bankruptcy Law > ... > ***Discharge*** & Dischargeability > Effect of ***Discharge*** > Effect on Third Parties

Bankruptcy Law > ... > ***Discharge*** &

Dischargeability > Effect of **_Discharge_** > Protection of Debtors

**HN2**[⬇] **Effect of Discharge, Effect on Third Parties**
The Bankruptcy Code's **_discharge_** provision, _11 U.S.C.S. § 524_, provides that a **_discharge_** in bankruptcy operates as an injunction against the commencement or continuation of an action, the employment of process, or an act to collect, recover, or offset any such debt as a personal liability of the debtor, whether or not discharged such debt is waived. _11 U.S.C.S. § 524(a)(2)_.

Bankruptcy Law > ... > **_Discharge_** & Dischargeability > Effect of **_Discharge_** > Effect on Third Parties

Governments > Legislation > Expiration, Repeal & Suspension

**HN3**[⬇] **Effect of Discharge, Effect on Third Parties**
When it is claimed that a later enacted statute creates an irreconcilable conflict with an earlier statute, the question is whether the later statute, by implication, has repealed all or, more typically, part of the earlier statute. Repeal by implication is disfavored. In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable. When the later statute is the Bankruptcy Code, a distinction must be made between claims brought under the earlier statute during the pendency of a bankruptcy proceeding and those brought after a **_discharge_**.

Banking Law > Consumer Protection > Fair Debt Collection > Liability for Violations

Bankruptcy Law > Case Administration > Commencement of Case

**HN4**[⬇] **Fair Debt Collection, Liability for Violations**
The federal Fair Debt Collection Practices Act does not authorize suit during the pendency of bankruptcy proceedings.

Banking Law > Consumer Protection > Fair Debt Collection > Liability for Violations

Bankruptcy Law > ... > **_Discharge_** &

Dischargeability > Effect of **_Discharge_** > Effect on Third Parties

Governments > Legislation > Expiration, Repeal & Suspension

Bankruptcy Law > ... > **_Discharge_** & Dischargeability > Effect of **_Discharge_** > Protection of Debtors

**HN5**[⬇] **Fair Debt Collection, Liability for Violations**
The Bankruptcy Code does not broadly repeal the federal Fair Debt Collection Practices Act (FDCPA) for purposes of FDCPA claims based on conduct that violates the **_discharge_** injunction. No irreconcilable conflict exists between the post-**_discharge_** remedies of the Bankruptcy Code and the FDCPA. There is no reason to assume that Congress did not expect these two statutory schemes to coexist in the post-**_discharge_** context.

Banking Law > Consumer Protection > Fair Debt Collection > Communications With Debtors

**HN6**[⬇] **Fair Debt Collection, Communications With Debtors**
See _15 U.S.C.S. § 1692e(11)_.

Banking Law > Consumer Protection > Fair Debt Collection > Communications With Debtors

**HN7**[⬇] **Fair Debt Collection, Communications With Debtors**
_15 U.S.C.S. § 1692g(a)(3)_ requires notice of an opportunity to dispute a debt.

Banking Law > Consumer Protection > Fair Debt Collection > Communications With Debtors

**HN8**[⬇] **Fair Debt Collection, Communications With Debtors**
See _15 U.S.C.S. § 1692g(a)(3)_.

Banking Law > Consumer Protection > Fair Debt Collection > Communications With Debtors

**HN9**[⬇] **Fair Debt Collection, Communications With**

**Debtors**

[15 U.S.C.S. § 1692e](#) prohibits use of any false, deceptive, or misleading representation or means in connection with the collection of any debt.

**Counsel:** Kenneth R. Hiller, Law Offices of Kenneth Hiller, PLLC, Amherst, NY, for Appellant.

Gary Neal Smith, Houser & Alison, APC, Newark, NJ, for Appellee.

(Daniel L. Geyser, Stris & Maher LLP, Los Angeles, CA, for amicus curiae National Association of Consumer Bankruptcy Attorneys, in support of Appellant.).

**Judges:** Before: NEWMAN, WINTER, and CABRANES, Circuit Judges.

**Opinion by:** JON O. NEWMAN

# Opinion

[*88] JON O. NEWMAN, Circuit Judge.

The principal issue on this appeal is whether a debtor who has received a claim on a debt that has been discharged in a bankruptcy proceeding can sue the claimant in a district court under the Fair Debt Collection Practices Act ("FDCPA") or must seek relief in the bankruptcy court. The issue arises on an appeal by Plaintiff-Appellant Donna Garfield from the January 26, [**2] 2015, judgment of the United States District Court for the Western District of New York (Elizabeth A. Wolford, District Judge), in favor of Defendant-Appellee **Ocwen** Loan Servicing, LLC ("**Ocwen**"). The judgment dismissed Garfield's complaint alleging various causes of action under the FDCPA.

We conclude that Garfield may pursue her FDCPA claims in a district court and therefore reverse and remand.

Background

[HN1](#)] The complaint alleges the following facts, which are assumed to be true on this appeal from dismissal for failure to state a claim on which relief can be granted. *See [Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)](#)*. Garfield obtained a mortgage from **Ocwen**'s predecessor-in-interest, Litton Loan Servicing L.P. and became personally obligated on a mortgage loan. Garfield failed to make payments on the mortgage loan and filed for **Chapter 13** Bankruptcy in the United States Bankruptcy

Court for the Western District of New York. During the bankruptcy proceedings, **Ocwen** acquired Garfield's mortgage loan.

Under her bankruptcy plan, Garfield paid the arrears on her mortgage loan through monthly payments made during the bankruptcy proceeding. Critical to the pending appeal, in August 2013 she obtained a **discharge** of her entire personal obligation [**2] for the mortgage loan.[1] However, Garfield agreed to pay $938 per month to prevent foreclosure of the mortgaged property.[2]

Garfield concedes that she made only one monthly payment after her bankruptcy **discharge** and that by March 2014 the arrears [**4] on her monthly obligation totaled $6,672.34. In February 2014 **Ocwen** contacted Garfield and demanded that she pay $21,825.15 or face foreclosure on her home. **Ocwen** sent a delinquency notice in April 2014 for $22,684.36. These amounts reflected both Garfield's conceded arrears for post-bankruptcy monthly payments [*89] and the mortgage loan arrears that had been discharged. **Ocwen** also reported to Equifax that Garfield owed the discharged amount.

In July 2014, Garfield filed her FDCPA complaint against **Ocwen** in the United States District Court for the Western District of New York. She alleged that **Ocwen**'s attempt to collect the arrears on her mortgage loan, which had been discharged,[3] violated several provisions

---

[1] Garfield's claim that her personal obligation on the mortgage debt was discharged is inferable from her complaint, but not precisely stated. The complaint alleges that Garfield's "bankruptcy was discharged," ¶ 14, and that **Ocwen** reported to Equifax that she "still owed the amount which was included in her **Chapter 13** bankruptcy," ¶ 19. Her brief in this Court explicitly alleges that her debt "had been discharged in her prior bankruptcy case," Br. for Appellant 1, and that "the Bankruptcy Court entered an order discharging Plaintiff's indebtedness on all of the debts listed on her bankruptcy petition, including her debt to **Ocwen**," *id.* 3-4 (citing Complaint ¶ 14).

[2] **Ocwen** contends that it is only the "servicer" of Garfield's mortgage, "not the owner of the security instrument," and "is not a secured creditor enforcing a valid security interest." Br. for Appellee 27 n.8. **Ocwen** does not dispute that Garfield's failure to make required payments risks foreclosure.

[3] [HN2](#)] The Bankruptcy Code's **discharge** provision, [11 U.S.C. § 524](#), provides in relevant part that a **discharge** in bankruptcy "operates as an injunction against the

of the FDCPA: 15 U.S.C. § 1692e, 15 U.S.C. § 1692e(2), 15 U.S.C. § 1692e(5), 15 U.S.C. § 1692e(8), 15 U.S.C. § 1692e(10), 15 U.S.C. § 1692e(11), 15 U.S.C. § 1692f, 15 U.S.C. § 1692f(1), and 15 U.S.C. § 1692g(a)(3).

Garfield also alleged that **Ocwen** violated the FDCPA in the manner it attempted to collect the [**5] post-bankruptcy monthly mortgage payments that she concedes she owes. Specifically, she alleges (1) that **Ocwen** violated subsection 1692e(11), which requires a so-called "mini-*Miranda* warning," during conversations with a debtor, and (2) that **Ocwen** failed to send within five days of its initial communications a 30-day notice of a debtor's right to dispute a debt, as required by subsection 1692g(a)(3).

The District Court dismissed Garfield's complaint. The Court held that the Bankruptcy Code provides the exclusive remedy for Garfield's claim that **Ocwen** attempted to collect an allegedly discharged debt.[4] The Court also stated that, even if the Code does not broadly preclude all FDCPA claims for conduct that violates the **discharge** injunction, Garfield's particular FDCPA claims conflict with the Code's remedies and were therefore precluded.

Discussion

I. Implied Repeal of All FDCPA Provisions Invoked for Claims After **Discharge**

The District Court held that the Bankruptcy Code precludes all claims under the FDCPA for conduct that [**6] violates a **discharge** injunction. Acknowledging Garfield's argument that the Supreme Court "should only rarely infer statutory repeal," the District Court ruled that "many of Plaintiff's allegations directly conflict with the Bankruptcy Code's **discharge** injunction provisions."

HN3[↑] When it is claimed that a later enacted statute creates an irreconcilable conflict with an earlier statute, the question is whether the later statute, by implication, has repealed all or, more typically, part of the earlier

statute. See National Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 662-63, 127 S. Ct. 2518, 168 L. Ed. 2d 467 (2007). Repeal by implication is disfavored. "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." Morton v. Mancari, 417 U.S. 535, 550, 94 S. Ct. 2474, 41 L. Ed. 2d 290 (1974).

[*90] Where, as in this case, the later statute is the Bankruptcy Code,[5] a distinction must be made between claims brought under the earlier statute *during* the pendency of a bankruptcy proceeding and those brought *after* a **discharge**. Four circuits have considered FDCPA claims brought during the pendency of a bankruptcy proceeding.

Our Court has ruled that HN4[↑] the FDCPA does not authorize suit during the pendency of bankruptcy proceedings. See Simmons v. Roundup Funding, LLC, 622 F.3d 93, 96 (2d Cir. 2010). This ruling appears to construe FDCPA provisions to be inapplicable when invoked for claims made during bankruptcy, rather than determine that such provisions have been impliedly repealed by the provision of the Bankruptcy Code authorizing a **discharge** injunction. See id. at 94. Our Court's opinion does not include the word "repeal."

In *Simmons*, the debtors, while engaged in a bankruptcy proceeding, objected to the amount of a creditor's proof of claim, which the bankruptcy court reduced. The debtors then brought a putative class action, contending that the creditor's filing of an inflated proof of claim violated the FDCPA. See id. The creditor moved to dismiss, arguing that the Bankruptcy Code exclusively provides whatever remedies exist for filing an inflated proof of claim. See id.

Affirming dismissal of the complaint, we said, "The FDCPA is designed to protect defenseless debtors" and "[t]here is no need to protect debtors [**8] who are already *under the protection of the bankruptcy court.*" Id. at 96 (emphasis added). Noting that some courts had

---

[4] Specifically, it held that the appropriate means to redress conduct that violates the **discharge** injunction is a motion for contempt filed in the bankruptcy court under **11 U.S.C. § 105(a)**.

commencement or continuation of an action, the employment of process, or an act[] to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharged of such debt is waived." Id. § 524(a)(2).

---

[5] The subsections of the FDCPA under which Garfield makes claims, with one exception discussed below, see note 11, *infra*, were enacted [**7] on September 20, 1977, and came into effect on March 20, 1978. See Pub. L. No. 95-109, §§ 807, 808, 809, 91 Stat. 874, 877, 879 (1977). The current version of the **discharge** injunction, 11 U.S.C. § 524(a), was enacted on November 6, 1978. See Pub. L. No. 95-598, 92 Stat. 2549, 2592 (1978).

broadly rejected all FDCPA claims (even claims filed after *__discharge__*) predicated on acts alleged to have violated the Bankruptcy Code, we observed that "[t]his broader rule has not been universally accepted, and we are not compelled to consider it in this case." *Id. at 96-97 n.2* (citation omitted).[6]

The Ninth Circuit has ruled that the Bankruptcy Code precludes FDCPA claims brought during the pendency of bankruptcy proceedings. *See Walls v. Wells Fargo Bank, N.A., 276 F.3d 502, 511 (9th Cir. 2002)*. This Court, like the District Court in [**9] the pending appeal, appears to have said "precludes" FDCPA claims to reflect that the FDCPA provisions invoked for such claims have been repealed by implication with respect to conduct that violates the *__discharge__* injunction.

Two circuits have ruled to the contrary. In *Randolph v. IMBS, Inc., 368 F.3d 726, 728 (7th Cir. 2004)*, the debtors brought FDCPA claims against creditors for seeking to collect debts in *__violation__* of the automatic stay. The creditors asserted that the Bankruptcy Code's remedies for violations of the automatic stay, *see 11 U.S.C. § 362(h)* [*91] (now *§ 362(k)*), precluded relief under the FDCPA.

The Seventh Circuit acknowledged that there were some "operational differences between the statutes," but stated that these differences constituted "overlap" between the statutes rather than "irreconcilable conflict," *id. at 730*, and that "[o]verlapping statutes do not repeal one another by implication," *Id. at 731*. "The Bankruptcy Code of 1986 does not work an implied repeal of the FDCPA, any more than the latter Act implicitly repeals itself." *Id. at 732*.

Judge Easterbrook helpfully assembled a chart comparing the statutes' differing treatment of conduct that violates both the automatic stay and the FDCPA:

---

[6] In a non-precedential decision, *Yaghobi v. Robinson, 145 F. App'x 697 (2d Cir. 2005)*, we affirmed the dismissal of claims, alleging violations of a *__discharge__* injunction, brought in a district court under the Bankruptcy Code's contempt provision, **11 U.S.C. § 105(a)**, the Code's *__discharge__* provision, id. *§ 524*, the FDCPA, and state law provisions. After affirming dismissal of claims brought under the Bankruptcy Code's provisions, we also affirmed the dismissal of "plaintiff's parallel federal and state unfair debt collection practice claims," adding, "We need not here decide whether debtors in bankruptcy can ever maintain such claims based on violations of the Bankruptcy Code," noting the circuit split discussed above. *See id. at 698*.

Go to table1

*Id.*

The Seventh Circuit concluded, "It is easy to enforce both statutes, and any debt collector can comply with both simultaneously." *Id.*

The Third Circuit has also ruled against implied repeal of FDCPA provisions invoked for claims brought during the pendency of bankruptcy proceedings, *see Simon v. FIA Card Services, N.A., 732 F.3d 259, 274 (3d Cir. 2013)*, concluding that the Bankruptcy Code effected "no broad preclusion" of FDCPA claims, *id. at 278*.

The pending appeal concerns FDCPA claims brought *after __discharge__*, the context we explicitly distinguished in *Simmons*. Now facing the issue of implied repeal of FDCPA provisions invoked for claims in the post-*__discharge__* context, we conclude that **HN5**[⬆] the Bankruptcy Code does not broadly repeal the FDCPA for purposes of FDCPA claims based [**11] on conduct that injunction. No irreconcilable conflict exists between the post-*__discharge__* remedies of the Bankruptcy Code and the FDCPA. There is no reason to assume that Congress did not expect these two statutory schemes to coexist in the post-*__discharge__* context. The Seventh Circuit's analysis of FDCPA and Bankruptcy Code provisions, although leading that Court to a result that differs from our *Simmons* decision in the pre-*__discharge__* context, argues against preclusion of FDCPA claims after *__discharge__*. At that point the former debtor no longer has the "protection of the bankruptcy court," *Simmons, 622 F.3d at 96*, which we deemed decisive on the preclusion issue prior to *__discharge__*. Indeed, the Bankruptcy Code provision concerning the *__discharge__* injunction, *see 11 U.S.C. § 524(a)(2)*, does not explicitly create a cause of action for its [*92] *__violation__*, whereas the automatic stay provision provides such a remedy, *see id. § 362(k)*.[7]

II. Implied Repeal of Specific FDCPA Provisions Invoked for [**12] Claims After *__Discharge__*

Even though the Bankruptcy Code does not impliedly repeal all FDCPA provisions to remedy conduct that

---

[7] In noting this distinction, we do not decide whether the *__discharge__* injunction provision should be construed implicitly to create a cause of action for its *__violation__*, in addition to a contempt remedy. *See 11 U.S.C. § 105(a)*; *Bessette v. Avco Financial Services, Inc., 230 F.3d 439, 445 (1st Cir. 2000)* (*__discharge__* injunction enforceable by contempt proceeding).

violates the *discharge* injunction, it might impliedly repeal some specific provisions invoked to remedy such conduct. *Ocwen* focuses first on Garfield's claim that *Ocwen*'s failure to provide a so-called "mini-*Miranda*" warning in its initial communication violated *subsection 1692e(11)* of the FDCPA.[8] This claim, *Ocwen* contends, irreconcilably conflicts with the Bankruptcy Code's post-*discharge* remedies.

In *Simon*, the Third Circuit held that the FDCPA could not require the creditor to include a mini-*Miranda* warning with its examination [**13] notice and subpoenas because a communication that included such a warning, sent prior to a *discharge*, would constitute a collection attempt forbidden by the automatic stay. *See 732 F.3d at 279-80*. Sending the notice and subpoenas prior to a *discharge* did not violate the Bankruptcy Code. *See id.* The Third Circuit ruled that *subsection 1692e(11)* conflicted with the Bankruptcy Code because including the warning would violate the Code and omitting it would violate the FDCPA. *See id. at 280*.

This holding in *Simon*, however, whether or not we would agree with it, has no application to Garfield's *subsection 1692e(11)* claim. *Ocwen*'s communication, even without a mini-*Miranda* warning, was an attempt to collect a discharged debt in *violation* of the Bankruptcy Code. The absence of a mini-*Miranda* warning also violated the FDCPA. There is no conflict.

Two of Garfield's FDCPA claims allege that *Ocwen* violated *subsections 1692e(11)* and *1692g(a)(3)* in the manner that *Ocwen* sought to collect Garfield's delinquent post-bankruptcy monthly payments, which she agreed to make to avoid foreclosure. *HN7*[⬆] *Subsection 1692g(a)(3)* requires notice of an opportunity to dispute a debt.[9] Both of these

subsections regulate *Ocwen*'s collection of debt that [**14] Garfield concedes she owes.

Garfield alleges that *Ocwen* sent her a bill on March 17, 2014, for her monthly payment as well as her arrears for post-*discharge* [*93] monthly payments missed from July 2013 to February 2014. She claims that *Ocwen* violated the mini-*Miranda* warning requirement of *subsection 1692e(11)* "during conversations with [her]," and that it violated *subsection 1692g(a)(3)* by failing to send a 30-day right-to-dispute notice within five days of the initial communication. These alleged violations do not conflict with any provisions of the Bankruptcy Code.[10]

*Ocwen* challenges several of Garfield's other FDCPA claims on a somewhat perverse ground. These are Garfield's claims under *subsections 1692e*, *1692e(2)*, *1692e(5)*, *1692e(8)*, *1692e(10)*, *1692f*, and *1692f(1)*, all of which regulate collection of a debt. *HN9*[⬆] *Subsection 1692e*, for example, prohibits use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." *Ocwen* contends that these provisions conflict with the Bankruptcy Code because, by regulating how to collect a debt, they imply that it can collect the discharged debt, an action that the *discharge* injunction prohibits. But, as Garfield responds, *Ocwen* can avoid violating both the cited provisions and the Bankruptcy Code simply by not attempting to collect the discharged debt. And once *Ocwen* tries to collect the discharged debt, it risks *violation* of both the cited provisions and the Bankruptcy Code. Either way, there is no conflict.

In sum, none of Garfield's individual [**16] FDCPA

---

[8] *Subsection 1692e(11)* prohibits

*HN6*[⬆] ] "[t]he failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action."

[9] *Subsection 1692g(a)(3)* provides:

*HN8*[⬆] ] "Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall . . . send the consumer a written notice containing . . . a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector . . . ."

[10] Had there been a conflict, the analysis with respect to *subsection 1692e(11)* would differ from that applicable to the FDCPA as a whole because this subsection was substantially reworded in a 1996 [**15] amendment, *see Pub. L. 104-208 § 2305, 110 Stat. 3009 (Sept. 30, 1996)*, and therefore is a later statute compared to the injunction provision of the Bankruptcy Code. In the absence of a conflict, the sequence of these provisions need not be considered on the issue of implied repeal.

claims conflicts with the *__discharge__* injunction under the Bankruptcy Code.

III. Piecemeal Litigation

The District Court ruled that, even if some of Garfield's claims do not pose a conflict with the *__discharge__* injunction, the Court should dismiss them and require Garfield to bring them in the Bankruptcy Court. The District Court relied on the "clear federal policy . . . [of] avoidance of piecemeal adjudication," Joint App'x at 39 (alteration in original), citing *Colorado River Water Conservation District v. United States, 424 U.S. 800, 819, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)*. That decision created a limited abstention doctrine in the context of ongoing, parallel state proceedings, which do not exist here. *See id. at 817-18*.

We do not rule out the unlikely possibility that in adjudicating a debtor's FDCPA claims, a district court might consider it useful to stay its proceedings to permit the plaintiff to seek clarification from a bankruptcy court as to the proper interpretation of some aspect of that court's rulings, including the *__discharge__* injunction. But the remote possibility of a need for such clarification provides no basis for routing all FDCPA claims exclusively into the bankruptcy court.

Conclusion

The judgment of the District Court is reversed, and the case is remanded with instruction to reinstate Garfield's FDCPA claims **[**17]** against *__Ocwen__*.

**Table1 (*Return to related document text*)**

| Who | Bankruptcy | FDCPA |
|---|---|---|
|  | Anyone | Debt collector only |
| Scienter | Willfulness | Strict liability (§ |
|  |  | *1692e(2)(A)* |
| Defense | None [**10] | Bona fide error plus due |
|  |  | care (*§ 1692k(c)*), or |
|  |  | reliance on FTC opinion |
|  |  | (*§ 1692k(e)*) |
| Statutory Damages | None | $1,000 maximum |
|  |  | (*§ 1692k(a)(2)(A)* |
| Compensatory Damages | Yes |  |
|  |  | Yes (*§ 1692k(a)(1)*) |
| Punitive Damages | Yes | No |
| Cap on Class Recovery | No |  |
|  |  | Yes (*§ 1692k(a)(2)(B)(ii)*) |
| Maximum recovery | No | Yes, $500,000 or 1% of net |
|  |  | worth, whichever is less |
|  |  | (*§ 1692k(a)(2)(B)(ii)*) |
| Attorneys' fees to debtor | No |  |
|  |  | Yes (*§ 1692k(a)(3)*) |
| Attorneys' fees to creditor | No |  |
|  |  | Yes (*§ 1692k(a)(3)*) |
| Statute of limitations | None (laches | One year (*§ 1692k(d)*) |
|  | defense only) |  |

**Table1 (*Return to related document text*)**



**User Name:** John Mickalovski1

**Date and Time:** Tuesday, July 18, 2017 11:29:00 AM CDT

**Job Number:** 50632013

## Document (1)

1. *Freeman v. Ocwen Loan Servicing, Inc., 2016 U.S. Dist. LEXIS 82751*

   **Client/Matter:** -None-

   **Search Terms:** "Ocwen" w/25 "discharge" w/10 "violation"

   **Search Type:** Terms and Connectors

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |


# *Freeman v. Ocwen Loan Servicing, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

June 27, 2016, Decided; June 27, 2016, Filed

Case No. 15 C 11888

**Reporter**
2016 U.S. Dist. LEXIS 82751 *; 2016 WL 3476681

SANDRA FREEMAN, Plaintiff, v. OCWEN LOAN SERVICING, INC., Defendant.

## Core Terms

Mortgage, motion to dismiss, collection, allegations, bankruptcy code, communications, discharged, Servicing, contends, bankruptcy discharge, deceptive, injunction, unfair, default, letters, debt collector, envelopes, notice, rights, phone, preempted, argues, merger, security interest, hand-delivered, practices, written communication, bankruptcy case, telephone call, parties

**Counsel:** [*1] For Sandra Freeman, Plaintiff: Mohammed Omar Badwan, LEAD ATTORNEY, Ahmad Tayseer Sulaiman, Daniel John McGarry, Sulaiman Law Group, Ltd., Oak Brook, IL.

For Ocwen Loan Servicing, LLC., Defendant: David F Standa, Douglas R Sargent, Irina Dashevsky, LEAD ATTORNEYS, Locke Lord LLP, Chicago, IL.

**Judges:** Joan B. Gottschall, United States District Judge.

**Opinion by:** Joan B. Gottschall

## Opinion

### MEMORANDUM OPINION AND ORDER

After plaintiff Sandra Freeman obtained a bankruptcy discharge of her personal debt, including the mortgage loan on her home, she continued to live in her home. According to Freeman, defendant Ocwen Loan Servicing obtained servicing rights on the discharged mortgage loan and then repeatedly called Freeman on her cell phone and sent her a series of documents that it characterizes as statements and Freeman characterizes as bills. Freeman contends that Ocwen's calls and written communications are illegal efforts to collect a discharged debt that violate the Telephone Consumer Protection Act ("TCPA") (Count I), *47 U.S.C. § 227*, the Fair Debt Collection Practices Act ("FDCPA") (Count II), *15 U.S.C. § 1692*, and the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), *815 Ill. Comp. Stat. § 505/1, et seq.* In contrast, Ocwen denies that it attempted to collect on the discharged [*2] debt and asserts that Freeman should have known that it was communicating information about the amounts she could pay to prevent Ocwen from foreclosing based on the security interest it retained in Freeman's home despite the discharge. Ocwen has moved to dismiss Freeman's FDCPA and ICFA counts pursuant to *Fed. R. Civ. P. 12(b)(6)*. For the following reasons, Ocwen's motion is denied in its entirety.

### I. BACKGROUND[1]

In 2003, Freeman obtained a mortgage loan from Wells Fargo that was secured by real property located in Romeoville, Illinois. In 2004, American Home Mortgage obtained servicing rights to Freeman's loan. Freeman alleges that she had "many disputes" with American Home Mortgage, "including but not limited to, the improper application of payments and improper charges made by [American Home Mortgage] to the subject loan." (Dkt. 1, Compl., ¶ 9.) American Home Mortgage repeatedly sent Freeman dunning letters stating that she was in default even though she was actually current on her payments.

---

[1] The following facts are drawn from the plaintiffs' complaint and are accepted as true for the purpose of the defendants' motion to dismiss. *See Cincinnati Life Ins. Co. v. Beyrer, 722 F.3d 939, 946 (7th Cir. 2013)*.

John Mickalovski1

On July 6, 2006, Freeman filed a Chapter 7 bankruptcy petition in the United [*3] States Bankruptcy Court for the Northern District of Illinois. She listed American Home Mortgage as a scheduled creditor. On December 18, 2006, the bankruptcy court issued an order discharging Freeman's debts, including her personal liability on the mortgage loan held by American Home Mortgage. Despite the discharge, from 2006 to 2013, American Home Mortgage sent dunning letters to Freeman stating that she was in default and remained liable for the loan.

On April 1, 2013, Ocwen acquired the servicing rights to Freeman's discharged mortgage.[2] Ocwen obtained Freeman's cellphone number by unknown means and called her an average of two times per day from April 2013 through November 2014, for a total of at least 1,200 calls. Freeman answered approximately 360 of these calls. When she answered, approximately three seconds passed between when she said "hello" and when the Ocwen agents introduced themselves. During these conversations, Freeman advised Ocwen of her bankruptcy discharge and asked Ocwen to stop calling her. During one call, on September 18, 2014, Freeman spoke to an Ocwen agent for 40 minutes about her bankruptcy discharge. According to Freeman, the agent stated that the calls [*4] were "proper" because Freeman's "bankruptcy was dismissed." (Dkt. 1, Compl., ¶ 31.)

In addition, between April 2013 and December 2015, Ocwen sent numerous written communications to Freeman that she characterizes as dunning letters and Ocwen characterizes as "account statements" that purportedly state that they are "for informational purposes only."[3] Freeman alleges that the communications seek payment on her discharged loan. Some of the letters advise that failure to pay will lead to negative credit reporting, some attach payment coupons with payment instructions and information about late charges, and some include the language, "Past Due Amounts DUE IMMEDIATELY." (Dkt. 1, Compl., ¶¶ 34-36.)

On November 17, December 5, and December 16, 2015, an Ocwen representative hand-delivered envelopes to Freeman's home. Each envelope identified the [*7] sender as "Ocwen." (Id. ¶ 37.) Each envelope contained a letter stating "IMPORTANT.....PLEASE CALL MORTGAGE CO.....(800) 746-29636.....PLEASE BE READY TO GIVE YOUR ACCOUNT NUMBER.....WE ARE EXPECTING YOUR CALL

---

[2] Ocwen asks the court to consider its Form 8-K (an SEC reporting form that Ocwen attaches to its motion to dismiss) to establish that it merged with American Home Mortgage and thus acquired Freeman's loan pursuant to a merger. A court may consider documents attached to a motion to dismiss if "they are referred to in the plaintiff's complaint and are central to [her] claim." See, e.g., Levenstein v. Salafsky, 164 F.3d 345, 347 (7th Cir. 1998). This exception is "aimed at cases interpreting, for example, a contract" and "is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." Id.; see also Smith v. Lakin, No. 15-CV-860-NJR-DGW, 2016 U.S. Dist. LEXIS 58066, 2016 WL 1730584, at *1 (S.D. Ill. May 2, 2016). Thus, the presence of an allegation about Subject X in a complaint does not give the defendant license to attach documents about Subject X to a motion to dismiss. Accordingly, the court will consider Freeman's allegation that Ocwen obtained servicing rights for her loan but exclude the SEC form that Ocwen provided that presents its position as to how this came about. In reaching this conclusion, the court considered whether to take judicial notice of the SEC filing since [*5] it is a public record and generally, public records are subject to judicial notice. See, e.g., White v. Keely, 814 F.3d 883, 886 n.2 (7th Cir. 2016). However, this rule allows the court to take judicial notice of the existence of an SEC disclosure form, as opposed to the content of the form, for the truth of the matters asserted therein. See, e.g., City of Sterling Heights Police & Fire Ret. Sys. v. Kohl's Corp., No. 13-C-1159, 2015 U.S. Dist. LEXIS 41917, 2015 WL 1478565, at *4 (E.D. Wis. Mar. 31, 2015) (collecting cases addressing requests for judicial notice of SEC forms). Thus, the content of the SEC form is not properly before the court at the motion to dismiss stage.

[3] Both Freeman and Ocwen attach a group of these statements to the complaint and motion to dismiss, respectively. (Dkt. 1 at Ex. [*6] E; Dkt. 14 at Ex. 2.) Freeman's group exhibit contains the front of her selected communications, while Ocwen's group exhibit contains the front and back sides of its selected communications. The reverse of the communications provided by Ocwen contains information in small type, including a box titled "Important Bankruptcy Information." At least one communication, dated May 3, 2013, is in both sets of submissions. (Dkt. 1 at PageID # 31; Dkt. 14 at PageID # 134.) Given that Freeman supplied the front of a document and Ocwen supplied the reverse of that same document, the information on the reverse is properly before the court at the motion to dismiss stage. See Levenstein, 164 F.3d at 347. This is not particularly helpful, however, as the court cannot ascertain if the information on the reverse of the May 3, 2013 form was presented in an identical way on the reverse of all of Ocwen's so-called statements. This is especially true given that the documents that Freeman has attached to her complaint (Dkt. 1, Compl., at Ex. E) do not all appear to be on identical forms.

TODAY." (*Id.*) Ultimately, Freeman retained counsel due to her concerns about Ocwen's communications.

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to *Rule 12(b)(6)*, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citing *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). A claim satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555-56*; *see also Swanson v. Citibank, N.A., 614 F.3d 400, 404 (7th Cir. 2010)* ("[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together."). For purposes of a motion to dismiss, the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald, 664 F.3d 206, 212 (7th Cir. 2011)*.

## III. DISCUSSION

Ocwen seeks to dismiss Freeman's FDCPA and FCRA claims (Counts II and II, respectively) pursuant to *Rule 12(b)(6)*.

### A. Freeman's FDCPA Claim (Count II)

Ocwen contends that it is outside the ambit of the FDCPA **[*8]** because it is not a debt collector. Alternatively, it contends that Freeman's allegations supporting her FDCPA claim are insufficient and that, in any event, the communications are not actionable under the FDCPA.

#### 1. Is Ocwen Within the Ambit of the FDCPA Because it Is a Debt Collector?

The FDCPA defines a "debt collector" as:
> any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another . . .

*15 U.S.C. § 1692a(6)*. However, "[t]he term 'debt collector' . . . does not include . . . any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such

activity . . . concerns a debt which was not in default at the time it was obtained by such person . . . " *15 U.S.C. § 1692a(6)(F)(iii)*. The rationale for this exception is that for debts that are acquired from another entity, "[i]f the one who acquired the debt continues to service it, it is acting much like the original creditor that created the debt. On the other hand, if it simply acquires the debt for collection, it is **[*9]** acting more like a debt collector." *Schlosser v. Fairbanks Capital Corp., 323 F.3d 534, 536 (7th Cir. 2003)*.

Ocwen argues that when a defendant acquires a debt though a merger with a plaintiff's creditor, as opposed to an assignment, the debt is not obtained while it is in default so the defendant cannot be a debt collector under the FDCPA. *See, e.g., Esquivel v. Bank of Am., N.A., No. 2:12-CV-02502-GEB, 2013 U.S. Dist. LEXIS 24152, 2013 WL 682925, at *2 (E.D. Cal. Feb. 21, 2013)*. According to Ocwen, it acquired Freeman's debt due to its merger with American Home Mortgage. Ocwen reasons that because American Home Mortgage held Freeman's loan before she defaulted, it stands in American Home Mortgage's shoes due to the merger so it is deemed to have acquired the debt before Freeman defaulted.

The problem with this argument is that it relies on the SEC filing that Ocwen attached to its motion to dismiss to establish that Ocwen merged with American Home Mortgage. As discussed above, the substance of the SEC filing is not properly before the court in connection with a *Rule 12(b)(6)* motion.

In the interests of completeness, however, the court notes that Freeman does not challenge Ocwen's reading of *§ 1692a(6)(F)(iii)*. Instead, she contends that under this section of the FDCPA, a loan servicer is considered to be a debt collector if the debt at issue is in default or the **[*10]** acquiring entity treats it as such when it acquires the debt. *Schlosser, 323 F.3d at 536*. Freeman argues that Ocwen acted as if she had defaulted from the moment it acquired servicing rights from American Home Mortgage and thus is covered by the "treated as such" language in *§ 1692a(6)(F)(iii)*.

According to the dates in Freeman's complaint, she took out her loan in 2003, American Home Mortgage acquired the loan in 2004 when she was not in default, and she filed for bankruptcy and received a discharge in 2006. Freeman alleges that American Home Mortgage began collection efforts in 2006 and Ocwen took over those efforts when it acquired the loan in 2013. As noted above, Ocwen's position is that the "treated as such"

exception is inapplicable because (1) nothing in the complaint indicates that American Home Mortgage treated Freeman's loan as if was in default in 2004 and (2) Ocwen is entitled to the 2004 date due to the purported merger. In contrast, Freeman focuses on the 2013 date and asserts generally that Ocwen treated her debt as if it was in default beginning at that time. The complaint indeed alleges that Ocwen commenced aggressive collection efforts starting in 2013. But this does not engage with Ocwen's arguments about [*11] the effect of the merger. The court cannot resolve the "treated as such" issue based on this record. If Ocwen raises the merger issue again in a procedurally proper way, Freeman should ensure that she provides a substantive response to its arguments about the date that is relevant for the purposes of § 1692a(6)(F)(iii).

Relatedly, the court notes that it finds Freeman's briefs confusing because she appears to be contending that Ocwen had no permissible basis to interact with her about money. For example, in her response to the motion to dismiss, Freeman asserts that "it is not obvious from the mortgage statements that Plaintiff has no continued debt." (Dkt. 32, Pl.'s Resp., at 7.) A lender's security interest (apparently acquired by Ocwen) in Freeman's home must have survived the discharge of Freeman's personal debts, because the discharge could not have given her clear title to her home. *See generally Lovegrove v. Ocwen Loan Servicing, LLC, No. 7:14CV00329, 2015 U.S. Dist. LEXIS 112768, 2015 WL 5042913, at *6 (W.D. Va. Aug. 26, 2015)* (holding that a "bankruptcy discharge does not extinguish a secured creditor's in rem rights as to the debtor's property; the discharge only prohibits an in personam claim against the debtor"). The court has thus proceeded based on the assumption [*12] that Freeman is arguing that Ocwen wrongfully tried to collect based on her personal liability in the mortgage, which was discharged in bankruptcy, as this is the only legally tenable reading of Freeman's complaint. But this is not what the complaint says, as Freeman takes issue with Ocwen's belief that she owed any money whatsoever in relation to her home following the discharge. Is Freeman's position that the discharge of her personal debt entitles her to stay—for free—in a property that is subject to a security interest? Freeman should consider whether she wishes to stand on her current complaint, seek leave to amend to clarify this point, address the issue in discovery, or otherwise respond to this concern.

But these are issues for another day. Ocwen's motion to dismiss based on its alleged merger, as established in the SEC filing, is denied without prejudice as

procedurally improper. The court, therefore, turns to Ocwen's contention that Freeman's FDCPA claim fails on the merits.

## 2. Sufficiency of Freeman's Allegations

The FDCPA forbids debt collectors from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection [*13] of a debt." 15 U.S.C. § 1692d. Ocwen contends that Freeman's FDCPA claim fails because she did not provide any details regarding the content of the alleged phone calls or the three hand-delivered envelopes and thus cannot plausibly claim that Ocwen violated § 1692d. The court disagrees.

The clear thrust of the complaint is that Ocwen's 1,200+ telephone calls and the three envelopes were abusive efforts to collect on a debt. Freeman's allegations about the indisputably high number of alleged calls made to her cellular phone easily support a FDCPA claim based on § 1692d because they "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555-56. Given the barrage of purported phone calls, the alleged contents of the envelopes, combined with Freeman's contention that they were allegedly hand-delivered to her home (as opposed to mailed via the United States Postal Service or a delivery service such as Federal Express), also supports an inference of oppressiveness.

Similarly, Freeman need not provide a summary of each conversation in her complaint to state an actionable FDCPA claim. See Twombly, 550 U.S. at 555. She has provided an illustrative summary of a call in 2014, when she alleges that she spent 40 minutes on the phone with an Ocwen representative [*14] who rejected her position about her bankruptcy discharge and insisted that Ocwen's collection efforts were proper. Ocwen can probe Freeman's recall of this conversation, as well as the approximately 360 other times that Freeman answered Ocwen's calls, in discovery. However, Ocwen's attempt to force Freeman to plead facts is unavailing.

## 3. Are the Communications Actionable Under the FDCPA?

Ocwen next argues that even if the communications are within the ambit of the FDCPA, they are not actionable because they were not made in connection with the collection of a debt. Alternatively, Ocwen argues that Freeman cannot state a claim under the FDCPA because the bankruptcy code authorized its

communications with Freeman despite her bankruptcy discharge and the bankruptcy code's specific language, as opposed to the FDCPA's general prohibition against improper debt collection practices, is controlling.

### a. Communications "In Connection With the Collection Of Any Debt"

The FDCPA "mak[es] clear that the statute does not apply to every communication between a debt collector and a debtor. *Gburek v. Litton Loan Servicing LP, 614 F.3d 380, 384-85 (7th Cir. 2010)*. Instead, to be actionable, a communication must be made "in connection with the collection of any debt." *Bailey v. Sec. Nat'l Servicing Corp., 154 F.3d 384, 388 (7th Cir. 1998)*. To determine [*15] if this has occurred, the court must conduct a "commonsense inquiry" by considering whether the communication contains a demand for payment, the nature of the parties' relationship, and the purpose and context of the communications between the parties. *Gburek, 614 F.3d at 385-86*. This inquiry is inherently fact-specific. *Mavroff v. Kohn Law Firm S.C., No. 15-CV-837, 2015 U.S. Dist. LEXIS 172940, 2015 WL 9581763, at *3 (E.D. Wis. Dec. 30, 2015)*.

Ocwen contends that its communications with Freeman were not made in connection with the collection of a debt as they were merely informational. *See Cook v. Green Tree Servicing, LLC, No. 13-CV-01189-JPG-DGW, 154 F. Supp. 3d 742, 2016 U.S. Dist. LEXIS 424, 2016 WL 51385, at *4 (S.D. Ill. Jan. 5, 2016)* (holding that "[i]nformational notices" are not communications made in connection with the collection of a debt). As discussed above, however, the court cannot parse the meaning of any disclaimers in the letters that Ocwen sent to Freeman as the reverse sides of all of the letters are not properly before the court at the motion to dismiss stage. In any event, the presence of a demand for payment is just one factor that is relevant when making the fact-specific determination of whether a communication falls within the ambit of the FDCPA. *See Gburek, 614 F.3d at 385-86*; *Mavroff, 2015 U.S. Dist. LEXIS 172940, 2015 WL 9581763, at *3*. Thus, the court declines to find, as a matter of law, that all of Ocwen's communications were informational and not made in connection with the collection of a debt. [*16] This portion of Ocwen's motion is denied.

### b. The Bankruptcy Code

The bankruptcy code provides that a bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act to collect, recover, or offset [a debt] as a personal liability of the debtor." *11 U.S.C. § 524(a)(2)*. However, *§ 524(j)* of the bankruptcy code contains an exception for "acts by a creditor that is the holder of a secured claim" if "(1) such creditor retains a security interest in real property that is the principal residence of the debtor; (2) such act is in the ordinary course of business between the creditor and debtor; and (3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien." *11 U.S.C. § 524(j)*; *see also In re Jones, No. 08-05439-AJM-7, 2009 Bankr. LEXIS 4316, 2009 WL 5842122, at *3 (Bankr. S.D. Ind. Nov. 25, 2009)* (granting summary judgment because a fully developed record showed that communications from a mortgage holder to an individual who had been granted a Chapter 7 discharge fell within the *§ 524(j)* exception covering certain security interests in real property). Ocwen argues that *§§ 1692e* and *1692f* of the FDCPA, which preclude "false, deceptive, or misleading" and "unfair [*17] or unconscionable" conduct in connection with the collection of a debt conflict with *§ 524(j)* of the bankruptcy code, which Ocwen characterizes as specific statutory language that authorized its written communications with Freeman despite her bankruptcy discharge. According to Ocwen, if its "*§ 524(j)* account statements are determined to be 'false, deceptive, or misleading' or 'unfair or unconscionable' debt-collection communications, Ocwen would be forced to choose between exercising its rights under the bankruptcy code and risking FDCPA liability, or foregoing its bankruptcy code rights to comply with the FDCPA." (Dkt. 14, Def.'s Mot., at 19.) Ocwen thus concludes that Freeman's FDCPA claims must be dismissed because *§ 524(j)* trumps the FDCPA's general prohibition against improper debt collection practices.

The Seventh Circuit teaches that "[w]hen two federal statutes address the same subject in different ways, the right question is whether one implicitly repeals the other — and repeal by implication is a rare bird indeed." *Randolph v. IMBS, Inc., 368 F.3d 726, 730 (7th Cir. 2004)* (finding that the FDCPA and the bankruptcy code provided overlapping remedies to a plaintiff who alleged that a creditor negligently attempt to collect a discharged debt in violation of the [*18] automatic stay). "It takes either irreconcilable conflict between the statutes or a clearly expressed legislative decision that one replace the other." *Id.*

Ocwen's conflict argument is unavailing at the motion to dismiss stage because the court must accept the

allegations in Freeman's complaint as true, and those allegations do not allow the court to determine if Ocwen is entitled to protection under § 524(j). First, Freeman describes the property where she resides as her "home." (Dkt. 1, Compl., ¶ 37.) However, she does not specifically allege that the real property where she resides is her principal residence. The court will not make findings of fact based on assumptions about Freeman's living arrangements.

Second, the parties have not addressed the relevant time that property must be a debtor's primary residence to fall within § 524(j)'s safe harbor. See In re Lemieux, 520 B.R. 361, 369 (Bankr. D. Mass. 2014) (considering location of the debtor's primary residence at the time of the post-discharge collection efforts); Bibolotti v. Am. Home Mortgage Servicing, Inc., No. 4:11-CV-472, 2013 U.S. Dist. LEXIS 69242, 2013 WL 2147949, at *9 (E.D. Tex. May 15, 2013) (considering the location of the debtor's primary residence as of the date she filed her bankruptcy petition). Presumably, Freeman has lived continuously at her home since [*19] 2003, when she obtained a mortgage loan secured by the property, so this is a distinction without a difference. But again, the court is limited to the complaint's allegations, which do not address this issue.

Third, the court cannot determine whether Ocwen acted "in the ordinary course of business" and limited its actions "to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien." See 11 U.S.C. § 524(j)(3). As discussed above, the complaint's allegations do not clearly lay out the relationship between Ocwen and Freeman, given Freeman's apparent position that Ocwen was not allowed to contact her for any reason whatsoever. In addition, the parties are not briefed whether placing approximately 1,200 telephone calls to request payment is "in the ordinary course of business."

Fourth, in the context of a motion to dismiss, the court cannot accept Ocwen's assertion that it sent appropriate written communications to Freeman that merely asked her to make periodic payments to avoid foreclosure.[4]

Ocwen's position is at odds with Freeman's allegations about the 1,200+ calls placed to her cellular number, which she alleges she did not [*20] give to Ocwen. In addition, the court cannot determine if Ocwen gave Freeman appropriate disclaimers during the approximately 360 conversations Freeman had with Ocwen agents when she answered her phone. See Dore v. Five Lakes Agency, Inc., No. 14 CV 6515, 2015 U.S. Dist. LEXIS 88338, 2015 WL 4113203, at *2 n.4 (N.D. Ill. July 8, 2015) (noting that the summary judgment record established that a collection agency which called the plaintiff, who had received a bankruptcy discharge, gave her appropriate disclaimers).

Similarly, Freeman alleges that she received three hand-delivered envelopes that arrived over the course of four weeks in late 2015 that stated "IMPORTANT..... PLEASE CALL MORTGAGE CO.....(800) 746-29636.....PLEASE BE READY TO GIVE YOUR ACCOUNT NUMBER.....WE ARE EXPECTING YOUR CALL TODAY." (Dkt. 1, Compl., ¶ 37.) While Ocwen emphasizes the content of reverse side of letters that are not all properly before the court, it does not explain how describing itself as "MORTGAGE CO." in hand delivered requests for immediate payment put Freeman on notice that it was requesting [*21] periodic payments to avoid foreclosure.

The court cannot simply accept Ocwen's assertion that its communications are covered by § 524(j); the contents of the written communications sent to Freeman and the purpose and content of the telephone calls must be explored in discovery. Thus, Ocwen's citation to the bankruptcy code's safe harbor provision for certain holders of a security interest in real property does not warrant dismissal of Freeman's FDCPA claim.

**B. Freeman's ICFA Claim (Count III)**

To state an ICFA claim, Freeman must allege that: (1) Ocwen's practices were deceptive or unfair; (2) Ocwen intended her to rely on its deceptive or unfair practice, (3) Ocwen's unfair or deceptive practice occurred in the course of conduct involving trade or commerce, and (4) Freeman incurred actual damages. See Wheeler v. Assurant Specialty Prop., 125 F. Supp. 3d 834, 841-42 (N.D. Ill. 2015) (citing Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 574 (7th Cir. 2012). Freeman contends that Ocwen's collection practices were unfair. See Siegel v. Shell Oil Co., 612 F.3d 932, 935 (7th Cir. 2010) ("A plaintiff may allege that conduct is unfair

---

[4] In this regard, Ocwen's citations to cases addressing motions for summary judgment are unhelpful given that the court does not have the benefit of a full record. See, e.g., Lovegrove, 2015 U.S. Dist. LEXIS 112768, 2015 WL 5042913; Bibolotti v. Am. Home Mortgage Servicing, Inc., No. 4:11-CV-472, 2013 U.S. Dist. LEXIS 69242, 2013 WL 2147949, at *9 (E.D. Tex.

May 15, 2013).

under ICFA without alleging that the conduct is deceptive."). Because an unfair practices claim is not based on fraud, it does not need to satisfy *Rule 9(b)*'s heightened pleading standard. *Wheeler, 125 F. Supp. 3d at 842* (citing *Camasta v. Jos. A. Bank Clothiers, Inc., 761 F.3d 732, 737 (7th Cir. 2014))*. Conduct is unfair if it violates public policy, is "so oppressive that the consumer **[*22]** has little choice but to submit," or "cause[s] consumers substantial injury." *Id.* (quoting *Siegel, 612 F.3d at 935*).

Ocwen seeks dismissal of Freeman's ICFA claim, contending that it is preempted by the bankruptcy code. Alternatively, Ocwen contends that Freeman's ICFA claim fails on the merits because it is conclusory. As a fallback to that argument, Ocwen argues that its written communications with Freeman were purely informational and thus do not violate the ICFA as a matter of law.

## 1. Does the Bankruptcy Code Preempt Freeman's ICFA Claim?

After a debtor obtains a bankruptcy discharge, "creditors are enjoined from attempting to collect discharged debts 'as a personal liability of the debtor.'" *Dore, 2015 U.S. Dist. LEXIS 88338, 2015 WL 4113203, at *2* (quoting *11 U.S.C. § 524(a)(2)*). "[T]he sole remedy for a violation of [a bankruptcy discharge injunction] is a contempt action brought in the bankruptcy court that issued the order of discharge." *Asufrin v. Roundpoint Mortgage Servicing Corp., No. 15 C 9077, 2016 U.S. Dist. LEXIS 34420, 2016 WL 1056669, at *7 (N.D. Ill. Mar. 17, 2016)* (citing *Cox v. Zale Del., Inc., 239 F.3d 910, 914 (7th Cir. 2001))*. Freeman reopened her bankruptcy case to pursue a claim against **Ocwen** based on its alleged **violation** of the **discharge** injunction. This court withdrew the reference to the bankruptcy court as to this claim and the parties are currently pursuing discovery regarding whether **Ocwen** violated the discharge injunction.[5]

Freeman contends that Ocwen's efforts (its telephone calls, letters, and the three hand-delivered envelopes) to induce her to pay money following her bankruptcy discharge violate the ICFA. In response, Ocwen argues that the bankruptcy code preempts Freeman's ICFA claim because the ICFA claim is inextricably intertwined

with Freeman's claim that Ocwen violated the discharge injunction entered by the bankruptcy court.

State law claims are preempted if they "arise under" the bankruptcy code, are "related to" a bankruptcy case, or "arise in" bankruptcy. *In re Repository Techs., Inc., 601 F.3d 710, 719 (7th Cir. 2010)*; *Alabi v. Homecomings Fin. LLC, No. 09-CV-4757, 2011 U.S. Dist. LEXIS 107632, 2011 WL 4398140, at *6 (N.D. Ill. Sept. 21, 2011)* (collecting cases). Claims "arise under" the bankruptcy code if they "depend on a right created or determined by a statutory provision of title 11." *In re Repository Techs., 601 F.3d at 719* (internal quotation marks omitted). Claims are "related to" a bankruptcy case if they affect the amount of property available for distribution or the allocation of property among creditors. *In re Tolomeo, No. 15 C 8118, 2015 U.S. Dist. LEXIS 167200, 2015 WL 8741730, at *5 (N.D. Ill. Dec. 15, 2015)*. Claims "arise in" a bankruptcy case if they can exist only in a bankruptcy case and concern the administration **[*24]** of the debtor's estate, such as questions about the validity, extent or priority of liens and whether to discharge a deb or turn over of property of the bankruptcy estate. *In re Repository Techs., 601 F.3d at 719*.

Ocwen contends that Freeman's IFCA claim arises under and is related to her Chapter 7 case since "it is intricately related to and wholly dependent on asserted violations of the bankruptcy code." (Dkt. 33, Def.'s Reply, at 12.) However, to establish that a state law (here, the ICFA) "is preempted because it conflicts with federal law, defendant must prove either that (1) it is impossible to comply with both the challenged state law . . . and federal law; or (2) the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Ready Fixtures Co. v. Stevens Cabinets, 488 F. Supp 2d 787, 789 (W.D. Wis. 2007)* (rejecting motion to dismiss based on the defendant's argument that bankruptcy law preempted Wisconsin's insolvency preference statute) (citing *Crosby v. National Foreign Trade Council, 530 U.S. 363, 372-73, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000)*, and *Hillsborough Cnty., Florida v. Automated Medical Labs., Inc., 471 U.S. 707, 712, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985))*.

Given the dearth of cases addressing whether the bankruptcy code can preempt the ICFA, the court turns to FDCPA cases, as the FDCPA and the ICFA are conceptually similar because they both impose liability for damages caused by unfair practices. *See Osborn v. J.R.S.-I., Inc., 949 F. Supp. 2d 807, 813 (N.D. Ill. 2013)*.

---

[5] Freeman's claim for a violation of **[*23]** the discharge injunction is before the court because it withdrew the reference. However, it does not appear in her complaint. She must amend her complaint so that it contains all of her claims.

A plaintiff can seek relief **[\*25]** under the FDCPA while simultaneously contending that a creditor violated a discharge injunction because the FDCPA and the bankruptcy code "are not so incompatible or contradictory that they serve to repeal one another, and instead complement each other." *Mogg v. Jacobs, No. 15-CV-1142-JPG-DGW, 2016 U.S. Dist. LEXIS 33229, 2016 WL 1029396, at \*3 (S.D. Ill. Mar. 15, 2016)* (citing *Randolph, 368 F.3d at 731*).

Specifically, according to the Seventh Circuit:

> a debtor can bring an FDCPA claim against a debt collector that demands payment that is not really "due" by virtue of the automatic bankruptcy stay or a discharge injunction . . . . For example, remedies under the bankruptcy code are only available for willful violations, that is, where a creditor or debt collector knows its demand is forbidden, but not for other violations for which the FDCPA would provide a remedy, although a less substantial one. It further notes that the bankruptcy code remedies are not so "comprehensive" after all because they do not address numerous topics covered by the FDCPA such as, for example, class actions, maximum recovery, attorney's fees, and a limitations period. The [*Randolph*] court] concluded that both remedial systems can coexist.

*Id.* (internal citations omitted).

The same can be said for the ICFA. The court must **[\*26]** accept Freeman's allegations as true for the purpose of Ocwen's motion to dismiss. It is possible for Ocwen to send out a notice that complies with *§ 524(j)*'s safe harbor as well as the ICFA. But that is not what Freeman alleges occurred, as she contends that the letters, hand delivered envelopes referencing a "MORTGAGE CO.," and the 1,200+ telephone calls were unfair and confusing in light of her bankruptcy discharge. *See Whalen v. Specialized Loan Servicing, LLC, 155 F. Supp. 3d 905, No. 15-CV-410-BBC, 2016 U.S. Dist. LEXIS 2853, 2016 WL 126919, at \*5 (W.D. Wis. Jan. 11, 2016)* (denying creditor's motion to dismiss a FDCPA claim based on *§ 524(j)* because *§ 524(j)* is a "red herring" given that the FDCPA "does not prohibit creditors from collecting a debt; it prohibits them from using 'false, deceptive or misleading' methods when making representations in connection with the collection of a debt"). Based on Freeman's allegations, "[b]ecause [Ocwen] does not argue that the bankruptcy code gave it the right to enforce its security interest in a way that is false, deceptive or misleading, there is no

risk that a ruling in favor of [Freeman] will undermine [Ocwen's] rights under the bankruptcy code." *Id.* Thus, Ocwen has not shown that it would be impossible to comply with the ICFA and the bankruptcy code.

Ocwen also does not explain how the ICFA's prohibition against unfair **[\*27]** collection practices undercuts the narrow remedy of seeking a contempt order based on an alleged violation of the discharge injunction. *See Price v. Seterus, Inc., No. 15 C 7541, 2016 U.S. Dist. LEXIS 48028, 2016 WL 1392331, at \*6 (N.D. Ill. Apr. 8, 2016)* (distinguishing between a claim based on the alleged violation of a bankruptcy discharge order and an ICFA claim based on the plaintiff's contention that the defendant unfairly and deceptively attempted to induce him to make payments on an allegedly uncollectible debt); *see also In re Waggett, No. 09-4152-8-SWH, 2015 Bankr. LEXIS 840, 2015 WL 1384087, at \*8 (Bankr. E.D.N.C. Mar. 23, 2015)* (denying motion to dismiss state claims based on preemption when the claims "are premised on other grounds than just a violation of the discharge injunction, and are instead premised on allegations of continuous, negligent, deceptive and unlawful debt collection activities of the defendants which occurred" after a bankruptcy case was closed); *Albright v. Beneficial West Virginia, Inc.*, No. 3:15-CV-52, 2015 WL 8664281, at \*2 n.6 (N.D.W. Va. Dec. 11, 2015) (state law claims that seek relief other than a contempt order based on an alleged **_violation_** of a **_discharge_** injunction are not preempted).

In sum, **_Ocwen_**'s motion to dismiss Freeman's ICFA claim based on preemption is denied.

## 2. _Ocwen_'s Contention that Freeman's ICFA Claim Fails on the Merits

Ocwen's two alternative arguments about the merits of Freeman's **[\*28]** ICFA claim can be easily dispatched. Ocwen argues that Freeman did not allege what transpired during the phone calls or describe the complete contents of the three hand-delivered packages and thus has failed to state a plausible ICFA unfairness claim. Federal notice pleading standards, rather than Illinois fact pleading requirements, apply to ICFA claims raised in federal court. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc., 536 F.3d 663, 670 (7th Cir. 2008)*. "Because neither fraud nor mistake is an element of unfair conduct under [the ICFA], a cause of action for unfair practices under the [ICFA] need only meet the notice pleading standard of *Rule 8(a)*, not the particularity requirement in *Rule 9(b)*." *Id.*

Ocwen's attack on Freeman's ICFA claim is premised on its contention that its actions were lawful and appropriate efforts to provide information pursuant to § 524(j). The court cannot make this finding at the motion to dismiss stage given Freeman's allegations that:

• Ocwen used "false pretenses and deception to attempt to collect a debt that was not owed at the time the demands for payment were made" because it attempted to force her to make mortgage payments even though the loan had been discharged. (Dkt. 1, Compl., ¶ 84.)

• Ocwen unfairly sought to collect a discharged loan "through **[*29]** constant misleading letters, statements, continuous phone calls to her cellular phone, and sending representatives to her home to coerce her into making a payment on a discharged debt." (*Id.* ¶ 85.)

• Ocwen "led [Freeman] to believe that her bankruptcy had no legal effect" by "bull[ying her] into near submission with perpetual unfair and deceptive conduct through lies, harassment, intimidation, and deception regarding the collectability of the subject loan," refusing to stop calling her despite at least 360 oral requests, and sending "representatives to [her] home to intimidate and coerce her into paying a discharged debt." (*Id.* ¶¶ 86-88.)

As with Freeman's FDCPA claim, these allegations place Ocwen on notice regarding the basis for her ICFA claim and plausibly suggest that she is entitled to relief. *See Twombly, 550 U.S. at 555-56*. Thus, they are sufficient to survive a motion to dismiss. *See Blanton v. Roundpoint Mortgage Servicing Corp., No. 15 C 3156, 2016 U.S. Dist. LEXIS 79246, 2016 WL 3364790, at *9 (N.D. Ill. June 17, 2016)* (denying motion to dismiss an ICFA claim when the plaintiff alleged that the defendants deceived her by attempting to "collect unauthorized fees and charges from [her] and to foreclose on [her] home"); *see also Wong v. Whole Foods Mkt. Grp., Inc., No. 15 C 848, 2015 U.S. Dist. LEXIS 178103, 2015 WL 10852508, at *2 (N.D. Ill. June 15, 2015)* (holding that the plaintiff's allegation that the defendant supermarket had charged excessive sales tax survived **[*30]** a motion to dismiss because that "may constitute an unfair practice under the ICFA"). Ocwen's contention that Freeman needs to plead more facts to state a claim for which relief may be granted is, therefore, unavailing.

As a fallback, Ocwen contends that even if the court finds that Freeman's ICFA claim is plausible, it should still be dismissed because the "account statements" that it sent to Freeman were purely informational and thus do not show that it unfairly sought to collect on a discharged debt. As discussed above, the court cannot determine this issue at the motion to dismiss stage because Freeman has plausibly alleged that Ocwen did, in fact, try to collect on her discharged debt. Moreover, Ocwen's focus on the purported disclaimers on the reverse side of the letters it sent fails to engage with Freeman's allegations about the 1,200+ telephone calls (including approximately 360 conversations) and the hand-delivered envelopes instructing Freeman to "PLEASE CALL MORTGAGE CO.....(800) 746-29636.....PLEASE BE READY TO GIVE YOUR ACCOUNT NUMBER.....WE ARE EXPECTING YOUR CALL TODAY." (Dkt. 1, Compl., ¶ 37.) In sum, Ocwen's arguments about the legal significance of its actions are **[*31]** premature since the parties dispute what Ocwen did vis-a-vis Freeman's discharged loan. For all of these reasons, Ocwen's motion to dismiss Freeman's ICFA claim is denied.

## IV. CONCLUSION

Ocwen's motion to dismiss [14] is denied in its entirety. Because this court withdrew the reference regarding Freeman's claim that Ocwen violated the discharge injunction, Freeman must amend her complaint so that it includes this claim. Freeman shall file an amended complaint by July 11, 2016. Ocwen shall answer by August 1, 2016. This case is set for status on August 10, 2016, at 9:30 a.m.

Date: June 27, 2016

/s/ Joan B. Gottschall

United States District Judge

**End of Document**



**User Name:** John Mickalovski1
**Date and Time:** Tuesday, July 18, 2017 12:14:00 PM CDT
**Job Number:** 50636108

## Document (1)

1. *In re Todt, 567 B.R. 667*
   **Client/Matter:** -None-
   **Search Terms:** "Todt" and "Ocwen"
   **Search Type:** Terms and Connectors
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

# [In re Todt](#)

United States Bankruptcy Court for the District of New Hampshire

May 17, 2017, Decided

Bk. No. 11-12617-JMD, Chapter 7, Adv. No. 15-1040-JMD

**Reporter**
567 B.R. 667 *; 2017 Bankr. LEXIS 1337 **; 2017 BNH 007

In re: Randall G. ***Todt*** and Sharon L. ***Todt***, Debtors;Randall G. ***Todt*** and Sharon L. ***Todt***, Plaintiffs, v. ***Ocwen*** Loan Servicing, LLC, Saxon Mortgage Services, Inc., and The Bank of New York Mellon FKA The Bank of New York, as Successor Trustee for JPMorgan Chase Bank, N.A., as Trustee for Novastar Mortgage Funding Trust, Series 2005-3, Series 2005-3 Novastar Home Equity Loan Asset-Backed Certificates, Series 2005-3, Defendants

## Core Terms

injunction, mortgage, monthly statement, foreclosure, escrow, communications, services, discharged, letters, notice, damages, violations, expenses, bankruptcy discharge, emotional distress, informational, disclaimer, reporting, records, rem, foreclosure sale, attorney's fees, harassment, provides, spent, deed, co-worker, consisted, coupon, hazard

## Case Summary

### Overview

HOLDINGS: [1]-Mortgage servicer violated the discharge injunction, *11 U.S.C.S. § 524*, by continuing to send monthly statements to the debtors, a total of 21 in all, seeking payment of the mortgage when the mortgage debt had already been discharged and the home was in foreclosure; [2]-The statements improperly coerced and harassed the debtors in violation of the discharge injunction; [3]-Debtors presented sufficient evidence that they suffered severe emotional distress due to the servicer's post-discharge coercion and harassment of them, and accordingly debtors were awarded $500 per communication, or a total of $13,000, plus approximately $31,000 in attorneys' fees; [4]-

Punitive damages were not warranted here, particularly since debtors were permitted to live rent free, and without paying any mortgage, insurance, or taxes, for a period of 55 months.

### Outcome

Judgment in favor of debtors for damages and attorneys' fees.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

*HN1*[⬇] **Effect of Discharge, Protection of Debtors**

Generally a bankruptcy discharge relieves a debtor from all personal liability for prepetition debt. *11 U.S.C.S. § 524(a)(2)* acts as an injunction prohibiting acts to collect, recover or offset debts that were discharged in a bankruptcy proceeding personally from the debtor. *11 U.S.C.S. § 524(a)(2)*. The discharge injunction embodies the fresh start policy of the Bankruptcy Code, by which honest but unfortunate debtors are relieved of personal liability for their discharged debts. The discharge injunction does not prohibit every communication between a creditor and a debtor; demands for payment of discharged debts are prohibited.

Bankruptcy Law > ... > Bankruptcy > Case Administration > Bankruptcy Court Powers

Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

Page 2 of 14

567 B.R. 667, *667; 2017 Bankr. LEXIS 1337, **1337

*HN2*[🔻] **Case Administration, Bankruptcy Court Powers**

To prove a discharge injunction violation, a debtor must establish that the creditor (1) has notice of the debtor's discharge; (2) intends the actions which constituted the violation; and (3) acts in a way that improperly coerces or harasses the debtor. The scope of the discharge injunction is broad and bankruptcy courts may enforce it through their statutory contempt powers under *11 U.S.C.S. § 105(a)*, which inherently include the ability to sanction a party. Monetary sanctions for violation of the discharge injunction include actual damages, attorney's fees, or even punitive damages. And, actual damages may include compensation for sustained emotional injury that is attributable to a violation of the discharge injunction. Sanctions imposed for violation of the discharge injunction are in the nature of civil contempt.

> Bankruptcy Law > ... > Discharge &
> Dischargeability > Effect of Discharge > Protection
> of Debtors

*HN3*[🔻] **Effect of Discharge, Protection of Debtors**

When deciding whether the discharge injunction has been violated, courts must decide whether conduct is improperly coercive or harassing under an objective standard—the debtor's subjective feeling of coercion or harassment is not enough. Courts do not employ a "specific test" to determine whether a creditor's conduct meets this objective standard; rather, courts must consider the facts and circumstances of each case, including factors such as the immediateness of any threatened action and the context in which a statement is made. A creditor violates the discharge injunction only if it acts to collect or enforce a prepetition debt; bad acts that do not have a coercive effect on the debtor do not violate the discharge. Statements that are informational in nature, even if they include a payoff amount, generally are not actionable if they do not demand payment. In addition, letters that mention potential foreclosure after bankruptcy also are not actionable if they do not threaten any immediate action against the debtors. The burden of proof is on the debtor to establish by clear and convincing evidence that the creditor violated the discharge injunction.

> Bankruptcy Law > ... > Discharge &
> Dischargeability > Effect of Discharge > Protection
> of Debtors

*HN4*[🔻] **Effect of Discharge, Protection of Debtors**

The discharge injunction does not prohibit a secured creditor from enforcing a valid prepetition mortgage lien. A discharge merely releases a debtor from personal liability on the discharged debt; when a creditor holds a mortgage lien or other interest to secure the debt, the creditor's rights in the collateral, such as foreclosure rights survive or pass through the bankruptcy. Thus, secured creditors may take appropriate action to enforce a valid lien surviving discharge, as long as the creditor does not seek to hold the debtor personally liable for the debt.

> Bankruptcy Law > ... > Discharge &
> Dischargeability > Effect of Discharge > Protection
> of Debtors

*HN5*[🔻] **Effect of Discharge, Protection of Debtors**

*11 U.S.C.S. § 524(j)* provides an exception to the discharge injunction for creditors who hold claims secured by the debtor's principal residence as long as the creditor's acts are in the ordinary course of business between the debtor and the creditor, and limited to seeking payments in lieu of in rem relief. The requirements are conjunctive, meaning that all must be satisfied for the exception to apply.

> Business & Corporate Law > ... > Duties &
> Liabilities > Authorized Acts of Agents > Liability of
> Principals

*HN6*[🔻] **Authorized Acts of Agents, Liability of Principals**

The general rule of respondeat superior provides that a principal is liable for the wrongful acts of its agent within the scope of the agent's authority. The agent and principal may be held jointly and severally liable for the wrongful acts of the agent. No requirement exists that an agent must also be a creditor for that agent to be held accountable for violations of the discharge injunction.

> Bankruptcy Law > ... > Discharge &
> Dischargeability > Effect of Discharge > Protection
> of Debtors

*HN7*[🔻] **Effect of Discharge, Protection of Debtors**

Acts in the ordinary course of business in furtherance of

Page 3 of 14

567 B.R. 667, *667; 2017 Bankr. LEXIS 1337, **1337

collection of periodic payments associated with a valid mortgage on a personal residence are expressly permitted under the Bankruptcy Code. However, *11 U.S.C.S. § 524(j)(3)* requires that (1) the request be for periodic payments, and (2) be in lieu of pursuit of in rem relief to enforce the lien. *11 U.S.C.S. § 524(j)(3)*.

Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

*HN8*[⤓] **Effect of Discharge, Protection of Debtors**
A creditor cannot avoid the consequences of violating the automatic stay or discharge injunction simply by burying an alternative explanation for a clear demand for payment in fine print. Disclaimer language may not be used to shield an improper demand for payment should there be one.

Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

*HN9*[⤓] **Effect of Discharge, Protection of Debtors**
The use of a pro forma bankruptcy disclaimer is not a "get out of jail free" card that can absolve a creditor of liability for a pattern of conduct that is inconsistent with the terms of the disclaimer itself.

Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

*HN10*[⤓] **Effect of Discharge, Protection of Debtors**
The Bankruptcy Code prohibits a party that has no contractual or in rem relationship with a discharged debtor from sending the debtor letters based on a relationship that no longer exists. Purposeless letters relating to past debts and obligations constitute harassment proscribed by the discharge injunction.

Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

*HN11*[⤓] **Effect of Discharge, Protection of Debtors**
Reporting false or outdated information to a credit agency in an attempt to coerce payment on a discharged debt can violate the discharge injunction. The reason: negative credit reports have consequences—like reducing creditworthiness, and with it the debtor's ability to get loans in the future—and so a false report might coerce a debtor into paying a discharged debt to avoid those consequences. Evidence that a creditor refused to change a false or outdated report can give rise to an inference that the creditor intended to coerce the debtor into paying the discharged debt.

Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

*HN12*[⤓] **Effect of Discharge, Protection of Debtors**
Sanctions for violating the discharge injunction may include the payment of actual damages, including those for emotional distress, attorney's fees, and punitive damages.

Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

Civil Procedure > Remedies > Damages > Compensatory Damages

*HN13*[⤓] **Effect of Discharge, Protection of Debtors**
Emotional distress or anxiety arising from a debtor's financial condition, or the filing of a bankruptcy petition, is not grounds for an award of damages where there is a violation of the discharge injunction. Damages for emotional distress are proper where the debtor clearly establishes that he or she suffered significant harm and demonstrates a causal connection between that significant harm and the willful violation of the discharge injunction. Emotional harm must be significant; fleeting or trivial anxiety or distress is not sufficient. There are several ways a debtor can clearly establish significant emotional harm, including but not limited to offering corroborating medical evidence, offering corroborating non-expert testimony, showing the violator engaged in egregious conduct, or testifying (without corroboration) about circumstances in which a reasonable person would obviously suffer significant emotional harm.

Page 4 of 14

567 B.R. 667, *667; 2017 Bankr. LEXIS 1337, **1337

Bankruptcy Law > ... > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

Civil Procedure > ... > Costs & Attorney Fees > Attorney Fees & Expenses > Reasonable Fees

**HN14**[🔽] **Effect of Discharge, Protection of Debtors** Bankruptcy courts have routinely awarded attorneys' fees as a sanction against a party that violates the discharge injunction upon a finding of contempt. In awarding attorney's fees, the Court applies a lodestar analysis, which requires the Court to take the product of a reasonable hourly rate and the number of hours productively spent. Then, the Court may adjust this amount based on a number of factors including: (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

Bankruptcy Law > ... > Automatic Stay > Violations of Stay > Damages

Civil Procedure > Remedies > Damages > Punitive Damages

**HN15**[🔽] **Violations of Stay, Damages** The Court has explained in the context of stay violation cases that an award of punitive damages is within the sound discretion of the court and may be awarded when a defendant's conduct is malicious, wanton, or oppressive.

**Counsel: [**1]** For Plaintiffs: Raymond J. DiLucci, Esq., Raymond J. DiLucci, P.A., Concord, New Hampshire.

For **Ocwen** Loan Servicing, LLC and The Bank of New York Mellon, Defendants: William J. Amann, Esq., Craig, Deachman & Amann, PLLC, Manchester, New Hampshire.

**Judges:** J. Michael Deasy, Bankruptcy Judge.

**Opinion by:** J. Michael Deasy

# Opinion

[*671] <u>**MEMORANDUM OPINION**</u>

## I. INTRODUCTION

Randall and Sharon **Todt** (the "Debtors") filed for chapter 7 bankruptcy relief in 2011 and received their bankruptcy discharges in 2012. After their bankruptcy case was closed, the Debtors continued to receive monthly statements from their mortgage servicer indicating their mortgage was past due. The mortgage on their home was eventually foreclosed in 2013. The Debtors received several additional communications from the mortgage servicer in 2014. The Debtors reopened their bankruptcy case in 2015 and filed this adversary proceeding against Saxon Mortgage Services, Inc. ("Saxon"), **Ocwen** Loan Servicing, LLC ("**Ocwen**"), and The Bank of New York Mellon FKA The Bank of New York, as Successor Trustee for JPMorgan Chase Bank, N.A., as Trustee for Novastar Mortgage Funding Trust, Series 2005-3, Series 2005-3 Novastar Home Equity Loan Asset-Backed Certificates, Series [**2] 2005-3 ("BONY" and collectively with **Ocwen**, the "Defendants"), alleging they willfully violated the discharge injunction set forth in *11 U.S.C. § 524(a)(2)*. The Court entered a default against Saxon on August 4, 2015. On summary judgment, the Court ruled that certain actions taken by **Ocwen** violated the discharge injunction and did not fall within the safe harbor provision of *11 U.S.C. § 524(j)*. The Court held a trial on the outstanding issues on March 9, 2017, and took the matter under advisement. This Court has jurisdiction of the subject matter and the parties pursuant to *28 U.S.C. §§ 1334* and *157(a)* and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire. This is a core proceeding in accordance with *28 U.S.C. § 157(b)*.

## II. FACTS

The Debtors filed a chapter 7 bankruptcy petition on July 1, 2011. On Schedule A they listed their residence located at 136 Chauncey Street, Manchester, New Hampshire (the "Property") and indicated it was worth $250,000.00. On Schedule D they listed both BONY and Saxon as creditors holding a security interest in the Property with Saxon being owed $338,000.00 and BONY being owed $0. Saxon apparently serviced the

Page 5 of 14

567 B.R. 667, *671; 2017 Bankr. LEXIS 1337, **2

loan held by BONY. The Debtors did not reaffirm the debt secured by the Property.[1]

Mrs. **_Todt_** testified at trial [**3] that the Debtors had no intention of keeping their house. At the time of the Debtors' bankruptcy filing, Mr. **_Todt_** had been unemployed for ten years due to medical issues and Mrs. **_Todt_** had been re-employed only for a few months, having been laid off in 2010 from an administrative position with a financial services company. By 2011, the Debtors had been unable to keep up with their mortgage payments for several years. Back in 2007, the Debtors tried to sell the Property but Saxon would not agree to a sale. In 2008, they attempted to refinance their mortgage with a local bank but Saxon was unwilling to write-off $10,000.00 to permit the refinance to take place. In 2009, the Debtors attempted a short sale but Saxon ignored their requests for approval. Mrs. **_Todt_** testified that the Debtors repeatedly asked Saxon for help but they did not receive it. Instead, Saxon scheduled several foreclosure sales, which never took place.

[*672] Over time, the Debtors realized they would not be able to keep the Property and so they sought bankruptcy relief. Mrs. **_Todt_** testified that, by filing bankruptcy, she and her husband would no longer owe any money on the mortgage debt. While the mortgage would still exist, [**4] they would not owe any money to the mortgagee, i.e., there would be a "zero balance" as they would be giving up their financial responsibility for it. She understood that eventually the Property would be foreclosed. Mrs. **_Todt_** testified that, in the Debtors' view, the Property was "really gone" once their bankruptcy discharges entered: they understood that they no longer had any ownership interest in the house once they filed bankruptcy as "bankruptcy took the house away from them."

The Debtors received bankruptcy discharges on January 26, 2012. The Court served Saxon and BONY[2] with notice of the Debtors' discharges on or about January 28, 2012. Ex. 9. Shortly, thereafter, on or about March 12, 2012, Saxon sent the Debtors a notice advising them that the servicing of their mortgage would be transferred from Saxon to **_Ocwen_** effective April 2, 2012. Ex. 13.

From April 12, 2012, through December 17, 2013, **_Ocwen_** sent the Debtors twenty-one monthly statements indicating their mortgage with BONY was past due. Exs. 15-24, 26, 29, 31, 34, 36, 39-41, 43, 45-46. The statements were nearly identical, except the total amount due increased from $140,574.80 on the first statement to $199,872.83 on the [**5] last statement. Each statement listed a "Current Amount Due," which consisted of principal, interest, and escrow for the current month and ranged from $2,745.91 on the first statement to $2,745.92 on the last statement. Each statement also listed "Past Due Amounts DUE IMMEDIATELY," which also consisted of principal, interest, and escrow and ranged from $118,074.13 on the first statement to $172,992.37 on the last statement. Each statement further contained an amount for "Total Fees/Expenses Outstanding," which consisted of late charges, prior servicer fees, property inspection fees, and foreclosure and other miscellaneous fees and ranged from $19,754.76 on the first statement to $24,134.54 on the last statement. Each statement also contained a detachable payment coupon that listed the "AMOUNT DUE" as the total amount due consisting of both the current amount due and the past amount due, which ranged from $140,574.80 to $199,872.83, as noted above.

Each of the statements contained bankruptcy disclaimer language on the front in a section labeled, "Important Messages," which provided:

> If you are currently in bankruptcy or if you have filed for bankruptcy since obtaining this loan, please [**6] read the bankruptcy information provided on the back of this statement.

On the back of the statement, in a section labeled, "IMPORTANT BANKRUPTCY INFORMATION," it provided:

> If you or your account are subject to a pending bankruptcy or the obligation referenced in this statement has been discharged in bankruptcy, this statement is for informational purposes only and is not an attempt to collect a debt.

> If you have questions regarding this statement, or do not want **_Ocwen_** to send you monthly statements in the future, please contact us at 1-888-554-6599. Bankruptcy payments from the Trustee should be mailed to **_Ocwen_** Loan Servicing, LLC, P.O. Box 24781, West Palm Beach, FL 33416-4781.

[*673] See, e.g., Ex. 15. The monthly statements

---

[1] The Debtors did not list the Property on the Chapter 7 Individual Debtor's Statement of Intention filed in their bankruptcy case. Accordingly, they did not indicate any intent to "surrender" or "retain" the Property.

[2] Service on BONY was in care of its attorneys.

Page 6 of 14

567 B.R. 667, *673; 2017 Bankr. LEXIS 1337, **6

further noted in the "Important Messages" section that "Our records indicate that your loan is in foreclosure. Accordingly, this statement may be for informational purposes only." See id.

Mrs. **Todt** testified that she called **Ocwen** to question why they were receiving monthly statements. A representative told her that he could see the Debtors' bankruptcy filing and the bankruptcy discharge in **Ocwen**'s records; the representative told Mrs. **Todt** that the Debtors should "just [**7] ignore" the statements. Mrs. **Todt** testified that it was upsetting to receive these statements each month since **Ocwen** had "no right" to send them these bills. She stated that she was constantly worried whether **Ocwen** would come after them for money, including the difference between what was owed and what **Ocwen** might receive at a foreclosure sale. At trial, Mrs. **Todt** indicated that she never read the bankruptcy disclaimer language contained in the statements, focusing instead on the amounts set forth in the statements.

On March 16, 2013, the Debtors received a letter from **Ocwen** indicating a foreclosure sale had been scheduled on the Property. Ex. 27. It encouraged the Debtors to contact **Ocwen** to discuss possible alternatives to save their home. Shortly thereafter, the Debtors received an official "Notice of Mortgage Foreclosure Sale," from BONY's attorneys, which was sent in accordance with the provisions of NH RSA 479:25 and which advised the Debtors that their home would be sold at a public auction on April 10, 2013, at 3:00 p.m.

For reasons that are not clear from the record, the Property was not foreclosed on April 10, 2013. Instead, **Ocwen** continued to send the Debtors monthly statements showing [**8] more than $148,000.00 "past due" as well as letters indicating it "may not be too late to save [their home]," and notices advising the Debtors of an interest rate/payment change. Exs. 32-34, 36, 37, and 38-43. Mrs. **Todt** testified that she was worried that **Ocwen** would come after them for the money listed in the statements. She indicated her husband was just as upset as she was by the statements.

The Debtors were sent a second "Notice of Mortgage Foreclosure Sale" on or about November 14, 2013. Ex. 44. This notice informed the Debtors that a foreclosure auction would take place on December 16, 2013, at 12:00 p.m. Within a few days, on November 18, 2013, **Ocwen** sent the Debtors another monthly statement. Ex. 45.

The mortgage on the Debtors' home was foreclosed on December 16, 2013. Nonetheless, **Ocwen** sent the Debtors another monthly statement on December 17, 2013. Ex. 46. A foreclosure deed was executed on January 14, 2014; it shows that BONY bought the property for $285,000.00. Ex. 47. Another foreclosure deed was executed on March 26, 2014; it too indicates that BONY bought the property for $285,000.00. Ex. 50. A third foreclosure deed was executed on November 7, 2014, also showing a sale [**9] to BONY for $285,000.00. Ex. 58. This third foreclosure deed was the one recorded with the Hillsborough County Registry of Deeds on December 8, 2014.[3] Id.

 [*674]  The Debtors received several additional communications from **Ocwen** after the foreclosure sale. Specifically, the Debtors received a letter from **Ocwen** dated September 9, 2014, notifying them that a relationship manager had been assigned to them and would be "assisting in identifying solutions for their mortgage." The letter expressly stated that "[t]his communication is from a debt collector attempting to collect a debt." Ex. 53. On September 26, 2014, **Ocwen** sent the Debtors a letter informing them that their hazard insurance policy had expired and that **Ocwen** would be buying insurance for the Property for which the Debtors "must pay" **Ocwen**. Ex. 54. Mrs. **Todt** was upset by this as she believed legally she could not insure a house she did not own. She called her insurance company and asked them to contact **Ocwen** and inform **Ocwen** that they no longer owned the Property.

On October 16, 2014, **Ocwen** sent the Debtors an annual escrow account disclosure statement detailing actual and scheduled activity in the Debtors' escrow account between October 2008 [**10] and November 2014. Ex. 55. This statement also indicated that "[t]his communication is from a debt collector attempting to collect a debt." The statement also included an "Escrow Shortage Payment" coupon seeking a payment of

---

[3] The parties did not explain during trial why three separate foreclosure deeds were executed or why there was such a delay in recording the foreclosure deed. While the deed was recorded in December 2014, Mrs. **Todt** testified that the Debtors did not vacate the Property until September 2015. Mrs. **Todt** further testified that the Debtors paid nothing for the Property from the date they filed bankruptcy on July 1, 2011, through September 1, 2015, i.e., they did not make any payments to **Ocwen**, they did not pay for any home insurance, and they did not pay any real estate taxes (which amounted to about $6,000.00/year).

John Mickalovski1

Page 7 of 14

567 B.R. 667, *674; 2017 Bankr. LEXIS 1337, **10

$2,435.66 from the Debtors. On October 26, 2014, **Ocwen** sent the Debtors a second letter informing them that if they failed to provide proof of insurance to **Ocwen**, it would purchase a policy and the Debtors would be responsible for reimbursing **Ocwen** for its cost, which **Ocwen** estimated to be $2,413.00. Ex. 56. On December 23, 2014, **Ocwen** sent another escrow analysis statement notification to the Debtors informing them that the earlier escrow analysis was sent in error and that "[c]urrent monthly payments should continue to be made until **Ocwen** provides a new escrow analysis." Ex. 59.

Apparently in an attempt to stop **Ocwen**'s continuing communications and requests for payment, the Debtors reached out to the New Hampshire Banking Department, who in turn contacted **Ocwen** on their behalf. **Ocwen** acknowledged in a letter to the New Hampshire Banking Department dated November 17, 2014, that "[u]nfortunately, **Ocwen** inadvertently failed to update the loan records accordingly" after the foreclosure sale took **[**11]** place on December 16, 2013, "and as a result the loan was reflecting in active status, which in turn caused the system to issue modification solicitation letters to the **Todt**'s." Ex. 57. It advised that "**Ocwen** has updated their records accordingly." Id. Notwithstanding **Ocwen**'s statement that it had updated its records, **Ocwen** sent the Debtors the escrow analysis statement notification dated December 23, 2014. Ex. 59.

On April 24, 2014, Mrs. **Todt** obtained her credit report from two different credit reporting agencies. Both reports reflected a balance of $0 being owed on the mortgage and further indicated that the debt was "included in bankruptcy" and "Discharged through Bankruptcy Chapter 7." Exs. 51 and 52. On March 27, 2015, Mr. **Todt** obtained his credit report from a credit reporting agency and it reflected a balance of $0 on the mortgage. Ex. 60. On March 28, 2015, Mrs. **Todt** obtained a credit report from a personal finance website (not one of the three major credit reporting agencies, i.e., Equifax, Experian, and TransUnion), and it showed a balance of $313,432.00 being owed to **Ocwen** on the mortgage. Ex. 61.

On June 19, 2015, the Debtors reopened their bankruptcy case and filed this **[**12]** adversary **[*675]** proceeding. Saxon did not appear or file an answer and so it was defaulted on August 8, 2015. The Court declined to enter default judgment against Saxon at that time because the complaint and the motion for default judgment did "not establish that Saxon violated the

discharge injunction and [did] not establish any basis for awarding damages [since] [t]he communications and activities about which the Debtors complain appear to have taken place after Saxon transferred its servicing rights to **Ocwen**."

On June 8, 2016, the Court granted in part and denied in part the Debtors' motion for summary judgment, ruling specifically that the letters and statements sent between September 9, 2014, and December 23, 2014, described above, "violated the discharge injunction of _11 U.S.C. § 524(a)(2)_ and did not fall within the safe harbor provision of _11 U.S.C. § 524(j)_ as these actions all occurred after the mortgage on the Debtors' residence was foreclosed on December 16, 2013." See Exs. 53-56 and 59.

The Court held a trial on March 9, 2017, in order to determine whether any other actions by **Ocwen** and BONY violated the discharge injunction and whether the Debtors are entitled to damages. Mr. **Todt** was unable to testify due to his ongoing **[**13]** medical issues. Mrs. **Todt** testified as did one of her health care providers and a former co-worker.

The health care provider testified that she has seen Mrs. **Todt** on an annual basis since 2005 and that starting three or four years ago (so starting in 2013 or 2014) Mrs. **Todt** reported that she was feeling stressed, was teary, and was having difficulty sleeping. She further told her provider that her husband was ill, that she was the only one working, and that the Debtors were having financial issues and were concerned about losing their home and being out on the street.

Mrs. **Todt**'s co-worker testified that she and the Debtor worked together, speaking on a daily basis, for a five-year period from 2011 through 2016. She observed that Mrs. **Todt** was emotionally upset and cried often at work. The co-worker indicated that the crying started gradually over time, probably starting in 2014 and 2015, and that she (and other co-workers) noticed it, with consistent crying occurring during the last six months of 2016. She testified that Mrs. **Todt** was often distraught at work and that her issues escalated over time. She indicated that Mrs. **Todt** informed her that she was experiencing financial difficulties, **[**14]** had filed bankruptcy, and was feeling pressure from her mortgagee. She testified that Mrs. **Todt** was afraid someone would come to her home and lock her out.

**Ocwen** and BONY did not present any witness testimony at trial, the Court having granted the Debtors' motion in limine prior to trial barring testimony by

Page 8 of 14

567 B.R. 667, *675; 2017 Bankr. LEXIS 1337, **14

*Ocwen*'s only proposed witness.

## III. DISCUSSION

### A. Legal Analysis

**HN1**[🔼]] Generally a bankruptcy discharge relieves a debtor from all personal liability for pre-petition debt. *Bessette v. Avco Fin. Servs., Inc., 230 F.3d 439, 444 (1st Cir. 2000)*. *Section 524(a)(2) of the Bankruptcy Code* acts as an injunction prohibiting acts "to collect, recover or offset" debts that were discharged in a bankruptcy proceeding personally from the debtor. *11 U.S.C. § 524(a)(2)*; see *Bates v. CitiMortgage, Inc., 844 F.3d 300, 304 (1st Cir. 2016)* (citing *Canning v. Beneficial Me., Inc. (In re Canning), 706 F.3d 64, 69 (1st Cir. 2013))*. "The discharge injunction embodies the fresh start policy of the Bankruptcy Code, by which honest but unfortunate debtors are relieved of personal **[*676]** liability for their discharged debts." *Best v. Nationstar Mortg., LLC (In re Best), 540 B.R. 1, 8 (B.A.P. 1st Cir. 2015)* (internal quotations and citations omitted). The discharge injunction does not prohibit every communication between a creditor and a debtor; "demands for payment of discharged debts are prohibited." *In re Brown, 481 B.R. 351, 358 n.10 (Bankr. W.D. Pa. 2012)* (quoted in *Best, 540 B.R. at 10*); see also *In re Gill, 529 B.R. 31, 37 (Bankr. W.D.N.Y. 2015)* (cited in *Best, 540 B.R. at 9*).

**HN2**[🔼]] "To prove a discharge injunction violation, a debtor must establish that the creditor '(1) has notice of the debtor's discharge ... **[**15]** ; (2) intends the actions which constituted the violation; and (3) acts in a way that improperly coerces or harasses the debtor.'" *Bates, 844 F.3d at 304* (quoting *Lumb v. Cimenian (In re Lumb), 401 B.R. 1, 6 (B.A.P. 1st Cir. 2009))*. The scope of the discharge injunction is "broad," *Canning, 706 F.3d at 69*, and bankruptcy courts may enforce it through their "statutory contempt powers" under *11 U.S.C. § 105(a)*, which "inherently include the ability to sanction a party," see *Ameriquest Mortg. Co. v. Nosek (In re Nosek), 544 F.3d 34, 43-44 (1st Cir. 2008)*; *Bessette, 230 F.3d at 445 (1st Cir. 2000)* ("[A] bankruptcy court is authorized to invoke *§ 105* to enforce the discharge injunction imposed by *§ 524* and order damages ... if the merits so require."). Monetary sanctions for violation of the discharge injunction include "actual damages, attorney's fees, or even punitive damages." *Robbins v. Walter E. Jock Oil, Co., Inc. (In re Robbins), Bk. No. 14-11166-BAH, Adv. No. 16-1046-BAH, 2017 Bankr. LEXIS 630, 2017 WL 946282, at *2 (Bankr. D.N.H. Mar. 9, 2017)* (citing *Bessette, 230 F.3d at 445*). And, actual

damages may include compensation for "sustained emotional injury" that is attributable to a violation of the discharge injunction. *United States v. Rivera Torres, 309 B.R. 643, 649-50 (B.A.P. 1st Cir. 2004)*, rev'd and remanded on other grounds, *432 F.3d 20 (1st Cir. 2005)* (holding the United States was immune pursuant to *11 U.S.C. § 106(a)* from an award of emotional distress damages as a contempt sanction under *11 U.S.C. § 105* for violation of the discharge injunction); see also *In re A.G. Wassem, 456 B.R. 566, 572 (Bankr. M.D. Fla. 2009)* ("Emotional distress constitutes actual damages."). Sanctions imposed for violation of the discharge injunction **[**16]** are in the nature of civil contempt. *Canning, 706 F.3d at 69*.

**HN3**[🔼]] When deciding whether the discharge injunction has been violated, courts must decide "whether conduct is improperly coercive or harassing under an objective standard—the debtor's subjective feeling of coercion or harassment is not enough," *Bates, 844 F.3d at 304* (citing *Lumb, 401 B.R. at 6*; *Pratt v. Gen. Motors Acceptance Corp. (In re Pratt), 462 F.3d 14, 19 (1st Cir. 2006))*. Courts do not employ a "specific test" to determine whether a creditor's conduct meets this objective standard; rather, courts must consider "the facts and circumstances of each case, including factors such as the 'immediateness of any threatened action and the context in which a statement is made.'" *Bates, 844 F.3d at 304* (quoting *Diamond v. Premier Capital, Inc. (In re Diamond), 346 F.3d 224, 227 (1st Cir. 2003))*. "[A] creditor violates the discharge injunction only if it acts to collect or enforce a pre-petition debt; bad acts that do not have a coercive effect on the debtor do not violate the discharge." *Lumb, 401 B.R. at 7* (quoted in *Bates, 844 F.3d at 304*). Statements that are informational in nature, even if they include a payoff amount, generally are not actionable if they do not demand payment. *Bates, 844 F.3d at 304* (citing *Best, 540 B.R. at 11*). In addition, letters that mention potential foreclosure after bankruptcy **[*677]** also are not actionable if they do not threaten any immediate action against the debtors. *Bates, 844 F.3d at 304* (citing *Jamo v. Katahdin Fed. Credit Union (In re Jamo), 283 F.3d 392, 402 (1st Cir. 2002))*. The burden of proof is on the debtor to establish by clear **[**17]** and convincing evidence that the creditor violated the discharge injunction. *Best, 540 B.R. at 9* (citing *Manning v. CitiMortgage, Inc. (In re Manning), 505 B.R. 383, 386 (Bankr. D.N.H. 2014))*; *In re Zine, 521 B.R. 31, 38 (Bankr. D. Mass. 2014)*.

It is worth noting that **HN4**[🔼]] "the discharge injunction does not prohibit a secured creditor from enforcing a

Page 9 of 14

567 B.R. 667, *677; 2017 Bankr. LEXIS 1337, **17

valid pre-petition mortgage lien." *Best, 540 B.R. at 9.* "[A] discharge merely releases a debtor from personal liability on the discharged debt; when a creditor holds a mortgage lien or other interest to secure the debt, the creditor's rights in the collateral, such as foreclosure rights survive or pass through the bankruptcy." *In re Reuss, No. DT-07-05279, 2011 Bankr. LEXIS 1547, 2001 WL 1522333, at *2 (Bankr. W.D. Mich. April 12, 2011)* (quoted in *Best, 540 B.R. at 9*). Thus, secured creditors may take appropriate action to enforce a valid lien surviving discharge, as long as the creditor does not seek to hold the debtor personally liable for the debt. *Best, 540 B.R. at 9.*

"In addition, *HN5*[🔼] *§ 524(j)* [of the Bankruptcy Code] provides an exception to the discharge injunction for creditors who hold claims secured by the debtor's principal residence as long as the creditor's acts are in the ordinary course of business between the debtor and the creditor, and limited to seeking payments in lieu of in rem relief." Id. Specifically, *11 U.S.C. § 524(j)* provides:

> *Subsection (a)(2)* does not operate as an injunction against an act by a creditor that is the holder of a secured claim, if—
>
>> (1) **[**18**]** such creditor retains a security interest in real property that is the principal residence of the debtor;
>> (2) such act is in the ordinary course of business between the creditor and the debtor; and
>> (3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.

*11 U.S.C. § 524(j).* The requirements are conjunctive, meaning that all must be satisfied for the exception to apply. *Best, 540 B.R. at 10.*

**B. Analysis**

**1. Violations**

*Ocwen* and BONY[4] do not challenge the first and

second findings that the Court must make in determining whether they have violated the discharge injunction, i.e., they do not dispute that (1) they had notice of the Debtors' bankruptcy discharge; **[*678]** and (2) they intended the actions that constitute the alleged violations, i.e., that *Ocwen* sent various statements and letters to the Debtors. At issue then is whether the actions taken by *Ocwen* satisfy the third element, i.e., whether they were "objectively coercive creditor collection actions." *Bates, 844 F.3d at 305.*

**a. Monthly Statements**

*Ocwen* began sending the Debtors monthly statements in April 2012, a few months after the Debtors received **[**19**]** their discharges. Unlike some statements sent by mortgage companies, *Ocwen*'s statements clearly demand payment from the Debtors.[566] As the Court has previously indicated, *HN7*[

statements were sent by *Ocwen*, its agent. BONY has not challenged the notion that it can be held liable for damages based on its agent's violation of the discharge injunction. *See Pague v. Harshman (In re Pague), Bk. No. 3:01-bk-32061, Adv. No. 3:09-ap-00071, 2010 Bankr. LEXIS 912, 2010 WL 1416120, *6 (Bankr. N.D. W. Va. Apr. 5, 2010)* (*HN6*[🔼] "The general rule of *respondeat superior* ... provides that a principal is liable for the wrongful acts of its agent within the scope of the agent's authority. The agent and principal may be held jointly and severally liable for the wrongful acts of the agent. No requirement exists that an [agent] must also be a creditor for that [agent] to be held accountable for violations of the discharge injunction." (citations omitted)).

---

[5] For example, in the case of *Lemieux v. America's Servicing Co. (In re Lemieux), 520 B.R. 361, 366 (Bankr. D. Mass. 2014)*, the monthly statements sent to the debtors omitted "the word 'due,' a word that indicates an attempt to collect a debt" and the detachable coupon had "blank lines that a borrower might fill in to indicate a monthly payment amount, additional principal, late charges and additional escrow." The payment coupons also included additional language stating: "*If you are currently a party in a bankruptcy case, and you choose to make a voluntary payment, detach and return the remittance coupon with your payment.*" *Id. at 365* (emphasis in original). In *McConnie Navarro v. Banco Popular de Puerto Rico (In re McConnie Navarro), 563 B.R. 127, 146-47 (Bankr. D.P.R. 2017)*, the "mortgage statements did not include the amount of payment, a due date, a late charge if not received by a date certain, or a past due amount and included a disclaimer." In addition, the monthly payment coupon did not include amounts for "the monthly payment, additional principal, additional escrow, late fees and other" but rather they were "all left blank."

---

[4] The parties did not make any distinction between BONY and *Ocwen* at trial. From the record, it appears that BONY held the claim against the Debtors in the form of a promissory note secured by a mortgage on the Property and *Ocwen* serviced BONY's note and mortgage. The record shows that BONY took no direct action against the Debtors; rather, all letters and

Page 10 of 14

567 B.R. 667, *678; 2017 Bankr. LEXIS 1337, **19

] "[a]cts in the ordinary course of business in furtherance of collection of periodic payments associated with a valid mortgage on a personal residence are expressly permitted under the Bankruptcy Code." *Bates, 517 B.R. 395, 399 (Bankr. D.N.H. 2014)* (citing *11 U.S.C. § 524(j)*), aff'd, *550 B.R. 12 (D.N.H. 2016)*, aff'd, *844 F.3d 300 (1st Cir. 2016)*. However, *§ 524(j)(3)* requires that (1) the request be for "periodic payments," and (2) be "in lieu of pursuit of in rem relief to enforce the lien." *11 U.S.C. § 524(j)(3)*. The record in this case shows that *Ocwen*'s statements did not satisfy these requirements and therefore *Ocwen* was not protected by *§ 524(j)*'s exception to the discharge injunction.

First, the monthly statements indicate, from the time that *Ocwen* first started sending statements in April 2012, that the Debtors' loan was "in foreclosure." For that reason, it would appear that *Ocwen* and BONY were pursuing in rem relief from as early as April 2012. There is no doubt that by March 2013, when BONY's attorneys sent the Debtors **[**20]** the statutorily required "Notice of Foreclosure Sale," Ex. 28, they were seeking in rem relief. Accordingly, the monthly statements could not have been sent in "in lieu of pursuit of in rem relief."

Second, the monthly statements do not show that *Ocwen* was seeking only "periodic payments" from the Debtors but instead they show that *Ocwen* was seeking payment of all past due amounts. Between April 12, 2012, and March 18, 2013, *Ocwen* sent the Debtors twelve monthly statements. Each of those statements was substantively identical except for the total **[*679]** amount due, which increased incrementally with each successive statement. These statements did not reflect that the Debtors had received a bankruptcy discharge on January 26, 2012, a fact that *Ocwen* does not dispute and admitted to the Debtors in one or more telephone communications. Instead, the statements only contain a boilerplate notice on the front indicating that the recipient should read a provision on the back if the recipient were in bankruptcy. The back of the monthly

statements included a sentence noting that if the recipient were in bankruptcy, or had been discharged in bankruptcy, the monthly statement was for informational purposes **[**21]** only and was not an attempt to collect a debt. Thus, *Ocwen*'s monthly statements did not reflect any real recognition by *Ocwen* that the Debtors' bankruptcy discharges had entered and that, accordingly, both the content of *Ocwen*'s monthly statements and the demands that *Ocwen* could make therein should have been affected.

In addition, after *Ocwen* noticed the foreclosure sale in March 2013 (and clearly began pursuing in rem rights under BONY's mortgage), *Ocwen* continued to send the same form of notice demanding payment. After the foreclosure on December 16, 2013, *Ocwen* sent an additional monthly statement as well as letters regarding hazard insurance for the property, an offer to attempt to resolve mortgage problems, and annual escrow statements. Not all of the post-foreclosure communications contained prominent bankruptcy disclaimer language.

*Ocwen* defends its actions on the grounds that the monthly statements sent post-discharge include bankruptcy disclaimer language; however, this elevates form over substance. The totality of *Ocwen*'s communications on and after April 12, 2012, with the exception of communications in connection with the enforcement of its in rem rights under the mortgage, **[**22]** reflected no recognition of the issuance of the bankruptcy discharge. All such communications expressly and implicitly reflect attempts to collect discharged obligations from the Debtors. No pro forma bankruptcy disclaimer can overcome the effects of repeated and continuous communications in which *Ocwen* took the position that these obligations were collectible. *HN9*[ ] The use of a pro forma bankruptcy disclaimer is not a "get out of jail free" card that can absolve a creditor of liability for a pattern of conduct that is inconsistent with the terms of the disclaimer itself. Accordingly, the Court finds that the twenty-one monthly statements sent between April 2012 and December 2013 improperly coerced and harassed the Debtors in violation of the discharge injunction.

**b. Post-Foreclosure Letters**

The Court previously ruled on summary judgment that *Ocwen*'s post-foreclosure communications were not protected by *§ 524(j)* and violated the discharge injunction. Thus, *Ocwen*'s and BONY's argument in their post-trial memorandum that these communications

---

[6] *Ocwen* argues that its statements contain bankruptcy disclaimer language that indicates the statements were being sent for "informational purposes only." In the Court's view, *HN8*[ ] "[a] creditor cannot avoid the consequences of violating the automatic stay or discharge injunction simply by burying an alternative explanation for a clear demand for payment in fine print." *Zine, 521 B.R. at 40.* "[D]isclaimer language may not be used to shield an improper demand for payment should there be one." *McConnie Navarro, 563 B.R. at 149.*

Page 11 of 14

567 B.R. 667, *679; 2017 Bankr. LEXIS 1337, **22

were not coercive is misplaced; the Court has already concluded that they were coercive and harassing. The letters **Ocwen** sent to the Debtors informed them that **[**23]** (1) they needed to provide **Ocwen** with evidence of hazard insurance or they would be required to reimburse **Ocwen** approximately $2,413.00 for its purchase of a hazard insurance policy;[7] and (2) an updated escrow analysis had been completed and an escrow shortage payment of $2,435.66 should be made and current monthly payments should continue. The last of the five communications **[*680]** informed the Debtors that they had a relationship manager who would help them identify "solutions for their mortgage," a mortgage which already had been extinguished.

At the time **Ocwen** sent these five communications to the Debtors, the Debtors had no personal liability on the note, and BONY had already obtained ownership of the Property through foreclosure. **HN10**[⬆] The Bankruptcy Code prohibits a party that has "no contractual or *in rem* relationship with a discharged debtor" from sending the debtor letters based on a relationship that no longer exists.[8] *Collins v. Wealthbridge Mortg. Corp. (In re Collins), 474 B.R. 317, 321 (Bankr. D. Me. 2012).* "[P]urposeless letters relating to past debts and obligations constitute harassment proscribed by the discharge injunction." Id.

### c. Credit Reporting

**HN11**[⬆] "Reporting false or outdated information to a credit agency in an attempt to coerce payment on a discharged debt can violate the discharge **[**24]** injunction. . . . The reason: negative credit reports have consequences—like reducing creditworthiness, and with it the debtor's ability to get loans in the future—and so a false report might coerce a debtor into paying a discharged debt to avoid those consequences. . . . Evidence that a creditor refused to change a false or outdated report can give rise to an inference that the creditor intended to coerce the debtor into paying the

discharged debt." *Bates, 844 F.3d at 306* (citing *Zine, 521 B.R. at 40*; *Torres v. Chase Bank USA, N.A. (In re Torres), 367 B.R. 478, 486 (Bankr. S.D.N.Y. 2007)).*

The Debtors state that the credit reporting on their mortgage was accurate in 2014, but in 2015, that reporting was negative. Upon review by the Court, it appears that Mr. **Todt**'s credit report accurately reflected a balance of $0 being owed on the mortgage in 2015 but Mrs. **Todt**'s report inaccurately reflected a balance of $313,432.00 being owed to **Ocwen**. The Court notes that the inaccurate report was not generated by one of the three major credit reporting agencies but instead by a different online company. The Debtors did not provide any evidence that would prove that **Ocwen** was the source of this inaccurate information. Furthermore, the Debtors have not demonstrated that false information was given in an attempt to coerce **[**25]** the Debtors into making payment on a discharged debt. For these reasons, the Court cannot find that negative credit reporting constituted a violation of the discharge injunction by the Defendants.

### 2. Damages

**HN12**[⬆] Sanctions for violating the discharge injunction may include the payment of actual damages, including those for emotional distress, attorney's fees, and punitive damages. *Robbins, 2017 Bankr. LEXIS 630, 2017 WL 946282, at *2.* The Debtors contend all three should be awarded in this case.

### a. Actual Damages

The Debtors did not present evidence that they suffered any out-of-pocket expenses related to **Ocwen**'s violation of the discharge injunction. Instead, the Debtors focus on the emotional distress they suffered on account of their receipt of the **[*681]** monthly statements and post-foreclosure communications from **Ocwen**. At trial, Mrs. **Todt** testified about the impact that **Ocwen**'s post-discharge communications had on her and her husband. She testified that she and her husband were each "a wreck" and worried that the Defendants "were going to come after [them] because [they] kept getting these statements." Mrs. **Todt** indicated that she lost sleep and received a prescription for "anti-anxiety medication." She stated she was crying at work and looked **[**26]** "stupid" for crying at work "in front of co-workers." She felt she could not explain what was happening because she did not want to have to "tell everybody in the world" about the bankruptcy. Mrs. **Todt** further indicated that she was stressed, losing work, and

---

[7] As a result of their discharge, the Debtors had no obligation to obtain hazard insurance on the Property. *Lemieux, 520 B.R. at 367 n.5.*

[8] The Court notes that the letters **Ocwen** sent to the Debtors relate to obligations that arose under the note and mortgage documents, i.e., expenses for insurance and escrow related to preserving the Property. They did not relate to the Debtors' continued occupation of the Property for which it may have been appropriate for **Ocwen** and/or BONY to contact the Debtors.

Page 12 of 14

567 B.R. 667, *681; 2017 Bankr. LEXIS 1337, **26

was having difficulty concentrating, especially with respect to "details," which was important in her job as an administrative assistant. Mrs. *Todt* further testified that "every single month for years this went on."

Mrs. *Todt*'s testimony was corroborated by the testimony of her health care provider who indicated that Mrs. *Todt* was feeling stressed, was teary, and was having difficulty sleeping back in 2013 and 2014, which was during the time *Ocwen* improperly was sending the Debtors statements and letters concerning the debt on the Property. She testified that Mrs. *Todt* informed her that she was having financial issues and was concerned about losing her home and being out on the street.

Mrs. *Todt*'s testimony was also corroborated by the testimony of a co-worker who also observed Mrs. *Todt* being upset at work during 2014. The co-worker testified that Mrs. *Todt* informed her that she was experiencing financial difficulties, had filed [**27] bankruptcy, and was feeling pressure from her mortgagee.

HN13[↑] Emotional distress or anxiety arising from a debtor's financial condition, or the filing of a bankruptcy petition, is not grounds for an award of damages where there is a violation of the discharge injunction. "Damages for emotional distress are proper where the debtor clearly establishes that he or she suffered significant harm and demonstrates a causal connection between that significant harm and the willful violation of the discharge injunction." *McLean v. Greenpoint Credit LLC, 515 B.R. 841, 848 (M.D. Ala. 2014)*. "Emotional harm must be significant; fleeting or trivial anxiety or distress is not sufficient." *Id. at 849*. "There are several ways a debtor can clearly establish significant emotional harm, including but not limited to offering corroborating medical evidence, offering corroborating non-expert testimony, showing the violator engaged in egregious conduct, or testifying (without corroboration) about circumstances in which a reasonable person would obviously suffer significant emotional harm." Id.

The Debtors have presented sufficient evidence that they suffered severe emotional distress due to *Ocwen*'s post-discharge coercion and harassment of them, seeking payments from the Debtors after their [**28] personal liability was discharged and their home was foreclosed. Accordingly, the Court will award $500.00 in damages for each violation of the discharge injunction to compensate the Debtors for the real emotional distress they suffered that negatively affected their quality of life from April 2012 through the date of their last communication with the Debtors in December 2014.

Those communications include twenty-one monthly statements, the offer to solve "mortgage problems" dated September 9, 2014, the demand for insurance dated September 26, 2014, the annual escrow statement and "Escrow Shortage Payment" coupon dated [*682] October 16, 2014, the second demand for hazard insurance dated October 26, 2014, and the escrow analysis statement dated December 23, 2014. The total damages awarded for these twenty-six communications shall be $13,000.00 ($500.00 x 26).

**b. Attorney's Fees**

HN14[↑] "Bankruptcy courts have routinely awarded attorneys' fees as a sanction against a party that violates the discharge injunction upon a finding of contempt." *In re Meyers, 344 B.R. 61, 68 (Bankr. E.D. Pa. 2006)*. In awarding attorney's fees, the Court applies a lodestar analysis, which requires the Court to take the product of a reasonable hourly rate and the number of hours [**29] productively spent. *Robbins, 2017 Bankr. LEXIS 630, 2017 WL 946282, at *3* (citing *Berliner v. Pappalardo (In re Sullivan), 674 F.3d 65, 69 (1st Cir. 2012))*. Then, the Court may adjust this amount based on a number of factors including: (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Robbins, 2017 Bankr. LEXIS 630, 2017 WL 946282, at *3 n.6* (citing *Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 718 (5th Cir. 1974))*.

The Debtors' law firm has performed services for the Debtors for a total fee of $45,254.75, which consists of 317.89 hours at an average rate of $142.36 per hour.[9] In addition, due to Debtors' counsel's illness, the Debtors were required to obtain the services of another law firm to cover a hearing on the Debtors' motion in limine. That attorney's fees total $4,195.00; the Court has not been provided any breakdown for that amount in terms of hours or rate. [**30] In total, the Debtors seek to recover $49,449.75 in attorney's fees.

---

[9] Counsel bills his services at the rate of $250.00 per hour and his paralegals' services at the rate of $100.00 per hour.

Page 13 of 14

567 B.R. 667, *682; 2017 Bankr. LEXIS 1337, **30

The Court finds that the rates charged by the Debtors' law firm are reasonable. However, the Court cannot find that all of the hours spent by Debtors' counsel to pursue this action were productive or reasonable. For example, upon a review of the invoice provided to the Court, it appears counsel spent nearly forty hours on the complaint in this adversary proceeding, both conferencing with the Debtors in connection with the complaint and preparing and filing the actual pleading. The Court finds those hours to be excessive. In addition, counsel spent nearly eight hours on a three page motion for default judgment, both discussing the matter with the Debtors and drafting and filing the motion. Again, the Court finds those hours to be excessive. Overall, counsel spent nearly forty hours conferencing with the Debtors, not including time spent preparing for depositions or trial testimony. The Court notes further that for most of these meetings both the Debtors' attorney and his paralegal attended, essentially duplicating effort.

Because the Court cannot assess the fees of substitute counsel under the lodestar method given the [**31] record before it and because, additionally, the Court finds that [*683] the Defendants should not have to pay for time spent getting additional counsel up to speed due to Debtors' counsel's illness, the Court will not award the Debtors the fees charged by substitute counsel. Further, because the billing records show a lot of duplicative effort between Debtors' counsel and his paralegals and because the billing records show that overall excessive time was spent on routine tasks, the Court shall award fees for 200 hours at $150.00 per hour, or $30,000.00, as reasonable and necessary.

The billing records reflect that $1,077.07 was incurred in expenses, mostly for photocopies and travel expenses. The Court finds this amount reasonable and necessary and will include it as part of the damage award for the Defendants' violation of the discharge injunction.

### c. Punitive Damages

HN15[↑] The Court has explained in the context of stay violation cases that an award of punitive damages is "within the sound discretion of the court" and may be awarded when a defendant's conduct is "malicious, wanton, or oppressive." *Mosher v. Evergreen Mgmt., Inc. (In re Mosher), 432 B.R. 472, 477 (Bankr. D.N.H. 2010)*; *Sherkanowski v. GMAC Mortg. Corp. (In re Sherkanowski), Bk. No. 99-12204-JMD, Adv. No. 11-1008-JMD, 2000 Bankr. LEXIS 1794, 2000 WL 33679425, at *8 (Bankr. D.N.H. Aug. 15, 2000)*.

While [**32] the Court is concerned that *Ocwen* pursued the Debtors after it commenced foreclosure proceedings and even after the foreclosure sale took place, the Court concludes that punitive damages are not necessary under the circumstances of this case. In making that determination the Court considers the fact that the Debtors did not pay any expenses related to the Property from the date they filed bankruptcy through the date they vacated the premises. Accordingly, from July 1, 2011, through September 1, 2015, they did not make any mortgage payments, they did not pay for any home insurance, they did not pay any real estate taxes, and they did not pay any rent for use of the Property. Thus, for a period of fifty-one months, the Debtors had no housing expenses other than the payments for their utilities. This amounted to an incredible savings for the Debtors, probably on the magnitude of more than $100,000.00.[10] Instead, the Defendants had to pay some of these expenses. To order the Defendants to pay punitive damages would result in an additional benefit to the Debtors that is not warranted under the facts of this case.

### IV. CONCLUSION

The Debtors deserved "a fresh start without being harassed by their [**33] former creditor." *Collins, 474 B.R. at 322*. Unfortunately, that did not happen in this case. Instead, the Debtors continued to receive monthly statements requesting payment even after the Defendants commenced foreclosure proceedings to recover the Property. Even more surprising is that *Ocwen* continued to contact the Debtors requesting payment of escrow shortage amounts and reimbursement for the hazard insurance premiums after the foreclosure took place.

Based on *Ocwen*'s violations of the discharge injunction, for which BONY is also [*684] liable as principal for its agent *Ocwen*, the Court will enter a separate judgment holding the Defendants jointly and severally liable to pay damages of $44,077.07 to the

---

[10] Assuming a monthly rent of $1,500.00 for the Property (which is probably low for the Property but not if the rent does not include insurance and real estate tax payments), the Debtors may have expended $76,500.00 ($1,500.00/mo. X 51 mos.) in rent. Assuming annual insurance payments of $500.00, the Debtors may have expended $2,125.00 ($500.00/yr. x 4.25 yrs.) for insurance. With real estate taxes for the Property accruing at $6,000.00 per year, the Debtors may have expended $25,500.00 ($6,000.00/yr. x 4.25 yrs.) for real estate taxes.

Page 14 of 14

567 B.R. 667, *684; 2017 Bankr. LEXIS 1337, **33

Debtors, consisting of $13,000.00 for emotional distress and $31,077.07 for attorney's fees and expenses. The Court will not enter a default judgment against Saxon as the trial record does not establish any grounds for entering a judgment against it. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with *Federal Rule of Bankruptcy Procedure 7052*.

ENTERED at Manchester, New Hampshire.

Date: May 17, 2017

/s/ J. Michael Deasy

J. Michael Deasy

Bankruptcy Judge

[EDITOR'S NOTE: The following court-provided text does not appear at this cite in B.R.]

[*none] **FINAL JUDGMENT**

This proceeding having come before the Court on [**34] March 9, 2017, for a trial and the Court having issued its memorandum opinion of even date, it is hereby ORDERED:

   1. Judgment is entered against ***Ocwen*** Loan Servicing, LLC ("***Ocwen***") and in favor of Randall G. ***Todt*** and Sharon L. ***Todt*** (the "Debtors').
   2. Judgment is entered against The Bank of New York Mellon FKA The Bank of New York, as Successor Trustee for JPMorgan Chase Bank, N.A., as Trustee for Novastar Mortgage Funding Trust, Series 2005-3, Series 2005-3 Novastar Home Equity Loan Asset-Backed Certificates, Series 2005-3 ("BONY"), and in favor of the Debtors.
   3. Judgment is entered against the Debtors and in favor of Saxon Mortgage Services, Inc.

   4. ***Ocwen*** and BONY are jointly and severally liable to pay damages of $44,077.07 to the Debtors, consisting of $13,000.00 for emotional distress and $31,077.07 for attorney's fees and expenses, for violations of the discharge injunction of *11 U.S.C. § 524(a)(2)*.

This is a core proceeding in accordance with *28 U.S.C. § 157(b)* as to which this Court has jurisdiction of the subject matter and the parties.

ENTERED at Manchester, New Hampshire.

Date: May 17, 2017

/s/ J. Michael Deasy

J. Michael Deasy

Bankruptcy Judge

---

End of Document