IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MONETTE E. SACCAMENO, ) | |
| ) | |
| Plaintiff, ) | Case No. 15 C 1164 |
| ) | |
| ) | Judge Joan B. Gottschall |
| v. ) | |
| ) | |
| OCWEN LOAN SERVICING, LLC, and ) | |
| U.S. BANK NATIONAL ASSOCIATION, ) | |
| as trustee for C-BASS MORTGAGE LOAN ) | |
| ASSET-BACKED CERTIFICATES, Series ) | |
| 2007 RP1, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Monette Saccameno ("Saccameno") asserts several causes of action against Ocwen Loan Servicing, LLC ("Ocwen") and U.S. Bank National Association ("U.S. Bank") (Ocwen and U.S. Bank together, "defendants"), based on their alleged wrongful loan-servicing and debt-collection activities.[1] The defendants have moved for summary judgment with respect to several counts of Saccameno's complaint. For the reasons discussed below, the motion is granted in part and denied in part.

**I. Background**

In January 2002, Saccameno obtained a mortgage for a home located in Franklin Park, Illinois. Originally issued by Ameriquest Mortgage Company, the loan was later transferred to

---

[1] Although both U.S. Bank and Ocwen are named as defendants in the suit, Saccameno's claims are based almost entirely on Ocwen's conduct. Saccameno's claims against U.S. Bank are based chiefly on the theory that U.S. Bank is vicariously liable for Ocwen's conduct. *See* 2d Am. Compl. ¶ 7. Originally, Saccameno also named Potestivo & Associates, P.C., as a defendant in connection with her FDCPA claims. The court dismissed the claims against Potestivo in a previous order. *See Saccameno v. Ocwen Loan Servicing, LLC*, No. 15 C 1164, 2015 WL 7293530, at *7 (N.D. Ill. Nov. 19, 2015).

U.S. Bank. From November 2008 to February 2009, Saccameno failed to make her monthly mortgage payments. As a result, U.S. Bank declared Saccameno to be in default and accelerated the entire balance of the loan. In February 2009, U.S. Bank filed a foreclosure action against Saccameno in the Circuit Court of Cook County, Illinois.

In December 2009, Saccameno filed a Chapter 13 bankruptcy petition. Under the terms of her Chapter 13 plan, Saccameno would pay the mortgage arrears to the Chapter 13 trustee, and in January 2010, would begin making current monthly payments to U.S. Bank. The plan provided that if Saccameno cured the pre-petition defaults, her mortgage would "be reinstated according to the original terms, extinguishing any right of the mortgagee to recover any amount alleged to have arisen prior to filing of the petition." Defs.' Ex. 8, Plaintiff's Modified Chapter 13 Plan ¶ (B)(2)(a), ECF No. 133-7.

It is undisputed that Saccameno made all of the payments in accordance with the plan's terms. In June 2013, the bankruptcy trustee issued a Notice of Final Cure Payment to Ocwen pursuant to Federal Bankruptcy Rule 3002. Ocwen did not file a response or object to the notice. Later that month, the bankruptcy court entered an order of discharge in the bankruptcy proceedings. Although Ocwen received documentation from the PACER system in July 2013 indicating that Saccameno had received a "standard discharge" in the proceedings, Ocwen's bankruptcy department coded the action as "dismissed" rather than as discharged. As a result, the loan was returned to Ocwen's foreclosure department, and in July 2013, Ocwen began sending letters to Saccameno requesting payment of amounts that had in fact been discharged in the bankruptcy proceedings.[2]

---

[2] Initially, Saccameno's loan was serviced by Litton Loan Servicing LP, which was subsequently acquired by Ocwen. Ocwen became the loan's servicer in July 2011.

Over the course of the next several months, Saccameno contacted Ocwen on numerous occasions in an attempt to correct the problem. Her efforts were unavailing. In September 2013, Ocwen began returning Saccameno's monthly loan payments because, according to Ocwen's records, they did not cure her default. In all, Ocwen rejected seventeen of Saccameno's payments. Saccameno also claims that, despite her bankruptcy discharge, Ocwen continued to pursue the foreclosure action that had been initiated against her in 2009. Although Ocwen contests this assertion, it is undisputed that Ocwen's miscoding of the discharge "triggered the already pending foreclosure action that had been in placed [sic] prior to Ocwen servicing the loan." Defs.' L.R. 56.1 Stmt. of Material Facts ("SOF") ¶ 24, ECF No. 131. Further, in June 2014, one of Ocwen's contract management coordinators "prepared and executed an Affidavit of Amounts Due and Owing for the Cook County Foreclosure matter stating that as of June 2, 2014, Saccameno owed $129,242.37." Pl.'s L.R. 56.1(b)(3)(c) Stmt. of Add'l Facts ("SOAF") ¶ 23, ECF No. 142.

Saccameno claims that until Ocwen corrected its error—apparently after the filing of this suit—she lived in fear that she would lose her home. As a result, she suffered "emotional distress, depression, mental anguish, [and] anxiety." 2d Am. Compl. ¶ 54, ECF No. 98. Saccameno also alleges that the emotional distress caused her to lose her job. Her complaint pleads five causes of action against the defendants: (1) violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*; (2) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 810 ILCS 505/1 *et seq*; (3) violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*; (4) breach of fiduciary duty; and (5) violation of a bankruptcy court's discharge injunction. In addition to compensatory relief, Saccameno seeks punitive damages.

Ocwen moves for summary judgment as to Saccameno's ICFA, breach-of-contract, and breach-of-fiduciary-duty claims. It also seeks summary judgment as to Saccameno's request for punitive damages.

**II. Discussion**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**A.     ICFA**

Ocwen first seeks summary judgment as to Saccameno's claim under the ICFA. "To state a claim under the ICFA, Plaintiffs must allege five elements: (1) a deceptive act or unfair practice occurred, (2) the defendant intended for plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) such damages were proximately caused by the defendant's deception." *Armbrister v. Pushpin Holdings, LLC*, 896 F. Supp. 2d 746, 754 (N.D. Ill. 2012). Saccameno claims that Ocwen violated the ICFA by, *inter alia*, charging her unearned fees, attempting to collect and foreclose upon a debt that was not in default; and employing communications designed to confuse her about the status of her loan.

Ocwen argues that Saccameno's ICFA claim fails because she has produced no evidence that she suffered actual damages as a result of Ocwen's conduct. According to Ocwen, Saccameno's evidence shows only emotional injury, which by itself is not compensable under

the ICFA. Rather, it is well settled that the "actual damage element of a private ICFA action requires that the plaintiff suffer 'actual pecuniary loss.'" *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (quoting *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1197 (Ill. App. Ct. 2008)). The court disagrees. As noted above, for example, Saccameno claims that she lost her job due to emotional distress caused by her problems with Ocwen.[3] Saccameno testified that she was so upset and preoccupied with trying to resolve her problems with Ocwen that she could not focus on her work. At the time, Saccameno was employed as the regional manager of dialysis facilities. She recounts carrying all of her Ocwen-related documents in a bag and bringing it to work every day, where she would spend time reviewing the paperwork, asking for advice, and discussing the problems with her coworkers.

Ocwen argues that Saccameno's narrative is contradicted by deposition testimony in which she stated that her employer never gave her a reason for her termination. *See* Def.s' Ex. 12, Saccameno Dep. at 172:9-12, ECF No. 133-11 (Q. "Okay. What reason did they give you, this dialysis place? A. They didn't really. It's not working out. Nothing was working out at that point."). But Saccameno never claimed to have been told that she was being terminated specifically because she was having trouble focusing on work. Her employer's general explanation that things "weren't working out" is entirely compatible with Saccameno's claim that her inability to concentrate on work was the root cause of her termination. Ocwen also places great weight on Saccameno's testimony that she "didn't like being in dialysis." But nothing in this statement contradicts her claim that she was fired because of her inability to focus

---

[3] Although Ocwen disputes that the termination of Saccameno's employment was caused by her problems with Ocwen, it does not dispute that a loss of employment would constitute actual damages within the meaning of the ICFA.

5

on her job. On this record, a jury could reasonably find that Saccameno would have been unable to focus on her work, and would have been terminated, even if she enjoyed her job.

Further, in addition to her own testimony, Saccameno cites the deposition of Jill Anderson ("Anderson"), one of her coworkers during the period in question. Anderson corroborates Saccameno's testimony that she spent most of her time at work focused on her dispute with Ocwen. *See, e.g.*, Pl.'s Ex. J, Anderson Dep. at 18:21-24, ECF No. 140-10 ("Q. Based on your recollection, do you remember [Saccameno] spending a majority of the time talking to people about these issues? A. Yes."); *see also id.* at 17:15-24 ("Q. Do you recall approximately how much time Monette would spend reviewing the documents and making calculations when you were working with her at the dialysis company? A. All the time. Q. What do you mean by 'all the time'? A. Well, it got to be a daily thing. She would come in and start talking about this situation of making the extra payments and that -- how the mortgage company wasn't taking the extra payments."); *id.* at 18:8-13 (A. "So she would go from one office to the next and just, you know, tell the same story over and over. And, you know, I would tell her, You're not getting any work done. You have to stop talking about it. It's going to work itself out. It just seemed kind of crazy to me that it wouldn't get worked out."). Ocwen argues that Anderson's testimony should be excluded because she has no direct knowledge of the reasons for Saccameno's termination. But Anderson witnessed Saccameno's behavior at work and she is perfectly competent to testify to regarding such matters. *See* Anderson Dep. at 33:15-21 ("A. I've -- I feel like I'm a witness to her -- kind of, her state of mind at the time. It affected her greatly. You know, I saw her kind of unravel before my eyes. I tried to help her and help her keep her job, but I really felt like she lost her job because of this -- what's happening. That was my perspective."). Viewing the record in the light most favorable to Saccameno, a jury could

reasonably conclude that her difficulties with Ocwen affected her ability to do her job and resulted in her termination.

In addition to her loss of employment, Saccameno claims prescription costs as a second form of actual damages in support of her ICFA claim. Specifically, Saccameno claims that she sought treatment for depression and anxiety as a result of her difficulties with Ocwen, and that she incurred expenses in paying for the medications (Wellbutrin and Xanax) prescribed by her physician, William Sarantos, M.D. Ocwen advances a barrage of arguments in opposition to this claim, but none of these is convincing.

First, Ocwen cites Saccameno's testimony that she was never formally diagnosed with depression or anxiety. It is true that when questioned on this point during her deposition, Saccameno expressed uncertainty regarding whether she had been formally diagnosed. *See* Saccameno Dep. at 96:19-97:1 ("Q. Okay. When were you -- have you ever been diagnosed with depression? A. I don't -- not officially. Q. Do you take -- A. I mean, I'm a nurse. Q. What now? A. I'm a nurse. I know when I'm depressed."); *see also id.* at 101:1-10 ("Q. Have you ever been diagnosed with depression? A. No. Q. Have you ever been diagnosed with any anxiety disorder? A. The doctor says that's -- I mean . . . Yeah, I mean, he says obviously that I'm under anxiety and depression, but I don't know if it would be clinical."). However, Dr. Sarantos testified that he diagnosed Saccameno with depression and anxiety. *See, e.g.*, Sarantos Dep. at 11:4-10 ("Q. All right. So tell me -- I think that letter is dated August of 2015; is that correct? A. Yes. Q. All right. At that time what was your impression of Ms. Saccameno's condition or your diagnosis? A. My diagnosis was she was suffering from anxiety and depression."). And regardless of whether the diagnosis can be deemed "official" or "clinical," it is clear that Sarantos prescribed Wellbutrin and Xanax for Saccameno to treat her depression and anxiety. Sarantos's notes and

his deposition testimony additionally make clear that, in his view, these conditions were the result of Saccameno's problems with Ocwen. *See* Defs.' Ex. 33, Sarantos Dep. at 11:8-11; 12:1-7, ECF No. 133-32 ("Q. Okay. So is it your understanding that she was having trouble with her mortgage company after her bankruptcy was discharged? A. Correct. Q. And that had caused this anxiety and depression she was experiencing. A. Yes.").

Ocwen seeks to minimize the significance of Dr. Sarantos's opinions by noting that he is a general practitioner, not a psychiatrist; but Ocwen cites no authority to suggest that expenses for medications for depression and anxiety are compensable only if prescribed by a psychiatrist. Ocwen additionally notes that Dr. Sarantos was a friend of Saccameno's family: he knew Saccameno's mother; and both Saccameno and her daughter had worked for Sarantos at different times. However, the relevance of this fact is not entirely clear. Ocwen appears to insinuate that Dr. Sarantos might have prescribed the medications for Saccameno even though she did not need them. But based on Dr. Sarantos's testimony and the observations he recorded in Saccameno's medical chart, it can reasonably be inferred that he believed Saccameno's conditions to be real.

Taking yet another tack, Ocwen points to evidence indicating that Saccameno felt depressed and anxious in 2009 when she filed for bankruptcy. Notably, however, the evidence indicates that it was only after the post-discharge problems with Ocwen that Saccameno began taking medication. *See* Saccameno Dep. at 113:1-2 (stating that Saccameno began taking Xanax in September 2013); *id.* at 114:8-19 (stating that Saccameno started taking Wellbutrin in November 2013). According to Ocwen, any expenses relating to Saccameno's purchase of Xanax are not relevant because Saccameno testified that she uses the medication only to sleep, not for anxiety. Again, this is not entirely correct. For one thing, Dr. Sarantos testified, and his contemporaneous notes indicate, that he prescribed the Xanax because Saccameno suffered from

anxiety. *See* Sarantos Dep. at 17:21-18:5 ("A. I gave her an anxiolytic called Xanax alprazolam. Q. Okay. A. A small dose. Q. All right. And is that a common drug used to manage anxiety? …. A. And panic disorder."). Further, while Saccameno indeed testified that Xanax helped her sleep, she also testified that she needed a sleep aid because of her troubles with Ocwen. *See* Saccameno Dep. at 100:17-20 ("Q. Do you take any sleeping pills? A. I take Xanax then at night, not every night, but depends on if I'm thinking about Ocwen or not."). It is true that Saccameno is on a very low dose of Xanax and that, according to her own testimony, she refills the prescription only infrequently. Saccameno Dep. at 102:2-19. However, while this might be used to show that Saccameno's Xanax expenses are modest, they are expenses nonetheless. Ocwen does not contend that the money Saccameno has spent on Xanax is so little as to be *de minimis*. And in any case, this argument does not apply to Saccameno's expenses for Wellbutrin.

Lastly, Ocwen objects that Saccameno has not submitted any evidence in the form of receipts or bills. Ocwen suggests that, in the absence of such evidence, Saccameno's claim to have purchased the medications is not credible. It is unclear whether Ocwen means to suggest that the prescriptions may never in fact have been purchased, or that someone other than Saccameno paid for them. However, Ocwen points to nothing in the record to cast doubt on the claim that Saccameno paid for them herself. Ocwen also argues that documentary evidence is necessary to quantify Saccameno's expenses, and that failure to quantify her expenses is somehow fatal to her claim. While it is clear under the ICFA that actual damages must be quantifiable or calculable. *See, e.g.*, *Hart v. Amazon.com, Inc.*, 191 F. Supp. 3d 809, 823 (N.D. Ill. 2016) ("'Actual damages [under the ICFA] must be calculable and measured by the plaintiff[']s loss.'") (quoting *Morris v. Harvey Cycle & Camper, Inc.,* 911 N.E.2d 1049, 1053

(Ill. App. Ct. 2009)), Ocwen cites no authority for the proposition that, at the summary judgment stage, a plaintiff must quantify her actual damages.

In sum, Saccameno has presented evidence from which a jury could reasonably conclude that she suffered actual damages within the meaning of the ICFA.[4] As a result, Ocwen's motion for summary judgment is denied as to Saccameno's ICFA claim.

**B.     Breach of Contract**

Ocwen next moves for summary judgment with respect to Saccameno's claim for breach of contract. Saccameno's complaint alleges that she "fully performed her duties under the note and/or mortgage as modified by Chapter 13 plan [sic] by tendering all monthly payments to the US Bank and/or Ocwen," 2d Am. Compl. ¶ 57, and that Ocwen breached the contract because it wrongfully "charged and maintained deposits in Saccameno's escrow account above the limits allowed by Saccameno's mortgage contract"; refused to accept her mortgage payments; assessed her account with unauthorized fees and costs; and failed to dismiss the foreclosure action for thirteen months, *id.* ¶¶ 60-61.

Ocwen's seeks summary judgment as to Saccameno's breach-of-contract claim on the same basis as it sought summary judgment as to Saccameno's ICFA claim: namely, that (1) actual damages are an essential element of a claim for breach of contract, and (2) that Saccameno has failed to present any evidence that she suffered such damages. The court notes that proposition (1) is not entirely true. Under Illinois law, it is possible—albeit in limited

---

[4] In addition to her loss of employment and prescription costs, Saccameno enumerates several other categories of purported pecuniary harm, including Ocwen's requests for payments that had been discharged and its return of many of Saccameno's monthly payments. *See* Pl.'s Ex. K. At least as framed in her response to Ocwen's summary judgment motion, it is not clear that these resulted in pecuniary harm to Saccameno. However, because the court concludes that the termination of Saccameno's employment and her prescription costs constitute actual damages within the meaning of the ICFA, it is unnecessary to consider whether the other forms of harm asserted by Saccameno likewise qualify as actual damages.

10

circumstances—to recover for emotional injury based on a breach of contract. *See, e.g.*, *Parks v. Wells Fargo Home Mortg., Inc.*, 398 F.3d 937, 940–41 (7th Cir. 2005) ("Illinois … does not ordinarily allow punitive and emotional distress damages for breaches of contract. Damages for breach will not be given as compensation for mental suffering, except where the breach was wanton or reckless and caused bodily harm, or where defendant had reason to know, when the contract was made, that its breach would cause mental suffering for reasons other than mere pecuniary loss.") (quotation marks, brackets, and citations omitted). In any case, proposition (2) is incorrect: as as already discussed, Saccameno has presented evidence of actual injury resulting from Ocwen's conduct. Hence, for the reasons previously discussed in connection with Saccameno's ICFA claim, Ocwen's motion for summary judgment fails as to Saccameno's claim for breach of contract.[5]

**C.      Breach of Fiduciary Duty**

---

[5] Saccameno's response brief muddies the waters somewhat by advancing an additional theory in support of her breach-of-contract claim. While the theory asserted in the complaint is based on Ocwen's violation of the terms of the "note and/or mortgage," Saccameno's response brief claims that the Chapter 13 plan approved by the bankruptcy court represented a separate contract, and that Ocwen breached the contract by misapplying trustee funds and mishandling payments. *See* Pl.'s Resp. Br. 4, ECF No. 138. As Ocwen points out, Saccameno made no mention of this theory until her response to Ocwen's summary judgment motion. Accordingly, for purposes of this motion, the court deems Saccameno to have forfeited this argument. *See, e.g.*, *Delaware Motel Assocs., Inc. v. Capital Crossing Servicing Co. LLC*, No. 17 C 1715, 2017 WL 4512709, at *3 (N.D. Ill. Oct. 10, 2017) ("Though a plaintiff need not plead a legal theory and may therefore change legal theories throughout the course of litigation, a court may treat a theory raised for the first time at the summary judgment stage as forfeited if 'the new argument change[s] the complaint's factual theory in an important way.'") (quoting *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017)); *Bell v. Bimbo Foods Bakeries Distribution, Inc.*, No. 11 C 03343, 2013 WL 6253450, at *6 (N.D. Ill. Dec. 3, 2013) ("Because Bell did not assert this theory of liability—essentially, a new claim—until his opposition to summary judgment, this untimely claim cannot be raised now.").

The final cause of action on which Ocwen seeks summary judgment is Saccameno's claim for breach of fiduciary duty. This claim is based on Ocwen's alleged mismanagement of an escrow account associated with Saccameno's loan. Specifically, the complaint alleges that "US Bank and/or Ocwen breached their duty by (a) using escrow funds to pay unearned fees and costs and to overpay taxes and insurance; (b) misleading Plaintiff as to the amount of insurance and taxes owed; (c) debiting illegal amounts from the escrow account without authorization; and (d) profiting from undisclosed fees and costs and overpayment of taxes and insurance." 2d Am. Compl. ¶ 108.

Ocwen once again argues that Saccameno's claim fails because she has not cited evidence of any injury resulting from the alleged mismanagement of the escrow account. Here, however, Ocwen's argument is persuasive. In fact, Saccameno barely responds to the argument, offering only a terse three sentences in rejoinder. First, Saccameno observes that at least one court has held that a mortgage servicer's mishandling of an escrow account can serve as the basis for a claim for breach of fiduciary duty. *See, e.g.*, *Typpi v. PNC Bank, Nat'l Ass'n*, No. 13 CV 3930, 2014 WL 296035, at \*7 (N.D. Ill. Jan. 27, 2014). This contention is true, but also inapposite: Ocwen does not dispute as a general matter that it may be held liable for its alleged mishandling Saccameno's escrow account. Rather, as already noted, Ocwen challenges whether Saccameno has adduced any evidence establishing a link between its alleged conduct and resulting harm. Saccameno's citation to *Typpi* simply does not address that issue.

Second, Saccameno claims that her expert witness, Jay Patterson, opined that "Ocwen mishandled the escrow account of Saccameno by misapplying $921.43," and that Gina Feezer, Ocwen's Corporate Witness, admitted in her deposition that Ocwen "mishandle[ed] payments received from the Bankruptcy Trustee and misapply[ied] those funds as well." Pl.'s Resp. Br. at

7. These assertions, too, speak only to Ocwen's alleged mishandling of the escrow account, not the issue of resulting damages. In fact, the cited portions of Feezer's testimony do not appear even to address Ocwen's conduct with respect to the escrow account but instead pertain to mishandled payments generally. Beyond this, however, the court notes that Saccameno's characterization of Patterson's report is inaccurate. Patterson opined that "Ocwen applied $921.43 in pre-petition funds to post-petition amounts." Pl.'s Ex. A, Expert Report of Bernard Jay Patterson 21, ECF No. 140-1. Thus, so far as the court is able to discern, the $921.43 amount is unrelated to Ocwen's handling of the escrow account. Insofar as Patterson addresses Ocwen's handling of escrow funds, he concludes that "Litton and Ocwen applied $1,130.72 more in post-petition funds to escrow than what was claimed." *Id*. As Ocwen argues, however, it is unclear how an *over*payment to escrow resulted in any harm to Saccameno. An explanation is perhaps to be found somewhere in Patterson's report. For example, at one point Patterson states that the over-application of funds to the escrow account resulted in a cumulative under-application to other accounts. *Id*. at 12. However, Saccameno does not advance this argument, or indeed any other argument on this point, and "[i]t is not the court's responsibility to research the law and construct the parties' arguments for them." *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008).

In short, because Saccameno has failed to cite any evidence to support a finding of harm as a result of Ocwen's alleged mishandling of the escrow account, Ocwen is entitled to summary judgment with respect to her claim for breach of fiduciary duty.

**D.     Punitive Damages**

Finally, Ocwen seeks summary judgment as to the issue of punitive damages, which Saccameno requests in connection with her state-law ICFA and breach-of-contract claims, as

13

well as her claim for violation of the bankruptcy court's discharge injunction.[6] Because Saccameno's request for punitive damages under the state-law claims raises issues slightly different from those raised by her request for punitive damages under the discharge injunction, the court discusses the requests separately.

**1.      ICFA & Breach of Contract**

"Under Illinois law, punitive damages may be awarded for … violations of the ICFA based on unfair conduct in cases where the defendant acts maliciously or with deliberate indifference." *Wendorf v. Landers*, 755 F. Supp. 2d 972, 981 (N.D. Ill. 2010) (citing *Dubey v. Pub. Storage, Inc.*, 918 N.E.2d 265, 277–80 (2009); 815 Ill. Comp. Stat. 505/10a(a)). Similarly, punitive damages are available for breach of contract "where the breach amounts to an independent tort and there are proper allegations of malice, wantonness or oppression." *Northbound Grp., Inc. v. Norvax, Inc.*, 5 F. Supp. 3d 956, 971–72 (N.D. Ill. 2013) (quotation marks, citations, and brackets omitted). Determining "whether to impose punitive damages requires a two-step process." *In re Estate of Wernick*, 535 N.E.2d 876, 886 (Ill. 1989). "The trial court must initially decide whether the cause of action in general and the facts of the particular case provide sufficient proof of aggravated circumstances to warrant submitting the issue to the trier of fact. This determination is a matter of law." *Id*. "If the facts of the case legally justify an award of punitive damages, the issue is then submitted to the trier of fact." *Id*.

Ocwen argues that punitive damages cannot be awarded against it in this case because its conduct is not sufficiently egregious. In support of its argument, Ocwen cites a number of factors that it believes weigh against a finding that it acted with the requisite malice in this case. First,

---

[6] Saccameno also seeks punitive damages in connection with her claim for breach of fiduciary duty. Because the court has concluded that Ocwen is entitled to summary judgment on that claim, it is unnecessary to consider whether it may support an award of punitive damages.

Ocwen claims that its miscoding of Saccameno's bankruptcy discharge was inadvertent. However, the question of whether the miscoding can be characterized as "inadvertent" is disputed. Saccameno contends that Ocwen's conduct was deliberate, or that it was at least recklessly indifferent to her rights. *See, e.g.*, Pl.'s Resp. Br. 10. On this record, a jury could reasonably draw such a conclusion.

As a second mitigating factor, Ocwen cites its attempts to assist Saccameno in obtaining a loan modification that would have reduced her interest rate and monthly payment. Here, too, however, the evidence is not entirely undisputed. Saccameno points to evidence indicating that, at least at one point, Ocwen informed her that she was not eligible for a loan modification. *See* Pl.'s Stmt. Add'l Facts ¶¶ 14-15. And even taking into account Ocwen's purported loan-modification offers, a jury still could reasonably conclude that punitive damages are warranted given Ocwen's attempts to collect payments and its failure to address the error.

As a further mitigating factor, Ocwen states that "between the time of her discharge in June 2013, and March 10, 2014 (about eight months), Plaintiff only called Ocwen 15 times, which averages about two calls a month." Defs.' Mem. Supp. Mot. Summ. J. 11, ECF No. 130. It is not self-evident, however, that this militates *against* a finding of punitive damages. The fact that it took so many phone calls and such a long period of time to resolve what would appear to be an easily-corrected error might reasonably lead a jury to conclude that Ocwen exhibited deliberate indifference to Saccameno's rights. Ocwen further contends that "no action was taken by Ocwen in the foreclosure action after Plaintiff received her discharge," and that "no steps were taken to evict Plaintiff from her home." Once again, however, this is disputed. Ocwen acknowledges that the miscoding of the discharge as a dismissal "triggered the already pending foreclosure action that had been in placed prior to Ocwen servicing the loan." Defs.' L.R. 56.1

15

Stmt. ¶ 24. Ocwen also acknowledges that in June 2014, one of its contract management coordinators "prepared and executed an Affidavit of Amounts Due and Owing for the Cook County Foreclosure matter stating that as of June 2, 2014, Saccameno owed $129,242.37." Pl.'s L.R. 56.1(b)(3)(c) Stmt. of Add'l Facts ¶ 23, ECF No. 142.

In sum, on this record, the court denies Ocwen's motion for summary judgment as to Saccameno's request for punitive damages on her ICFA and breach-of-contract claims.[7]

## 2. Discharge Injunction

Saccameno also seeks punitive damages based on Ocwen's violation of the bankruptcy court's discharge injunction. The law is clear that punitive damages may be awarded for violations of discharge injunctions. *See, e.g.*, *Romanucci & Blandin, LLC v. Lempesis*, No. 16 C 9710, 2017 WL 4401643, at *6–7 (N.D. Ill. May 4, 2017); *see also* 3 William L. Norton Jr. & William L. Norton III, Norton Bankruptcy Law and Practice § 58:2 (3d ed. 2017) ("A majority of courts also allow punitive damages in appropriate cases for a violation of the discharge injunction although, unlike the statute governing violations of the automatic stay, punitive damages are not specifically mentioned in Code § 524.6.") (citation omitted). "[C]ourts that have awarded punitive sanctions for violations of the discharge injunction require actions taken with

---

[7] In her Local Rule 56.1(b)(3)(C) Statement of Additional Material Facts, Saccameno cites evidence regarding consent judgments that Ocwen entered into with the New York State Department of Financial Services beginning in 2011. *See* Pl.'s SOAF ¶¶ 29-40. The judgments identified a number of deficiencies in Ocwen's infrastructure and loan servicing practices, and required Ocwen to take corrective measures, including retention of an independent compliance monitor. *See* Pl.'s SOAF ¶¶ 29, 31. Saccameno further observes that the compliance monitor subsequently found that Ocwen had failed to implement certain of the corrective measures. *Id*. ¶¶ 34-39. Based in part on this evidence, Saccameno asserts in her Statement of Additional Material Facts that Ocwen "has a history as a recidivist violator of the discharge injunction." *Id*. ¶ 40. Ocwen argues on various grounds that the evidence of the consent judgments is inadmissible. However, Saccameno has not relied on any of this evidence in opposing Ocwen's motion for summary judgment. Accordingly, the court need not address the admissibility *vel non* of the consent judgments.

either a malevolent intent or a clear disregard and disrespect of the bankruptcy laws[,] and . . . it is not sufficient to merely show that the actions were deliberate." *In re Vazquez*, 221 B.R. 222, 231 (Bankr. N.D. Ill. 1998).

Ocwen argues that the standard for awarding punitive damages for violation of a discharge injunction is more onerous than the ordinary standard for punitive damages. According to Ocwen, this is because punitive damages for violation of a bankruptcy discharge are based on the court's contempt power, not on any statutory authority. It is not clear whether Ocwen is correct on this point. While some courts have indeed relied on the contempt power in imposing punitive damages for violation of a discharge injunction, others have awarded punitive damages based on § 105 of the Bankruptcy Code, which provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out" Title 11's provisions. 11 U.S.C. § 105. *See, e.g.*, *Romanucci & Blandin,* 2017 WL 4401643, at *6–7; *see also In re Walker*, 180 B.R. 834, 847–48 (Bankr. W.D. La. 1995) ("The majority of courts also allow punitive damages [for violations of discharge injunctions] but differ as to their reasoning."). Yet even assuming that the standard for punitive damages is indeed more onerous for violations of discharge injunctions, the court concludes that there is sufficient evidence in the record from which a jury could conclude that the standard has been met here. It is unclear precisely why Saccameno's discharge was initially miscoded. It is also unclear why the error took so long to correct, particularly in light of Saccameno's numerous attempts to communicate with Ocwen. On this record, the court cannot say as a matter of law that in violating the bankruptcy discharge injunction, Ocwen acted without malevolent intent or a clear disregard for bankruptcy laws.[8]

---

[8] Because Ocwen contends that punitive damages for violations of discharge injunctions are imposed pursuant to the court's contempt power, Ocwen additionally argues that the issue of whether to award such damages is one for the court, not a jury. As noted above, it is not clear

Thus, the court denies Ocwen's motion for summary judgment with respect to Saccameno's request for punitive damages.

### III. Conclusion

For the reasons discussed above, Ocwen's motion for partial summary judgment, ECF No. 129, is granted as to Saccameno's claim for breach of fiduciary duty and denied in all other respects.

Date:  November 8, 2017                                       /s/
                                                 Joan B. Gottschall
                                                 United States District Judge

---

that punitive damages in this context must be based on the court's contempt power. In any event, the court declines to address the issue because it was raised for the first time only in Ocwen's reply brief. *See, e.g.*, *Landale Signs & Neon, Ltd. v. Runnion Equip. Co.*, No. 16-CV-7619, 2017 WL 1208506, at *3 (N.D. Ill. Apr. 3, 2017) ("Federal courts may consider arguments raised on reply at their discretion.") (citing *United States v. Wilson*, 962 F.2d 621, 627 (7th Cir. 1992)).