```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   MONETTE SACCAMENO              )   Docket No. 15 C 01164
                                    )
 4                 Plaintiff,       )   Chicago, Illinois
                                    )   April 3, 2018
 5          v.                      )   9:30 a.m.
                                    )
 6   OCWEN LOAN SERVICING, LLC, and )
     U.S. BANK NATIONAL ASSOCIATION,)
 7   as trustee for C-BASS MORTGAGE )
     LOAN ASSET-BACKED CERTIFICATES,)
 8   Series 2007 RP1,               )
                                    )
 9                 Defendants.      )

10                          VOLUME 1-A
                   TRANSCRIPT OF PROCEEDINGS - Trial
11        BEFORE THE HONORABLE JOAN B. GOTTSCHALL, and a Jury

12   APPEARANCES:

13   For the Plaintiff:   NICK WOOTEN, LLC, by
                          MR. NICK WOOTEN
14                        4935 Bay Hill Drive
                          Conway, AR 72034
15
                          SULAIMAN LAW GROUP, LTD., by
16                        MR. MOHAMMED O. BADWAN
                          MR. ROSS M. ZAMBON
17                        2500 South Highland Avenue
                          Suite 200
18                        Lombard, IL60148

19   For the Defendants:  DUANE MORRIS, LLP, by
                          MR. ALEXANDER D. BONO
20                        MS. LYNNE E. EVANS
                          MS. KELLY K. HUFF
21                        30 South 17th Street
                          Philadelphia, PA 19103
22
     Court Reporter:      LISA H. BREITER, CSR, RMR, CRR
23                        Official Court Reporter
                          219 S. Dearborn Street, Room 1854B
24                        Chicago, IL 60604
                          (312) 818-6683
25                        lisa_breiter@ilnd.uscourts.gov
```

1          (In open court outside the presence of the jury.)

2          THE COURT:  Okay.  We put in these clocks so they're

3     all at the same time, and they're completely not.  One of the

4     jurors just walked in, so we're just going to wait until she's

5     ready and then we're set to go.

6          MR. WOOTEN:  Your Honor, before we start, Mr. Bono and

7     I want to bring up an issue to just bring to the Court's

8     attention, get your guidance on how we need to address it, and

9     we can do that now if you'd like.

10         THE COURT:  You better do it because I needed to know

11    before we recessed last night.

12         MR. WOOTEN:  It is.  Well, this is what -- this is

13    what came up overnight.  Nick Wooten for Ms. Saccameno.

14         After we had the jury impaneled, I asked my paralegal

15    to go back and make sure that none of the jurors were -- none

16    of the jurors had -- were posting social media or had anything

17    that was potentially problematic.

18         Her investigation seems to indicate that Juror No. 1

19    potentially was involved in a foreclosure bankruptcy a few

20    years ago when she was previously married, and none of us

21    recall that she mentioned that.  And so in fairness, I told

22    Mr. Bono about it, and he suggested we let you know and ask you

23    what we should do.

24         THE COURT:  You tell me what you want me to do.  I

25    mean, I don't think we should stop this morning, but if you

1     want me to inquire of her at some point, I would be happy to do

2     it.  But I don't think we should hold off on the opening

3     statements.

4              MR. WOOTEN:  I don't want to either necessarily.  I

5     want us to get going, but I did want everyone to be aware in

6     the sense of fairness.

7              THE COURT:  Thank you.

8              MR. BONO:  First, your Honor, I appreciate Mr. Wooten

9     advising me of that.

10             THE COURT:  Let's get beyond formalities because we're

11    in a hurry.  Just tell me what you want me to do.

12             MR. BONO:  I think you should examine her at some

13    point about whether this is accurate or not.  I don't know

14    whether it is or not, but I think it is --

15             THE COURT:  Okay, so what --

16             MR. BONO:  -- worth inquiry because she didn't respond

17    to your questions or ours.

18             THE COURT:  Will you give me at a convenient time the

19    name and what you found.  My guess is do you want to do it at

20    the break.  I mean --

21             MR. BONO:  Yeah.

22             THE COURT:  We'll take a break between the two opening

23    statements like a 10-minute break, or do you want to do it at

24    lunchtime?  You know, it's sensitive, so let me know what you

25    want me to do and I'll do it.

1          MR. WOOTEN:  If it ends up, you know, that we have to

2     excuse her, that's obviously your discretion.  I think if we do

3     it at lunchtime, it's not going to make any difference if she

4     sits here half a day.

5          THE COURT:  Lunchtime is fine with you?

6          MR. BONO:  Yes.  Yes, your Honor.

7          MR. WOOTEN:  I'll have my paralegal send the

8     information to Jason so that he can give it to you.

9          THE COURT:  That's perfect.  And then I want to tell

10     you what I plan to do once I've seen the information and

11     we'll -- maybe we'll do it -- well, we can talk at the break

12     about when we're going to do it as soon as I've seen the

13     information.  Are we ready?  Yes, we are ready.

14          MR. BONO:  I love your screensaver, your Honor.

15     That's one of the greatest places on the face of the earth.

16          (Jury enters courtroom at 9:34 a.m.)

17          THE COURT:  Good morning, ladies and gentlemen.

18     Please be seated.

19          As I said last evening, we're going to begin with the

20     opening statements, and if we're -- Mr. Wooten, are you ready

21     to go?

22          MR. WOOTEN:  Just one second.

23          THE COURT:  Sure.

24          MR. WOOTEN:  In my argument, I was making an edit, and

25     I'll be ready.

Opening Statement - Plaintiff

1           THE COURT:  Let's see.  Did you get pads and pencils?

2    Oh, good.  Did you get coffee?  A successful morning.

3           MR. WOOTEN:  Good morning, everybody.

4           THE JURORS:  Good morning.

5              OPENING STATEMENT ON BEHALF OF PLAINTIFF

6           MR. WOOTEN:  You're going to see a stack of papers.

7    Don't be intimidated by it.  The case is too important for me

8    to -- I'm starting off great.  I think this is a comedy show at

9    the moment.

10          As I was saying, the case is just a little too

11   important for me to try to remember all this.  So I've got it

12   written down, and you'll see me look down at it and I hope you

13   won't hold it against me.

14          Yesterday we talked a lot about bankruptcy because the

15   importance that this issue's going to play in the case.  I

16   wanted to just talk to the jury this morning and describe to

17   you the two types of consumer bankruptcies and explain what

18   Ms. Saccameno's bankruptcy was so that you can focus on the

19   proper issue in this case.

20          We've got a little graphic for you.  The two types of

21   bankruptcies are Chapter 7 and Chapter 13.  And now you'll see

22   it pop up.  But when you're talking about a Chapter 7, this is

23   where I think most people think of as bankruptcy.  Chapter 7 is

24   a liquidation.

25          You say I cannot pay my debts, and you go to court and

Opening Statement - Plaintiff

1   you file a petition and the Court gives you a discharge and you

2   walk away.  You don't pay anything.  So for purposes of the

3   explanation, the hypothetical we're talking about is we're just

4   assuming a $20,000 default.  The debtor determines that they

5   can't pay it.  So they walk away from their home and they walk

6   away from the debt, and they go to court and they file a

7   Chapter 7.

8          The Bankruptcy Court looks at the petition and says,

9   okay, they can't pay.  It's clear that they should be

10  discharged.  And they enter an order of discharge and that --

11  that discharge is the debtor's obligation to pay that debt.

12  And it also discharges a creditor's ability to collect it.

13         But what also happens is the bank can then turn around

14  and foreclose on the property and sell the home to a new buyer

15  to recover their loan.

16         Now, in Chapter 13, what bankruptcy lawyers call this

17  is a repayment plan.  And in a Chapter 13, let's talk about

18  that same $20,000 default.  Here's the important part.  The

19  homeowners stay in the home.  They do not walk away.  And they

20  propose a plan to repay the default through the bankruptcy

21  court.

22         The bankruptcy court take a look at that plan, and

23  they have to approve it.  We'll get into that detail a little

24  bit.  But once they approve it, then the trustee is going to

25  oversee the repayment of that default.

Opening Statement - Plaintiff

1    The Court will confirm that repayment occurs when all
2    the payments are made, and then the Court will enter a
3    discharge.  And what happens then is when all this process is
4    completed after the discharge is entered, there should be no
5    more default, the loan is declared current, the discharge order
6    will prevent any collection from any amounts that were owed
7    prior to the discharge being entered.  But the obligation to
8    keep paying that mortgage payment continues.
9    So it's not a release of debt, and it's not protection
10   from the mortgage payment.  This is simply an opportunity to
11   pay back what you fell behind on, and then you're protected
12   from someone saying, oh, wait a minute, wait a minute, wait a
13   minute, we forgot about this, okay.
14   So when you get to the discharge order, you've reached
15   completion.  And I'll talk a little bit about the plan and how
16   it works in a minute.  Now, we heard some bits and pieces
17   yesterday in jury instructions, and we really couldn't get into
18   you in full about what the evidence was until we had this group
19   of people in place.
20   Now, when we get to the end of this case, I think what
21   you're going to realize is this case is not going to be about
22   whether Monette Saccameno should win this case and you should
23   find in her favor because Ocwen's going to admit everything
24   that we've alleged to establish that they're liable to Monette
25   Saccameno.

Opening Statement - Plaintiff

1          Instead, I think what you're going to find is the

2    fight and the clash in this case is going to be about the

3    question of what you should do with that finding of liability.

4    The question's going to be should Ocwen only pay compensation

5    to Monette Saccameno or should you also punish Ocwen in

6    addition to compensation for the way they treated Ms. Saccameno

7    over a period of four years and nine months.

8          I believe when you look at all the evidence in the

9    case, you're going to find that Ocwen was involved in utterly

10   reckless disregard of the law and of the effects of its conduct

11   on Monette Saccameno.

12         Now, going back to the parties, as I talk about this,

13   let me clarify something for you.  You're going to hear me talk

14   about the terms "mortgage servicer," "servicer," "mortgage

15   company," and I'll try not to be loose with that language.  But

16   if you hear that language, I'm going to be talking about Ocwen

17   unless I specifically say otherwise.

18         There will be a point where we talk about the prior

19   servicer for a few minutes.  Not a big deal.  When I use those

20   terms, I'm generally going to be talking about Ocwen every

21   time.  But I'll try to say "Ocwen" in most instances.

22         The second part of this is U.S. Bank.  You notice that

23   the people here are representing Ocwen, and U.S. Bank is also a

24   defendant.  And the situation with U.S. Bank is this:  During

25   the course of this case, you're not going to hear a lot about

Opening Statement - Plaintiff

1    U.S. Bank.  In fact, I think most of what you hear about U.S.

2    Bank, you'll probably hear in the first 30 minutes of

3    testimony.

4            And that's because there's probably not going to be

5    any real dispute that what happened is U.S. Bank hired Ocwen to

6    service mortgage loans.  And one of those loans was

7    Ms. Saccameno's.  And I think Ocwen's going to admit everything

8    about its relationship that you'll need to know to be able to

9    find that U.S. Bank is also responsible for what Ocwen did in

10   this case.

11           And the judge will tell you at the end of the case

12   what we have to show, but when we start talking about U.S. Bank

13   in the first 15 or 20 minutes, make some good notes on what's

14   agreed to there because that's going to be all you need is just

15   three, four, five facts.  And then most of everything else

16   you're going to hear is going to be about Ocwen.

17           Now, let me talk a little bit about burden in the

18   case.  The judge spoke to you in the preliminary charges about

19   our burden.  And it's really -- it's not just our burden, it's

20   their burden.  If there's any fact in dispute in this case, all

21   you have to do is decide if the fact is more likely true than

22   not true.  No more than that.

23           You don't have to get to any higher hurdle.  It's just

24   simply when you've heard everything, is this likely true.  And

25   when you think about that standard, don't allow your mind to

Opening Statement - Plaintiff

1    say, oh, well, I've got to have absolute certainty that this

2    occurred.  I got to know beyond a shadow of a doubt.

3            There will be a lot of facts in this case that are not

4    even in dispute.  A lot of things that we say are wrong,

5    Ocwen's going to admit to you they did.  So when you start

6    thinking about the things that are actually contested, remember

7    you can take all the facts together to find that what's in

8    dispute is more likely true than not true.

9            Now, let me talk to you for a little bit about how

10   Chapter 13 works operationally, how the plan actually works.

11   Chris, can you put up that graphic for me on that.

12           When Ms. Saccameno or any consumer proposes a

13   Chapter 13 plan, they actually are taking on an extra

14   obligation.  They have to do two things during the term of this

15   plan.  And in Ms. Saccameno's case, she had a 42-month plan.

16   So she filed her petition in December of 2009, and her plan

17   called for her to continue to make each mortgage payment just

18   like she had no default going forward for 42 months.

19           And at the same time, she's paying an additional

20   amount to the trustee that's appointed by the bankruptcy court,

21   and she's got to make that monthly payment for 42 months.  And

22   so she's going to do that every month -- and it's going to be

23   undisputed -- between when her plan started and the discharge

24   date in this case, which is June 27th of '13.

25           And the reason it's important is this:  You see these

Opening Statement - Plaintiff

1    shows on TV about the Animal Planet and all the predators in

2    the wild and they look at the herd and they're waiting on one

3    to be weak or make a mistake and they pounce.  It's a similar

4    analogy to how the bankruptcy Chapter 13 process works for the

5    mortgage company.

6           Think of it as a race.  Monette's got to run that 42

7    months, and she's got to hit both those dots every month.  And

8    the first time she stumbles, the mortgage company's going to be

9    on her.  Judge, she missed a payment, throw her out of

10   bankruptcy.

11          So if she doesn't get to that finish line, the judge

12   says, yep, she missed payments, let me throw her out, it's

13   going to be just like she never filed bankruptcy at all.

14   That's the significance of the discharge.  If she got there,

15   she did everything she was supposed to do.

16          Now, once she gets to this point, she's made all the

17   payments, the Chapter 13 trustee will go to the Court and say

18   according to my records, this consumer's paid everything she's

19   supposed to pay.  And the Court will look at the trustee's

20   report and say, yep, it looks like it.

21          In this district, a lot of times the discharge order

22   will go out in a mortgage case like Monette's where she's

23   repaying her mortgage, and right about the same time, another

24   important document will go out and it's called a notice of

25   cure.

Opening Statement - Plaintiff

1          Now, what that notice of cure requires is that the

2    creditor who was the mortgage creditor during the Chapter 13

3    gets the notice of cure.  Chris, show us Exhibit 10 for a

4    second.  And I'm going to show you the form of this notice.

5          And what this notice of cure requires -- and this

6    notice went to Ocwen in this case.  But what this notice

7    requires is down in the bottom paragraph, the trustee says in

8    this box this is what the claim allowed and this is what she

9    paid.  And then down at the bottom, it says this. "Within 21

10   days of the service of the notice of final cure payment, the

11   creditor must file and serve a statement as a supplement to the

12   proof of claim."

13         They have to answer two questions, y'all, and the two

14   questions are this.  Do you agree with the trustee that they've

15   paid you everything you're supposed to get paid under the proof

16   of claim, and do you agree that the debtor has paid every

17   payment during the term of her plan.

18         Now, that seems like maybe it's a little tedious.  It

19   seems like if somebody who missed a payment, we'd already know

20   about it.  But this rule is designed to protect both sides.

21   It's designed to prevent us from being here today.

22         Because what's supposed to happen in this process is

23   that company is supposed to respond to that order and say we

24   agree or we don't agree.  And if they don't agree, then the

25   Court has a process to resolve that dispute.  Monette could

Opening Statement - Plaintiff

1    either make a few more payments if she actually owed money that

2    she had not paid, or the Court could look at what they said and

3    say you know what, you're wrong, she made these payments, she's

4    done.

5              But the point of it is to keep us from being where we

6    are today.  The point obviously keep a creditor from coming

7    back after discharge and saying no, you owe us money from back

8    here, and that's exactly what happened in this case.

9              Now, Ocwen agrees that it has to follow the rules of

10   bankruptcy in servicing any mortgage loan account.  Ocwen also

11   agrees that it cannot collect debt in violation of the law

12   including the bankruptcy discharge.  Now, having said that, let

13   me tell you about the rules that apply to this case.

14             Rule No. 1, every mortgage company is required to

15   follow the loan agreements between the lender and the consumer.

16             Rule No. 2, every mortgage company is required to

17   properly handle a consumer's payments.

18             Rule No. 3, every mortgage company is required to

19   follow the law.  This includes treating consumers fairly and

20   dealing honestly while handling the consumer's mortgage loan

21   account.  Another way to say it is a mortgage company can never

22   cause needless harm to a consumer or needlessly threaten a

23   consumer's home ownership.

24             Now, let me tell you the story of what happened in

25   this case.  Between November of 2008 and January of 2009,

Opening Statement - Plaintiff

1    Monette had some financial problems.  When she gets on the

2    stand, I'll let her tell you specifically what happened.  But

3    she got behind on her mortgage.  You'll find out how.  It was

4    unavoidable.  It is also irrelevant.

5         Because what happened is in early 2009, she was trying

6    to catch up, but her prior mortgage company filed foreclosure.

7    So Monette had a decision to make.  Do I walk away, or do I

8    propose a plan to repay this default and save my family home,

9    which she had owned at that time about 15 years.

10        Monette decided that what she wanted to do was repay

11   the default and get a fresh start, so she filed a Chapter 13.

12   As I showed you on the previous graphic, that was filed on

13   December 31st of 2009, and it required her to pay back her

14   mortgage -- her default over 42 months.

15        You'll find out that this was not an easy decision for

16   Monette.  She felt like a failure.  It was upsetting.  She even

17   had to take some medicine for a couple months to deal with her

18   angst and her upset about the feelings of failure that she had

19   from being in this position, and she was upset with herself.

20        But after a couple months, she got into a groove and

21   she realized that she was going to handle it and she went

22   forward, and she was making all of her payments.  And nobody's

23   going to dispute that she made every payment.

24        Now, once this started in early -- in January of 2010,

25   everything was fine until September 1st of 2011.  At that point

Opening Statement - Plaintiff

1    Monette got a notice that Ocwen was going to become her

2    mortgage loan company.  Now, you'll find that what happened

3    here is something called a transfer of mortgage servicing

4    rights.  And this is common in the industry.

5             Anyone with a home mortgage could go home today and

6    find a notice saying your current mortgage company is no longer

7    your mortgage company.  You're going to have this new mortgage

8    company.  And that's what happened here.

9             Now, this process and industry standard and the way

10   the business works means that no one determines who their

11   mortgage company is.  We could have any mortgage company handle

12   our loans and we have no say-so.  There's no box to check to

13   take a vote.  It's simply whatever the industry does.  We have

14   no say.

15            Now, after September 1st, 2011, Monette continued to

16   make direct mortgage payments to Ocwen now and also to the

17   trustee for her Chapter 13 plan.  But once Ocwen came in the

18   picture, some things started happening, and she got a little

19   bit concerned.  Let me give you one example.  Chris, can you

20   show us 1088, please.

21            Now, she got a statement in October of 2011, the month

22   after Ocwen became the servicer.  And the statement said that

23   she had a payment due of over $16,000.  Now, obviously if

24   you're in Chapter 13 and you're paying back your default, you'd

25   be upset to see someone saying you owed $16,000 for a single

Opening Statement - Plaintiff

1   month.  Because the way Chapter 13 works is you commit any

2   extra income you have to pay back your default.

3          So Monette knew she couldn't pay $16,000, so she

4   called her bankruptcy lawyer up and said, hey, what is this?

5   And he said, look, don't worry about this.  When you get to

6   discharge, all this will be straightened out.  You just send a

7   payment every month.  And so she took her lawyer's advice, and

8   that's what she did.

9          Now, you're going to see statements throughout this

10  case that are like this.  They're just really not explainable.

11  They don't fit into the factual outline.  And we'll talk a lot

12  about it as we go through.

13         Now, Monette made all her payments despite these

14  statement issues all the way through to June 27th, 2013.  She

15  made her last payment according to the discharge, and the Court

16  served the notice of cure on Ocwen.

17         Now, despite Ocwen being obligated to respond to the

18  notice of cure and say to the Court and to Monette we agree

19  you've paid everything you're supposed to pay or we don't

20  agree, Ocwen made its first mistake.  An employee of Ocwen

21  looked at the notice of cure and made an entry in Ocwen's

22  records that this notice of cure that we showed you was

23  actually an order dismissing Monette's case.

24         Again, the difference between dismissal and discharge

25  is critical to your understanding of this case.  So let me show

Opening Statement - Plaintiff

1    you what we're talking about.  If you think of -- go back to

2    the plan analogy that we had, the other exhibit.  If you think

3    of this plan as a race, Monette's got to hit 42 dots for the

4    regular payments and 42 dots for the trustee over a period of

5    three and a half years.  And if she hits all those dots and she

6    gets to the end of that race, it's like running through the

7    finish line.  Whoo, I got a discharge.  I'm free.  I can start

8    over.

9            Now, what free and starting over means in this case is

10   not that she doesn't owe her mortgage.  It means I'm back to

11   zero.  I don't have anything behind, and I can go forward

12   clean.  That's what discharge means in this case.

13           Dismissal, if she missed any of those dots, is a

14   different story.  You're right back to start zero, nothing.

15   It's just like you never filed.  She could have had her plan

16   dismissed on the 41st month if she had missed payments.  The

17   Court doesn't care.  You either pay your plan or you don't.

18   And if you don't, you get dismissed.  That's the rules.

19           So I wanted to use these analysis to help you

20   understand discharge versus dismissal because it's so critical.

21   Ocwen does not dispute that this coding error happened.  And

22   Ocwen will tell you that they've never seen a document in this

23   case that said Monette's bankruptcy was dismissed.

24           And I think Ocwen will agree that no competent

25   employee could work in bankruptcy and not be able to

Opening Statement - Plaintiff

1   distinguish a notice of cure from an order of dismissal.

2           Now, this is where we get to the crux of this case

3   because Ocwen's going to stand up and they're going to say this

4   was -- I believe the term was simple human error, unintentional

5   and harmless to Saccameno.  We obviously disagree or we

6   wouldn't be here today.

7           Our position is that what they call simple human error

8   is actually just how Ocwen does business.  Ocwen conducts its

9   business knowing normal daily practices will cause needless

10  harm to consumers, but Ocwen does nothing to fix the problems.

11          We believe the evidence will also show that even after

12  acknowledging this mistake, Ocwen did not do anything to

13  correct the problem.  The evidence will show that Ocwen took

14  steps to intentionally ignore the discharge.  We'll show you

15  Ocwen's own records where one employee will say, hey, she got a

16  discharge, and another employee will say don't pay attention to

17  that.  She owes us money.

18          We also will show you that despite Ocwen failing to

19  respond to the Court and ignoring this notice of cure, Ocwen

20  claimed that Monette did not pay everything she was supposed to

21  pay and use that as a basis to restart her foreclosure to begin

22  way back in 2009 and to start collections actions against her.

23          We also believe the evidence will show that Ocwen's

24  system of record, REALServicing, the Ocwen employee's operating

25  system, made significant mistakes in Saccameno's payment

Opening Statement - Plaintiff

1    history.  These mistakes led directly to Ocwen's claim that

2    Saccameno had not paid all the money she was supposed to pay

3    during her bankruptcy case.

4         We think that we'll show that the problems Monette had

5    with Ocwen are problems that any customer of Ocwen could have

6    had because the systemic problems that Ocwen has.  We also

7    believe the evidence will show that Ocwen had many, many

8    opportunities to fix this problem.

9         Ocwen lacked either the ability or the willingness to

10   correct this mistake.  And by not correcting this mistake, they

11   allowed this nightmare to go on for four years and nine months,

12   from the date of the mistake until this day right here.

13        We also think that this mistake, you'll see, is a

14   mistake that benefits Ocwen financially, that there's a

15   financial motive to make this type of error and not correct it.

16   We believe the evidence will reveal that anybody who has Ocwen

17   as their mortgage company could have this type of problem, and

18   it could go on this long.

19        The reason to discharge is important in this case is

20   because it is a rule of law that prevents Ocwen from doing

21   exactly what it did here.  Once the discharge was ordered,

22   Ocwen could not do anything to collect money from Monette

23   Saccameno that occurred or they claim was owed prior to the day

24   the discharge entered.

25        Remember, she's got to make her payments going

Opening Statement - Plaintiff

1    forward.  That's not in dispute.  But the whole purpose of this

2    race she ran for 42 months was to cross that finish line and

3    get back to zero so she could go forward clean.

4         Ocwen ignored that and continued throughout this

5    entire period of time since June 27th of '13 to pursue

6    collection against her until we were in this litigation.

7         Now, you'll also hear about problems with Ocwen

8    failing to accurately transfer information into its system.

9    And the process of bringing Monette's loan onto REALServicing,

10   Ocwen made an accounting error that just so happened to be in

11   their favor in the amount of about $4,200 and change.

12        The evidence will also show you that Ocwen failed to

13   correctly process a number of payments.  In other words, they

14   failed to recognize them and handle them the right way.  You'll

15   also learn that Ocwen made mistakes with something called an

16   escrow account.  And if you don't know what an escrow account

17   is, it's simply money that you pay each month that your

18   mortgage company holds to pay your taxes and insurance.  And

19   you'll find out that Ocwen made mistakes there as well.

20        We're also going to show you a number of documents

21   from Ocwen to Ms. Saccameno that have false statements and

22   material inaccuracies.  Chris, can you show us 1080.

23        Now, 1080 is a March 2013 statement.  Now, this

24   statement shows that three months before discharge, Ocwen

25   claimed that Ms. Saccameno owed almost -- well, over $9,000

Opening Statement - Plaintiff

1    worth of late payment, and they also claimed -- if you'll go to

2    the middle section, Chris, in the statement, that this amount

3    was due immediately.

4         Now, the very next month, despite the fact that

5    Ms. Saccameno had only paid a single mortgage payment as her

6    plan required, she received a statement in April of 2013 that

7    said -- it's your computer?  We got to reboot the computer, but

8    I will tell you what the statement says.  The statement says

9    two things that are important to this case.

10        First, that Ocwen now owes Monette $1100.  She's got

11   an $1100 credit balance in her favor and she doesn't owe

12   another payment until September of 2013.  Ladies and gentlemen,

13   those two documents don't pass any logic at all.  She made one

14   payment, and the balance changed by almost $10,000.  And the

15   next payment according to Ocwen was not due until three months

16   after she was discharged.  Another example of the types of

17   things Monette was dealing with the whole time she was dealing

18   with Ocwen.

19        Throughout the case, you're going to see a significant

20   number of errors like that.  You're going to see a significant

21   number of confusing, misleading and false statements containing

22   documents, and you'll hear about some of the things that

23   Monette was told by Ocwen while she was trying to resolve this

24   problem.

25        You'll also see that Ocwen's attempts to collect from

Opening Statement - Plaintiff

1    Monette again just days after her discharge.  For instance, on

2    July 6th of 2013, she got a letter from Ocwen that basically

3    said -- and Monette will tell you this is how she termed it --

4    if you don't pay us, you'll never be able to even rent in this

5    town again.

6            And that is merely four days after they made the

7    coding error where they tagged her loan as being dismissed, not

8    crossing the finish line instead of discharged, crossing that

9    finish line.  We'll show you many times Ocwen could have

10   prevented or stopped this nightmare by demonstrating what I

11   think you will agree will be basic competence.  That simply

12   didn't happen in this case.

13           Now, what did this do?  You're going to hear from

14   Monette that when she first realized there was an issue, she

15   called actually asking about refinancing.  She thought her

16   interest rate was high given the market.  And someone told her,

17   hey, you're $8,000 behind.  This is less than a week, maybe a

18   week after the discharge order was entered.  And she said no,

19   ma'am, I've paid everything I'm supposed to pay.  I should be

20   due for this month.

21           And so she took her documents and faxed them to Ocwen

22   and said, hey, let's get this straight, and she started with an

23   optimism that it was a simple misunderstanding and it would be

24   cleared up easily and there would be no problems.

25           After a couple months, a crushing reality set in that

Opening Statement - Plaintiff

1    ultimately caused Monette to experience depression, anxiety,

2    stress and fear.  Fear of losing her home and fear of becoming

3    homeless.  You'll find Monette was diagnosed by her family

4    physician with anxiety and depression.

5         Her family physician is a gentleman named

6    Dr. Sarantos, and because of his schedule, we're going to have

7    him here Wednesday morning.  He'll be the first witness.

8    Dr. Sarantos, he's going to tell you about all the treatment he

9    provided and all the diagnoses he made and how he came to his

10   conclusions to reach his diagnosis.

11        Now, Dr. Sarantos, you're going to find -- and I'm

12   telling you now -- has had a long-standing relationship with

13   Monette and her family.  He's going to tell you that he knew

14   Monette's mother.  They knew Monette and Monette's daughter.

15        In fact, Monette and Monette's daughter both worked

16   for him periodically during their careers.  But I think what

17   you're also going to find is that Ocwen does not contest his

18   diagnosis.  They're not going to show you medical evidence

19   that's wrong.  They may harp on his relationship, but they

20   can't rebut what he says.

21        But I also think you're going to find that

22   Dr. Sarantos is going to be very truthful and very credible.

23   You're going to have no reason not to accept what he tells you

24   about Monette's condition.

25        You're going to also hear from another person who's a

Opening Statement - Plaintiff

1    forensic accountant.  His name is Jay Patterson.  I think if

2    everything goes smoothly, we'll have him on the stand Thursday

3    morning.  It's possible we might have to move that around a

4    little bit depending on the flow of things.

5           But Jay Patterson, what he does is he takes years of

6    payment histories from the servicer's records, and he

7    reconstructs it into a format that we can understand.  And he

8    points out any issues in the math, any issues with any payments

9    that didn't go the way the mortgage loan said it should go or

10   the Chapter 13 plan said it should go so that we can highlight

11   where we should focus our energy on the accounting portion.

12          Now, similar to Dr. Sarantos, Jay Patterson is a

13   friend of mine.  I've known Jay for 10 years.  His wife's an

14   attorney.  That's how we met.  But Jay's never testified for me

15   before.  And I think Jay will tell you as soon as he gets on

16   the stand that if I came to him and asked him to testify in a

17   case and he thought there was an issue with the accounting,

18   he'll tell me, and if he didn't think there was an issue with

19   the accounting, he'd tell me that, too.  Because he didn't have

20   time to fool with cases where he didn't have something that he

21   could work on.

22          Now, Jay's accounting's going to show you every dime,

23   every penny, everything that happened to show you exactly what

24   went wrong, exactly when it went wrong, and exactly how those

25   things affected Ocwen's statement at discharge that Monette

Opening Statement - Plaintiff

1   still owed money.

2           Now, Jay also gets paid for his time.  So when Jay

3   gets on the stand, I'm going to go over what he's been paid and

4   what he's done so that there's -- that's no secret either.  You

5   don't hire a forensic accountant without paying him.  I think

6   everybody understands that.

7           And you don't hire somebody to come testify in court

8   without paying them.  So I'm going to tell you all about that

9   while he's on the stand when we're talking so we cover all

10  these things for you, and you can focus on the actual findings

11  and the evidence versus what he got paid and who he's friends

12  with.

13          Now, other witnesses you're going to hear from in this

14  case.  You'll hear from two of Monette's former co-workers, a

15  lady named Jill Anderson and a lady named Susan Van Sky.

16  You'll find out that Susan Van Sky is an attorney and a nurse.

17  And Monette met her at work, and Susan tried to help her fix

18  this problem.

19          I think you'll hear from Susan that she thought after

20  she looked at Monette's records the same thing Monette thought.

21  This has got to be a misunderstanding.  This is too

22  straightforward.  This should be simple so fix.  And so she

23  agreed to help Monette thinking that a lawyer telling them the

24  same thing that Monette had already told them would hopefully

25  get Ocwen's attention and they would fix the problem.  She'll

Opening Statement - Plaintiff

1   tell you how that worked out for her.

2          Jill Anderson was a co-worker of Monette's during the

3   summer of 2014, and she's going to tell you how this was

4   affecting Monette by this time.  She's going to tell you

5   Monette was toting a bag around with all the records.  She was

6   completely distracted.  She couldn't function at work, and

7   ultimately Monette was fired because she wasn't working.  She

8   was focused on her problem with Ocwen.

9          Monette's children will talk to you about how this has

10  impacted their mother.  The type of testimony is always

11  difficult for me because by this time in the case, I'm close to

12  my client.  I'm closer to family.  But you're going to hear how

13  this changed Monette and how difficult this process has been

14  for her.

15         Because of Ocwen's actions, Saccameno was forced to

16  seek legal help to address her problem with Ocwen.  Ocwen

17  ignored her payments, made serious accounting errors, ignored

18  the bankruptcy discharge and pursued foreclosure over a period

19  of years.  Only this lawsuit stopped Ocwen's collection

20  efforts.

21         We're suing Ocwen for violating three important rules.

22  First, Ocwen did not follow the loan documents that made up

23  Saccameno's mortgage loan account.  Ocwen acknowledges it must

24  follow the loan documents when servicing a mortgage loan

25  account, and I expect the evidence will require Ocwen to admit

Opening Statement - Plaintiff

1   that it did not follow these loan documents when servicing

2   Monette's mortgage loan account.

3           When a mortgage company does not follow the loan

4   documents when servicing a mortgage loan account, consumers can

5   lose their homes.  When a mortgage company does not follow the

6   loan documents when servicing a mortgage loan account,

7   consumers can lose substantial amounts of money trying to

8   prevent a foreclosure.

9           When a mortgage company does not follow the law,

10  consumers are needlessly harmed.  Ocwen did not handle properly

11  Monette's mortgage payments.  Ocwen admits that the law

12  requires Ocwen to properly handle her mortgage payments.

13          Saccameno and the bankruptcy trustee paid to Ocwen all

14  42 payments required of each of them for the Chapter 13 plan.

15  Ocwen mishandled some of these payments.  After the discharge,

16  beginning in August of 2013, Saccameno paid to Ocwen a mortgage

17  payment every month for 17 months, and Ocwen wrongfully

18  rejected all 17 of these payments while trying to pursue

19  foreclosure.

20          When a mortgage company does not handle payments

21  correctly, consumers are needlessly harmed.  Ocwen admits it

22  did not single out Saccameno for special treatment.  Ocwen

23  admits it handles every customer's mortgage loan account the

24  same way Ocwen handled Saccameno's.

25          Anyone who has a mortgage loan account serviced by

Opening Statement - Plaintiff

1    Ocwen can find themselves facing the same nightmare experience

2    that Monette's lived through.  Ocwen will admit failure to

3    handle a consumer's payments correctly needlessly threatens a

4    consumer's home ownership and needlessly harms consumers.

5           Ocwen did not follow the law and did not treat

6    Saccameno fairly or deal with her honestly while servicing her

7    mortgage loan account.  This conduct began when Ocwen did not

8    handle Saccameno's and the bankruptcy trustee's payments

9    correctly during her Chapter 13.

10          It continued when Ocwen did not honor Saccameno's

11   bankruptcy discharge.  It went on further when Ocwen did not

12   follow the required rules of bankruptcy procedure regarding the

13   notice of cure, and the conduct continued after the discharge

14   when Ocwen refused to correct its account records, continued to

15   refuse to honor the discharge and began to pursue foreclosure

16   and reject payments.

17          Ocwen's witness will testify Ocwen was aware that

18   Saccameno was in Chapter 13 when Ocwen became her mortgage

19   servicer.  Ocwen will admit that Ocwen had access to all the

20   information needed to properly process Saccameno's bankruptcy

21   discharge in its records.

22          Ocwen's records will show Ocwen did not process

23   Saccameno's bankruptcy discharge correctly.  Ocwen either did

24   not look at readily available documents and records within its

25   system to find the discharge order or Ocwen chose to ignore the

Opening Statement - Plaintiff

1    discharge order.

2           Ocwen also got notice of the discharge directly from

3    Monette Saccameno in early July 2013, merely days after it had

4    been entered when she found out Ocwen was requesting $8,000.

5    Ocwen again chose to ignore the bankruptcy and the order of

6    discharge from the bankruptcy court.

7           Ocwen received all the money required by Saccameno's

8    Chapter 13.  Ocwen failed to accurately account for these

9    payments, and they chose not to properly account for payments

10   or they ignored certain payments to continue to pursue

11   Saccameno.

12          After July 23rd, 2013, less than a month after the

13   discharge was entered, Ocwen admits any employee using its

14   servicing software, REALServicing, would have knowledge of

15   Saccameno's bankruptcy discharge.

16          Ocwen either did not look at its own records or chose

17   to ignore those records so it could continue to pursue

18   Saccameno.  Ocwen received evidence Saccameno had made all

19   payments due from Monette Saccameno directly in August of 2013

20   and again from Susan Van Sky in March and April of 2014.  Ocwen

21   either did not look at these proofs of payment or chose to

22   ignore the proofs of payment.

23          Ocwen ignored the discharge order and continued to

24   pursue collections and foreclosures after June 27th of 2013.

25   Ocwen sought thousands of dollars from Saccameno to reinstate

Opening Statement - Plaintiff

1   her mortgage loan that Ocwen had no right to collect.  They did

2   this and refused to allow Saccameno to pay the mortgage

3   according to the terms of her mortgage loan documents.

4          Ocwen kept Saccameno's home tied up in foreclosure

5   from the time of the discharge through about March 14th of

6   2016.  Ocwen did not abandon the foreclosure that it filed

7   until this litigation had been ongoing for more than a year.

8          Illinois state law forbids unfairness and deception in

9   the conduct of trade or commerce.  Federal law requires a

10  mortgage company to do certain things in response to requests

11  from consumers.

12         Federal law forbids debt collectors from any act or

13  conduct that harasses, oppresses or abuses.  Federal law

14  forbids debt collectors from using any faults, deceptive or

15  misleading means to collect a debt.  Federal law forbids debt

16  collectors from any using any unfair or unconscionable means to

17  collect any debt.

18         When a mortgage company ignores the law, mortgage

19  company needlessly threatens a consumer's home ownership.  When

20  a mortgage company ignores the law, improper foreclosures

21  occur.  When a mortgage company ignores the law, consumers can

22  lose thousands of dollars.  And when a mortgage company ignores

23  the law, consumers are needlessly harmed.

24         Because Ocwen broke these rules, Monette Saccameno

25  lost thousands of dollars trying to save her home.  Monette

Opening Statement - Plaintiff

1    lost hundreds of hours trying to get Ocwen to correct its

2    records.  Monette lost a job because of distraction, stress,

3    worry caused by Ocwen's conduct.

4          Because Ocwen broke these rules, Monette Saccameno

5    suffered mental anguish including stress, anxiety, fear, worry

6    and depression.  You'll hear the testimony of Monette's

7    treating physician.  He'll testify about her condition.  He'll

8    testify about how her condition was during the time of his

9    treatment, and he'll explain his diagnosis and he'll explain

10   the treatment he gave her.

11         Dr. Sarantos will tell you he prescribed Monette Xanax

12   for her anxiety beginning September 28th, 2013, through at

13   least February of 2017 on an as-needed basis.  Dr. Sarantos

14   will tell you he made this prescription for Monette because of

15   stress, worry and anxiety.  We attribute these problems,

16   Monette and I, we attribute these problems solely to Ocwen's

17   treatment of her.

18         Dr. Sarantos will tell you he prescribed Monette

19   Saccameno Wellbutrin from September 28th, 2013, through at

20   least February of 2017.  Again, Dr. Sarantos will tell you that

21   he prescribed this medication based on the depression Monette

22   was experiencing during this time frame.  He will tell you that

23   the type of depression he diagnosed he described as a

24   melancholy type depression.  He equated that to the type of

25   depression one experiences when they lose a loved one.

Opening Statement - Plaintiff

1    In addition, Saccameno's co-workers and children will
2    provide you testimony regarding their observations of the harm
3    Monette experienced from Ocwen's conduct.  Every second of this
4    could have been avoided if Ocwen had simply honored the
5    bankruptcy discharge.
6    All of this could have been avoided if anyone from
7    Ocwen had cared to see the problems in Monette's payment
8    applications, if anyone from Ocwen had cared to see Saccameno's
9    Chapter 13 was discharged.  She crossed the finish line.  She
10   was back to zero versus dismissed.
11   If anyone had seen the Chapter 13 was discharged,
12   Ocwen would have allowed Saccameno to just make her normal
13   monthly payments, be back to zero and go forward without any of
14   this experience.  If anyone from Ocwen had reviewed their own
15   records, everything that's occurred in the last four years and
16   nine months would have been avoided.
17   Anyone could have seen the discharge order in any of
18   the following ways:  First, they could have reviewed the
19   electronic bankruptcy document or docket from the court.
20   Second, they could have reviewed their own redundant services
21   that provided them the bankruptcy filings from the court.
22   Third, they could have reviewed Monette's
23   communications with them in early July 2013.  Fourth, they
24   could have reviewed scanned images in REALServicing, at least
25   by July of 2013.

Opening Statement - Plaintiff

1          Fifth, they could have reviewed the notes logs in

2    REALServicing at any time after July 23rd, 2013, through today.

3    Ocwen either ignored all this information, failed to review

4    this information when received or simply wished not to see what

5    was in the records to be seen.

6          Ocwen used the excuse of nonpayment to push forward

7    with collections and pursue foreclosure against Saccameno in

8    July of 2013.  Ocwen rejected 17 straight monthly payments from

9    Saccameno beginning in the fall of 2013.  Ocwen could have

10   stopped all this harm by simply doing what the law required

11   Ocwen to do; by maintaining accurate, reliable records for

12   Saccameno's mortgage loan account; by honoring the discharge;

13   by not pursuing foreclosure and collections improperly; by

14   providing proper training to its employees; by implementing

15   proper procedures and policies to comply with the law.

16         Ocwen ignored multiple opportunities immediately

17   following discharge to avoid every harm Monette Saccameno has

18   experienced.

19         After Ocwen finally acknowledged receiving the

20   bankruptcy discharge in its internal records, Ocwen employees

21   on multiple occasions refused to do something in REALServicing

22   that would have stopped all the collection activity.  It's

23   something that Ocwen calls raising a bankruptcy flag.

24         It's literally as simple as going to the proper screen

25   at the computer and going "boop."  It literally takes that much

Opening Statement - Plaintiff

1    effort.  And no one did it at any time from July 23rd, 2013,

2    any time after the discharge to the present day.  In fact, you

3    will see numerous occasions where an Ocwen employee says

4    specifically do not raise the flag.

5            Ocwen demanded over $8,000 in July 2013 from Saccameno

6    within days of her discharge.  They told her if she didn't pay

7    this amount, she would be foreclosed on.  When Saccameno

8    refused to pay this amount, Ocwen, in fact, restarted its

9    foreclosure.

10           Based on what Monette Saccameno has experienced over

11   four years, she's experienced stress, anxiety, depression and

12   fear related both to losing her home and being homeless.

13   Another important factor is over this period of time, Monette's

14   mostly isolated herself, and you'll hear about this for her.

15           She denied herself simple pleasures in life.  She's a

16   widow, a mother of two children.  She had no romantic

17   interests.  She had no social life.  Monette will tell you she

18   was terrified to do anything for fear that if she incurred any

19   unnecessary expense, it would affect her ability to save her

20   home.

21           Ocwen's conduct made Saccameno a prisoner inside her

22   own home.  People will ask why would a mortgage company do this

23   to someone?  Why couldn't this problem be fixed?  I don't think

24   we'll ever get the answer to that question.  But there is a

25   theme that you're going to see throughout this evidence.

Opening Statement - Plaintiff

1    Ocwen continually sought money from Saccameno Ocwen
2    was not legally entitled to collect.  The evidence will show if
3    Ocwen honored the bankruptcy discharge, Ocwen could not claim
4    any of the money that it sought from Saccameno after June 27th,
5    2013.

6    We believe the evidence will show Ocwen made a
7    financial decision to ignore the discharge.  We believe Ocwen
8    thought one of two things would happen.  Saccameno would cave
9    in and pay thousands of dollars that Ocwen had no right to
10   collect to just stop this attack on her, and nobody could blame
11   her.

12   Or Ocwen must have thought that eventually to grind
13   Monette Saccameno into the ground, and she would just walk
14   away.  You can have it.  Just leave me alone.  Unfortunately
15   for Ocwen, neither one of those things happened.

16   Some people simply refer to this mindset as what I
17   like to call the Wall Street golden rule.  Mr. Bono mentioned
18   Wall Street several times during voir dire yesterday.  But the
19   Wall Street golden rule, as I call it, is he who has the gold
20   makes their own rules.

21   And apparently Ocwen believed that it did not have to
22   follow the law, that it could make its own rules and that it
23   could grind Monette Saccameno into the ground.  When Mr. Bono
24   stands up to tell you about Ocwen's position, I'm going to be
25   listening trying to understand what Ocwen says today about why

Opening Statement - Plaintiff

1    they did this to Monette.

2         Now, I suppose they might contend that Ocwen doesn't

3    believe Monette.  They might say that Monette isn't harmed the

4    way we say she's harmed.  They might contend that there's some

5    problem with some piece of this evidence, but I doubt you'll

6    hear Ocwen say that it handled Saccameno's payments correctly.

7         I doubt you'll hear them say that it handled

8    Saccameno's accounting correctly.  I doubt you'll hear them say

9    that they honored the bankruptcy discharge.  I doubt you'll

10   hear them say they complied with the rules about the notice of

11   cure.

12        You might hear them say it's all a big

13   misunderstanding.  They might say that Ocwen's nameless,

14   faceless employee sincerely apologizes for coding Monette

15   Saccameno's Chapter 13 as dismissed instead of discharged.  And

16   I hope you're all familiar with something I call crocodile

17   tears.  Any of you all ever heard that term?

18        Crocodile tears where I come from is what your kids

19   cry when they get caught.  It's not repentance.  It's not

20   sorrow.  It's, Daddy, I don't want a spanking because I did

21   wrong.  So if some form of crocodile tears comes from Ocwen

22   today and over the course of this trial off this witness stand,

23   I hope an alarm bell goes off in your head.  And the question I

24   hope that you ask yourself is why today?  Why not July of 2013?

25        At least even if you can honestly tell this jury that

Opening Statement - Plaintiff

1    you didn't get the notice through the normal procedures that

2    you had in place with redundancies, why not when you

3    acknowledged Monette Saccameno sent you the discharge, why

4    didn't you fix it then?

5             Or how about this question.  Why not any of the 1,735

6    days between that mistake and me standing in front of you

7    today?  Because that's a fair question, too.  To determine the

8    amounts of harm to losses, the only thing you can consider is

9    what Monette has been through.  You can only consider what she

10   suffered.

11            Everybody here, judge and all the lawyers and all the

12   parties agree your verdict has to be based on the evidence,

13   just the harms and losses only.  Everything else is outside the

14   box.

15            You might be angry.  You might be sympathetic.  You

16   might be upset.  You might think this is outrageous.  But you

17   can't let emotion drive a verdict.  What you have to have is

18   cold, hard analysis.  What does it take to make this lady right

19   for four years and nine months?  And what does it take to make

20   sure nobody else has this done to them?  That's the two things

21   you have to decide.

22            As I was thinking about this, I was trying to figure

23   out how I could express to you how much time is involved in

24   four years and nine months.  So I turned it into hours or days,

25   1,735.  That's a big number.  And when you multiply that by 24

Opening Statement - Plaintiff

1   hours, you get 41,640 hours.  That's a lot of hours, but what

2   does it mean?

3           All of us know about a 40-hour workweek.  That's one

4   way to do it.  If you look at a 40-hour workweek, that's 1,051

5   40-hour work weeks.  You know what it also is?  It's the same

6   amount of time in a 20-year career of 40-hour workweeks.  And

7   some of us are old enough to have been working something for 20

8   years, and we know that's a long time.

9           This lady did everything the law required her to do.

10  These people did nothing.  When you get to the end of the case,

11  because what she's been through, I want to ask you for what may

12  sound like a lot of money right now.  But when you get through

13  hearing all this, you may think it's not enough.

14          Because of this 20 years of 40-hour workweeks' worth

15  of suffering.  1,735 days of worry that every time she turned

16  the corner, all of her stuff was going to be in the front yard,

17  and she would be homeless.  That nightmare and the things that

18  flowed from it, I'm going to ask you at the end of this case to

19  award compensation to Monette Saccameno of $750,000.

20          That's just the first step.  The evidence is going to

21  show that she's entitled to at least compensation.  But I think

22  from what you're going to see, you're going to think that

23  punishment is appropriate.  And that's where you're going to

24  get the opportunity to say whether you think this conduct is

25  acceptable.

Opening Statement - Defendants

1    And when it comes time for you to say whether you

2  think this conduct is acceptable, I'm going to ask you to write

3  down a number of $5 million for punitive damages because Ocwen

4  should never treat anyone the way that it treated Monette

5  Saccameno.  Thank you for your attention, ladies and gentlemen.

6    THE COURT:  Thank you.  Ladies and gentlemen, before

7  we start the opening statement for the defense, it's a good

8  time for a short mid-morning break.  So let's try to keep it as

9  close to 10 minutes as we can.

10    COURT SECURITY OFFICER:  All rise.

11   (Jury exits courtroom at 10:31 a.m.)

12    MR. WOOTEN:  How much time did we go?

13    THE COURT:  You took almost an hour.

14    MR. WOOTEN:  Maybe lunch after they get through.

15    THE COURT:  Everybody take 10 minutes.

16   (Recess at 10:32 a.m., until 10:41 a.m.)

17    THE COURT:  Lawyers, don't forget we're waiting for

18  whatever you're going to give us.

19   (Jury enters courtroom at 10:42 a.m.)

20    THE COURT:  Please be seated, everyone.  Mr. Bono.

21    OPENING STATEMENT ON BEHALF OF DEFENDANTS

22    MR. BONO:  Thank you, your Honor.  To err is human, to

23  forgive, divine.  To err is human, to forgive, divine.  To err

24  is human, to forgive, divine.  These seven simple words capture

25  a human mystery.  We all made mistakes.  This case will be

Opening Statement - Defendants

1    about mistakes.

2          The evidence will show there may be mistakes on both

3    sides.  Remember the first thing we had up on the screen, the

4    scales?  There may be mistakes on both sides, but we're very

5    confident, very confident that we'll be -- that the evidence

6    will show after Ocwen's mistake, it took steps to rectify, to

7    fix and eventually give Monette Saccameno exactly what she

8    wanted.  Exactly what she wanted.  And should there be

9    forgiveness?  As the community, you get to decide that.

10         So just to go back and reiterate, who are we, why are

11   we here and what do we want?  As we said yesterday, my name is

12   Alexander Bono.  My father called me Lex for some reason.  That

13   means "law" in Latin, so -- and Bono means "good," so good law.

14         I happen to be supported with a great team.  With me

15   today are Lynne Evans, one of my colleagues from Philly.

16   Please stand.  She'll be involved in the case.  She'll be

17   examining witnesses depending on who gets involved.

18         Kelly Huff, another colleague who will probably

19   examine a witness depending on who gets involved.  And probably

20   the most important person for me is my expert technology

21   assistant, Justin Fields.  So Justin will be pulling up things

22   to be able to help me present evidence and help me present this

23   opening statement.

24         Also in the court, you met yesterday Joel Israel.

25   Joel Israel is from Ocwen from the legal department.  And you

Opening Statement - Defendants

1    didn't meet yesterday Gina Feezer.  So Gina Feezer, also from

2    Ocwen.  She's a loan analyst.  I hate to say that I drug her

3    into court today, but she wasn't here yesterday in court

4    because she was feeling under the weather.  I think it was

5    bronchitis or something like that.  But she's better now and

6    we're glad to have her here.

7            I'm privileged to appear before Judge Gotschall.  I'm

8    privileged to represent the two defendants, U.S. Bank and

9    Ocwen.  We'll use the short term, just Ocwen and U.S. Bank.

10           Why are we here?  Contrary to what we heard in the

11   opening on the other side, Ocwen adamantly disagrees that it

12   engaged in any kind of illegal conduct; that any of the claims

13   are valid, and we think that we will show to you through the

14   evidence that Ocwen engaged in reasonable conduct to try to fix

15   the problem.  And we're going to tell you there was a problem

16   here.  We're not running from it.  We're not going to hide from

17   it, and you'll hear about that.

18           And last, what do we want?  We're going to ask you at

19   the end of the case for what's called a defense verdict.  The

20   judge is going to give you a form that will say, in essence, do

21   you find for the plaintiff on this claim or defendants.

22           I forget if it has our name or just says "defendants."

23   I'm going to ask you to put a big black X next to the

24   defendants because we're confident the evidence will show

25   that's right, that's fair.  That's what the evidence shows.

Opening Statement - Defendants

1          So this opening statement, it's kind of like when you

2     go to the movies.  Previews, coming attractions.  We get to

3     tell you about what the evidence will show.  There are really

4     two key issues in this case that you're going to have to look

5     at.

6          And what you're going to have to decide, the two

7     issues you're going to have to decide is, one, is there

8     liability, and that's did Ocwen and U.S. Bank do something.

9     Did they breach a contract?  That's one of the claims.  Did

10    they violate the Illinois law?  Did they violate federal law?

11    So that will be an issue for you.

12         And then the second part of your job will be were

13    damages -- did the plaintiff prove, did the plaintiff prove

14    that damages were caused by U.S. Bank and by Ocwen?  So those

15    are the two key issues for you that we'll be looking at

16    throughout this trial.  We're going to be presenting evidence

17    to show you.

18         Next.  We go second.  And the judge brought this up in

19    voir dire and in the introduction.  It's very natural when

20    you're hearing someone explain that you listen to that side.

21    There's a lot of jury research that's done and said many jurors

22    decide within the first 48 minutes of the case how they're

23    going to decide at the end.

24         I'm going to ask you to do your best.  Please be

25    patient.  Please wait for all the evidence to come in, just as

Opening Statement - Defendants

1    we talked about in voir dire.  And I asked you specifically,

2    and you self-selected for us because you all agreed I can wait.

3    I can listen to both sides of the story before I do the last

4    thing, which is weigh the strength of the evidence.  Look at

5    the evidence from both sides, and then you get to decide those

6    two issues, liability and damages.

7            So next.  What's the setting of this case, of this

8    preview, this movie preview you were looking at?  We didn't

9    hear too much about this in the opening on the other side, but

10   where do you start?  You start that there was a loan.

11           The plaintiff borrowed $135,000 with an eight and a

12   half percent adjustable rate note that was secured by a

13   mortgage.  So all of you homeowners, you know how that works.

14   You want to buy that house.  You're not sitting around with

15   $135,000.

16           You go to a lender and you say I'd like to buy that

17   house.  Can you give me $135,000.  And the lender says, I'll

18   give it to you.  Here's the interest.  You're going to have to

19   pay me the interest back, and I'm going to have a mortgage,

20   which means I have a security interest in your home.

21           So if you don't pay me back, your home is -- the

22   technical term is collateral.  So you collateralize the debt by

23   your home.  Gina will explain that to you.  What was number two

24   as part of the setting?  There was a default.  There was a

25   default.

Opening Statement - Defendants

1        Mr. Wooten said she'll admit she had some problems,
2   but she failed to pay back the borrowed money.  I mean, when
3   you borrow money, the deal is I give you money as a lender and
4   you pay me back with interest.  She understood the deal.
5        Anybody who owns a home knows that's the deal.
6   Anybody who's ever borrowed knows that's the deal.  If you have
7   a credit card, you know I can use this piece of plastic and the
8   bank standing behind it will let me buy something and I don't
9   need cash, but I owe on my credit card.  I got to pay it back.
10       So the evidence will show that she defaulted not only
11  on the principal and interest, but the escrow account.  And pay
12  attention to what the evidence shows on the escrow account
13  because the evidence will show that taxes and insurance go into
14  this account.  It's not just the principal on the loan and the
15  interest.  You have to also put in money for taxes.  'Cause if
16  you don't, the tax collector of Cook County in this instance
17  will come around, foreclose on your home, and they'll take your
18  home for not paying your taxes.  So she defaulted on those
19  payments.
20       What happens next?  That triggers the lender that has
21  collateral in the home to initiate a foreclosure lawsuit.  So
22  we'll get an explanation from Gina about a foreclosure lawsuit.
23  But you probably heard or read about what a foreclosure is.
24       And that's the bank or the lender is allowed to go in
25  the court and say, The person I gave $135,000 isn't paying me

Opening Statement - Defendants

1    back.  I want to go in and I want to take my collateral.  And

2    that's what the document, the loan documents say.

3         If I don't pay you back, you can accelerate my loan,

4    which means you pay 100 percent of what's owed.  It's not just

5    a monthly payment due.  She agreed, the evidence will show, she

6    agreed to acceleration.  So by defaulting, she owed 100 percent

7    of what was due.

8         How do you get paid?  How do you get made whole?  You

9    just put out $135,000 five years ago.  We need the money back.

10   We didn't just give it away.  You have to foreclose.  And

11   there's a lot of negative and hateful kind of information that

12   comes about foreclosure.

13        But you have to look at it from the perspective of do

14   you have an IRA?  Does your IRA have mutual funds?  Does

15   your -- do your mutual funds invest in financial institutions?

16   You might own Ocwen and not even know it.

17        So there was a foreclosure lawsuit filed because a

18   loan wasn't being paid back.  And we're going to get into this

19   a little later in the outline, but this wasn't the first

20   foreclosure brought against Ms. Saccameno.  It was the third in

21   nine years, the third.

22        Do I want to say she understood the process?  If

23   you've gone through it once, that's enough for most people.

24   One foreclosure action is bad.  To go through three of them, I

25   bet that's really bad.  I'm just making a guess.  It hasn't

Opening Statement - Defendants

1    happened to me.

2         But instead of paying it off the third time through,

3    she filed for bankruptcy.  And what does bankruptcy do?

4    Bankruptcy just puts a stop and says you don't have to pay any

5    more, you're in bankruptcy.  Everything's on hold.  Pay through

6    the trustee.  Pay through the bankruptcy.

7         So what it does is it does give you a fresh start, but

8    it also gives you a timeout.  You don't have to pay when you're

9    in bankruptcy until you get a plan approved.  Once you get

10   what's called a bankruptcy plan approved -- the evidence will

11   show all this.  Once you get that plan approved, you pay what

12   the plan says.

13        Next.  So we say the evidence is going to show --

14   we're very confident the evidence is going to show there's no

15   liability here, and that's what you, as jurors, should find.

16        Next.  Why do we say there's no liability?  There are

17   really four important reasons.  The first, human error.  We're

18   going to describe Marla's mistake.  It's not some nameless

19   Ocwen employee.  It's a person like you or me.  She made a

20   mistake at work.  Her name's Marla.

21        Second, we're going to show you that the plaintiff

22   made some mistakes with borrowed money.  As I've already said,

23   this wasn't her first rodeo with foreclosure.  In fact, what

24   you're going to find out is that this loan, this $135,000 loan

25   was a refinance of a loan that she had defaulted on or been

Opening Statement - Defendants

1    foreclosed on.  So pay attention for that evidence coming in.

2         The fourth thing -- third thing you're going to hear

3    about is Ocwen helps its customers.  Ocwen cares about

4    customers.  It's not some abusive predator, which I think was

5    sort of the suggestion made, that you should punish Ocwen or

6    punish U.S. Bank.

7         It helps its customers, and Gina's going to talk about

8    that.  And you're going to see the documentary evidence.  We're

9    going to put up on your screens in the box the documents, and

10   look at those documents and see how many ways, how many times

11   Ocwen tried to help, offered solutions and tried to work with

12   this borrower.

13        It made exactly what she wanted.  They offered her

14   attractive loan modifications, interest rates going from

15   8 percent -- remember we said she borrowed at eight and a half

16   percent down to 3.6 percent.  Well, I'm a lawyer, so as a

17   matter of course, I can't be good at math.  Lawyers just aren't

18   unless they have accounting degrees, too.

19        But it doesn't take a rocket science to say you're at

20   eight and a half percent and we'll give you a loan at 3.66.  Is

21   that a deal?  Did they offer her a deal?

22        And then they offered her one even better.  They said

23   we'll give you a new mortgage at two percent, and your monthly

24   payment will go from 1600 bucks a month down to 875.  Wait for

25   the evidence to come in on that.  Pay attention.  It's very,

Opening Statement - Defendants

1    very important.

2         There are no counterclaims in this case.  Ocwen and

3    U.S. Bank aren't trying to collect on this debt.  It dismissed

4    the foreclosure action.  Ocwen and U.S. Bank aren't trying to

5    collect her defaults.  They're basically letting it go at this

6    point to show -- to show that this is an aberration.  This was

7    abnormal.  And Ocwen cares, helps and wanted to fix this

8    problem with Ms. Saccameno.

9         The last important point on liability is mental health

10   issues.  Very, very complicated.  I know you saw those little

11   things that were handed out to each juror for a reason.  We

12   dealt with them in confidence.  But mental health issues are

13   extremely complicated, and we're going to get into that.  There

14   will be a lot of evidence on that.

15        So next.  How is the evidence coming in?  First, Gina

16   Feezer is a senior loan analyst at Ocwen.  We're going to call

17   her.  She's going to describe the servicing industry.  She's

18   going to describe her experience.

19        I want you to pay attention because they're going to

20   bring in a self-proclaimed expert, self-proclaimed expert.  And

21   compare and contrast Gina's experience analyzing loans, on the

22   firing line as opposed to a hired gun who's going to -- who's

23   going to admit he teaches at a boot camp on how you beat up on

24   mortgage companies.

25        A boot camp to indoctrinate lawyers, to indoctrinate

Opening Statement - Defendants

1    lawyers how to beat up on mortgage companies.  That's who their

2    self-proclaimed expert is.  And compare him to the experience

3    you're going to hear about Gina looking at this.  She looked at

4    Ms. Saccameno's loan.  She's going to testify about the

5    details, the specifics.

6          She's going to testify about the company she works for

7    and why she loves working for Ocwen.  She's not just picking up

8    a paycheck.  She loves working for Ocwen because it is an

9    industry leader in trying to do the right thing, trying to fix

10   mortgage situations when customers run into problems.  It

11   helps.  It services.

12         She's also going to explain to you without too much

13   detail the investor, U.S. Bank.  What happens is banks go out.

14   They buy mortgages.  Then they need to have them serviced, so

15   they hire companies like Ocwen.  So servicing, in essence, is

16   they collect the payments, the monthly payments.

17         Though if they're collecting taxes and insurance,

18   they'll pay those as well, and then they send out monthly

19   statements.  So that's a very, very short nutshell.

20         Next.  Evidence is going to come in from plaintiff's

21   witnesses, and pay attention to what -- who the plaintiff's

22   witnesses are.  They're going to call Gina Feezer, our -- our

23   witness.  They're going to call Ms. Saccameno.  They're going

24   to call her daughter.  They're going to call her son.

25         They're going to call Jill Anderson, a friend and

Opening Statement - Defendants

1    co-worker.  Susan Van Sky, a friend, a lawyer, a nurse, former

2    co-worker.  What can you say about all those people with

3    Ms. Saccameno?  Will the evidence show loved ones?  Will the

4    evidence show friends that might, of course, empathize with

5    their mom, of course, empathize with their friends.

6          But the judge is going to instruct you on credibility

7    and how much credibility you have to give them on psychological

8    harm.  Next.  Dr. Sarantos, there's going to be a lot of

9    testimony from him coming in Wednesday.  I don't think he has

10   office hours then.  He's a family friend.  He went to Alana's

11   wedding.  He is an internist.

12         Next, Bernard Patterson.  He is a CFE.  And we'll talk

13   about that in a little bit.  Wait till you hear what a CFE is.

14   I'm just going to leave that now because I want you to think

15   about that.

16         Next.  The human error.  Here's what we're going to

17   see about human error.  We had the picture of somebody spilling

18   coffee on their computer board.  I'm going to say that never

19   happened to me, but I hope it will be true.

20         So what we're going to see is Marla's mistake.  Marla

21   is the person who miscoded the bankruptcy.  There's no question

22   she miscoded it.  It should have said "discharge."  She put

23   "dismissed."  Instead of being discharged, the case was

24   dismissed.  And what did that do?

25         Next -- oh, before that, Ocwen is sorry.  It's not

Opening Statement - Defendants

1    crocodile tears.  I mean, you shouldn't trivialize someone

2    who's trying to do the right thing, trivialize by calling it

3    crocodile tears.  You're going to hear from Gina about how

4    Ocwen cares.  You might even hear from Mr. Patterson about how

5    Ocwen cares.

6            Let's see if he knows any industry data about how many

7    loans were forgiven in Illinois in 2017 by Ocwen, how many were

8    forgiven in the United States of America by Ocwen.

9            So next.  The evidence will show that Ocwen fixed

10   Marla's mistake.  It went to their system.  They recognized she

11   made a mistake, and I have kind of a timeline here.  And how

12   did they -- how did this play out?

13           So the timeline is, one, they recognized the coding

14   error that was made.  The coding error was made July 2nd.  It

15   wasn't made right after?  The evidence is going to show Ocwen

16   did not receive this notice of cure until after the judge had

17   already dismissed -- had already discharged the bankruptcy.

18   They didn't get it until after the fact.

19           That's not an excuse.  We're not trying to make

20   excuses.  Ocwen will own up to the mistake.

21           What happened after this recoding?  Ms. Saccameno

22   called in on the 15th of July, and by July 25th, the miscoding

23   was fixed.  But unfortunately payments were returned over a

24   17-month period, and I'll explain why in a second.

25           Next.  There were two -- and why is there were two

Opening Statement - Defendants

1    impacts from Marla's mistake.  The first is the bankruptcy

2    process didn't follow the, quote, normal course, and Gina's

3    going to explain that much better than I will about what the

4    evidence will.

5            But I want you to think when you hear Gina testifying

6    about what is the normal course in a bankruptcy if there's a

7    discharge as opposed to a dismissal.  So Gina's going to

8    explain that to you.  And the second is the records showed she

9    was not, quote, contractually current.  So again, an important

10   term about why things went in the direction they did and the

11   payments were returned to Ms. Saccameno.

12           Next.  So a little more detail.  The miscoding by

13   Marla triggers what's called a workflow.  The workflow was

14   initiated.  FC means foreclosure.  We're going to admit they

15   opened up the foreclosure function within Ocwen, but I want you

16   to look at what we're going to -- what plaintiff has as its

17   No. 2 exhibit.

18           It's going to be Plaintiff's No. 2.  It's going to be

19   the complaint against Ms. Saccameno, what's called the docket

20   entries.  The docket entries list everything that happened in

21   that case.  I want you to look at it carefully, ladies and

22   gentlemen.  Because you look at it and see was Ocwen out there

23   trying to collect against her?

24           You're going to see nothing was happened in that case

25   until Ocwen eventually dismissed it.  So I heard that there's

Opening Statement - Defendants

1    going to be testimony about her fear that she was going to be

2    out on the street and homeless.  I want you to look at the

3    evidence that's coming in because the evidence is going to say

4    was that a rational fear?  When you use your common sense and

5    look at it, ask yourself was that a rational fear?

6         Next.  Ocwen initiated -- this is what you're going to

7    see.  The workflow starts, but you're not going to see demands

8    you owe me $135,000, pay me back.  I still hold your

9    collateral.  I still got that note.  You're going to see

10   letters coming out offering to help her.

11        You're going to see December the 3rd, the same day the

12   workflow was initiated, they kick out a HAMP mod to her and say

13   do you want to do HAMP?  And as we've mentioned yesterday in

14   voir dire, the HAMP is the Home Affordable Mortgage Program

15   that was initiated under President Obama's administration to

16   help residential mortgage borrowers after the financial crisis

17   that we had.

18        But you're also going to see that they sent letters

19   offering resolutions, ways to help and contacts within Ocwen

20   and to federal agencies outside of Ocwen.  You know, you don't

21   trust Ocwen?  Here are telephone numbers of people at the

22   federal government you can contact.  So that went out July the

23   6th.

24        So you may hear testimony about how brutal the letters

25   were coming from Ocwen.  I want you to pay attention to them

Opening Statement - Defendants

1    because words matter.  And when you look at the words, Gina's

2    going to tell you what the words are.  They're chosen for a

3    reason.  We're trying to help.  We're not trying to run you

4    into the ground.

5        And you're going to see there's a repeat of the

6    resolution three days later on July the 9th.  We didn't tell

7    her that we're going to drive you into the ground or the

8    evidence is not going to show that Ocwen said we're going to

9    drive you into the ground.

10        And I want you to look at these two because at the

11    very bottom of these letters, there's going to be what I call

12    the heads-up notice.  And the heads-up notice -- Gina will

13    describe it and you'll be able to read it.  It says, heads-up,

14    if you think you're discharged in bankruptcy, this is not an

15    effort to collect a debt.  It tells her we're not collecting a

16    debt if you're discharged.

17        Next.  As I mentioned before, Ms. Saccameno got one of

18    those letters that said we want to help you, call us, here's

19    the number.  She called in.  She took the invitation and she

20    made three requests.  Will you refinance for me?  Can I get a

21    HAMP?  I'd like a lower interest rate.  And we'll hear about

22    that.

23        And she also said -- we don't deny it -- she said, I

24    paid everything in bankruptcy and should not be behind.  Wait

25    till you see what happens, what the evidence will show what

Opening Statement - Defendants

1    happened next, what happened next.

2         A relationship manager is assigned.  They designated

3    somebody specific.  They gave her contact information.  So you

4    got problems with your loan, call this guy.

5         Second, they sent her another HAMP modification, and

6    it also had, in addition to HAMP, seven other options.  How do

7    you fix your mortgage?  There's eight and a half percent.  The

8    mortgage rates were going crazy.

9         After the Millennium, they were really low.  The

10   economy went bad, they went really up.  Then they started going

11   down again.  There were seven options offered.

12        And then the next thing that Ocwen did -- they didn't

13   just say we don't care, we're not going to look.  You're going

14   to see it conducted an investigation by the research

15   department, and the research department was looking at the,

16   quote, bankruptcy issue.

17        So next.  What did they do?  They found Marla's

18   mistake, they fixed Marla's mistake, and it was rerecorded as a

19   discharge July 25th.  So this will come in as evidence.

20        This is going to be -- there are going to be a lot of

21   code words used, so the exhibits have numbers.  It's going to

22   be P18, and we'll give you the precise page number.  But you

23   want to take notes on that one.  Take a look at that one.  They

24   fixed it, P18.  I don't have the page here, but we'll tell you

25   when the witness is up there.

Opening Statement - Defendants

1    Next.  Anthony Gomes, he didn't just sit back and hope

2    that Ms. Saccameno would call him.  He called her in August,

3    August the 6th.  He reached out to see if Ocwen can help.  He

4    asked her if you feel you paid everything, send a letter to our

5    research department.

6    Give us the receipt.  Show us what the bills that you

7    paid.  We'll gladly look at it.  We want to fix it.  And he

8    gave her the fax where she could fix it.  But guess what.  She

9    declined an appointment to set up to see what could be done.

10   She declined it.

11   Next.  What did the investigation show?  I mean, we

12   heard about 42 payments in the opening.  Ocwen's going to say

13   huh-uh, only 40 payments were applied and here's why.  This is

14   what the research department found.  These results, they didn't

15   just internalize them and forget about them.  They sent them to

16   Ms. Saccameno in a letter.

17   So august 14th.  This is like it took a month from

18   when she -- a month to do the research to get a letter out, and

19   that letter that tells her there's only 40 payments reflected,

20   it has that heads-up language, too.  Oh, by the way, if you

21   feel you're discharged, we're not trying to collect a debt

22   here.  We'll work with you.

23   Also, at the same time in August, the payment system

24   was sent -- sorry, payment history was sent, and they said

25   here's what our records show.  They asked her to fax

Opening Statement - Defendants

1  information.  They said here's a payment system.  We'll give it

2  to you, the history.  This is what we show.  Tell us why we're

3  wrong.

4          Next.  Yes, we heard 17 payments were returned.  Do we

5  wish it could have been faster that it was fixed?  But listen

6  to this.  I don't think you heard this in the opening for the

7  plaintiff.  In March and April 2015, something did happen.  She

8  sent two payments that were accepted, so she got what she

9  wanted.

10         Ocwen started taking payments.  And what did she do?

11  She never made a payment again.  She never made a payment again

12  since April 2015.  And what's she been doing?  Fearing for her

13  destiny, or was she out -- what the evidence will show --

14  putting a new roof on her home, fixing up the garage, using

15  what she would have paid for mortgage for her daughter Alana's

16  wedding.

17         I'm going to ask you to use your common sense.  Is

18  that somebody who's in fear of being put out on the street?

19  Use your common sense.  Is that someone who's suffering from

20  depression and anxiety because her payments are coming back?

21         She is increasing the equity and the value of the

22  asset that's owned by my clients.  If you're afraid that you're

23  going to lose your home, do you put more money into it?

24         Gina will tell you what usually happens.  People trash

25  their homes when they know they're going into foreclosure.

Opening Statement - Defendants

1   They pull out anything valuable.  They take out pipes.  They

2   take out the cabinets.  They take out electronics.

3           Next.  So did Ocwen just say go away?  Gina made two

4   loan modifications, and we have to the very far right copies of

5   the exhibits.  Could we call them up, Justin?  We don't really

6   have to, but I just want to show, you know, again, here's one

7   of the exhibits that's going to come in.  And it shows how the

8   monthly payment's going down to 1300.  She was paying 1600.

9           Next.  Do we have that other page that shows the rate,

10  Justin?  And here's what it shows.  Can I see that from here?

11  This is the wrong one.  That's the two percent one.  I wanted

12  to have the -- well, I'll just explain this.

13          So we're looking at the July 9, 2015, document.  That

14  one went down from eight and a half percent to two percent.

15  The first one we looked at was in February 2015.  The rate went

16  down from eight and a half percent to 3.66 percent.

17          Next.  What was Ms. Saccameno's response to those I'd

18  say attractive, I'd say significantly attractive, significantly

19  reduced.  But the evidence is going to come in.  You get to

20  characterize it or describe it.  But what did Ms. Saccameno do

21  when she got those two what I say is significantly reduced

22  offers?  Nothing.  She did nothing.  She didn't accept them.

23  She didn't reject them.  It's a blank page.

24          Next.  But what did Ocwen do?  Did Ocwen try to drive

25  her into the ground and put her out in the street?  No.  There

Opening Statement - Defendants

1    was no activity for three years.  We'll show you the docket.

2    There was no judgment ever sought after the discharge, and Gina

3    will explain the process of foreclosure.  You have to go

4    through a lot of steps.

5         You have procedural rights when you're being sued in

6    foreclosure.  You can try to stop it and defend it.  And then

7    ultimately what the creditor has to do is say, okay, I want a

8    judgment.  Judgment means you now have a paper from the court

9    that says, I can sell your home.

10        Never even asked for a judgment to sell her home, and

11   she knew that because she was a defendant in the case.  Never

12   sought eviction.  Never put locks on her door to keep her out.

13   And you'll see the documents entitle creditors, lenders to do

14   that.

15        Read your mortgage carefully because yours may say it,

16   too.  You don't pay, you have agreed, she agreed that you can

17   put a lock on my door and keep me out.  That didn't happen.

18   And in fact, what happened is she stayed in her home the entire

19   time as Ocwen tried to work with her to resolve it.

20        So no payments since 2015.  She's using her return

21   money, and she's not paying any property taxes.  Not paying any

22   property taxes for years.  And who's paying those taxes?  What

23   do you think the evidence will show?

24        The evidence will show Ocwen for Ms. Saccameno is

25   paying her taxes, even though there's nothing in her escrow

Opening Statement - Defendants

1   account.  Ocwen can send and Gina will tell you what's called a

2   de-escrowing letter, which says you're in default, we're

3   fighting about this, on and on, but oh, by the way, we will no

4   longer pay your taxes.  We will no longer pay your home

5   insurance because she wasn't paying that either out of her

6   escrow.

7          And you can send the de-escrow letter that basically

8   says you're on your own for taxes.  Ocwen never did that.  It's

9   such a horrible company, they then advanced the money for her,

10  even though she had nothing in her escrow account.

11         So keep that in mind when you think about is this

12  someone you should punish?  Did they act really badly?  Were

13  they trying to help?  Did they go above and beyond and actually

14  give her benefits?  They could have de-escrowed her.

15         Next.  I mentioned before they had a self-proclaimed

16  expert.  I'm not going to spend too much time on him, but pay

17  attention to his qualifications.  Pay attention to what a CFE

18  is.  It's going to be pretty interesting.

19         And I'm going to save that for what's called

20  cross-examination.  Cross-examination is considered to be the

21  greatest engine ever invented for getting out the truth.  Wait

22  for the cross-examination of Mr. Patterson.

23         And I want you to look at what was his methodology?

24  What did he do?  I have next to it made up.  Because guess who

25  made up his methodology?  He did.  He didn't go to some book

Opening Statement - Defendants

1    and say here's how you do a loan analysis.  He didn't go to

2    industry standards.

3            He didn't go through any of the mortgage agencies or

4    organizations.  There are lots of national organizations

5    involving mortgage servicers and mortgage companies.  He didn't

6    go to any of them.  He made his own up.

7            Gina will also testify -- and I'll stack her up

8    against him on experts.  She's not proclaimed to be an expert,

9    but look at her expertise compared to his.  She's going to say

10   he had some pretty bad misconceptions about what he's doing

11   here.  And last but not least, I want you to really pay

12   attention, he is not -- and I'll emphasize that again -- not a

13   damage expert.

14           Anything he puts up there, he's going to give you lots

15   of numbers and spreadsheets.  And it's the pseudoscience that

16   people create to make their stuff look good.  But none of his

17   numbers have any meaning when you look at damages.  He's not a

18   damage expert, and the judge will instruct you about that.

19           Next.  We say the plaintiff made some mistakes, too,

20   on borrowed money.  She had three defaults.  I mentioned this

21   before.  She had three defaults, three foreclosures in nine

22   years.

23           One in 2000, that was dismissed.  One in 2007 on this

24   exact mortgage.  She defaulted in 2007 on this exact mortgage.

25   She had a foreclosure action brought against her on this exact

Opening Statement - Defendants

1    mortgage.  That was eventually dismissed.

2           What did she do in 2009 when she defaulted again?

3    This time, the last day of the year, December 31, 2009, she

4    files for bankruptcy, which basically says you can't collect

5    any from me.  I want to do a plan.  I want to reorganize.  I

6    want a fresh start, and she's entitled to that.

7           Next.  There's going to be evidence on mental health

8    issues.  Again, very complicated.  Justin, let's go to the next

9    one.  Pay attention.  If you see a mental health expert in this

10   case, I'll be surprised.  They're not going to bring a mental

11   health expert in to say she suffers from depression, to say she

12   suffers from anxiety, to say she suffers from fear.

13          There is no mental health expert.  She's going to

14   claim she has anxiety, depression, I heard this morning fear.

15   I don't know that falls in a medical category.  I know a little

16   bit about depression and anxiety, and fear is worrying, which

17   fits into anxiety or depression, but fear is a new category

18   that's been invented this morning.

19          She's going to blame Ocwen.  Well, pay attention to

20   that.  Be alert.  Be alert.  Were there other traumas in her

21   life?  Were there other issues in her life way before Ocwen's

22   involvement?  Way before.  Wait for the evidence on that.

23          What she will have is she'll bring in her internal

24   medicine doc, and pay attention to his qualifications.  Can't

25   wait to cross-examine him, too.  He's prescribing psych meds,

Opening Statement - Defendants

1    psych meds.  He's not a shrink.  He's not a psychologist.  But

2    he decides I can prescribe psych meds for this person.

3         And look at his methodology.  You won't see any tests

4    from him.  He never tested her.  There are so many

5    psychological or psychiatric tests that are done by forensic

6    psychologists, forensic psychiatrists.

7         Everybody in the industry knows who they are, and what

8    do they have in them?  Validation, validation sections.  He'll

9    explain what a validation section is.  But basically you can't

10   just rely on someone in this position, particularly someone who

11   says they have mental health.

12        You can't just take their word for it.  You got to

13   test them to see if there's something there.  Could be a

14   personality issue.  Could be genetic.  There are a lot of

15   things it could be.  No tests here.

16        Next.  We're almost finished.  I'm not going to dwell

17   on damages.  We're very confident she's not going to be able to

18   prove there were any damages caused, caused by Ocwen or U.S.

19   Bank.  Pay attention.  She has any documents, it might be news

20   to me because I'm not seeing documents for her damages.

21        The judge is going to instruct you on what actual

22   damages are.  It's a critical issue in the law.  The law

23   describes what are actual damages, and I'm not going to get

24   into trying to explain that.  But you pay attention to what she

25   says, and then when her Honors instructs you on jury

Opening Statement - Defendants

1    instructions at the end of the case, connect the dots.  I'm

2    very confident, you guys, that you can connect the dots and say

3    these don't fit in that actual damages that the judge told me

4    about.

5            Likewise, pecuniary loss.  Not going to see any

6    documents of pecuniary loss, but be ready for when she talks

7    about damages.  And again, the judge is going to instruct you.

8    It's a specific legal term, pecuniary loss.

9            I have confidence you guys can connect the dots.  When

10   we try to connect the dots, they're not going to connect.

11   You're going to say I don't see that pecuniary loss caused by

12   Ocwen and U.S. Bank.

13           So the last one I talked about there is causation and

14   I was harping on that already so ... Last but not least, I'm

15   going to thank you for your jury service.  I'm going to thank

16   you for considering the evidence.

17           I'm going to thank you in advance for waiting to hear

18   our side of the story, for waiting to hear what I get the

19   witness to say on cross-examination, for waiting to hear our

20   side of the case.  And in the end, to err is human, to forgive,

21   divine.  Thank you.

22           THE COURT:  Okay.  I think at this point we ought to

23   begin with the evidence.  We'll go until about noon, give or

24   take a few minutes, and then we'll take a lunch break.

25           MR. WOOTEN:  Your Honor, the plaintiff calls Gina

Feezer - Direct by Wooten

1    Freezer for Ocwen.

2            COURT SECURITY OFFICER:  Step up here.

3            THE COURT:  Please raise your right hand.

4        (Witness duly sworn and takes the stand.)

5            THE COURT:  Please be seated, and that's fresh water

6    and help yourself to tissues if you need them.

7            THE WITNESS:  Thank you.

8            MR. BONO:  Sorry, your Honor, I couldn't see the

9    witness from back there.

10           THE COURT:  Move wherever you need to.

11           MR. BONO:  Thank you.

12         GINA FEEZER, PLAINTIFF'S ADVERSE WITNESS, SWORN

13                    DIRECT EXAMINATION

14   BY MR. WOOTEN:

15   Q   Good morning, Ms. Feezer.

16   A   Good morning.

17   Q   Good to see you again.

18   A   Good to see you.

19   Q   Sorry you're not feeling well today.

20   A   Thank you.

21   Q   I'll try to be gentle, and I hope I won't have to keep you

22   on the stand too long.

23           Ms. Feezer, tell us how you're presently employed.

24   A   I'm a senior loan analyst at Ocwen.

25   Q   How long have you been employed by Ocwen, Ms. Feezer?

Feezer - Direct by Wooten

1    A    Since 2004.

2         (Off-the-record discussion.)

3    BY MR. WOOTEN:

4    Q    You've been employed by Ocwen since 2004, correct?

5    A    Yes, sir.

6    Q    And what was your initial employment with Ocwen?

7    A    My first position there was as the bankruptcy manager in

8    the default servicing business unit.

9    Q    So you are not a stranger to bankruptcy or its

10   requirements?

11   A    No.

12   Q    And once you changed positions, what was your next position

13   with Ocwen?

14   A    I took a position in the law department in my current

15   position as a senior loan analyst.

16   Q    And what time did you accept that position?

17   A    In May of 2006.

18   Q    And so about two years into your employment with Ocwen, you

19   became a senior loan analyst, correct?

20   A    Yes, sir.

21   Q    Now, as a senior loan analyst, what is your function?  What

22   do you do for Ocwen?

23   A    I handle researching the allegations of any contested

24   litigated matter that is received by the law department, and I

25   review the business records, the servicing history, allegations

Feezer - Direct by Wooten

1    of the dispute and report my findings back to counsel and then,

2    of course, from time to time, that would require that I appear

3    at court to testify about my review of the servicing history of

4    the loan and/or verify discovery, appear at trial, things of

5    those natures.

6    Q    Okay.  And you would agree a major part of your work with

7    Ocwen is providing testimony in court cases or deposition

8    testimony for cases that have not yet reached the courtroom?

9    A    Not a -- not -- I wouldn't say that that's a majority of my

10   work.  A lot of my work is research.  A lot of my work is

11   reviewing the complaints and reporting my findings and review

12   of the business records to outside counsel.

13   Q    You would agree that you do not spend time on what I'll

14   call the front lines any longer servicing loans?

15   A    Well, even as my position in the bankruptcy department, I

16   was the manager of the bankruptcy department.  So I never

17   worked one-on-one with a loan portfolio.

18           My job in the bankruptcy department was to manage the

19   business unit as a whole, which meant that any loan that was

20   coded for a bankruptcy that Ocwen service fell within my

21   department, and my responsibility was to manage the individuals

22   within my department and their job task with respect to the

23   bankruptcy.

24   Q    How many loans are you aware of were coded "dismissed"

25   versus "discharged" improperly during the time that you served

Feezer - Direct by Wooten

1    as manager in bankruptcy for Ocwen?

2    A    I'll be honest with you, I've never seen this situation

3    before.

4    Q    That's because this is a hard mistake to make, right?

5    A    Well, it's clear from the business records that we did

6    receive a discharge.  I mean, the mailroom received it, coded

7    it.  And the process of that would be then to send it to the

8    coordinator.  The coordinator's the one that made the failed

9    mistake of distinguishing the discharge versus the dismissal.

10   Q    I don't want to get too deep into the weeds yet.  I want to

11   go back and get some general things handled.  We'll come back

12   to that point.

13         Do you know how many times you gave testimony in a

14   court proceeding in 2016?

15   A    No.

16   Q    Do you know how many times you gave court testimony in the

17   first 10 months of 2015?

18   A    No.

19         MR. WOOTEN:  May I approach?  I need to refresh the

20   witness' recollection.

21         THE COURT:  Sure.

22         MR. BONO:  Excuse me, your Honor, can I hear what is

23   being shown to the witness?

24         THE COURT:  Yeah, everything needs to be heard by the

25   court reporter, so keep your voice up.

Feezer - Direct by Wooten

1          (Counsel conferring.)

2              MR. BONO:  I need a copy.

3          (Counsel conferring.)

4              MR. BONO:  I object, your Honor.

5              THE COURT:  You need a copy?  How are we going to get

6      a copy?

7              MR. BONO:  Your Honor --

8              THE COURT:  It's to refresh recollection, so I think

9      it was sort of unpredictable.  Can you both look onto that?

10             MR. BONO:  I read it, your Honor.

11             MR. WOOTEN:  May we step to sidebar so I can give you

12     the context on this issue right quick.

13         (At sidebar outside the hearing of the jury.)

14             MR. WOOTEN:  Your Honor, I'm trying to establish that

15     one of the things that she prominently does is testimony.  It's

16     a major part of her life.

17             THE COURT:  Right.

18             MR. WOOTEN:  There's a California bankruptcy case

19     where she was required to submit a declaration regarding the

20     number of times she provided testimony.

21             THE COURT:  Okay.

22             MR. WOOTEN:  In 2015, 2014.

23             THE COURT:  Okay.

24             MR. WOOTEN:  After submitting that declaration during

25     the recital of the facts, the Court said that she -- her

Feezer - Direct by Wooten

1    declaration said she testified 70 times in the first 10 months

2    of 2015.

3                THE COURT:  Okay.  I got it.  What is the problem,

4    though, because, I mean, it is we're talking about refreshing

5    recollection.  You're not allowed to read this.  You're not

6    allowed to describe it.  You need to show it to her and see if

7    it refreshes her recollection.

8                MR. BONO:  It's not her affidavit.  He's saying --

9                MR. WOOTEN:  Yes it is.

10               THE COURT:  It doesn't matter what it is, okay.  You

11   cannot -- you cannot put it into evidence.  You cannot say what

12   it is.  But you can show it to her and see if it does or does

13   not refresh her recollection.  I think you can show her a comic

14   book and see if it refreshes her recollection.

15               MR. WOOTEN:  Can I describe it as --

16               THE COURT:  No.  Just show it to her and what are you

17   going to call it?  That's what you're going to call it.

18               MR. WOOTEN:  I'm just going to ask her if she recalls

19   submitting a declaration in another matter about how frequently

20   she testified.

21               THE COURT:  And is that what this is?

22               MR. BONO:  I don't know.

23               MR. WOOTEN:  This is the judge's statement on what she

24   submitted.

25               THE COURT:  Hold on.  Hold on.  What?

Feezer - Direct by Wooten

1          MR. WOOTEN:  I overspoke.  Excuse me.

2          MR. BONO:  This isn't even Gina's declaration.  This

3     is a third party, a judge, summary of what the declaration

4     supposedly said.

5          THE COURT:  I understand that.  I think you can ask

6     her if she -- well, just ask her if this refreshes her

7     recollection.  I mean, this is problematic because it's

8     multiple layers and I think the only question that's relevant

9     is show her this and see if that refreshes her recollection.

10    That's what we're going to limit this to.

11         MR. WOOTEN:  I understand, your Honor.  Thank you.

12        (In open court in the hearing of the jury.)

13         MR. WOOTEN:  Thank you, your Honor.  Again, may I

14    approach?

15         THE COURT:  You may.

16         MR. WOOTEN:  This is just to refresh your

17    recollection.

18         THE COURT:  Let's -- counsel has shown the witness a

19    document that's on his iPad and asked if it refreshes her

20    recollection.

21         So Ms. Feezer, what is being asked is looking at that,

22    does it help you remember anything that was the subject of the

23    questioning?

24         THE WITNESS:  I don't recall this.

25    BY MR. WOOTEN:

Feezer - Direct by Wooten

1   Q    So even after reviewing that document, you have no

2   independent recollection of how many times you testified

3   between January and October of 2015?

4   A    Like I said, I mean, testimony is only part of my job

5   duties.  With respect to do I keep a tally sheet with respect

6   to every time I testify for a deposition versus a trial or a

7   hearing or even testimony in general, no, I do not.  It's part

8   of the case, the process of what I handle in the law

9   department.

10  Q    Do you remember how many times you've given testimony in

11  the last three weeks?

12  A    No, I do not.

13  Q    What about the last three months?

14  A    No.

15  Q    When's the last time you remember giving testimony in a

16  case prior to today?

17  A    I really don't recall.  I mean, I believe it was a

18  foreclosure hearing.

19  Q    Was that near where your home is as far as your office and

20  your work, or did you have to travel somewhere to go there?

21  A    It was near my home.

22  Q    So somewhere in the state of Florida?

23  A    Yes.

24  Q    Now, let me see if we can agree on a couple of basic

25  things.

Feezer - Direct by Wooten

1          First, can you agree with me that in Ocwen's servicing

2     of a mortgage loan account, it cannot cause needless consumer

3     harm?

4     A    No.

5     Q    You can't agree?

6     A    No, we -- no, we don't cause needless harm to any of our

7     customers, no.

8     Q    Okay.  So you're saying you do agree that Ocwen cannot

9     cause needless harm?

10    A    Correct.

11    Q    And you would agree that in the servicing of mortgage

12    loans, Ocwen cannot needlessly threaten a homeowner's home

13    ownership?

14    A    Correct.

15    Q    Okay.  Can we also agree that Ocwen did not specifically

16    target Monette Saccameno in this case?

17    A    No, we did not.

18    Q    Can we agree that what happened to Monette Saccameno is

19    simply the result of Ocwen applying its processes and its

20    system of record and its training of its employees that caused

21    the outcome?

22    A    Well, that's just it.  That was the error part, the human

23    error part of this, is that no, it's not the process.

24    Q    Okay.  So in other words, the human error was the process

25    did not occur correctly?

Feezer - Direct by Wooten

1    A    Correct.

2    Q    Now, let's talk for just a second about U.S. Bank and your

3    relationship between Ocwen and U.S. Bank.

4              You would agree that U.S. Bank hired Ocwen through a

5    contract to service mortgage loans that included

6    Ms. Saccameno's mortgage loan?

7    A    Yes, we serviced the trust that Mrs. Saccameno's loan is a

8    part of, yes.

9    Q    And you would agree that your contract with U.S. Bank

10   delegates the authority for you to service these loans

11   according to the terms of that agreement?

12   A    To the terms of the servicing agreement?

13   Q    Yes.

14   A    Yes.

15   Q    And you would agree that everything that Ocwen did during

16   the servicing of this loan was done with the agreement of U.S.

17   Bank?

18   A    Insofar as we were the servicer of the loan, yes.

19   Q    In other words, if Ocwen told U.S. Bank that Ocwen believed

20   it should foreclose on Ms. Saccameno's loan, U.S. Bank would

21   have either approved that specifically or approved that through

22   the contract?

23   A    Well, as the servicer of the loan, we're responsible for

24   the day in/day out activities.  So yes, Ocwen, as the servicer,

25   would be responsible for that -- those type of activities with

Feezer - Direct by Wooten

1    customer interaction, collection of the note.

2    Q    Okay.  Now, is there anything that Ocwen did in the course

3    of servicing this loan that Ocwen says is outside of its

4    agreement with U.S. Bank?

5    A    I don't understand your question.

6    Q    In other words, did Ocwen do anything during the last four

7    years and nine months that violated any of the agreements that

8    Ocwen had with U.S. Bank about servicing this loan?

9    A    No.

10   Q    Now, let's talk for a moment about a couple of other

11   things.

12          You can agree with me that Ocwen became Monette

13   Saccameno's mortgage servicer on September 1st, 2011?

14   A    Yes.

15   Q    And that happened through a transfer of servicing rights

16   from a prior servicer to Ocwen?

17   A    That's correct.

18   Q    And you would agree with me that Ocwen must have accurate

19   records of things like the amounts that are owed and payments

20   that are due, interest rates, that type of thing when it puts a

21   loan into Ocwen's system of record?

22   A    Absolutely, yes.

23   Q    Now, would you also agree with me that Ocwen does not

24   verify any of the information provided by a previous servicer

25   when they on-board the data into REALServicing?

Feezer - Direct by Wooten

1   A    No, that's inaccurate.

2   Q    So what do they do to verify that the amounts the previous

3   servicer say are owed are actually owed?

4   A    Well, the prior servicer has the same function as Ocwen as

5   a servicer.  We're responsible for the day in/day out servicing

6   of the loan, which is collection of the payments, taxes,

7   insurance, things of that nature.

8           So in the prior servicer ending their servicing on

9   behalf of the trust, Ocwen picks up servicing on behalf of the

10  trust.  So the ending balance of the prior servicer is going to

11  be the opening balance of Ocwen.

12  Q    Okay.  And I think that's my point.  So for any amounts

13  that Ocwen pulls from the prior servicer, those amounts come

14  into Ocwen's system unquestioned?

15  A    With respect to the servicing history, we receive also a

16  service -- or the prior servicer's transaction history.

17  There's a loan setup department that also in a boarding issue,

18  and that's what we refer to, boarding a loan into our servicing

19  platform, is that there's a loan setup team that makes

20  verification about the ending balance, the data that was

21  transmitted from the prior servicer and on making sure that our

22  information is updated with their ending -- their actual ending

23  balance.

24          So we get various verification points, business

25  records that we maintain that become part of our servicing

Feezer - Direct by Wooten

1    history and maintain those records on behalf of the trust on a

2    moving-forward basis.  So the loan setup department does make

3    verification about the transaction history and the business

4    records that we then incorporate into our business records.

5    Q    By September 1st, 2011, did Ocwen have any notice of

6    potential problems with the accuracy of information being

7    boarded into REALServicing?

8    A    Not that I'm aware of, no.

9    Q    I'll come back to that in a moment.

10         Now, once the loan is boarded onto Ocwen's platform,

11   are there any safety checks to ensure that the number Ocwen

12   sought to import from the prior servicer is the number that

13   actually went into Ocwen's business record?

14         In other words, do you match the data points after the

15   entries are made into REALServicing?

16   A    Can you clarify what you mean by entry points?

17   Q    So just for the jury's understanding, I know that you and I

18   are familiar with some of the terminology of servicing, and I

19   don't want to forget that the members of the jury have never

20   heard any of this before.  So let's talk about on-boarding for

21   just a sec.

22   A    Okay.

23   Q    On-boarding is what the industry refers to as bringing an

24   account from one mortgage servicer to another, correct?

25   A    Correct.

Feezer - Direct by Wooten

1    Q    And that on-boarding process is matching a set of data

2    points about things like the amounts owed and past due balances

3    and status, bankruptcy foreclosure current, matching those data

4    points and bringing them accurately into the new servicer's

5    platform, right?

6    A    Yes.

7    Q    And my question is simply this.  Once Ocwen has brought the

8    data over from the prior servicer, does Ocwen have any

9    procedure in place to ensure that the accurate numbers from the

10   prior service -- servicer went into REALServicing?

11   A    Yes.

12   Q    And is that done manually or automatically?

13   A    No, it's done manually by the loan setup department.

14   Q    And how many people are in the loan setup department?

15   A    I'm not sure.

16   Q    Now, in September of 2011, was Ocwen in a phase of growth?

17   A    With respect to servicing?

18   Q    Acquiring servicing rights.

19   A    Yes.

20   Q    Are you aware of any issues that Ocwen was having with the

21   on-boarding process arising from its growth phase?

22   A    With respect to Litton, Ocwen actually purchased Litton,

23   which is the prior servicer in this instance, and we have

24   access to Litton's database.

25         So with respect to business records and data, Ocwen

Feezer - Direct by Wooten

1   had not only the on-boarding information, we also maintained

2   the servicing platform from the prior servicer, Litton.

3   Q    Does Ocwen still maintain that platform?

4   A    Yes, we do.

5   Q    And how long has Ocwen maintained that platform?

6   A    We've maintained it since the inception of the acquisition

7   of the Litton servicing.

8   Q    With respect to this particular case, I want to call your

9   attention to a document that is a portion of Exhibit 31, Chris.

10  It's Exhibit 1088.  It's page 1088 of Exhibit 31.

11        In your preparations to testify for us today, have you

12  had a chance to review this document?

13  A    I can't see the document.

14  Q    Is it not on your screen?

15  A    No, sir.

16        THE COURT:  You have a screen, right?

17        THE WITNESS:  I do.

18        THE COURT:  But the document is not -- what is --do

19  we --

20        MR. WOOTEN:  May not be on.

21        THE COURT:  Life was so easy before technology.  We

22  had paper.

23        MR. WOOTEN:  It was the power button.

24  BY MR. WOOTEN:

25  Q    Are you able to see that document now?

Feezer - Direct by Wooten

1   A    It's still not populated.  Oh, there it goes.

2   Q    Are we good?

3   A    Yes.

4   Q    Okay.  And this is the October 17th, 2011, statement?  Can

5   we agree on that?

6   A    Yes, sir.

7   Q    And this statement indicates that there's a current amount

8   due of a little over $16,000, right?

9   A    Yes.

10  Q    Do you know if Ocwen's own internal accounting records

11  reflected that Ms. Saccameno was due to make a payment of over

12  $16,000 in October of 2011?

13  A    No, she was not.

14  Q    So Ocwen's own internal records would have set an amount

15  different than this amount was due?

16  A    This is what -- I mean, you're showing me a piece of it,

17  but this billing statement is going to be one of the first

18  account statements that went out to the customer.  And in part

19  of loan boarding, there is many departments that come into play

20  depending upon the status of a loan of how it's coded from the

21  prior servicer.

22          In this particular instance, she was -- there was a

23  pending foreclosure with a bankruptcy staying that foreclosure.

24  So when not only is loan setup involved with the underlying

25  data, principal data, then also the default servicing

Feezer - Direct by Wooten

1  department's also going to be involved because they're going to

2  be setting up the module for the foreclosure module.

3          And the bankruptcy department's going to be setting up

4  the bankruptcy module and raising the appropriate flag.  So in

5  this instance, this is an account statement that would have

6  gone out prior to the bankruptcy department completing their

7  setup of the bankruptcy module.

8          MR. WOOTEN:  Your Honor, this is one of the documents

9  the parties have agreed is admitted.  Can we publish this to

10  the jury?

11          THE COURT:  Certainly.

12          MR. WOOTEN:  I did not realize they were not able to

13  see this on their displays till my tech gentleman warned me

14  that was an issue.

15          COURT SECURITY OFFICER:  One moment.  They're good.

16          MR. WOOTEN:  All right.  Your Honor, if there's a

17  document that we refer to that's in contest, we'll bring that

18  to your attention beforehand.

19          THE COURT:  Right.  If everybody is agreed or there's

20  been a ruling that something is admissible, you can just use

21  it.

22          MR. WOOTEN:  Yeah, okay.

23  BY MR. WOOTEN:

24  Q   So you're saying that part of the reason that Ms. Saccameno

25  got a statement in October of 2011 saying that she owed over

Feezer - Direct by Wooten

1   $16,000 payment had to do with all the departments of Ocwen

2   sorting out the information that came into REALServicing?

3   A   Well, there's several different departments that's going to

4   be involved in loan setup.  The initial data is going to be

5   from the loan setup department's going to handle the standard

6   common data, information about the customer, information about

7   the note, the mortgage, the imaging documents.

8         The other business unit's that's going to also be

9   involved is going to be escrow, insurance.  If there's a

10  default, it's going to be -- foreclosure is going to become

11  involved.

12        All these modules have to be set up.  They're business

13  unit specific.  So in this instance, this would have been also

14  a loan setup of the bankruptcy module on an ongoing Chapter 13

15  bankruptcy.

16        The plan had already been confirmed.  Payments were

17  already being received by both the trustee as well as

18  post-petition payments direct from the borrower.  Excuse me.

19  Q   Are you okay?

20  A   Yeah.

21  Q   If you need to take a break, please let us know.  We're not

22  trying to torture you.  I know it feels like it at times, but

23  I'm not trying to abuse you.

24        With respect to the bankruptcy plan -- Chris, let's

25  talk about first let's go back to the actual plan itself, one

Feezer - Direct by Wooten

1    of the early ones.  You got that number?  I think it's 3 maybe.

2            Let me just ask you this.  We know that there was a

3    plan, and we know that that plan was confirmed, right?

4    A   Yes, sir.

5    Q   Okay.  Now, you can agree with me that the plan called for

6    Ms. Saccameno to pay 42 monthly payments to the Chapter 13

7    trustee, correct?

8    A   I believe that's what it said, yes.

9    Q   All right.  And, Chris, can you highlight the portion of

10   that that states what the amount is on the payment if you can

11   see that on there.

12           There's a 700 dollar and something amount.  792.15; is

13   that right?

14   A   Yes.

15   Q   Okay.  So she's paying almost $800 a month to the trustee,

16   and the amount that she was required to cure would have been in

17   the proof of claim that the previous servicer had filed, right?

18   A   That is correct.

19   Q   Okay.  Now, Chris, can you show us Exhibit 6, please, which

20   is the proof of claim.  Now, I think the simplest place to get

21   where we need to be is probably the second page, the next page,

22   the itemization.

23           Okay.  So Ocwen has reviewed the itemization of proof

24   of claim?  No one dispute --

25           MR. BONO:  Objection, your Honor.

Feezer - Direct by Wooten

1              THE COURT:  I'm sorry?

2              MR. BONO:  I object.

3              MR. WOOTEN:  I just simply said Ocwen reviewed --

4              THE COURT:  Hold on.  What's the basis for the

5    objection?

6              MR. BONO:  He's showing her excerpts from documents

7    that are multiple pages.  I think it's fair for the witness to

8    be able to look at the whole document, not just an excerpt.

9              THE COURT:  If you gentlemen want to go to paper

10   documents, it is fine with me.  Can we get them at the end of

11   lunchtime and just give the -- if you want the witness to have

12   entire paper documents, that's probably what we need to do.

13             MR. BONO:  I don't care if it's paper or electronic,

14   but she's entitled to have --

15             THE COURT:  There's no way to do it electronically as

16   far as I know, right?  I mean, how do you give somebody a

17   multipage document electronically?  You just want the witness

18   to be able to have the whole document and just scroll through

19   it?

20             MR. WOOTEN:  Your Honor, I think this was stipulated.

21             THE COURT:  We can deal with this at lunchtime.  Maybe

22   we ought to take our lunch break now.

23             MR. WOOTEN:  That's fine with me, your Honor.

24             THE COURT:  We'll start again promptly at 1:00 p.m.

25   and we'll get this worked out in the meantime.

Feezer - Direct by Wooten

1          COURT SECURITY OFFICER:  All rise.

2       (Jury exits courtroom at 11:56 a.m.)

3          THE COURT:  Okay.  So do we have paper documents in a

4    binder that we can give the witness?

5          MR. BONO:  We have them in folders.

6          THE COURT:  I don't care what form they're in, but if

7    that's what we're going to do, that's what we're going to do.

8          MR. WOOTEN:  Your Honor, I had no idea there was an

9    issue with the amount of the proof of claim from the

10   bankruptcy.  It's been undisputed so far.

11         THE COURT:  Well, it sounds to me like if we're not

12   going to have unnecessary delays for no good reason, the

13   defense would like this witness to have paper documents so she

14   can look through.

15         MR. BONO:  Well, I think it's fair that a witness

16   being examined on a document gets the entire document.

17         THE COURT:  You know what, if you want it, you're

18   going to have it, okay?  That was what I just said, okay?

19         MR. BONO:  Thank you.

20         THE COURT:  So, you know, normally it just means the

21   witness has to deal with an overwhelming amount of paper.  But

22   if that's the defense preference, I don't care, and if there's

23   any issue about the fairness of the witness not having the full

24   document, let's just get beyond that.  Okay, now --

25         MR. WOOTEN:  All right.

Feezer - Direct by Wooten

1                THE COURT:  Okay?  Now --

2                MR. WOOTEN:  Your Honor, may we continue to just show

3       the jury and our counsel table the electronic portions of the

4       documents we've been doing?

5                MR. BONO:  Absolutely.

6                THE COURT:  Yes, yes.

7                MR. WOOTEN:  We'll pull the box and pull the binder of

8       the exhibits.  It's not a problem.

9           (The Court and law clerk conferring.)

10               THE COURT:  We'll have this in 20 seconds, everybody.

11      Counsel, I'm still waiting for this document, but do you have

12      any recollection of when in the process Ms. Poremba was

13      questioned about this?

14               MR. WOOTEN:  She was in the first seat, your Honor.

15               THE COURT:  Right, but whose voir dire was it?

16               MR. WOOTEN:  We asked questions about -- we had zero

17      questions about --

18               MR. BONO:  I believe the first go-around, Mr. Wooten

19      asked if any panel members had been foreclosed on.

20               MR. WOOTEN:  I think we both discussed foreclosure.

21               THE COURT:  So we need the whole jury selection.  I'm

22      trying to see what she said.

23               MR. WOOTEN:  So she was the very first juror on the

24      panel.

25               THE COURT:  Yeah, I know that.

Feezer - Direct by Wooten

1          MR. WOOTEN:  And it would have been in my question, I

2     think it probably would have been somewhere around the third or

3     fourth questioning.  I think Mr. Bono also had a specific

4     question about it.

5          THE COURT:  So we need the whole jury selection.

6     Now --

7          MR. WOOTEN:  So.

8          THE COURT:  I'm going to have to get -- if we need

9     that, I'm going to have to wait till the end of lunch for it

10    because that's going to take some time.

11         Now, what do I have in front of me?  I have three sets

12    of notes.  Whose notes are these?

13         MR. WOOTEN:  Your Honor, that was the information my

14    paralegal used to try to verify the issues whether anybody

15    might have been using social media or might --

16         THE COURT:  I got to give this to you because this is

17    gobbledygook to me.  You tell me what you think it says.

18         MR. WOOTEN:  The issue is apparently she appears to

19    match -- had previously used the name of Margarijo.  That's how

20    I pronounce it.  M-A-R-G-A-R-I-J-O.  And she also appears to

21    have used the same Gina Pango, P-A-N-G-O.

22         There was a foreclosure filed 2-6-2006 against Gina

23    Margarijo and Francisco Margarijo with an order of possession

24    dated October 11, 2006, and Fremont investment, the foreclosure

25    firm representing them filed a motion for leave to stay and a

Feezer - Direct by Wooten

1   Chapter 7.

2           She also had another name up under Facebook, but it

3   was not the name that we have here.  It looks like Frank Marjo,

4   M-A-R-J-O, which is also known as Francisco Margarijo, the same

5   person that was on the foreclosure filed a Chapter 7 on

6   January 10th of 2017, which was discharged April 11th, 2017.

7           There also appears to be a Chapter 7 in 2005,

8   discharged in March of 2006 where Ms. -- I think our potential

9   juror -- at that time it would have been Gina Margarijo -- was

10  named a co-debtor on Schedule H.  And the records indicate that

11  she's divorced from this gentleman.  So it also mentioned we

12  found --

13          THE COURT:  Okay.  This is impossible for me to

14  digest.  I don't have the transcript at this point of the voir

15  dire, so I don't know what she said.

16          I'm assuming that you think she said that she had

17  never been in a foreclosure.

18          MR. WOOTEN:  Or a bankruptcy.

19          THE COURT:  Or a bankruptcy.  And can you tell me what

20  this says that's relevant to those issues?

21          MR. WOOTEN:  Well, it appears that she was a party on

22  a Chapter 7 bankruptcy in 2005, which was discharged in 2006.

23          THE COURT:  And where's that?

24          MR. WOOTEN:  That is three-quarters of the way down

25  the page where it's in bold.  It says Francisco Margarijo filed

Feezer - Direct by Wooten

1    Chapter 7, on 10-14-2005, discharged 3-29-2006.

2                  THE COURT:  Oh, I see it.  10-14-2005.

3                  MR. WOOTEN:  Discharged 3-29-2006.  It says she was

4    listed as a co-debtor.

5                  THE COURT:  Okay.  So that's one thing.  All right.

6    And you said there was something else?

7                  MR. WOOTEN:  At the top of the page, it said that she

8    was a co-party in a foreclosure filed February 6, 2006, where

9    there was a motion for leave to stay filed in the bankruptcy

10   and order of possession in October.

11                 THE COURT:  Okay.  I'm looking at the fourth bullet

12   point.

13                 MR. WOOTEN:  Yes, ma'am.

14                 THE COURT:  I don't know how to make -- I don't know

15   how to connect what it says to what you're saying.  So what is

16   this saying?

17                 MR. WOOTEN:  It's saying she was a party to a

18   foreclosure that was filed.

19                 THE COURT:  Is FC a foreclosure?

20                 MR. WOOTEN:  Yes, ma'am.

21                 THE COURT:  Okay.  And I'm assuming that what you

22   found was that these two people, Gina and Francisco, that means

23   they were co-parties in a foreclosure?

24                 MR. WOOTEN:  Yes, ma'am.

25                 THE COURT:  And an order of possession was granted on

Feezer - Direct by Wooten

1    10-11?

2         MR. WOOTEN:  Yes, ma'am.

3         THE COURT:  Now, how do you connect our juror to these

4    people?

5         MR. WOOTEN:  Well, my paralegal's research indicated

6    that she was known by these names previously.  She was

7    previously married to and has a divorce record from Francisco

8    Margarijo.

9         THE COURT:  Okay.  So what do you want me to do?

10        MR. WOOTEN:  Your Honor, I brought this to Mr. Bono's

11   attention.  It probably doesn't prejudice me.  She might be in

12   my favor.

13        THE COURT:  I don't care.  Tell me what you want me to

14   do so I can get some lunch.

15        MR. WOOTEN:  I asked him -- I asked him what he wanted

16   to do.

17        MR. BONO:  I think we have to verify is she this

18   person.  Because a lot of times there are names --

19        THE COURT:  So you need to make me some questions that

20   you agree on, okay?  I'm going to call her in and I'm going to

21   ask her that.

22        I'm assuming that we do not need the transcript of

23   jury selection or we do need the transcript of jury selection?

24        MR. WOOTEN:  I don't believe we do.

25        MR. BONO:  I don't need to see it, your Honor.  Nick

Feezer - Direct by Wooten

1    and I asked questions about this.

2              THE COURT:  All right.  So let me just see if we can

3    do this quickly.  You want me to ask her if she previously used

4    the name M-A-R-G-A-R-I-J-O?

5              MR. WOOTEN:  Yes, ma'am.

6              THE COURT:  And then what else did you want me to ask

7    her?

8              MR. WOOTEN:  Was she previously married to Francisco,

9    last name, same spelling.

10             THE COURT:  And you need the dates of that, I assume,

11   or not?

12             MR. WOOTEN:  Yes, ma'am.

13             THE COURT:  Married to Francisco whatever and the

14   dates of their marriage?

15             MR. WOOTEN:  Yes, ma'am.

16             THE COURT:  Or the dates that they were married.

17             And how do you suggest I breach with her the issue of

18   how we have all this data about her supposedly?

19             MR. WOOTEN:  Public records?

20             THE COURT:  Yeah, I'm not even sure that's even

21   allowed in this court, but it may be, I don't know.  There was

22   a lot of controversy about it.

23             That's -- so it's only this one name.  So I guess I

24   could just not tell her anything about where we got this

25   information and just ask her if she's the same person who

Feezer - Direct by Wooten

1   previously was married to Francisco and went by this name.  She

2   tells us yes or no.

3           MR. BONO:  I agree, your Honor.

4           THE COURT:  And that's it?

5           MR. BONO:  I don't think you have to get into how the

6   information was --

7           THE COURT:  Fine, fine.  And then once let's say she

8   says yes, then what do we do?

9           MR. BONO:  If she was in a foreclosure action and she

10  was in a bankruptcy action, if she says yes, I may not want her

11  on this panel and we may have to let her go.

12          THE COURT:  Well, assuming you asked her the question

13  in voir dire and she said no.  If you didn't ask her the

14  question in voir dire, it's not my problem.

15          MR. BONO:  I specifically asked bankruptcy, and I'm

16  very confident if she was on the first panel, that Nick asked

17  her.

18          THE COURT:  Let me tell you what you need to do if I'm

19  going to do this.  You need to get this transcript in rough.

20  We don't need a final.  The court reporter can get it for you,

21  and you need to show me where you asked her the question and

22  she answered it.

23          MR. BONO:  Your Honor, we don't have to do this this

24  afternoon.  I mean, you've instructed the jurors not to talk

25  about the case.  I hope they follow you.  And I don't think

Feezer - Direct by Wooten

1   she's going to infect the jury.

2          THE COURT:  I've got this now.  You know what you need

3   to do to make this record.

4          MR. BONO:  Yes, yes.

5          THE COURT:  Because I think, if you're correct, we're

6   going to end up having to dismiss her from the jury.  So I want

7   to have a record to do that.

8          MR. BONO:  Understood, your Honor.

9          THE COURT:  Okay.  So as soon as you've got the

10  record, you can make it available, the jury selection.  Did you

11  get daily copy of that jury selection yesterday?

12         MR. BONO:  I don't know.  I don't think we ordered

13  daily of the jury selection.

14         THE COURT:  Okay.

15         MR. BONO:  We're getting daily during testimony.

16         THE COURT:  So we'll get a rough which should be

17  enough.

18     (Court and court reporter conferring.)

19         THE COURT:  The question was put to me.  The lawyers

20  have told me that they both questioned her on this subject.  So

21  I don't know how you can extract over basically an hour and a

22  half of questioning just this juror, but that's all we need.

23  We just need Poremba.

24         MR. BONO:  I think what might be the case is Nick

25  asked a question and I asked the question, bankruptcy, and no

Feezer - Direct by Wooten

1    one responded.

2            THE COURT:  Let me tell you.  I'm trying to get out of

3    here.  I'm telling the court reporter what you're telling me.

4    The lawyers are saying it was not just once, okay?  I have no

5    idea if that's true or not, but I need to see every possible

6    question for her.  So however it's easiest for you to get us

7    all questioning of Ms. Poremba.  That's, I think, what I need

8    to have.

9            THE REPORTER:  Okay, I understand.

10           THE COURT:  And it does not have to be at the end of

11   lunchtime.  We can do it by tomorrow or overnight or something

12   like that.

13           THE REPORTER:  And it can be rough draft?

14           THE COURT:  And it can be rough draft.

15       (Adjourned at 12:10 p.m.)

16                       * * * * * * * * *

17                   C E R T I F I C A T E

18       I certify that the foregoing is a correct transcript of the

19   record of proceedings in the above-entitled matter.

20

21   _/s/ LISA H. BREITER_____    _April 4_, 2018
     LISA H. BREITER, CSR, RMR, CRR
22   Official Court Reporter

23

24

25