**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MONETTE E. SACCAMENO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15 CV 1164 |
| v. | ) | |
| | ) | Honorable Joan B. Gottschall |
| OCWEN LOAN SERVICING, LLC, and | ) | |
| U.S. BANK NATIONAL ASSOCIATION, | ) | |
| as trustee for C-BASS MORTGAGE LOAN | ) | |
| ASSET-BACKED CERTIFICATES, Series | ) | |
| 2007 RP1, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In February 2015, Monette Saccameno ("Saccameno") sued Ocwen Loan Servicing, LLC ("Ocwen") and U.S. Bank National Association, as trustee for C-Bass Mortgage Loan Asset-Backed Certificates, Series 2007 RP1 ("U.S. Bank"), alleging that they had engaged in wrongful loan servicing and debt collection practices.[1] In April 2018, the case went to trial and Saccameno prevailed on all of her claims. The jury awarded her a total of $582,000 in compensatory damages and $3 million in punitive damages. Ocwen has filed three post-trial motions: (1) a renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50; (2) a motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a); and (3) a motion to amend the judgment pursuant to Federal Rule of Civil Procedure 59(e). For the reasons discussed below, the motions are denied.

---

[1] Although both U.S. Bank and Ocwen are named as defendants, Saccameno's claims are based solely on Ocwen's conduct. Her claims against U.S. Bank are based entirely on a theory of vicarious liability. *See* 2d Am. Compl. ¶ 7. For this reason, the court's discussion refers to Ocwen in particular rather than to both defendants generically.

## I. Background

In January 2002, Saccameno obtained a home mortgage loan in the amount of $135,000 for a house located in Franklin Park, Illinois. *See* Ex. P1. In November 2008, Saccameno began to fall behind on her monthly payments, and in February 2009, U.S. Bank declared her to be in default. U.S. Bank accelerated the entire balance of the loan and filed a foreclosure action against her in the Circuit Court of Cook County, Illinois. *See* Ex. P2.

In December 2009, Saccameno filed for bankruptcy pursuant to Chapter 13. The bankruptcy plan called for Saccameno to repay the amount in arrears ($25,713.42) by making monthly payments to the Chapter 13 Trustee. It also required Saccameno to make forty-two monthly mortgage payments to Ocwen. *See* Exs. P5 & P6.[2] It is undisputed that Saccameno made all of the payments to the Chapter 13 Trustee. *See* Tr. 295:14-16.[3] The record also showed that Saccameno had made all forty-two monthly payments to Ocwen. *See* Tr. 287:9-293:23.

In June 2013, the Trustee filed a Notice of Final Cure Payment with the bankruptcy court. *See* Ex. P10. It is undisputed that Ocwen received notice of the final cure payment but did not file a response. *See* Tr. 471:25-472:5. On June 27, 2013, the bankruptcy court entered an order of discharge in the bankruptcy proceedings. *See* Ex. P11. It is undisputed that Ocwen received notice of the discharge as well. *See*, *e.g.*, Tr. 68:5-7.

---

[2] The original plan was filed on December 31, 2009. *See* Ex. P4. A modified plan was filed on February 2, 2010. *See* Ex. P5. Only the modified plan is relevant for purposes of this discussion.

[3] A complete set of trial transcripts, consisting of seven volumes, was originally docketed on April 26, 2018. *See* ECF Nos. 278-90. Due to a pagination error, however, corrected versions of volumes 5A through 7 were docketed on September 26, 2018. *See* ECF Nos. 325-329. Although the parties in some cases cite to the original, incorrectly-paginated volumes, all of the court's citations are to the corrected versions.

The problems giving rise to this litigation began shortly after Saccameno's bankruptcy discharge. On or about July 2, 2013, an Ocwen employee identified as "Marla" mistakenly coded Saccameno's bankruptcy discharge as a dismissal in Ocwen's computer system. *See, e.g.*, Tr. 140:5-18. As a result, Saccameno's loan was returned to Ocwen's foreclosure department. During roughly the same time, Ocwen's bankruptcy department improperly advanced the post-petition due date for Saccameno's loan payments. *See* Tr. 116:7-15. In addition, Ocwen's records incorrectly indicated that Saccameno had made only forty of the forty-two ongoing mortgage payments required under her Chapter 13 plan. *See, e.g.*, Tr. 125:9-22; Tr. 181:11-21; Tr. 182:18-20; Tr. 775:17-21.

A few days later, Ocwen began sending letters to Saccameno stating that her account was delinquent. The first letter, dated July 6, 2013, stated:

> Recently we called your attention to your severely delinquent mortgage loan referenced above. We either have not heard from you or we have not reached a resolution. It is imperative that you contact us immediately to resolve this matter. Failure to do so can result in the accumulation of fees and costs associated with foreclosure, the sale of this property at auction and even eviction.
>
> Time is running out.
>
> We may have resolutions available to help you avoid losing your home and having to make plans to vacate the property. Remember, poor credit may affect your ability to secure another place to live even as a tenant of a rental property.
>
> There is still time to resolve this matter, and we may have programs available to help you.

Ex. P14 at 1. Ocwen sent Saccameno an identical letter dated July 9, 2013. Ex. D1 at 1.

On July 15, 2013, Saccameno phoned Ocwen to discuss the possibility of modifying or refinancing her mortgage. Tr. 763:12-16. (At the time of the call, it appears that Saccameno had not yet seen the July 6, 2013 and July 9, 2013 letters. *Id*.). During the conversation, an Ocwen representative told Saccameno that she was behind on her payments. *See* Tr. 763:12-764:24. On

July 17, 2013, Saccameno sent a fax to Ocwen stating that she had recently completed a Chapter 13 bankruptcy lasting forty-two months and that she had never missed a payment. *See* Ex. P16 at 16. In fact, she stated, she had sent three extra mortgage payments in May 2013. *Id*. Saccameno's fax included a copy of the bankruptcy discharge order. *Id*. at 2; Tr. 166:2-20.

By July 25, 2013, Ocwen had corrected the miscoding of the bankruptcy discharge in its computer system. *See, e.g.*, Tr. 550:5-9; Tr. 1078:10-12. By this time, Ocwen's records also included all forty-two payments by Saccameno, *See* Tr. 293:17-20; Tr. 296:12-19, Ex. 21 at 000051 (showing Saccameno's forty-second post-petition payment on June 18, 2013). Nevertheless, Ocwen continued to treat her account as delinquent. (Indeed, it appears that it was only during the trial that Ocwen acknowledged that Saccameno had made all forty-two payments).

Saccameno continued to make monthly mortgage payments as per usual. However, in September 2013, Ocwen began returning her checks because, according to its records, the payments were insufficient to cure her default. *See* Tr. 311:20-312:1. For the next seventeen months, Saccameno continued to make mortgage payments and Ocwen continued to reject them. *Id*. During this time, Saccameno had numerous communications with Ocwen representatives in an attempt to show that she had never missed any mortgage payments. *See, e.g*., Tr. 861:8-863:22. None of these efforts was successful. Meanwhile, Ocwen continued to send Saccameno letters informing that her mortgage loan was "severely delinquent." *See, e.g*., Ex. D7 (Letter from Ocwen to Saccameno dated Jan. 1, 2014); Ex. D8 (Letter from Ocwen to Saccameno dated Jan. 7, 2014); Ex D15 (Letter from Ocwen to Saccameno dated Apr. 30, 2014).

In March 2014, Saccameno enlisted the help of attorney Susan Van Sky ("Van Sky"), a friend of a friend, to help resolve the problem. *See, e.g*., Tr. 781:24-782:22; Tr. 821:10-13.

Despite several phone calls and written communications with Ocwen, Van Sky's efforts proved unavailing. *See, e.g.*, Tr. 513:2-15; Ex. P33 (Letter from Van Sky to Ocwen, Mar. 20, 2014); Ex. P34 (Letter from Van Sky to Ocwen, April 28, 2014). In December 2014, Saccameno stopped making monthly payments to Ocwen, and in February 2015, she filed this suit, asserting claims for breach of contract (Count I); violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. (Count II); violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 810 ILCS 505/1 *et seq.* (Count III); and violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq*. (Count IV).[4]

The case went to trial on April 3, 2018. During her testimony, Saccameno stated that she suffered from depression and anxiety as a result of Ocwen's conduct and that she lived in fear that her home would be repossessed. *See, e.g.*, Tr. 818:3-17; 780:6-1. She further testified that she was so upset by Ocwen's continued collection attempts that she was unable to concentrate on her job and was fired. *See* Tr. 779:17-19. In addition to several other witnesses, the jury heard from Saccameno's doctor, William Sarantos, MD ("Sarantos"), who testified that he had diagnosed Saccameno with depression and panic disorder, *see* Tr. 205:23-206:9, and that he had prescribed medications to treat the conditions, *see* Tr. 210:2-6. Following the close of Saccameno's case, Ocwen moved for judgment as a matter of law. *See* ECF No. 265. The court reserved ruling on the motion. *See* Tr. 958:17-959:1; ECF No. 270. Ocwen's sole witness was

---

[4] Saccameno also asserted claims for breach of fiduciary duty (Count V) and for violation of the bankruptcy court's discharge injunction (Count VI). The court granted Ocwen summary judgment on the breach of fiduciary duty claim. *See Saccameno v. Ocwen Loan Servicing, LLC*, No. 15 C 1164, 2017 WL 5171199, at *6 (N.D. Ill. Nov. 8, 2017). The parties agreed to hold a separate bench trial on the discharge injunction claim, *see* ECF No. 193, and ultimately settled the claim following the jury trial, *see* ECF No. 306.

Gina Feezer ("Feezer"), a senior loan analyst (whom Saccameno had also called as her first witness).

On April 11, 2018, the jury returned a verdict for Saccameno on all counts. It awarded her $500,000 in compensatory damages on her breach of contract, RESPA, and FDCPA claims. The jury awarded Saccameno an additional $82,000 in compensatory damages and $3 million in punitive damages on her ICFA claim.

Following the trial, Ocwen renewed its motion for judgment as a matter of law. In addition, Ocwen has separately moved for a new trial based on purported evidentiary errors by the court. Ocwen has filed a third motion seeking to amend the judgment, arguing that the jury's punitive damage award is excessive. The court addresses these motions in turn.

## II. Renewed Motion for Judgment as a Matter of Law

The court turns first to Ocwen's renewed motion for judgment as a matter of law. Under Federal Rule of Civil Procedure 50, "a court may enter judgment as a matter of law when it 'finds that a reasonable jury would not have a legally sufficient evidentiary basis' to support its verdict." *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018) (quoting Fed. R. Civ. P. 50(a)(1)). Federal Rule 50(b) permits a party to renew a motion for judgment as a matter of law after a case has been submitted to a jury. Fed. R. Civ. P. 50(b). "The standard that must be met before judgment as a matter of law may be granted is formidable." *Florez v. Delbovo*, 939 F. Supp. 1341, 1342 (N.D. Ill. 1996). As the Seventh Circuit has explained:

> in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.... Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence

> supporting the moving party that is uncontradicted and unimpeached, at least to
> the extent that that evidence comes from disinterested witnesses.

*Robinson v. Perales*, 894 F.3d 818, 833 (7th Cir. 2018) (quoting *Reeves v. Sanderson Plumbing*

*Prods., Inc.*, 530 U.S. 133, 150-51 (2000)). Here, Ocwen seeks judgment as a matter of law with

respect to all of Saccameno's claims except her FDCPA claim.

## A.     Mootness

In her response to Ocwen's motion, Saccameno argues that the challenges to her RESPA

and breach of contract claims are moot. Because mootness is a threshold jurisdictional issue, the

court must address it before considering the merits of Ocwen's motion. *See, e.g.*, *Worldwide St.*

*Preachers' Fellowship v. Peterson*, 388 F.3d 555, 558 (7th Cir. 2004).

Saccameno's argument rests on the fact that the jury awarded a single sum of

compensatory damages for her FDCPA, RESPA, and breach of contract claims. She correctly

notes that, under Illinois law, "'where several causes of actions are charged and a general verdict

results, the verdict will be sustained if there are one or more good causes of action or counts to

support it.'" JMOL Resp. Br. 3, ECF No. 335 (quoting *Hudson v. City of Chi.*, 881 N.E.2d 430,

451 (Ill. App. Ct. 2007)) (brackets omitted). Since Ocwen has not challenged her FDCPA claim,

Saccameno contends, the jury's verdict on that count is sufficient to support the award,

irrespective of the merits of her breach of contract and RESPA claims.[5]

---

[5] In response, Ocwen argues that the court must address the merits of the breach of contract and
RESPA claims because it has separately moved for a new trial. According to Ocwen, Saccameno
will not be entitled to retry these claims if they lacked sufficient evidentiary support in the first
trial. This argument is a non-starter because, as is discussed more fully below, *see* Part III, *infra*,
Ocwen's motion for a new trial fails.

Saccameno's reliance on Illinois' general verdict rule is misplaced.[6] The general verdict rule comes into play where a verdict leaves uncertainty regarding the theory or claim on which a jury's finding of *liability* is based. Here, in contrast, the verdict form makes clear that the jury found Ocwen liable for each of the three claims in question. *See* Verdict Form, ECF No. 275. At issue is merely how much of the compensatory damage award is attributable to the various claims. *See, e.g.*, *BP Amoco Chemical Co. v. Flint Hills Resources, LLC*, 697 F. Supp. 2d 1001, 1016 (N.D. Ill. 2010) (general verdict rule did not apply because the "verdict form in [the] case was not 'general' in the traditional sense as to the question of liability or defenses," but "simply did not itemize the amount of damages awarded").

---

[6] Neither of the parties addresses Saccameno's assumption that Illinois law applies for purposes of deciding this issue. Given that the court's jurisdiction in this case is based on Saccameno's assertion of federal claims (viz., the FDCPA and RESPA), *see* 2d Am. Compl. ¶ 3, that assumption is likely incorrect. Indeed, even in diversity cases, federal courts have applied the federal rule regarding general verdicts. *See, e.g.*, *Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 31 (1st Cir. 2004) ("Some courts have treated the appellate consequences of general verdicts encompassing multiple claims or theories as a procedural issue to be determined by federal law even in a diversity case; others have assumed without discussion that state law controlled. Our own tentative view is the former.") (citations omitted); *Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1278 (4th Cir. 1994) ("Federal procedural law governs the use of general or special verdicts."). Nevertheless, the fate of Saccameno's mootness argument is the same under federal law. Notably, the general verdict rule applied by most circuits is the opposite of the Illinois rule. *See, e.g.*, *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 134 (1st Cir. 1997) ("Where ... a reviewing court cannot identify which of the two claims—one proper and one improper—the jury relied upon to reach the general verdict, the usual rule is that the verdict must be vacated.") (citations omitted); J. Timothy Eaton, Michael W. Rathsack, Michael T. Reagan, *The Too-Expansive Illinois General Verdict Rule*, 101 Ill. B.J. 142, 143 (2013). However, Seventh Circuit law is essentially the same as Illinois.' *See, e.g.*, *Kossman v. Ne. Illinois Reg'l Commuter R.R. Corp.*, 211 F.3d 1031, 1037 (7th Cir. 2000) ("Because the defendant never requested any special form of verdict, the jury only returned a general verdict for Kossman. And when a jury only returns a general verdict, we need only find support in the record for one of the theories presented to the jury in order to affirm the jury award.") (citing *Wassell v. Adams*, 865 F.2d 849, 855 (7th Cir. 1989); *Culli v. Marathon Petroleum Co.*, 862 F.2d 119, 123 (7th Cir. 1988)).

Saccameno seems to suggest that the jury's apportionment of damages among the three claims does not matter because "her injuries arise from a single set of indivisible facts." JMOL Resp. Br. 3, ECF No. 335. Exactly what Saccameno means by this is unclear. She offers no explanation of the assertion nor any argument in support of it.[7] However, she appears to claim that the damage award for the FDCPA, RESPA, and breach of contract claims would have been the same regardless of the jury's verdict on her RESPA and breach of contract claims. Otherwise, it is unclear how the verdict on the FDCPA claim alone could support the entire damage award for all three claims. To the extent that this is Saccameno's contention, it is implausible: it requires positing that the jury awarded the entire $500,000 in compensatory damages based exclusively on Saccameno's FDCPA claim, and that the jury awarded no damages for the RESPA and breach of contract claims—despite finding Ocwen liable on those claims.

Saccameno's claim that her injuries arise from a single set of "indivisible facts" is also implausible. As will become clear in what follows, her FDCPA, RESPA, and breach of contract claims are based on different conduct by Ocwen: Saccameno's breach of contract claim is based on Ocwen's rejection of her mortgage payments; her FDCPA claim is based on the collection letters that Ocwen sent to her; and her RESPA claim is based on Ocwen's responses to her inquiries requesting correction of her account. These facts, while obviously related, are not "indivisible." In addition, the claims provide redress for different kinds of injury. For example, the RESPA and FDCPA statutes allow compensation for emotional distress and other non-

---

[7] Saccameno repeats this claim in her response to Ocwen's motion to amend, but the discussion there is equally cryptic. *See* Rule 59(e) Resp. Br. 5-7, ECF No. 334.

economic harm, while breach of contract claims generally do not.[8] *See, e.g., Parks v. Wells Fargo Home Mortg., Inc.*, 398 F.3d 937, 940–41 (7th Cir. 2005) ("Illinois ... does not ordinarily allow punitive and emotional distress damages for breaches of contract.").

In short, the fact that Ocwen does not challenge the jury's verdict with respect to Saccameno's FDCPA claim does not moot its challenges to her breach of contract and RESPA claims.

## B. Breach of Contract (Count I)

Proceeding to the merits, the court first considers Ocwen's contention that it is entitled to judgment as a matter of law with respect to Saccameno's breach of contract claim. "Under Illinois law, to sustain a breach of contract claim a plaintiff must prove: '(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *Roberts v. Columbia Coll. Chicago*, 821 F.3d 855, 863 (7th Cir. 2016) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). Ocwen argues that Saccameno's breach of contract claim fails for two reasons: first, because she failed to identify any contractual provision that Ocwen purportedly breached; and second, because she failed to present any evidence that she suffered actual damages as a result of the breach. Neither of these arguments is persuasive.

---

[8] Illinois law permits emotional distress damages for breaches of contract "where the breach was wanton or reckless and caused bodily harm, or where defendant had reason to know, when the contract was made, that its breach would cause mental suffering for reasons other than mere pecuniary loss." *Parks v. Wells Fargo Home Mortg., Inc.*, 398 F.3d 937, 940–41 (7th Cir. 2005) (quotation marks omitted). However, Saccameno does not argue that she was entitled to emotional distress damages based on her breach of contract claim. The jury instructions likewise make clear that recovery for emotional distress was permitted in connection with her FDCPA, RESPA, and ICFA claims, but not for breach of contract. *Compare* Jury Inst. 39 (describing damages for claims under the FDCPA, RESPA, and ICFA), *with* Jury Inst. 25 (describing damages for breach of contract).

In response to the first argument, Saccameno asserts that Ocwen breached her mortgage

contract by improperly rejecting her mortgage payments from October 2013 to February 2015.

Courts have recognized that returning mortgage payments, or otherwise failing properly to apply

them, may indeed constitute a breach of a mortgage agreement. *See, e.g.*, *Catalan v. GMAC*

*Mortg. Corp.*, 629 F.3d 676, 690 (7th Cir. 2011) (plaintiff stated claim against transferee

mortgage servicer by alleging that it refused to accept mortgage payments and apply them to

plaintiff's debt); *Gray v. Brown*, No. 3:17-CV-153 (CDL), 2018 WL 1914287, at *5 (M.D. Ga.

Apr. 23, 2018) ("The Court notes that normally, a claim that the mortgage servicer did not

properly apply a borrower's payments would be a breach of contract claim for failure to apply

the loan payments in accordance with the security deed."); *Holt v. Ocwen Loan Servicing, LLC*,

No. 3:13-CV-120, 2013 WL 7211759, at *1 (S.D. Tex. Dec. 12, 2013) ("Holt's allegation that

Defendants breached the loan agreement by failing to credit her timely mortgage payments is

sufficient to state a breach of contract claim."). In any event, Ocwen has not responded to

Saccameno's argument on this score and has therefore conceded the point. *See, e.g.*, *Perry v.*

*Coles Cty., Illinois*, 906 F.3d 583, 590 n.5 (7th Cir. 2018) ("Plaintiffs did not respond to this

argument in their reply brief, so waiver applies."); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466

(7th Cir. 2010) ("Failure to respond to an argument … results in waiver.").

Ocwen's second argument—that Saccameno presented no evidence of actual damages—

i.e., economic harm or pecuniary loss—is contradicted by the record. Saccameno presented

evidence of economic harm in the form of her loss of employment and her medication expenses.

With respect to her loss of employment, Saccameno testified that she was so distracted by

Ocwen's mishandling of her loan that she was unable to concentrate on her work. *See, e.g.*, Tr.

777:24-779:19. In particular, she testified that she brought with her to work each day all of the

11

correspondence and other documents that she had received from Ocwen, and that she spent much of her time at work reviewing these materials, checking to see whether she had in fact made all of her payments, talking to Ocwen on the phone, and trying to figure out what had gone wrong. *See* Tr. 779:15-19. According to Saccameno, she frequently sought help from her coworkers, asking them, for example, to double-check her calculation of the number of payments she had made. *See* Tr. 777:24-778:7; 779:3-10. She testified that her job was not particularly challenging, but that she was unable to perform the work because she just "wasn't focused." *Id*. She was terminated from the position after less than a year. Tr. 837:12-14. It was the only time Saccameno could recall having been fired from a job. Tr. 814:27.

Saccameno's testimony was corroborated by Jill Anderson ("Anderson"), a former coworker, who testified that during the period in question, Saccameno "kept trying to get [her mortgage] straightened out, and it wasn't straightening out. And the longer it went, the more agitated she was about that and just things at work just started to kind of unravel." Tr. 890:8-11. Anderson corroborated Saccameno's testimony that she spent a great deal of time during working hours counting her payments and reviewing documents she had received from Ocwen. *See* Tr. 668:22-669:5. Anderson further corroborated Saccameno's testimony that she frequently sought assistance from her coworkers, going "from cubicle to cubicle, office to office, and just, you know, everyone down the line, the same stuff over and over again"—asking them to look at her checkbook and check her calculations. Tr. 891:8-10. Eventually, Anderson stated, things "got to … the point where we both were talking about the possibility that she was going to get fired. She just really could not focus, and she did get fired." Tr. 891:25-892:2. Based on this testimony, a reasonable jury could have concluded that Saccameno was fired from her job due to Ocwen's

mishandling of her loan, and that she incurred a monetary loss during the time she was unemployed—which, she estimated, was likely less than a month. *See* Tr. 789:4-6.

As for Saccameno's medication expenses, her physician, Dr. Sarantos, testified that during a visit in September 2013, Saccameno reported that "she was very depressed regarding her mortgage, that she was going to lose her house." Tr. 205:13-16; Tr. 211:18-22. Sarantos explained that he subsequently diagnosed Saccameno with anxiety and depression, *see* Tr. 205:9-12, and that he prescribed medications to treat the conditions, *see* Tr. 205:9-206:9. Saccameno testified that she paid out of pocket for the medications. *See* Tr. 820:9-25. On this record, a jury could reasonably have concluded that Saccameno suffered from depression and anxiety as a result of Ocwen's improper loan servicing practices, and that she suffered pecuniary loss in purchasing anti-depressant and anti-anxiety medications.

Ocwen advances a litany of arguments against the foregoing evidence. For example, Ocwen claims that Jill Anderson lacked competence to testify regarding the reason for Saccameno's firing, and that Saccameno's depression predated her mortgage problems and thus could not have been caused by Ocwen. The court has considered and rejected these arguments (along with many others) in prior orders and opinions. *See, e.g.*, *Saccameno v. Ocwen Loan Servicing, LLC*, No. 15 C 1164, 2017 WL 5171199, at *5 (N.D. Ill. Nov. 8, 2017) (ruling on Ocwen's motion for summary judgment); *Saccameno v. Ocwen Loan Servicing, LLC*, No. 15 C 1164, 2018 WL 1240347, at *4 -*7 (N.D. Ill. Mar. 9, 2018) (ruling on Ocwen's motion for reconsideration); ECF No. 235 (order ruling on Defendants' Motion in Limine to Preclude Testimony Regarding Loss of Job); ECF No. 236 (order ruling on Defendants' Motion to Exclude Evidence or Testimony From Fact Witnesses on Medical Causation); ECF No. 240

(order ruling on Defendants' Motion in Limine to Preclude Evidence Regarding Actual Damages). The court will not rehearse its analysis of these issues here.[9]

Because Saccameno presented sufficient evidence of a contractual breach by Ocwen, and of resulting pecuniary harm, the court denies Ocwen's motion for judgment as a matter of law as to Saccameno's breach of contract claim.

## C. Illinois Consumer Fraud Act (Count III)

Ocwen next argues that it is entitled to judgment as a matter of law with respect to Saccameno's claim under the Illinois Consumer Fraud Act. "The elements of a claim under the ICFA are: '(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce.'" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012) (quoting *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010)). In addition, a plaintiff "must show 'actual damage' in order to maintain an action under the ICFA." *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010). "The actual damage element of a private ICFA action requires that the plaintiff suffer 'actual pecuniary loss.'" *Id.* (quoting *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1197 (Ill. App. Ct. 2008)). Plaintiffs may assert claims under ICFA based on either deceptive conduct or unfair conduct (or both). *See, e.g.*, *Camasta v. Omaha Steaks Int'l, Inc.*, No. 12-CV-08285, 2013 WL 4495661, at *8 (N.D. Ill. Aug. 21, 2013) ("Recovery may be obtained for unfair *and* deceptive conduct, and thus Camasta may

---

[9] Ocwen also cites Saccameno's purported lack of actual damages in seeking judgment as a matter of law on her ICFA and RESPA claims. *See* JMOL Br. 7-8 (arguing that Saccameno presented no evidence of actual damages in support of her ICFA claim); *id.* at 14-15 (arguing that Saccameno presented no evidence of actual damages in support of her RESPA claim). These arguments, too, have been thoroughly addressed in the court's prior opinions and orders and thus will not be revisited here.

proceed under either theory.") (citing *Robinson v. Toyota Motor Credit Corp*., 775 N.E.2d 951, 960 (Ill. 2002)). Here, Saccameno proceeds under both theories. The court separately considers Ocwen's arguments with respect to each theory.

### 1. Deceptive Acts or Practices

The "Consumer Fraud Act defines deceptive acts or practices as: 'including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of any trade or commerce.'" *Phillips v. DePaul Univ*., 19 N.E.3d 1019, 1028 (Ill. App. Ct. 2014) (quoting 815 Ill. Comp. Stat. 505/2). It is undisputed that Ocwen made numerous false statements to Saccameno regarding the delinquency of her mortgage loan. Nevertheless, Ocwen argues that, given other information it provided to Saccameno, its communications cannot be deemed "deceptive." Specifically, Ocwen points to the following language included in fine print at the bottom of its letters to Saccameno:

> This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is not intended as and does not constitute an attempt to collect a debt.

Ex. D1 at 1; *see also* Ex. D2 at 1; Ex. D7 at 1. In light of this "heads up" disclaimer, Ocwen insists, "every time she got a letter, Saccameno had express written notice that those letters were not an attempt to collect on her since she knew she had a bankruptcy discharge." JMOL Br. 6, ECF No. 314.

As an initial matter, the court notes that Saccameno claims to have received deceptive communications from Ocwen both orally and in writing. In addition to sending her multiple

letters, Ocwen had numerous phone calls with Saccameno during which its representatives falsely told her that she owed past-due amounts on her mortgage. *See, e.g.*, Tr. 764, Tr. 766, Tr. 771, Tr. 778, Tr. 860. Since the disclaimer applies only to Ocwen's written communications, Ocwen's argument fails insofar as Saccameno's ICFA claim is premised on deceptive statements made in Ocwen's oral communications.

Even as to the written communications, however, Ocwen's argument is unpersuasive. For whatever the disclaimer might have said, Ocwen's conduct unquestionably indicated that it was attempting to collect a debt from Saccameno. For over a year, despite Saccameno's repeated efforts to show Ocwen that her bankruptcy had been discharged and that she had made all of her payments, Ocwen continued to send letters stating that her account was delinquent, demanding payment from her, and reminding her of the possibility of foreclosure. Although Ocwen's records were incorrect, it plainly believed that Saccameno had missed some of her mortgage payments and regarded itself as attempting properly to collect a debt from her. Indeed, Saccameno testified that Ocwen's persistence and intransigence caused her at times to doubt whether she had in fact made all of her payments. *See* Tr. 778:1-7. In light of Ocwen's conduct, the fine-print "heads up" language in its letters does nothing to dispel the notion that it was attempting to collect a debt from her. *Cf. In re Marino*, 577 B.R. 772, 784 (B.A.P. 9th Cir. 2017) ("[A]lthough Ocwen knew that the Marinos had filed for bankruptcy protection and received a discharge, thirteen of the fifteen letters with disclaimers spoke of bankruptcy as a hypothetical possibility (e.g., 'if you filed for bankruptcy and your case is still active, or if you have received an order of discharge, please be advised that this is not an attempt to collect a prepetition or discharged debt'). Ocwen makes no attempt to explain why it was proper for Ocwen to obscure the fact (known to Ocwen) that the Marinos had already received a discharge.").

16

Ocwen also contends that Saccameno's deceptiveness claim fails because there was no evidence of its intent to deceive Saccameno. It is well settled, however, that ICFA does not require a showing of the defendant's intent to *deceive*; it requires a showing only of the defendant's intent that the plaintiff *rely* on the deceptive act or statement. *See, e.g.*, *Wigod*, 673 F.3d at 575 ("[A] claim for 'deceptive' business practices under the Consumer Fraud Act does not require proof of intent to deceive. It is enough to allege that the defendant committed a deceptive or unfair act and intended that the plaintiff rely on that act.") (quoting *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1044 n. 5 (N.D. Ill. 2007)). There is ample evidence in the record indicating that Ocwen intended for Saccameno to rely on its statements.[10]

For these reasons, the court concludes that Saccameno presented sufficient evidence to support a deceptive practices claim under ICFA.

## 2.    Unfair Acts or Practices

Saccameno also presented sufficient evidence to support an ICFA claim based on unfair practices. "To show that something is an 'unfair practice' under the CFA, the practice must offend public policy; be immoral, unethical, oppressive, or unscrupulous; or cause substantial

---

[10] In further support of her ICFA deceptive acts claim, Saccameno alleges that Ocwen engaged in deceptive conduct during the course of the litigation. She asserts, for example, that Ocwen tampered with evidence by making changes to Saccameno's loan payment history. *See* JMOL Resp. Br. 6-7, ECF No. 335. She also claims that Ocwen offered deceptive testimony at trial, citing Feezer's initial testimony that Saccameno had made only forty of her forty-two mortgage payments. *Id*. at 7. Ocwen vigorously denies these accusations. It is unnecessary to resolve the matter, however, for even if Saccameno's allegations were true, she offers no explanation as to how they might form the basis for her ICFA claim. Among other things, she makes no attempt to address the fact that the conduct in question occurred after the filing of her complaint (and her subsequent amended complaints), and that she never moved to supplement the pleading, *see* Fed. R. Civ. P. 15(d), or to amend the pleading to conform to evidence presented at trial, *see* Fed. R. Civ. P. 15(b). Accordingly, the court has not considered these allegations in assessing the sufficiency of the evidence supporting Saccameno's ICFA claim.

injury to consumers." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 665 (7th Cir. 2008) (quoting *Robinson*, 775 N.E.2d at 961). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id*. (citing *Robinson*, 775 N.E.2d at 961). The record in this case contains sufficient evidence of unfair practices under all three criteria.

First, the record supported a finding that Ocwen's conduct offended public policy. A practice offends public policy under ICFA where it "violates statutory or administrative rules establishing a certain standard of conduct." *Saika v. Ocwen Loan Servicing, LLC*, No. 18 C 3888, 2018 WL 6433853, at *8 (N.D. Ill. Dec. 7, 2018). This can encompass standards of conduct imposed by consent decrees and settlement agreements. In *Lowry v. Wells Fargo Bank, N.A.*, No. 15 C 4433, 2016 WL 4593815 (N.D. Ill. Sept. 2, 2016), for example, the plaintiffs alleged that Wells Fargo had violated ICFA based on its handling of their mortgage after they had defaulted. Among other things, they alleged that Wells Fargo had engaged in unfair practices under ICFA by failing to adhere to the terms of a consent decree and national settlement that it had reached with the Office of Comptroller the Currency and the Department of Justice. *Id*. at *9. Although the plaintiffs were not parties to either of the agreements and were not seeking to enforce them, the court agreed that if Wells Fargo's handling of the plaintiffs' mortgage had violated the terms of the agreements, its conduct offended public policy and was thus "unfair" under ICFA. *Id*. at *9.

Here, Saccameno presented evidence of similar consent orders that Ocwen had reached with state and federal regulatory agencies.[11] In December 2013, for example, Ocwen entered into

---

[11] This evidence is the subject of Ocwen's motion for a new trial and will be discussed at length below. *See* Part III, *infra*.

a consent judgment to resolve a lawsuit brought against it by the Consumer Financial Protection Bureau together with forty-nine states and the District of Columbia. *See* Settlement Agreement and Consent Order, *In Re: Ocwen Financial Corporation and Ocwen Loan Servicing, LLC*, No. C-13-1153-14-CO01 (Dec. 19, 2013). Pursuant to the consent judgment, Ocwen agreed to adopt numerous controls and standards in it servicing of loans. Specifically, Ocwen agreed to "maintain adequate documentation of borrower account information," to "maintain procedures to ensure accuracy and timely updating of borrower's account information," and to "take appropriate action to promptly remediate any inaccuracies in borrowers' account information." Ex. P42 at A-4 & A-7. In connection with Chapter 13 cases, Ocwen agreed to ensure that "the debtor is treated as being current so long as the debtor is making payments in accordance with the terms of the then-effective confirmed [bankruptcy] plan"; and to ensure "as of the date of dismissal of a debtor's bankruptcy case, entry of an order granting Servicer relief from the stay, or entry of an order granting the debtor a discharge, there is a reconciliation of payments received with respect to the debtor's obligations during the case and appropriately update the Servicer's systems of record." *Id*. at A-8. A jury could reasonably have concluded that Ocwen's servicing of Saccameno's loan failed to comply with these obligations and that it thereby offended public policy for purposes of ICFA.[12]

---

[12] Ocwen argues that the consent judgment is irrelevant to Saccameno's case because it did not become effective until December 2013—six months after the miscoding of Saccameno's bankruptcy. As the court explains in addressing Ocwen's motion for a new trial, *see* Part III, *infra*, even if Ocwen's initial error(s) occurred prior to the consent judgment, its subsequent failure to correct the errors extended well beyond December 2013. By continuing to mishandle Saccameno's loan, Ocwen engaged in conduct proscribed by the consent judgment after the judgment became effective.

Second, Saccameno presented evidence that Ocwen's conduct was "immoral, unethical, oppressive, or unscrupulous." For purposes of ICFA, "a practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer." *Stonecrafters, Inc. v. Foxfire Printing & Packaging, Inc.*, 633 F. Supp. 2d 610, 616 (N.D. Ill. 2009) (brackets and quotation marks omitted). Here, a jury could reasonably have concluded that Ocwen's conduct left Saccameno with a lack of meaningful choice. After all, Saccameno had no choice in selecting Ocwen as her loan servicer and she had no ability to get rid of Ocwen after it began mishandling her account. In characterizing her experience in dealing with Ocwen, Saccameno stated: "I was speaking to vapors…. [It was h]opeless. There's no control. I can't write a check. I can't fix it with money." *See* Tr. 780:18-781:1. Nor, in any case, can there can be any doubt that Ocwen's conduct placed an "unreasonable burden" on Saccameno: for eighteen months she experienced depression and anxiety because of Ocwen's failure to fix errors that, to all appearances, could have been fixed in a matter of hours, if not minutes.

Finally, there was sufficient evidence that Ocwen's conduct resulted in substantial injury to consumers. "A practice causes substantial injury to consumers if it causes significant harm to the plaintiff and has the potential to cause injury to a large number of consumers." *Stonecrafters, Inc. v. Foxfire Printing & Packaging, Inc.*, 633 F. Supp. 2d 610, 617 (N.D. Ill. 2009) (quotation marks omitted). The record in this case makes abundantly clear that Ocwen's conduct caused Saccameno significant harm, particularly in the form of emotional distress. However, the record also contains evidence that Ocwen's conduct had the potential to injure a large number of other consumers. Although Ocwen maintains that the problems with Saccameno's account boil down to a one-off mistake by a lone employee, a jury could have concluded that the difficulties

20

stemmed from systemic defects with Ocwen's loan servicing practices. For example, on direct examination, Gina Feezer testified that several of Ocwen's business units were involved in responding to Saccameno's requests that her account be corrected. In particular, she explained that the inquiries were received by the company's Research Department, which then sent out workflows to various other departments, *see, e.g.*, Tr. 617:13-17; Tr. 174:25-175:2, Tr. 280:10-15, including the Bankruptcy Department, *see, e.g.*, Tr. 170, Tr. 174, Tr. 178, Tr. 180; the Foreclosure Department, *see, e.g.*, Tr. 189, Tr. 308; and the Cashiering Department, *see, e.g.*, Tr. 174, Tr. 309, Tr. 470. There is no evidence that the procedures Ocwen used in handling Saccameno's inquiries and concerns deviated from its procedures for handling customer complaints and inquiries generally. The fact that Ocwen's procedures were unable to correct the errors it had made in servicing Saccameno's loan could have led a jury reasonably to conclude that the procedures themselves were defective. This is especially so given that the errors were fairly simple and straightforward, and the fact that the procedures failed not just once but repeatedly. To the extent that Ocwen's loan servicing practices are themselves defective, they carry the potential to result in similar harm to other consumers.

To be sure, Feezer testified that Saccameno's case was the only one in which she had seen a miscoding error of this sort. *See* Tr. 131:16-17. On cross-examination, however, Feezer admitted that she had conducted virtually no investigation to determine whether Marla, or any other employee, had miscoded bankruptcy discharge orders in other cases. *See* Tr. 130:13-17; Tr. 136:16-137:13. The record therefore sheds little light on how frequently similar problems might have occurred in Ocwen's servicing of other loans. But it does not matter how often similar problems *actually* occurred in other cases. The question is only whether Ocwen's conduct carries the *potential* to harm a large number of other consumers. On this record, a jury could reasonably

have concluded that the loan servicing practices employed by Ocwen in this case hold the potential to harm other consumers. And given the sheer size of Ocwen's loan portfolio, it is likewise reasonable to conclude that the potential harm extends to a large number of consumers.[13] *Cf. Stephens v. Capital One, N.A.*, No. 15-CV-9702, 2016 WL 4697986, at *6 (N.D. Ill. Sept. 7, 2016) ("Defendant's expansive consumer base similarly allows the Court to reasonably infer that a large consumer base may be at risk for similar conduct that has been alleged to qualify as 'unfair' under the ICFA.") (citation omitted); *Wilson v. Harris N.A.*, No. 06 C 5840, 2007 WL 2608521, at *8 (N.D. Ill. Sept. 4, 2007) ("Given that Harris Bank is alleged to have more than two hundred branches in the Chicagoland area and northwest Indiana, the court can reasonably infer that its large consumer base may be at risk of being subjected to cursory and inadequate investigations of claims of unauthorized transactions.") (citation omitted).

Thus, there is sufficient evidence under each of the criteria singled out above to support Saccameno's ICFA unfairness claim; and to the extent that the evidence is insufficient as to any of the criteria individually, the evidence is sufficient when viewed collectively. Hence, whether based on deceptive conduct or unfair conduct, Saccameno's ICFA claim is adequately supported by the record. Accordingly, the court denies Ocwen's motion for judgment as a matter of law as to Count III.

## D.     Punitive Damages

Ocwen next argues that it is entitled to judgment as a matter of law with respect to Saccameno's request for punitive damages. "Under Illinois law, punitive damages may be

---

[13] According to Ocwen's website, it "is one of the largest mortgage companies in America." *See* http://www.ocwen.com/about. The court may take judicial notice of undisputed material hosted on a party's public website. *See, e.g.*, *Newbold v. State Farm Mut. Auto. Ins. Co.*, No. 13 C 9131, 2015 WL 13658554, at *4 n.7 (N.D. Ill. Jan. 23, 2015) (citing *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 944 n.3 (7th Cir. 2010)).

awarded for ... violations of the ICFA based on unfair conduct in cases where the defendant acts

maliciously or with deliberate indifference." *Wendorf v. Landers*, 755 F. Supp. 2d 972, 981

(N.D. Ill. 2010); *see also Linhart v. Bridgeview Creek Dev., Inc.*, 909 N.E.2d 865, 875 (Ill. App.

Ct. 2009) ("The Consumer Fraud Act explicitly allows for the recovery of punitive damages

where the conduct of the defendant was willful or intentional and done with evil motive or

reckless indifference to the rights of others."). Ocwen argues that its conduct was not egregious

enough to meet this standard. Ocwen additionally contends that, on this record, it cannot be held

liable for punitive damages based on the actions of its employees. The court addresses these

contentions in turn.

**1.      Ocwen's Conduct Was Sufficiently Egregious**

Ocwen first maintains that its conduct was not sufficiently egregious to warrant punitive

damages. This is because, according to Ocwen, the record shows that the miscoding of

Saccameno's bankruptcy discharge was an honest case of human error, not the result of malice or

deliberate indifference.

For several reasons, this argument is unconvincing. As an initial matter, the record does

not conclusively show that the miscoding was the result of human error. In fact, the precise

reason for the miscoding is unclear. There is no dispute that the employee identified as Marla

miscoded the discharge; but to show who committed the error is not to show how or why it

occurred. When questioned on the matter, Feezer expressed bafflement and conceded that the

error would have been a difficult one for an employee in Marla's position to make. *See, e.g.*, Tr.

139:6-10. More importantly, even assuming that the initial miscoding could be explained as an

accident, the question remains as to why Ocwen failed to correct the problem in the months that

followed. Ocwen's failure to correct the issue is especially puzzling in light of the fact that

23

Ocwen continued to treat Saccameno's loan as severely delinquent even after the miscoding was corrected in its computer system in July 2013.

Further, in addition to miscoding Saccameno's bankruptcy, Ocwen improperly advanced the due date for her loan payments and failed to credit two of the payments that she made during her bankruptcy. While a single error might be explained as a mere accident, multiple errors might reasonably be viewed as a pattern indicating deliberate indifference, if not malice. Notably, all but one of Ocwen's errors in connection with Saccameno's account would have redounded to Ocwen's benefit, requiring Saccameno to make additional mortgage payments as well as to pay various fines and fees. *See, e.g.*, Tr. 156:16-158:2 (discussing inspection fees); Tr. 344:19-25 (property valuation and title fees). The sole exception is the fact that, between April and June 2013, Ocwen's records (apparently incorrectly) reflected a credit balance in Saccameno's favor of between of $1,156.83 and $2,840.12. *See* Tr. 113:14-17; Tr. 122:15-24. Unlike the errors that would have benefitted Ocwen, however, the error in Saccameno's favor was corrected swiftly and on Ocwen's own initiative.

On this record, a jury could reasonably have concluded that Ocwen's conduct was egregious enough to warrant punitive damages. In his closing argument, Saccameno's counsel suggested to the jury that Ocwen had essentially waged a war of attrition against Saccameno, pursuing its collection efforts in the hope that she eventually would capitulate by agreeing to make extra payments or by entering into a loan modification on terms more favorable to Ocwen. *See* Tr. 1041:17-21; Tr. 1049:7-1050:6. Viewing the evidence in the light most favorable to Saccameno, the court cannot say that such an inference would have been unreasonable. But regardless of whether jurors might have accepted the specific theory advanced by Saccameno, a jury could reasonably have concluded—based on the number and nature of Ocwen's missteps,

and the time it took to correct them—that Ocwen acted maliciously, or at least with deliberate indifference to Saccameno's rights.

Ocwen argues that such an inference is contradicted by the fact that it offered Saccameno various forms of assistance. For example, Ocwen points out that many of its letters to Saccameno included the phone numbers for housing counseling services approved by the Department of Housing and Urban Development (HUD) and the hotline for the Homeownership and Opportunity for People Everywhere ("HOPE") Program. *See, e.g.*, Ex. DX1 at 3; Ex. DX6 at 3; Ex. DX7 at 3. But this information appears to have been included routinely in Ocwen's collection letters and shows no effort to address the specific problems with Saccameno's account. In fact, Ocwen's letters list these resources under the heading, "Financial Counseling Services." Having emerged from bankruptcy, however, Saccameno no longer needed financial assistance; she simply needed Ocwen to correct its records.

In July 2013, Ocwen also assigned a "Relationship Manager" to assist Saccameno. This individual, Anthony Gomes ("Gomes"), was to "be responsible for monitoring [Saccameno's] account, making sure that [Ocwen had] all of [her] critical information and carefully reviewing [her] situation." Ex. DX2 ("Relationship Manager Notice," July 16, 2013). There is no evidence, however, that Gomes actually performed these functions. The record indicates that Saccameno spoke with him once by phone in August 2013, at which time he instructed her to resubmit the information that she previously had faxed on July 17, 2013. *See* Tr. 472:6-15; Tr. 776:16-767:6; Tr. 860:15-861:20. Saccameno sent Gomes the materials, but nothing came of it.

Finally, Ocwen notes that it gave Saccameno several opportunities to modify the terms of her loan. However, the two proposals discussed at trial were offered to Saccameno only in 2015, after she had filed suit. *See* Ex. DX16; Tr. 493:17-19; Tr. 495:18-22 (discussing loan

modification offered on Feb. 13, 2015); Ex. DX17; Tr. 497:5-8 (discussing loan modification offered in July 2015). Moreover, while the modifications would have lowered Saccameno's monthly payments, they also would have increased the loan's principal balance, *see* Tr. 622:17-623:4; Tr. 625:12-24, and lengthened the term of the mortgage from fifteen to thirty years, *see, e.g.*, Tr. 626:15-20. In the long run, therefore, Ocwen's proposed loan modifications might well have been costlier to Saccameno—and more beneficial to Ocwen.

In short, based on the record evidence in this case, a jury could reasonably have concluded that Ocwen's conduct was reprehensible enough to warrant punitive damages.

## 2. Corporate Complicity

Next, Ocwen argues that it cannot be held liable for punitive damages because Saccameno presented no evidence that its corporate management authorized or approved of its employees' actions. *See* JMOL Br. 10, ECF No. 314. Under Illinois' so-called "corporate complicity" doctrine, punitive damages may be awarded against a principal or corporation based on the acts of its employees where:

> (a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act.

*Mattyasovszky v. West Towns Bus Co*., 330 N.E.2d 509, 512 (Ill. 1975).

Here, a jury could reasonably have concluded that Ocwen "ratified or approved" of its employees' actions. Under Illinois law, "[r]atification is the equivalent of authorization, but it occurs after the fact, when a principal gains knowledge of an unauthorized transaction but then retains the benefits or otherwise takes a position inconsistent with nonaffirmation." *Progress Printing Corp. v. Jane Byrne Political Comm*., 601 N.E.2d 1055, 1067 (Ill. App. Ct. 1992).

"[R]atification need not be express; it may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an unauthorized transaction." *Id*. The record in this case contains sufficient evidence both that Ocwen's management was aware of its employees' actions and that Ocwen took a "position inconsistent with nonaffirmation" of those actions.

First, there is sufficient evidence in the record that Ocwen's management was on notice of potential problems with its loan servicing practices throughout the company generally. For example, as mentioned above, *see* Part II.C.2, *supra*, Saccameno's exhibits included consent orders that Ocwen entered into with state and federal regulatory bodies. These exhibits showed that, based on investigations conducted in 2010 and 2011, state and federal regulatory agencies had raised a host of concerns regarding Ocwen's handling of distressed loans. *See* Exs. P42 & P44. Among other things, the regulators claimed to have found a "[l]ack of controls related to general borrower account management, including … [m]isapplication of borrower payments" and "[a]ssessment of unauthorized fees and charges," Ex. P42 at 6; and "[d]eficiencies in management control and supervision necessary to ensure compliance with applicable laws and regulations," *id*. at 7; as well as "deficiencies in Ocwen's servicing platform and loss mitigation infrastructure, including … failure to properly maintain books and records," Ex. P44 at 3. A jury could reasonably have inferred that various regulators had informed Ocwen that its procedures were subject to the kind of deficiencies that gave rise to the problems in Saccameno's case, and that, in light of the regulatory investigations on which the consent orders were based, Ocwen was aware of its employees' improper conduct in handling loans.

Ocwen appears to concede the consent orders constitute evidence of corporate complicity. It argues, however, that these exhibits were inadmissible. As previously noted,

Ocwen's arguments on this point will be discussed in depth in Part III. However, even without the consent orders' evidence indicating knowledge of companywide problems with Ocwen's loan servicing practices, Saccameno presented sufficient evidence from which a jury could have found that Ocwen's management was aware that her account in particular was being improperly serviced. For more than a year, Saccameno and her attorney had numerous communications with Ocwen employees. Some of these should have been cause for alarm. For example, Van Sky's letters to Ocwen expressly threatened litigation. *See* Ex. P33; Ex. P34. The record shows that Saccameno's complaints and inquiries were distributed to and handled by several of Ocwen's corporate departments. Tr. 617:13-17; Tr. 174:25-175:2, Tr. 280:10-15. All of these communications—along with electronic images of the bankruptcy discharge order, the notice of final cure, and other documents—were logged in Ocwen's computer system, *see generally* Ex. P18; Tr. 138:18-139:3, and could be viewed by any Ocwen employee who accessed Saccameno's account, *see, e.g.*, Tr. 169:12-170:18. As of August 2013, Ocwen's records contained all of the information necessary to determine that Saccameno's account was current. *See, e.g.*, Tr. 328:21-23. Moreover, in the words of Ocwen's counsel, Saccameno's account was "bumped up" to a higher level when a Relationship Manager was assigned to monitor and review her situation. *See* Tr. 1077:15-1078:2. Given all of these facts, a jury could reasonably have found that awareness of the mishandling of Saccameno's account had percolated up to Ocwen's management.[14]

---

[14] Even if Ocwen's management was not actually aware of the problems with Saccameno's account, Ocwen would not thereby be absolved of liability. For while a principal ordinarily must have knowledge of the agent's actions in order to be held liable for those actions, under Illinois law, "one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be estopped as if he had full knowledge of the facts." *Progress Printing*, 601 N.E.2d at 1067-68; *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 822 (N.D. Ill. 2008) (quoting *Progress Printing*). On this record, a jury could reasonably have concluded that,

Second, on this record, a jury could reasonably have inferred that Ocwen retained the benefits, or otherwise took a "position inconsistent with nonaffirmation," of its employees' conduct. We have seen that Ocwen stood to benefit from its mishandling of Saccameno's account in several ways. Among other things, its mistakes would have required Saccameno to make additional mortgage payments and to pay additional fees and charges, *see, e.g.*, Tr. 156:16-158:2; Tr. 344:19-25, and might also have led her to modify her loan on terms more profitable to Ocwen, s*ee* Part II.D.1*, supra*. To be sure, Ocwen ultimately did not retain these benefits: Saccameno did not make the extra payments Ocwen demanded; the fees and charges to her account were later reversed, *see, e.g.*, Tr. 471:5-23; Tr. 966:22-67:22; and Saccameno never accepted Ocwen's loan modification proposals. Nevertheless, it can reasonably be inferred that Ocwen would have retained these benefits if Saccameno had not filed suit.

Further, regardless of whether Ocwen ultimately retained any benefit from the mishandling of Saccameno's loan, a jury could reasonably have concluded that Ocwen took a "position inconsistent with nonaffirmation" of its employees' conduct. For example, the record indicates that Ocwen took no steps to prevent the problems that arose in Saccameno's case from recurring in the case of other consumers. As noted above, Feezer admitted that she had conducted virtually no investigation into the circumstances surrounding the miscoding of Saccameno's bankruptcy discharge: she admitted that she never spoke with Marla regarding the issue and did not check to see whether she or other employees had miscoded bankruptcy

---

to the extent Ocwen was unaware of the problems with Saccameno's account, Ocwen is estopped from pleading ignorance because its lack of knowledge was deliberate or the result of culpable negligence. *See, e.g.*, *Williams v. Schram*, No. 06-CV-00557-DRH, 2008 WL 2788758, at *5 (S.D. Ill. July 16, 2008) (punitive damages could be awarded against corporation based on evidence that the corporation "turned a blind-eye" to employee's violations of federal regulations).

discharges in other cases. *See, e.g.,* Tr. 132:3-136:1. Tr. 130:13-17; Tr. 136:16-137:13. To fail to take such corrective action is to take a "position inconsistent with the nonaffirmation" of employees' actions. *See, e.g.*, *Langan v. Rasmussen*, Nos. 15-1295 & 15-1207, 13-15 (C.D. Ill. Aug. 28, 2018) (jury could reasonably have concluded that defendant corporation ratified employee's unsafe driving because, based on corporation's auditing procedures, it "should have known that employee was falsifying his logs and operating in an unsafe manner") (quotation marks omitted); *LeClercq v. Lockformer Co*., No. 00 C 7164, 2002 WL 992671, at *3 (N.D. Ill. May 7, 2002) (evidence supported conclusion that management was aware of employees' unsafe delivery methods and potential environmental contamination and that, by taking no action to contact residents or test well water, corporation ratified employees' conduct); *Robinson v. Wieboldt Stores, Inc*., 433 N.E.2d 1005, 1009 (Ill. App. Ct. 1982) (upholding punitive damage award against corporation for security guard's actions because, *inter alia*, "defendant has continued to defend the actions of its agent throughout the course of this litigation and has shown no attempt to alter its procedures in regard to situations such as the one encountered by plaintiff").

In short, on this record, a jury could reasonably have concluded that Ocwen's management was aware of the mishandling of Saccameno's account, and that by acquiescing in its employees' conduct, Ocwen ratified their actions. *See Langan*, 15-1295 & 15-1207, 13-15; *LeClercq*, 2002 WL 992671, at *3. For these reasons, the record supports holding Ocwen liable for punitive damages based on the actions of its employees. Having concluded that the record also supports a finding that Ocwen acted with the requisite culpability, the court denies Ocwen's motion for judgment as a matter of law as to Saccameno's claim for punitive damages.

E.    **RESPA (Count IV)**

Lastly, Ocwen seeks judgment as a matter of law with respect to Saccameno's RESPA claim. "RESPA is a consumer protection statute that regulates the real estate settlement process, including servicing of loans and assignment of those loans." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 680 (7th Cir. 2011). As relevant here, "the statute requires loan servicers to promptly respond to a 'qualified written request' ["QWR"] from a borrower seeking 'information related to the servicing' of his loan or alleging that his account is in error." *Perron on behalf of Jackson v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 856-57 (7th Cir. 2017) (quoting 12 U.S.C. § 2605(e)(1)(A)–(B)). Specifically, RESPA requires loan servicers to take one of following actions within thirty days of receiving a QWR: (1) "make appropriate corrections in the account of the borrower … and transmit to the borrower a written notification of such correction," 12 U.S.C. § 2605(e)(2)(A); (2) "after conducting an investigation, provide the borrower with a written explanation or clarification that includes … to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer," 12 U.S.C. § 2605(e)(2)(B); or (3) "after conducting an investigation, provide the borrower with a written explanation or clarification that includes … information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer," 12 U.S.C. § 2605(e)(2)(C).

Saccameno claims that Ocwen failed to comply with these requirements in responding to her inquiries regarding her account. To prevail on her RESPA claim, Saccameno must show that Ocwen failed to comply with one of § 2605(e)(2)'s requirements and that she suffered actual injury as a result. *See, e.g.*, *Baez v. Specialized Loan Servicing, LLC*, 709 F. App'x 979, 982 (11th Cir. 2017) ("[T]o prevail on a RESPA claim, a plaintiff must show (1) a failure to comply

31

with a RESPA obligation and (2) actual damages sustained as a result of the failure to comply."). The parties agree that Saccameno sent Ocwen at least two distinct QWRs: the first was Saccameno's fax to Ocwen in July 2013; the second was Susan Van Sky's letter sent in March 2014. The court considers the evidence with respect to each QWR separately.[15]

---

[15] On January 10, 2014, the Consumer Financial Protection Bureau promulgated regulations to implement RESPA's requirements. *See* Mortgage Servicing Rules under the Real Estate Settlement Procedures Act, codified at 12 C.F.R. § 1024. Some courts have held that one of these regulations ("Regulation X") imposed stricter requirements on servicers in responding to QWRs. This view is based on the fact that, whereas RESPA's statutory text requires servicers to provide borrowers with a written explanation or clarification "after conducting an investigation," 12 U.S.C. § 2605(e)(2)(B), Regulation X requires servicers to respond to QWRs after "[c]onducting a *reasonable* investigation," 12 C.F.R. § 1024.35(e)(1)(i)(B) (emphasis added). According to some courts, the regulation's addition of the term "reasonable" signifies a heightened standard for servicers' investigations. *See, e.g., Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 804 (E.D. Pa. 2014) ("[P]re-Regulation X statutory language required nothing more than 'an investigation' and a 'written explanation' that the servicer believes supports its determination that the account is correct…. [Under] Regulation X, however, … a servicer must now conduct a 'reasonable investigation.' The addition of the word 'reasonable' seemingly imposes a substantive obligation that is not satisfied by the mere procedural completion of some investigation followed by a written statement of reasons."); *but see Wirtz v. Specialized Loan Servicing, LLC*, 886 F.3d 713, 717 (8th Cir. 2018) ("Effective January 2014, the Bureau of Consumer Financial Protection amended its Regulation X to require that mortgage loan servicers conduct a 'reasonable investigation' in response to a qualified written request. The addition of a new regulatory command, however, does not imply that the statute previously did not include one. In this case, we conclude that the new regulation simply reflects a requirement already dictated by the statutory text.") (citations omitted). For this reason, the RESPA jury instructions in this case distinguished between claims based on QWRs received prior to January 10, 2014 and those received after that date. *See* Jury Inst. 37. The distinction is not important here, however, because Ocwen's motion does not invoke it. On the contrary, Ocwen appears to agree that a reasonableness requirement applies under RESPA generally. *See* JMOL Br. 11 ("When responding to a qualified written request, it is irrelevant whether the servicer's understanding of the account is correct, so long as it is reasonable.") (citing *Vilkofsky v. Specialized Loan Servicing, LLC*, 2017 U.S. Dist. LEXIS 29994, at *15 (W.D. Pa. Mar. 3, 2017)). The distinction between pre- and post-Regulation X requirements is also unimportant because, even assuming that a less stringent standard applies to investigations conducted prior to the regulation's enactment, a jury could reasonably have concluded on this record that Ocwen failed to meet it.

1.      **The July 2013 QWR**

Saccameno's first QWR was prompted by communications she received from Ocwen in July 2013 informing her that her account was delinquent. As noted above, on July 15, 2013, she called Ocwen to inquire about the possibility of refinancing her loan. Tr. 763:12-16. During the conversation, an Ocwen representative informed Saccameno that, according to its records, she was $8,000 in arrears. Tr. 764:12-19. On July 17, 2013, she sent a fax to Ocwen stating:

> I just spoke to your company regarding the possibility of refinancing at a lower interest rate as I am at 8.5%. She indicated your company thinks I am > 8000.00 in arrears! This is not true! In fact in May I superfluously sent an extra 3 payments for my principal. As you can see in the attached I have just completed a Chapter 13 bankruptcy lasting 42 months during which time I didn't miss a mortgage payment!

*See* Ex. P16. Saccameno's fax included several pages of documentation, including a copy of the bankruptcy discharge order entered in her case. *Id*. at 7; Tr. 166:2-10.

On August 6, 2013, after speaking with Anthony Gomes, Saccameno sent Ocwen a second fax that included the same information. *See* Ex. P15 at 7; *see also* Tr. 182:5-8; Tr. 764:25-765:5. Ocwen consolidated the two requests, *see* Ex. P18 at 2324, and responded in a letter dated August 14, 2013, *see* Ex. P16. The letter summarized Saccameno's concerns, stating: "[Y]ou requested us to provide you with the details regarding the payments which were sent in the month of May 2013." Ex. P16 at 1. In addition, the letter acknowledged that Saccameno had "provided [Ocwen] the details of the discharged bankruptcy." *Id*. In response to Saccameno's concerns, Ocwen stated:

> Our records reflect that you filed for protection under bankruptcy chapter 13 on December 31, 2009. Please note that we received 40 payments for the post petition plan, which were applied from January 1, 2010 through April 1, 2013 leaving the loan due for May 1, 2013 payment. Additionally, we have waived fees in the amount of $1,673.21, which were assessed to the loan by prior servicer and Ocwen.

*Id*.

33

A jury could reasonably have concluded that this response failed to meet RESPA's requirements under § 2605(e)(2). There is no dispute that Ocwen did not comply with § 2605(e)(2)(A), which requires servicers to "make appropriate corrections in the account of the borrower." Although Ocwen waived fees assessed by Saccameno's previous servicer, Ocwen did not correct its records to reflect that Saccameno had made all of her payments. Ocwen's response also did not comply with § 2605(e)(2)(C) because Ocwen did not claim that it was unable to obtain the information Saccameno had requested. The question is thus whether Ocwen complied with § 2605(e)(2)(B)'s requirement that the servicer, "after conducting an investigation, provide the borrower with a written explanation or clarification" as to why it believes the account does not need correction.

Here, there is sufficient evidence that Ocwen failed both to conduct a sufficient investigation and to provide an adequate explanation as to why Saccameno's account needed no correction. With respect to the adequacy of Ocwen's investigation, we have already seen that, by the time it sent its August 2013 response letter, Ocwen had all the information necessary to determine that Saccameno had in fact made all forty-two of her post-petition payments. *See, e.g.*, Tr. 328:21-23. Further, even if Saccameno had missed payments, Ocwen would have been unable to collect them because it failed to respond to the Chapter 13 Trustee's Notice of Final Cure Payment. *See* Tr. 471:25-472:5. Still further, we have seen that by the end of July 2013, Ocwen had in fact corrected the miscoding of Saccameno's bankruptcy discharge. This information, which was accessible to all of Ocwen's employees, unequivocally showed that Saccameno was not responsible for any missed payments. Yet Ocwen offers no explanation as to why it responded by telling Saccameno that her loan was delinquent. In the absence of an

34

alternative explanation, a jury could reasonably have concluded that Ocwen's mistaken response resulted from its failure to investigate Saccameno's account.

A jury could also reasonably have concluded that the explanation provided in Ocwen's response letter failed to comply with § 2605(e)(2)(B). Indeed, at a basic level, the letter's explanation was not responsive to Saccameno's QWR at all. For example, although Ocwen's response acknowledges that Saccameno provided details regarding her bankruptcy discharge, the letter makes no attempt to address this information. Similarly, the letter notes that Saccameno had filed for bankruptcy in December 2009 but says nothing in response to Saccameno's claim that the bankruptcy had been discharged. Indeed, Ocwen's response appears to misconstrue the point of Saccameno's inquiry. The letter describes Saccameno's QWR as seeking details regarding the payments she had made in May 2013. Ex. P16 at 1. But Saccameno's fax specifically characterized those payments as "superfluous." The point of her inquiry was to dispute and correct Ocwen's claim that her account was in arrears. As to that issue, Ocwen's letter simply asserts that it had received only forty payments from Saccameno. It offers no further explanation or supporting documentation. An oblique response of this kind is not sufficient to comply with RESPA. *See, e.g.*, *Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 725 (S.D. Ohio 2014) (servicer's response failed to comply with RESPA because the information it provided did not "explain or clarify the issue at the heart of Marais' QWR—that Marais believed her account was in error because payments had been misapplied, fees unjustly assessed, and payments counted late though they had not been") (quotation marks and brackets omitted).

On this record, therefore, a jury could reasonably have concluded that Ocwen's response to the July 2013 QWR failed to comply with RESPA's investigation and explanation requirements.

## 2.      The March 2014 QWR

On March 21, 2014, Susan Van Sky sent Ocwen a second QWR. *See* Ex. P33; Tr. 327:13-25; Tr. 507:11-14. The letter attached over 100 pages of supporting documentation showing that Saccameno had in fact made all of her mortgage payments. Tr. 508:25-509:12; Tr. 783:7-13. Van Sky requested that Ocwen "review these documents and call me with an explanation as to how you plan to remedy this situation." *Id*. Ocwen's response letter, dated April 9, 2014, acknowledged that Van Sky "provided us with the proof of payment and requested us to review and provide you with assistance in this regard," Ex. DX14. However, the letter went on to say: "A review of our record [sic] indicates that all payment [sic] reference [sic] in your correspondence have been received and applied towards the loan." *Id*. Ocwen also separately sent Van Sky a "Payment Reconciliation History," a twelve-page spreadsheet purportedly reflecting "all credits and disbursements, made to the loan and the resulting loan status." *See* Ex. DX13.

As with Ocwen's August 2013 response letter, a jury could reasonably have concluded that Ocwen's April 2014 letter fell short of § 2605(e)(2)(B)'s investigation and explanation requirements. Although Ocwen was still in possession of all of the information it needed to determine that Saccameno had missed no payments, it continued to maintain that her loan was delinquent. A jury could reasonably have concluded that Ocwen's failure to recognize its error—especially after being given a second opportunity—was due to its failure adequately to investigate the matter.

36

Similarly, like the August 2013 letter, the April 2014 letter was not responsive to the QWR and failed to explain why Ocwen believed that its understanding of Saccameno's account was accurate. Ocwen acknowledges that Van Sky had provided proof of payment but makes no attempt to respond to her proof. The letter says that all of Saccameno's payments had been properly applied but provides no explanation for this conclusion. Indeed, virtually all of the information in the April 9, 2014 letter is generic, offering no information relevant to the particulars of Saccameno's case. *See, e.g.*, Ex. DX14 ("Any payment received would be posted to the loan within twenty-four (24) business hours from its receipt. The payments received are first applied to the contractual payments due on a loan. In addition, any payments not equal in the contractual amount will be applied towards the suspense (partial payment) credit account, until there are sufficient funds to complete a contractual payment."). In fact, the letter in one place incorrectly identifies the borrower as "Michelle Ruby," *see* Ex. DX14, strongly suggesting that Ocwen responded to Saccameno's letter by cutting and pasting text from its response to another customer. Boilerplate responses of this sort are insufficient to meet RESPA's requirements. *See, e.g.*, *Lage v. Ocwen Loan Servicing LLC*, 145 F. Supp. 3d 1172, 1190 (S.D. Fla. 2015) ("The sending of a template or form letter which fails to substantively address concerns raised by the borrower's inquiry does not satisfy the servicer's obligations under [RESPA's] error resolution procedures."); *Marais*, 24 F. Supp. 3d at 724 (servicer violated RESPA by sending "a form letter with no individualized features apart from the list of enclosures" and "therefore explained nothing whatsoever about [the borrower's] individual circumstances or her account").

True, Ocwen also sent Van Sky a "Payment Reconciliation History." *See* Ex. DX13. At trial, however, Van Sky testified that she found the document incomprehensible. Tr. 511:12-14.

The document lists all transactions involving Saccameno's account from July 2011 (when Ocwen began servicing Saccameno's loan) to April 2014. It thus includes not only Saccameno's mortgage payments but also fees and charges to her account, tax and insurance disbursements, escrow adjustments, and other transactions. Even after isolating the spreadsheet entries reflecting Saccameno's payments, Ocwen's accounting is very difficult to follow. Several different types of payments are included in the document (e.g., pre-petition payments, suspense payments, "Payment-REV"), and oftentimes there are consecutive entries showing a payment for a particular amount followed by a payment in the amount of "0." Ocwen provided no explanation as to how the document purportedly shows that Saccameno made only forty payments; nor did the document include information to assist the layperson in deciphering it. This is not enough to comply with RESPA. *See, e.g.*, *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244–45 (11th Cir. 2016) (plaintiff stated claim for RESPA violation where, in responding to QWR, servicer "just said there was no error and pointed to attachments"); *Marais*, 24 F. Supp. 3d at 725.

Notably, on April 28, 2014, Van Sky sent Ocwen another letter explaining in some detail why Ocwen's April 9, 2014 response failed to address her questions and concerns. Ex. P34; Tr. 508:25-511:3. Van Sky testified that she received no response to this letter, Tr. 510:6-19, and Ocwen has presented no evidence to the contrary. Saccameno argues that the April 28, 2014 letter represents a third QWR, and that by failing to respond to the letter, Ocwen violated RESPA a third time. *See* JMOL Resp. Br. 15, ECF No. 335. Ocwen has not responded to this argument and has therefore conceded the point. *See, e.g.*, *Perry v. Coles Cty., Illinois*, 906 F.3d 583, 590 n.5 (7th Cir. 2018). Hence, even if Saccameno's claim failed with respect to the two prior QWRs, Ocwen would not be entitled to judgment as a matter of law on the RESPA count.

In light of the foregoing, the record sufficiently shows that Ocwen failed to comply with RESPA in responding to Saccameno's March 2014 QWR.

## 3.  RESPA Damages

As a final basis for seeking judgment as a matter of law with respect to the RESPA count, Ocwen argues that Saccameno failed to produce sufficient evidence on the issue of damages. More specifically, Ocwen claims that Saccameno failed to show that she suffered actual damages—which, according to Ocwen, requires a showing of pecuniary harm. This argument is a non-starter because, as already explained, there is sufficient evidence that Saccameno suffered pecuniary harm. *See* Part II.B, *supra*. Moreover, for purposes of RESPA, "actual damages" includes both pecuniary and non-pecuniary harm. *See, e.g.*, *Hammer v. Residential Credit Sols., Inc.*, No. 13 C 6397, 2015 WL 7776807, at *24 (N.D. Ill. Dec. 3, 2015) ("Courts have held that the term 'actual damages' includes not only pecuniary losses but damages for emotional distress, humiliation or mental anguish as well. This general holding has been applied specifically to actual damages arising under RESPA.") (citation omitted); Jury Inst. No. 38 ("Under RESPA, the term 'actual damages' includes economic and non-economic damages caused by the RESPA violation."); *cf. Catalan*, 629 F.3d at 696 (noting defendant's concession that emotional distress damages are recoverable as actual damages under RESPA). The record contains sufficient evidence that Saccameno suffered compensable RESPA damages.[16]

---

[16] Ocwen appears to acknowledge that non-pecuniary damages are recoverable under RESPA but contends that such damages are available only after a plaintiff has established pecuniary loss. However, the case that Ocwen cites in support of this position, *Aiello v. Providian Financial Corporation*, 239 F.3d 876 (7th Cir. 2001), is inapposite. The question presented in *Aiello* was whether the bankruptcy code authorized recovery for emotional distress for violation of the automatic stay. The court held that emotional injury was not "compensable under section 362(h) when there is no financial loss to hitch it to." *Id*. at 880. Nothing in *Aiello* suggests that its holding applies to RESPA.

Ocwen additionally argues that Saccameno presented no evidence that her claimed RESPA damages were caused directly by Ocwen's response letters. The court disagrees. A jury could reasonably have found that Saccameno's emotional distress (along with her attendant medication expenses and loss of employment) were the direct result of Ocwen's failure properly to respond to her requests that her account be corrected.

Accordingly, the court denies Ocwen's motion for judgment as a matter of law as to Saccameno's RESPA claims.

## F.    Conclusion

In sum, the record evidence in this case is sufficient to support of all of Saccameno's claims, as well as her request for punitive damages. Accordingly, the court denies Ocwen's renewed motion for judgment as a matter of law.

### III.  Motion for a New Trial

The court next addresses Ocwen's motion for a new trial. "A new trial may be granted if the verdict is against the clear weight of the evidence or the trial was unfair to the moving party." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (quotation marks omitted). Ocwen's motion rests entirely on the court's rulings regarding the admissibility of the two consent orders mentioned above, *see* Part II.C.2, *supra*. "A party seeking a new trial based on a district court's alleged erroneous evidentiary rulings bears a 'heavy burden.'" *Weaver v. Mitchell*, No. 15 C 2950, 2019 WL 218745, at *5 (N.D. Ill. Jan. 16, 2019) (quoting *Alverio v. Sam's Warehouse Club*, 253 F.3d 933, 942 (7th Cir. 2001)). A new trial is warranted for purported evidentiary errors "only if the error has a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Lewis v. City of Chicago Police*

40

*Dep't*, 590 F.3d 427, 440 (7th Cir. 2009). "[E]ven if a judge's decision is found to be erroneous, it may be deemed harmless if the record indicates the trial result would have been the same." *Id.*

As discussed below, Ocwen's motion fails at the threshold because it has not shown that the court's evidentiary rulings were erroneous. In addition, even assuming the court's rulings were incorrect, Ocwen has failed to show that the errors had a "substantial and injurious effect or influence on the determination of a jury" leading to a result that is "inconsistent with substantial justice."

## A.      Background

Although the court briefly discussed the consent orders above, it is necessary for purposes of the present motion to describe the exhibits, and their use at trial, in greater detail. Both exhibits—designated Exhibits P42 and P44—are consent orders resulting from an examination conducted by state mortgage regulators into Ocwen's loan servicing practices (the "multistate examination").[17] *See* Settlement Agreement and Consent Order, *In Re: Ocwen Financial Corporation and Ocwen Loan Servicing, LLC*, No. C-13-1153-14-CO01, at 1-2 (Dec. 19, 2013).[18] Following the examination, which covered the period from December 2010 to

---

[17] Although the CFPB agreement is termed a "consent judgment" and the NYSDFS agreement is termed a "consent order," any differences between orders and judgments are immaterial for purposes of Ocwen's motion. For simplicity, therefore, the court uses these terms synonymously. *See, e.g.*, *Sec. & Exch. Comm'n v. Gilder*, No. 12-CV-02839, 2014 WL 1628474, at *2 n.2 (D. Colo. Apr. 24, 2014) ("Consent judgments are also known as 'consent orders' or 'consent decrees,' though, historically, consent decrees and consent orders have contained injunctive relief and consent judgments have not. For purposes of this Order, the terms 'settlement,' 'consent decree,' 'consent judgment,' and 'final judgment' are interchangeable.") (citations omitted).

[18] As is explained below, the consent orders used at trial were heavily redacted. Here—solely by way of background and context—the court takes judicial notice of, and occasionally cites to, the unredacted documents. *See, e.g.*, *Powers v. Stanley Black & Decker, Inc*., 137 F. Supp. 3d 358, 362 n.3 (S.D.N.Y. 2015) (taking judicial notice of facts regarding the parties' businesses "purely

October 2011, the state mortgage regulators reported that they had "identified practices that may

… violate the laws and regulations of the Participating States and related Federal law." *Id.* at 5.

As previously noted, the regulators reported finding, *inter alia*, a "[l]ack of controls related to

general borrower account management"; "[i]nadequate staffing and lack of internal controls

related to customer service"; and deficiencies in "loss mitigation and loan modification

processes" and in "document maintenance processes." *Id.* at 6-7.

Based on the multistate examination's findings, the Consumer Financial Protection

Bureau ("CFPB"), together with forty-nine states and the District of Columbia, sued Ocwen for

allegedly violating various state and federal consumer protection laws. *See Consumer Fin. Prot.

Bureau v. Ocwen Fin. Corp.*, No. CV 13-2025 (RMC) (D.D.C. filed Dec. 19, 2013). Exhibit P42

is the consent judgment that Ocwen entered into to resolve the CFPB litigation ("the CFPB

consent judgment"). The exhibit includes a Settlement Agreement and Consent Order executed

between Ocwen and the state mortgage regulators, which sets forth a number of the multistate

examination's factual findings regarding deficiencies in Ocwen's loan servicing practices.

Exhibit P42 also includes a Settlement Term Sheet, which describes Ocwen's going-forward

obligations pursuant to the CFPB consent judgment. As we have seen, Ocwen agreed to

"maintain adequate documentation of borrower account information," to "maintain procedures to

ensure accuracy and timely updating of borrower's account information," and to "take

appropriate action to promptly remediate any inaccuracies in borrowers' account information."

Ex. P42 at A-4 & A-7. More specifically, with respect to Chapter 13 cases, Ocwen agreed to

ensure that "the debtor is treated as being current so long as the debtor is making payments in

---

for purposes of background"); *Magritz v. Ozaukee Cty.*, 894 F. Supp. 2d 34, 35 n.1 (D.D.C.
2012) (taking judicial notice of news articles for background purposes).

accordance with the terms of the then-effective confirmed [bankruptcy] plan"; and to ensure "as of the date of … entry of an order granting the debtor a discharge, there is a reconciliation of payments received with respect to the debtor's obligations during the case and appropriately update the Servicer's systems of record." *Id*. at A-8.

Exhibit P44 is a 2014 consent order that Ocwen separately entered into with the New York State Department of Financial Services ("NYSDFS") pursuant to New York Banking Law § 44 ("the 2014 NYSDFS consent order," "the 2014 Order"). *See* Consent Order Pursuant to New York Banking Law § 44, *In the Matter of Ocwen Financial Corporation, Ocwen Loan Servicing, LLC* (Dec. 22, 2014). Like the CFPB consent judgment, Exhibit P44 recounts various findings of the 2010-2011 multistate examination. In particular, the NYSDFS consent order states that regulators found "deficiencies in Ocwen's servicing platform and loss mitigation infrastructure, including … failure to properly maintain books and records." Ex. P44 at 3. According to the NYSDFS, these practices resulted in "numerous and significant violations of New York State laws and regulations." *Id*. at 4. As a result, Ocwen entered into an initial agreement with the NYSDFS in 2011 "requir[ing] Ocwen to adhere to certain servicing practices in the best interest of borrowers and investors." *Id*. at 2. When a subsequent investigation showed Ocwen's "widespread noncompliance" with the agreement, Ocwen entered into a consent order with the NYSDFS in 2012. *Id*. However, monitoring once again "identified numerous and significant violations of the 2011 Agreement, as well as New York State laws and regulations." *Id*. at 5. In particular, the NYSDFS reported that Ocwen maintained "inadequate and ineffective information technology systems and personnel," and that as a result, "Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, … and maintains inaccurate records." *Id*. at 6. Thus, Ocwen entered into a second consent order with the NYSDFS

in 2014. Pursuant to the 2014 Order's settlement provisions, Ocwen agreed to continued monitoring of its loan servicing practices and agreed to pay a $100 million civil penalty and $50 million in restitution to New York borrowers. *Id*. at 10.

In addition to Exhibits P42 and P44, Saccameno originally sought to introduce several consent orders that Ocwen had entered into with other states, as well as a host of court decisions, verdict forms, and news stories involving Ocwen. Prior to the trial, Ocwen filed motions to bar all of these exhibits, arguing that they were irrelevant, that they constituted evidence of prior bad acts under Federal Rule of Evidence 404(b), and were unfairly prejudicial under Rule 403. *See* Defendants' Motion in Limine to Preclude Testimony Regarding Any and All Regulatory Actions Against Ocwen Loan Servicing, LLC, ECF No. 189; Defendants' Motion in Limine to Preclude Evidence of Prior Unproven Allegations and Prior Findings Relating to Ocwen, ECF No. 191. The court held that the consent orders, while not admissible to show Ocwen's bad character, were admissible for other purposes. *See* ECF No. 256 (granting in part and denying in part Ocwen's Motion in Limine to Preclude Testimony Regarding Any and All Regulatory Actions Against Ocwen Loan Servicing, LLC). Specifically, the court concluded that Saccameno had identified at least two permissible purposes for introducing the evidence: (1) to show that Ocwen had prior notice of problems with its loan servicing practices; and (2) to show Ocwen's obligations under the consent orders (with a view toward showing Ocwen's failure to abide by those obligations). *Id*. at 3 & 6. The court explained that such evidence was relevant to establishing Ocwen's liability under ICFA, as well as to the issue of punitive damages. *Id*. at 3-4. The court acknowledged that the exhibits were potentially prejudicial to Ocwen; and with respect to all of the other consent orders and related documents proffered by Saccameno, the court agreed that the potential prejudice outweighed the documents' probative value. In the case of

44

Exhibits P42 and P44, however, the court held that the documents' probative value predominated. *Id*. at 6. The court identified specific paragraphs of the exhibits that were admissible, and ordered that all other material in the documents be redacted. *Id*. at 4-5.

On the first day of trial, Saccameno's counsel questioned Gina Feezer regarding Exhibit P44. *See* Tr. 359:1-374:1. Feezer stated that she had no knowledge of the document. *See, e.g.*, Tr. 358:12-18; Tr. 365:4-8. As a result, the court ultimately held that Saccameno had failed to lay the foundation for the exhibit's admission into evidence. Later in the trial, on April 6, 2018, Saccameno requested that the court take judicial notice of Exhibits P42 and P44. *See* Tr. 609:6-12. The parties subsequently briefed the issue. *See* ECF Nos. 267 & 268. On April 9, 2018, after Ocwen had rested its case, the court stated that it would grant Saccameno's request for judicial notice, provided that Saccameno furnish the court with properly redacted versions of the exhibits. Tr. 980:11-14. On April 10, before the parties delivered their closing arguments, the court reiterated its ruling. Tr. 1022:14-16. Both parties referred to the exhibits in their closing arguments. In addition, the court included the following in the instructions read to the jury:

> I have taken judicial notice of two regulatory settlements involving Ocwen that were signed in December 2013 and December 2014 in which Ocwen compromised disputed claims. I have admitted into evidence portions of those documents for your consideration in this case. This evidence is not being offered for the truth of the contents but to indicate that certain issues were brought to Ocwen's attention. The documents state that Ocwen was not admitting any liability.

Jury Inst. 15.50; *see also* Tr. 1151:9-16.[19]

---

[19] Saccameno claims that the court's decision to take judicial notice of the exhibits was based on the fact that Ocwen had "attempt[ed] to sandbag the trial by having its corporate representative [i.e., Feezer] disavow knowledge of these documents to avoid discussing potentially damaging evidence." Rule 59(a) Resp. Br. 6. That is incorrect. In point of fact, the court expressly rejected this argument when Saccameno raised it during the proceedings:

> [MR. WOOTEN:] The problem that we had is, we were thwarted on our questioning by their rep's lack of knowledge, so we couldn't get into that.

## B.    Discussion

Ocwen claims that the court committed multiple errors in admitting Exhibits P42 and P44 into evidence. In particular, Ocwen asserts that: (1) the consent orders were inadmissible because they were irrelevant to the litigation and highly prejudicial; (2) the consent orders were not subject to judicial notice; and (3) that it was especially improper for the court to take judicial notice of the consent orders after the close of the evidence. The court addresses these arguments in turn.

### 1.    Relevance & Prejudice

Ocwen begins by asserting that Exhibits P42 and P44 were inadmissible because they were irrelevant to the litigation. With respect to Exhibit P42, Ocwen first contends that the CFPB consent judgment is irrelevant because it is concerned only with defects stemming from the company's computer platform, which is called "REALServicing." According to Ocwen, defects relating to REALServicing have nothing to do with Saccameno's case because the miscoding of her bankruptcy was purely the result of human error.

---

THE COURT: But I don't put on the case. You do …. I mean, this case has been going on for many years. I don't know why we didn't -- you know, I just don't know why we had a corporate representative who couldn't speak to these things. I don't know.

 MR. WOOTEN: I don't either. And if I had known that that was going to be claimed here, obviously I would have subpoenaed someone. We brought a corporate rep by agreement. That's why I said I think judicial notice is appropriate.

THE COURT: No, I don't think the fact that the lawyers failed to get all the ducks lined up means that I can ignore the rules of evidence.

Tr. 979:13-980:4.

As an initial matter, this argument mischaracterizes the CFPB consent judgment. While the document is centrally concerned with problems relating to REALServicing, it also refers more broadly to Ocwen's "[l]ack of controls related to general borrower account management," and to its [i]nadequate staffing and lack of internal controls related to customer service." Ex. P42 at 6. The lack of such controls in Ocwen's account management and customer service were directly at issue in Saccameno's case. In addition, Ocwen's argument also mischaracterizes the record: the evidence at trial did not establish that human error alone was responsible for the miscoding of Saccameno's discharge nor that Ocwen's computer system played no role in the error. As discussed previously, the record does not disclose precisely how or why the miscoding occurred. *See* Part II.D.1, *supra*. It is entirely possible that Ocwen's computer platform was in some way involved in the miscoding. Moreover, even assuming that REALServicing was not responsible in any way for the miscoding of Saccameno's bankruptcy discharge,[20] problems with the computer platform may well have been implicated in Ocwen's subsequent failure to remedy the error. And finally, even assuming that the miscoding—and Ocwen's subsequent failure to correct it—could be completely chalked up to human error, it would not follow that the other problems with Saccameno's account (i.e., Ocwen's miscalculation of how many payments Saccameno had made and when the payments were due) likewise resulted exclusively from human error. On this record, it can reasonably be inferred that the latter problems involved REALServicing.

---

[20] In support of this claim, Ocwen cites "Stipulated Undisputed Facts" 22-27. *See* Rule 59(a) Br. 6. However, the docket entry to which Ocwen cites, ECF No. 161, is Ocwen's Motion for Leave to Amend its Answer to Plaintiff's Second Amended Complaint, and does not include the parties' stipulations. The stipulations are set forth in the parties' proposed pretrial order, *see* ECF No. 174 at 2-4, but these do not include any stipulation that human error was solely responsible for the miscoding error.

Ocwen also argues that the CFPB consent judgment is irrelevant because it contains a clause stating that it may not be considered an admission by Ocwen of the allegations in the complaint or as evidence of Ocwen's liability. *See, e.g.*, Ex. P42 at 5 ("Ocwen enters into this Agreement solely for the purpose of resolving disputes with the State Mortgage Regulators concerning their findings as communicated in the Reports of Examination in their entirety and without admitting any allegations or implications of fact, and without admitting any violations of applicable laws, regulations, or rules governing the conduct and operation of its mortgage servicing business.").[21] Given this disclaimer, Ocwen says, it was "improper to allow the jury to consider the document as evidence that Ocwen had notice of problems with its loan servicing practices." Rule 59(a) Br. 7-8.

As an initial matter, this argument is not sufficiently developed—Ocwen devotes a mere two sentences to it—and has therefore been forfeited. *See, e.g.*, *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."). Without further elaboration, the logic of the argument is elusive. The CFPB consent judgment's allegations are relevant to the issue of notice regardless

---

[21] The consent judgment includes another clause stating the Ocwen enters into the agreement "without trial or adjudication of issue of fact or law [and] without this Consent Judgment constituting evidence against Defendant." CFPB Consent Judgment 8. The court does not read this as an absolute prohibition on the use of the consent judgment as evidence, but rather as forbidding the use of the agreement as evidence of liability. The case cited by Ocwen on this point, *Daniel v. Cook County*, 833 F.3d 728 (7th Cir. 2016), is not to the contrary. There, the plaintiff sought to use an agreed order between Cook County and the United States as evidence in support of a *Monell* claim asserting inadequate health care in Cook County Jail. The agreed order included a provision stating that it "would not be admissible against Defendants except in a proceeding involving the parties" to the order. *Id*. at 743 (internal quotation marks omitted). Based on this and other provisions in the document, the court held that the district court did not err in declining to take judicial notice of the agreed order. Unlike Saccameno, however, the plaintiff in *Daniel* specifically asked the court "to take judicial notice of the *facts* asserted in the Agreed Order." *Id.* at *4 (N.D. Ill. May 15, 2015) (emphasis added). Nothing in *Daniel* suggests that the clause precluded the use of the decree as evidence for the purposes at issue in this case.

of whether Ocwen disputes their truth. Put differently, even if Ocwen believed that the state regulators' findings were mistaken, the consent orders nonetheless show that the regulators had made Ocwen aware of their concerns. *See, e.g.*, *In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Injury Litig.*, No. 2:13-CV-170, 2016 WL 659112, at *54 (S.D. Ohio Feb. 17, 2016) ("The Consent Decree was offered as evidence that DuPont had knowledge that the EPA *believed* DuPont's handling of C-8 was deficient—not that its handling of C-8 was actually deficient."); *Jones v. City of Hartford*, 285 F. Supp. 2d 174, 185 (D. Conn. 2003) (complaints and consent decree were admissible when "considered for the fact that the City and the police department knew that citizens were accusing its officers of using excessive force in the course of their duties").

The court additionally notes that, irrespective of the consent order's relevance to the issue of notice, the disclaimer does not affect the exhibit's relevance as proof of Ocwen's obligations under the consent judgment. As discussed above, Saccameno sought to show that Ocwen failed to adhere to these obligations in servicing Saccameno's loan and that Ocwen therefore violated ICFA. When used for this purpose, it is irrelevant whether Ocwen disputes the consent judgment's factual recitations regarding Ocwen's past conduct. *See Lowry*, 2016 WL 4593815, at *9 ("Defendant also points out that it did not admit any misconduct in either settlement. But this argument is also a canard. Plaintiffs' invocation of the settlements has nothing to do with the wrongdoing alleged in those cases. What Plaintiffs do claim is (1) that Defendant's actions in this case run afoul of the terms of the settlements; and (2) that those actions are therefore 'unfair' under the ICFA.") (citation and quotation marks omitted). What matters is only what Ocwen's going-forward obligations were under the consent order. Ocwen does not dispute Saccameno's claims regarding the obligations imposed by the consent orders.

With respect to Exhibit P44, Ocwen claims that the NYSDFS consent order is irrelevant to Saccameno's case because it was concerned with Ocwen's servicing of loans in New York and its violation New York law regarding foreclosure proceedings. *See* Rule 59(a) Br. 7. Again, Ocwen's characterization of the document is incorrect: while the NYSDFS order is principally concerned with Ocwen's conduct in connection with foreclosures in New York, its scope is not entirely confined to those matters. Like the CFPB consent judgment, the NYSDFS consent order arose out of the broader multistate investigation into Ocwen's loan servicing practices. As a result, the NYSDFS consent order makes reference to many of the same general problems noted in the CFPB consent judgment. *See* Ex. P44 at 3 ("In 2010 and 2011, the Department participated in a multistate examination of Ocwen [that] … identified, among other things, deficiencies in Ocwen's servicing platform and loss mitigation infrastructure, including … failure to properly maintain books and records."). Notwithstanding its emphasis on New York, therefore, Exhibit P44 is relevant to showing Ocwen's notice of regulators' concerns with its loan servicing practices.

Ocwen goes on to argue that Exhibits P42 and P44 both lack relevance because both were executed after the miscoding of the bankruptcy discharge in Saccameno's case. Specifically, Ocwen observes that the miscoding took place in July 2013—six months before Ocwen entered into the CFPB consent judgment (December 2013) and eighteen months before Ocwen entered into the NYSDFS consent order (December 2014). As a result, Ocwen concludes, the "documents could not possibly be probative of whether Ocwen had complied with its going-forward obligations or was evidence of Ocwen's awareness of problems with its loan servicing practices at the time of the miscoding." Rule 59(a) Br. 7 (quotation marks omitted).

One problem with this argument is that, although the miscoding and other errors in Saccameno's case occurred prior to the CFPB consent judgment, Ocwen's failure to correct the errors spanned the ensuing eighteen months—and thus continued after Ocwen's entry into the consent judgment. If Ocwen had complied with its obligations under the CFPB consent judgment, it can reasonably be inferred that it would have discovered and corrected the problems with Saccameno's account sooner. Conversely, the fact that Ocwen failed to discover and correct the problems can be regarded as evidence of Ocwen's failure to comply with its obligations under the CFPB consent order. Exhibit P42 thus remains relevant to the compliance issue despite the fact that it was executed in December 2013.

In any case, both exhibits are relevant to the issue of notice. Although Ocwen did not enter into either of the agreements until after the miscoding in Saccameno's case, both consent orders were based on the multistate examination, which dated back to December 1, 2010. After the examination concluded in October 2011, the state mortgage regulators issued reports of their findings, and Ocwen had the opportunity to respond. *See* CFPB consent judgment at 4-5. Ocwen thus had notice of the regulators' concerns well before it entered into the consent orders, and well before the problems arose in Saccameno's case.

Finally, in addition to the issue of relevance, Ocwen argues that the consent orders are inadmissible because they constitute evidence of prior bad acts under Federal Rule of Evidence 404(b) and because they are unfairly prejudicial under Federal Rule of Evidence 403. Although the court previously addressed these objections in ruling on Ocwen's motion in limine seeking to exclude the exhibits, Ocwen contends that the court "erred by failing to analyze or explain how any probative value the Court discerned from these exhibits outweighed the substantial unfair prejudice, as required under both Rules 404(b) and 403." Rule 59(a) Br. 8, ECF No 312. The

court disagrees. In ruling on Ocwen's motion, the court examined each of Saccameno's proposed exhibits and explained the basis for its determinations with respect to each. The court acknowledged the documents' potentially prejudicial effect and, as noted above, the court agreed that in the case of most of the proposed exhibits, the potential prejudice outweighed the documents' probative value. With respect to Exhibits P42 and P44, however, the court concluded that, having examined the documents in light of the facts of the case, the documents' probative value outweighed the potential prejudice. *See* ECF No. 256 at 4 & 6.

In short, Exhibits P42 and P44 were neither irrelevant nor unfairly prejudicial, and the court committed no error in admitting them into evidence.

## 2. Judicial Notice

Next, Ocwen argues that it is entitled to a new trial because the court erred in taking judicial notice of the consent orders. Ocwen begins with the categorical assertion that consent orders are not properly subject to judicial notice. Rather, according to Ocwen, courts may take judicial notice only of decisions in other court or administrative proceedings. *See* Rule 59(a) Br. 10 ("[W]hile a court may take judicial notice of decisions in other court or administrative proceedings, neither the CFPB Consent Judgment or the NYSDFS Consent Order are judicial or administrative decisions.") (citation omitted). This contention is without merit. The case on which Ocwen relies, *Opoka v. I.N.S.*, 94 F.3d 392 (7th Cir. 1996), is inapposite. *Opoka* merely acknowledged the "well-settled principle that the decision of another court or agency, including the decision of an administrative law judge, is a proper subject of judicial notice." *Id*. at 394. Nothing in the opinion suggests that judicial and administrative decisions are the *only* documents of which courts may take judicial notice, or that judicial notice of consent orders is verboten.

On the contrary, that courts may take judicial notice of consent orders and similar agreements is settled beyond peradventure. *See, e.g.*, *Vill. of DePue, Ill. v. Viacom Int'l, Inc.*, 713 F. Supp. 2d 774, 776 n.3 (C.D. Ill. 2010) ("Judicial notice of the Consent Order is appropriate here, as its terms are not subject to reasonable dispute.") (citing *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081–82 (7th Cir. 1997)); *see also Commodity Futures Trading Comm'n v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 584 (9th Cir. 1982) (taking judicial notice of consent judgments entered against defendant because "evidence was relevant to show Goldstein's familiarity with commodities laws and was admissible to rebut Goldstein's contention that Co Petro's actions were, at worst, innocent, technical violations"); *Shadow v. Midland Credit Mgmt., Inc.*, No. 3:17-CV-02277-L-BLM, 2018 WL 4357980, at *3 n.1 (S.D. Cal. Sept. 13, 2018) (consent decree between CFPB and Midland Credit Management); *Spence v. Basic Research*, No. 2:16-CV-925-CW, 2018 WL 1997310, at *6 (D. Utah Apr. 27, 2018) (taking judicial notice of consent order between defendants and the Federal Trade Commission); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16CIV3495ATBCM, 2017 WL 4049253, at *4 (S.D.N.Y. June 28, 2017) (taking judicial notice of consent order between Deutsche Bank and the NYSDFS). In fact, as the court pointed out during colloquies with the parties, at least one decision has taken judicial notice of the very CFPB consent judgment at issue in this case. *See Gonzalez v. Ocwen Home Loan Servicing*, No. 3:14-CV-53 CSH, 2015 WL 2124365, at *2 n.6 (D. Conn. May 6, 2015).

Ocwen goes on to assert that insofar as judicial notice of the consent orders was permissible, the court was "[a]t most … authorized … to take judicial notice of the existence of

the consent judgments, not disputed facts within them." Rule 59(a) Br. 11.[22] But the court did not

take judicial notice of any disputed facts in the consent orders. As already noted, the court made

clear in its pretrial rulings and in its instructions to the jury that the consent orders were "not

being offered for the truth of the contents but to indicate that certain issues were brought to

Ocwen's attention." Tr. 1151:9-16; Jury Inst. 15.50. Courts have routinely taken judicial notice

of consent orders for precisely this purpose. *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 795

F.3d 1024, 1055 (9th Cir. 2015) ("Consent decrees can be introduced … to show notice or

knowledge."); *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 136 (2d Cir. 2008) ("A consent

decree may properly be admitted to demonstrate that a defendant was aware of its legal

obligations.") (citations omitted); *Petro Mktg. Grp., Inc.*, 680 F.2d at 584; *Dent v. U.S. Tennis

*Ass'n, Inc*., No. CV-08-1533 RJD VVP, 2008 WL 2483288, at *2 (E.D.N.Y. June 17, 2008)

(collecting cases). This remains true where, as here, the document includes language disclaiming

liability or agreement with the order's factual allegations. *See, e.g.*, *Citibank, N.A. v. York*, No.

2:17-CV-90-GZS, 2018 WL 2416587, at *2 n.13 (D. Me. May 29, 2018) (taking judicial notice

of a consent judgment containing similar clause indicating that it was made "without trial or

adjudication of issue of fact or law").

Nevertheless, Ocwen insists that despite the court's pretrial rulings, Saccameno's counsel

used the exhibits at trial for the truth of matters asserted. According to Ocwen, "[i]n closing

---

[22] The court notes that this argument is raised only with respect to the CFPB consent judgment. Although the reason for this is unclear, it is perhaps because, unlike the CFPB consent judgment, the NYSDFS consent order contains no clause disclaiming liability or refusing to admit the factual assertions in the document. On the contrary, the NYSDFS order's prefatory paragraphs specifically state that the parties agree to the statements subsequently outlined in the document. Ex. P44 at 2 ("NOW, THEREFORE, to resolve this matter, the Parties agree to the following…."). Nevertheless, the court's limiting instruction applied to both exhibits, and Saccameno was not permitted to rely on the NYSDFS consent order's factual allegations for their truth.

argument, counsel for Saccameno walked the jury paragraph by paragraph through the CFPB

Consent Judgment 'findings' and argued that Ocwen had a '[l]ack of controls related to general

borrower account management, misapplication of borrower payments, inaccurate escrow

accounting and statements, inadequate staffing, lack of internal controls.'" Rule 59(a) Br. 11-12

(citing Trial Tr. 1054:3-19). Ocwen further complains that, during his rebuttal argument,

Saccameno's counsel referred to Ocwen's servicing "obligations" stemming from the regulatory

action. *Id*. at 12 (citing Trial Tr. 1044:18-1045:23). According to Ocwen, "its compliance with

the [CFPB] Judgment was irrelevant to the legal issues in Saccameno's case and not a 'fact' that

the jury should have heard about." *Id*. (emphasis omitted).

     This argument founders at the outset because Ocwen failed to make any

contemporaneous objection on this point at trial. *See, e.g*., *Venson v. Altamirano*, 749 F.3d 641,

657 (7th Cir. 2014) (by failing to object at the time, defendant waived argument that counsel's

remarks during closing argument violated district court's motion in limine); *Merix Pharm.*

*Corp. v. Clinical Supplies Mgmt., Inc.*, 106 F. Supp. 3d 927, 933 (N.D. Ill. 2015) ("A party

forfeits any post-trial challenge to opposing counsel's arguments by failing to object at trial.").

Ocwen made two objections during Saccameno's closing, but neither of these pertained to

Exhibits P42 or P44, much less asserted that Saccameno had used the exhibits improperly. *See*

Tr. 1029:19-20 (objecting to Saccameno's counsel's references to his "life story"); Tr. 1138:2-9

(objecting to Saccameno's counsel's remark that "if you accept [Ocwen's] behavior and you say

it's okay, then tomorrow they will file that foreclosure again, and they will be right back on top

of her doing these same things again"). "Neither a general objection to the evidence nor a

specific objection on other grounds will preserve the issue for review." *Naeem v. McKesson*

*Drug Co*., 444 F.3d 593, 610 (7th Cir. 2006) (citations and quotation marks omitted). Rather, "a

party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection." *Id.* (citations and quotation marks omitted). For this reason, Ocwen has forfeited any objection to statements by Saccameno's counsel during closing and rebuttal arguments.

That said, Ocwen's argument fails on the merits as well. Notwithstanding Ocwen's insistence to the contrary, Saccameno's counsel's use of Exhibits P42 or P44 was not improper. For example, Ocwen's claim that "counsel for Saccameno walked the jury paragraph by paragraph through the CFPB Consent Judgment 'findings,'" Rule 59(a) Br. 11-12 (quoting Tr. 1054:3-12.), is untrue. Saccameno's counsel characterized the paragraphs not as "findings" but as what the regulators *told* Ocwen.[23] *See, e.g.*, Tr. 1054:8-12 ("Here's what these regulators told Ocwen. 'Lack of controls related to general borrower account management, misapplication of borrower payments, inaccurate escrow accounting and statements, inadequate staffing, lack of internal controls.'").[24]

---

[23] In contrast to his references to the CFPB consent judgment, Saccameno's counsel characterized certain of the statements in the NYSDFS consent order as "findings." *See, e.g.*, Tr. 1042:21-24 ("Here's what one regulator found. 'Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible.'"); Tr. 1044:2-4 ("[T]his regulator found deficiencies in Ocwen's servicing platform and loss mitigation infrastructure including a failure to properly maintain books and records."). However, Ocwen's argument on this point is directed only at the CFPB consent judgment.

[24] Ocwen separately maintains that these statements constitute hearsay because Saccameno told "the jury that the exhibits showing [sic] 'what the regulators told Ocwen' was the truth about the functionality, or dysfunctionality, of Ocwen's loan servicing platforms." Rule 59(a) Br. 12. Like Ocwen's other arguments on this score, this argument is forfeited because Ocwen failed to make a specific objection to this effect during Saccameno's closing argument. *See, e.g.*, *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006); *Holmes v. Elgin, Joliet & E. Ry. Co.*, 18 F.3d 1393, 1398 (7th Cir. 1994). The argument also fails because, as already explained, Saccameno did not cite the consent orders for the truth of matters asserted. *See, e.g.*, *In re: E. I. Du Pont De Nemours*, 2016 WL 659112, at *54 ("[T]he Consent Decree is not inadmissible hearsay, i.e., it is not being offered for the truth of the matters asserted in it. Indeed, the jury was

The court likewise finds nothing amiss in the remark by Saccameno's counsel during his rebuttal argument that he "'didn't hear any evidence' that Ocwen complied with the CFPB Consent Judgments [sic]." Rule 59(a) Br. 12 (citing Tr. 1187:9). According to Ocwen, this comment was improper because Ocwen's "compliance with the Judgment was irrelevant to the legal issues in Saccameno's case and not a 'fact' that the jury should have heard about." *Id*. As already explained, however, the question of whether Ocwen complied with the CFPB consent judgment bears directly on its liability under ICFA, as well as Saccameno's request for punitive damages. *See* Part II.C.2, *supra.* As for Ocwen's claim that Saccameno presented Ocwen's failure to comply with the CFPB consent judgment as a "fact," the nature of Ocwen's objection is unclear. If the objection is that Saccameno assumed the truth of factual statements in the consent judgment to show Ocwen's failure to comply with its obligations, the argument fails as a matter of logic: since Ocwen's obligations became effective only after it entered into the consent judgment, nothing in the consent judgment itself could be used to show Ocwen's failure to comply with the obligations. If, on the other hand, the objection is that Saccameno's counsel argued that Ocwen's conduct in her case showed Ocwen's failure to comply with its obligations under the CFPB consent judgment, Ocwen asserts nothing improper, for such an argument would not entail any presumption about the truth of the exhibit's factual statements.

Ocwen's final objection is that the court erred in taking judicial notice of Exhibits P42 and P44 after the close of evidence. The court disagrees. As an initial matter, there is nothing improper about taking judicial notice of a document after the close of evidence. Federal Rule of

---

expressly instructed that it was not to consider the Consent Decree as evidence of DuPont's liability, and as such, it was properly admitted into evidence for the limited purpose permitted by the Court."); *Acree v. Watson Pharm., Inc.*, No. 10 C 7812, 2012 WL 5893486, at *8 (N.D. Ill. Nov. 23, 2012) (reports would be hearsay if offered for their truth but were properly admissible to show notice on defendants' part).

Evidence 201 specifically provides that "[t]he court may take judicial notice at *any* stage of the proceeding." Fed. R. Evid. 201(d) (emphasis added). This includes taking judicial notice after the close of evidence. As one treatise explains:

> Even without having requested judicial notice in advance, a party who fails to offer evidence relating to some important adjudicative fact during her case-in-chief may still request notice of the fact. In this setting, judicial notice of adjudicative facts can provide a remedy for gaps in proof. Often courts take such notice in ruling on post-trial challenges to the sufficiency of a party's evidence. Such a request is often appropriate in resisting a challenge by the other side to the sufficiency of the evidence, commonly made by motion for judgment as a matter of law (or in some systems a directed verdict or nonsuit). Courts can entertain such requests without insisting that the requesting party first move to reopen its case. Rule 201(f) encourages this practice, and instructing a jury on the noticed fact does not pose the same threat to the orderliness of the trial process as allowing the party to call new witnesses.

Mueller & Kirkpatrick, 1 Federal Evidence § 2:8 (4th ed.); *see also Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1306 (Fed. Cir. 2005) ("Hallmark argues that the district court could not take judicial notice of the '752 patent's reinstatement because it occurred after the close of evidence. This argument fails because Federal Rule of Evidence 201(f) clearly states that '[j]udicial notice may be taken at any stage of the proceeding.'"); *Coleman v. Schwarzenegger*, No. C01-1351 TEH, 2009 WL 2407404, at *2 (E.D. Cal. Aug. 4, 2009) (taking judicial notice of assembly bills and governor's vetoes after close of evidence).

Ocwen's objection is that by taking judicial notice after the close of evidence, it had no opportunity to explain or rebut the exhibits. For several reasons, this argument is unpersuasive. First, given the court's rulings on Ocwen's motions in limine, there was every reason to believe prior to the start of trial that Exhibits P42 and P44 would be admitted into evidence. The exhibits were later deemed inadmissible only because Saccameno's counsel failed to lay a proper foundation. Perhaps Ocwen anticipated this eventuality. Nevertheless, it would have been reckless for Ocwen to have assumed at the outset that it would be unnecessary to address the

exhibits as part of its defense. Further, Saccameno's request for judicial notice was pending at the time Ocwen presented its case. Thus, while the final decision was not made until after the close of evidence, Ocwen was fully aware before putting on its case that the exhibits might come into evidence.[25]

Second, despite its protestations to the contrary, Ocwen had the opportunity to address the exhibits. In his closing argument, Ocwen's counsel discussed Exhibit P42. He highlighted the consent order's disclaimer and emphasized that by agreeing to the order, Ocwen had not admitted liability or agreed to the truth of the state regulators' purported factual findings. *See* Tr. 1110:14-1111:6. Rather, he argued, Ocwen entered into the consent orders only to avoid a protracted legal battle with the government. *See* Tr. 1111:6.[26]

---

[25] Ocwen similarly suggests that it was disadvantaged because the court changed its opinion regarding whether Exhibits P42 and P44 could go back to the jury during their deliberations. Specifically, Ocwen asserts that the court initially "ruled that the exhibits could be mentioned in closing argument but would not go back to the jury during deliberations," but that "hours later, after Defendants had made their closing arguments, the Court again changed its mind and decided to provide the exhibits to the jury with a limiting instruction." Rule 59(a) Br. 14. This is misleading, to put it nicely. The court's initial statement that the exhibits would not go back to the jury was expressly based on the fact that the court had yet to receive redacted versions of the proposed exhibits. Thus, after stating that the exhibits would not go back to the jury, the court immediately went on to say that redacted versions of the documents *could* go back to the jury. *See* Tr. 1023:9-12 ("[Exhibits P42 and P44] cannot go to the jury, okay. You can just use them in argument, okay? I don't think they ought to go back to the jury unless I see a very expurgated version, which is just the admissible portions.").

[26] Ocwen points out that, in response to Saccameno's motion for reconsideration, the court allowed additional paragraphs from the consent judgment to be included in Exhibit P42. The paragraph in question referenced the state mortgage regulators' reports that Ocwen suffered from "Lack of controls related to general borrower account management, including but not limited to: [1] Misapplication of borrower payments; [2] Inaccurate escrow accounting and statements; and [3] Assessment of unauthorized fees and charges. [d] Inadequate staffing and lack of internal controls related to customer service; [g] Deficiencies in management control and supervision necessary to ensure compliance with applicable laws and regulations." Ex. P42 at 6-7. Ocwen complains that it had no chance to respond to Saccameno's counsel's references to these passages of Exhibit 42. This might leave the false impression that it was the timing of the court's ruling on the motion to reconsider that prevented Ocwen responding to these passages. The court

Finally, Ocwen fails to specify any way in which it might have defended the case differently if it had been aware earlier in the proceedings that the court would take judicial notice of the exhibits. Notably, Gina Feezer was the only witness on Ocwen's witness list. *See* Pretrial Order at 7, ECF No. 174. Given her repeated testimony that she had no knowledge of the consent orders, nor any knowledge of concerns raised by state regulatory agencies regarding Ocwen's loan servicing practices, *see, e.g.*, Tr. 359:21-360:3; Tr. 545:15-20; 552:24-553:21, it is difficult to imagine how Ocwen might have addressed the exhibits if the court had issued its ruling sooner.

In sum, Ocwen has failed to show that the court erred in taking judicial notice of the consent orders or that Saccameno used the exhibits for purposes inconsistent with those delineated in the court's pretrial rulings.

**4.     Additional Issues**

Before concluding, the court briefly addresses two miscellaneous issues raised in Ocwen's motion for a new trial.

The first of these pertains to the cases that the court cited in taking judicial notice of the consent orders: *Gonzalez v. Ocwen Home Loan Servicing*, No. 3:14-CV-53 CSH, 2015 WL 2124365 (D. Conn. May 6, 2015), and *Lowry v. Wells Fargo Bank, N.A.*, No. 15 C 4433, 2016 WL 4593815 (N.D. Ill. Sept. 2, 2016). Ocwen argues that the cases are inapposite because neither decision considered the admissibility of consent orders at trial or the propriety of taking judicial notice of consent orders' contents. Rule 59(a) Br. 12-13. This argument mistakes the

---

ruled on the motion to reconsider before Ocwen put on its case-in-chief. *See* Tr. 948:3-11*; see also* ECF No. 270 (minute order granting in part Saccameno's motion to reconsider). If Ocwen had no opportunity to respond to these portions of the exhibit, it was only because Saccameno's counsel refrained from referring to them until his rebuttal argument.

purposes for which the court cited the decisions. The court cited *Gonzalez* only to address

Ocwen's sweeping claim that consent orders are not properly subject to judicial notice. Given

that *Gonzalez* took judicial notice of the very CPFB consent judgment at issue in this case, the

decision is directly on point. The court cited *Lowry* to address Ocwen's claim that the consent

orders were not relevant to Saccameno's case. In *Lowry*, it will be recalled, the plaintiff alleged

that Wells Fargo had violated ICFA by failing to comply with the provisions of a national

settlement and consent decree that, like the CFPB and NYSDFS consent orders at issue here,

pertained to improper mortgage servicing practices. The *Lowry* court held that if the complaint's

allegations were true, Wells Fargo's conduct would offend public policy and would qualify as

"unscrupulous" conduct for purposes of an ICFA unfairness claim. 2016 WL 4593815, at *9.

*Lowry* is relevant because Saccameno makes a parallel argument here, contending that Ocwen

has engaged in unfair conduct under ICFA by failing to comply with the CFPB and NYSDFS

consent orders. *See* Tr. 978:19-979:1.

The second residual issue has to do with Ocwen's reference to a portion of the transcript

where Ocwen's counsel stated that it was "outrageously prejudicial" to allow Saccameno to use

Exhibits P42 and P44 in her closing argument, to which the court replied, "Yes, it is." Tr.

982:23-25. Ocwen appears to attach great significance to the court's acknowledgment that the

consent orders were highly prejudicial. However, the potentially prejudicial nature of the exhibits

was never in question. That is why the court exercised great care in limiting the portions of the

documents that could come into evidence, and why the court instructed the jury that the exhibits

could be considered only for limited purposes. Rule 403, however, does not require the exclusion

of prejudicial evidence—even highly prejudicial evidence. It requires exclusion only where the

evidence's probative "value is substantially outweighed by a danger of … unfair prejudice." Fed.

R. Evid. 403; *see also United States v. Krenzelok*, 874 F.2d 480, 482 (7th Cir. 1989) ("[The evidence's] probative value was therefore great. Its prejudicial effect may well have been great too. But when the trial judge is in doubt, Rule 403 requires admission (this is the force of 'substantially outweighed' [in Rule 403]).") (Posner, J.). The consent orders here were highly probative with respect to key issues in this case. This is especially true with regard to Ocwen's prior awareness of concerns regarding its handling of distressed loans such as Saccameno's. As discussed above, Ocwen's prior awareness of such concerns was essential to showing that it acted with the culpability and corporate complicity necessary to justify punitive damages. The court's acknowledgment of the exhibits' potentially prejudicial nature, therefore, is fully consistent with its decision to admit the exhibits into evidence. The danger of unfair prejudice resulting from the consent orders' admission into evidence did not substantially outweigh the exhibits' probative value.

## C.    Conclusion

For the reasons explained above, the court concludes that it did not err in admitting Exhibits P42 and P44 into evidence. Accordingly, the court denies Ocwen's motion for a new trial.

## IV. Motion to Amend the Judgment

The third and final motion before the court is Ocwen's Rule 59(e) motion to amend the judgment. "Amendment of the judgment is proper only when the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact." *Stragapede v. City of Evanston, Illinois*, 865 F.3d 861, 868 (7th Cir. 2017) (quotation marks omitted). Ocwen argues that the judgment entered in the case must be amended because the jury's $3 million punitive

damage award is excessive. The motion asks that the court either reduce the punitive damage award unilaterally or that the court order a remittitur, requiring a new trial unless Saccameno agrees to a reduction of the punitive damage award. For the reasons discussed below, the court denies the motion.

## A.    Discussion

To determine whether the jury's award of punitive damages is excessive, it is first necessary to determine whether the award should be reviewed under state law or federal law. Saccameno argues that the court should apply state law. It is true that "Illinois law governs the substantive assessment of whether the evidence supports the damages awarded when liability is based on Illinois law." *See, e.g.*, *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1397 (7th Cir. 1997). Ocwen's argument, however, is not that the punitive damage award is unsupported by the evidence. Instead, Ocwen maintains that the punitive damage award is so excessive that it violates the Fourteenth Amendment's Due Process Clause. *See* Rule 59(e) Reply Br. 1-2. For purposes of this motion, therefore, federal constitutional law supplies the rule of decision.

As the Supreme Court has explained, the "Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). This is because "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). In *Gore*, the Court identified three guideposts for determining whether an award of punitive damages comports with the requirement of due process and fair notice: "(1) the

degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418. Applying these factors here, the court concludes that the jury's punitive damage award is not unconstitutional.

## 1.    Reprehensibility

The Supreme Court has stated that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 U.S. at 419 (quotation marks omitted). The Court has further instructed that, in assessing the reprehensibility of a defendant's conduct, courts should consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* at 419. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. *Id*.

The first two factors do not support Saccameno: her injury was chiefly emotional, not physical; and while Ocwen may have displayed a reckless disregard for Saccameno's emotional and psychological health, it did not do so with regard to her physical health. However, the remaining three factors weigh in Saccameno's favor: given that she was emerging from bankruptcy, she was highly vulnerable financially; Ocwen's conduct involved repeated actions (e.g., repeatedly failing to correct Saccameno's account; repeatedly seeking payment of funds it was not entitled to; repeatedly returning Saccameno's payments); and, as discussed above, there

is evidence from which the jury could have concluded that Ocwen's conduct was deceptive and, if not malicious, grossly indifferent to Saccameno's rights. *See* Part II.D.1, *supra*. On balance, therefore, the reprehensibility of Ocwen's conduct does not suggest that the punitive damage award in this case was excessive.[27]

## 2. Disparity Between the Punitive Damage Award and the Actual or Potential Harm Suffered

The second *Gore* factor is the disparity between the punitive damage award and the actual or potential harm suffered by the plaintiff. This is typically expressed as a ratio of punitive damages to compensatory damages. The Supreme Court "has recognized that in practice, 'few awards exceeding a single-digit ratio between punitive and compensatory damages ... will satisfy due process.'" *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 839 (7th Cir. 2013) (quoting *State Farm*, 538 U.S. at 424-25). Nevertheless, the Court "has repeatedly declined to set a fixed ratio to limit punitive damages based on constitutional grounds." *Id.*

Of the claims at issue here, only Saccameno's ICFA claim allowed for the recovery of punitive damages. It might thus appear that the relevant comparison for purposes of the *Gore* inquiry is between the $3 million in punitive damages and $82,000 in compensatory damages awarded on Saccameno's ICFA claim—which would result in a ratio of roughly 37:1. However, Ocwen and Saccameno each propose alternative formulations of the ratio. Ocwen contends that the court should consider only the $12,000 in economic damages awarded on Saccameno's ICFA claim, which would yield a ratio of 250:1. Saccameno says the court should consider the compensatory damages awarded on all of her claims—both the entire compensatory award for

---

[27] In addition to the reprehensibility factors specifically mentioned in *Gore*, Ocwen's conduct raises public policy concerns. Federal bankruptcy law has established complex procedural mechanisms to assist individuals precisely in Saccameno's position. Ocwen's conduct completely subverted these purposes by failing to honor her discharge.

her ICFA claim ($82,000), as well as the compensatory damages awarded for her FDCPA, RESPA, and breach of contract claims ($500,000). Saccameno's formulation results in a ratio of roughly 5:1. The first ratio—37:1—is probably (though, as discussed below, not necessarily) unconstitutional; Ocwen's proposed ratio of 250:1 is almost certainly unconstitutional; and Saccameno's proposed ratio of 5:1 is very likely constitutional. Although the matter is not free from doubt, the court concludes that the correct ratio is 5:1, though not for the reasons Saccameno urges.

Ocwen's 250:1 ratio can be rejected in fairly short order. The arguments it asserts in support of its position are difficult to follow and amount to non sequiturs. For example, Ocwen points out that under ICFA, punitive damages cannot be recovered without a showing of pecuniary loss. While that is true, it does not explain why other forms of compensatory damages awarded under ICFA should be disregarded in assessing the punitive/compensatory ratio. Ocwen also points out that ICFA defines "actual damages" to mean "actual pecuniary loss." Once again, this is true but fails to explain why only the economic damages awarded on Saccameno's ICFA claim should be considered for purposes of the *Gore* inquiry. The relevant ratio, after all, is not between punitive damages and *actual* damages but between punitive damages and *compensatory* damages—and under ICFA, compensatory damages encompass both economic and non-economic harm. *See, e.g.*, *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 829–30 (7th Cir. 2018) (observing that, under ICFA, "if the plaintiff has suffered an economic loss, noneconomic injuries are compensable").

Ocwen has cited no case, and the court has found none, in which a court reviewing the constitutionality of a punitive damage award limited its comparison to the economic component of a larger compensatory award. In fact, case authority is to the contrary. *See, e.g.*, *McGinnis v.*

*Am. Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1290 (11th Cir. 2018) (rejecting defendant's request to consider only economic damages, and to discount amount awarded for emotional distress, in conducting ratio analysis); *Nance v. Kentucky Nat. Ins. Co.*, 240 F. App'x 539, 549 (4th Cir. 2007) (rejecting defendant's argument that court could compare the ratio only between punitive damages and plaintiff's out-of-pocket damages, not the remaining compensatory damages); *Hammer v. Residential Credit Sols., Inc.*, No. 13 C 6397, 2015 WL 7776807, at *46 (N.D. Ill. Dec. 3, 2015) (same). At the very least, then, the punitive damage amount should be compared against both the economic and non-economic compensatory damages awarded under Saccameno's ICFA claim.

Somewhat more difficult is the question of whether, as Saccameno maintains, the court should compare the punitive damage figure with the cumulative amount of compensatory damages awarded on all of her claims. The court has found no Seventh Circuit authority directly addressing this issue.[28] Ocwen cites a handful of decisions from other circuits, *Quigley v. Winter*, 598 F.3d 938 (8th Cir. 2010); *Bennett v. Am. Med. Response, Inc.*, 226 F. App'x 725, 728 (9th Cir. 2007); *Williams v. ConAgra Poultry Co.*, 378 F.3d 790 (8th Cir. 2004), as well as decisions from the Illinois Court of Appeals, *Dubey v. Pub. Storage, Inc.*, 918 N.E.2d 265 (Ill. App. Ct.

---

[28] Ocwen's citation to the Seventh Circuit's decision in *U.S. ex rel. Pileco, Inc. v. Slurry Sys., Inc.*, 804 F.3d 889 (7th Cir. 2015), is wide of the mark. The questions presented in *Pileco* had nothing to do with the punitive/compensatory damages ratio, much less with whether compensatory damages may be combined for purposes of assessing the ratio. The *Pileco* Court mentions the issue of punitive damages only in recounting the case's procedural history, observing that the trial court had been forced to order a new trial after the jury awarded the plaintiff $20 million in punitive damages on an ICFA claim without awarding any compensatory damages. Given that punitive damages cannot be awarded under ICFA absent a finding of actual damages, the verdict was plainly defective. In passing, *Pileco* also remarked on the problems presented by the punitive/compensatory ratio of the first jury's award, noting not only that the ratio was excessive but that that the "ratio of $20 million to zero is not two to one or a hundred to one or 20 million or any other number to one; it is undefined, like any other division by zero." *Id.* at 892.

2009); *Gehrett v. Chrysler Corp.*, 882 N.E.2d 1102 (Ill. App. Ct. 2008), in which courts assessed the punitive/compensatory ratio by considering the compensatory damages only for the claim on which punitive damages were awarded. Unfortunately, none of these decisions explains its reasoning for proceeding in this manner. Indeed, in all of the cases except *Gehrett*, the courts do not even acknowledge the question of whether the compensatory damages may be aggregated across claims, but instead simply assume that the compensatory damages awarded on other claims should be excluded from the calculus. And while *Gehrett* acknowledged the question, it offers no explanation for its conclusion that the plaintiff's compensatory damage awards should not be combined. *See Gehrett*, 882 N.E.2d at 1119; *see also Tomao v. Abbott Labs., Inc*., No. 04 C 3470, 2007 WL 2225905, at *22 n.6 (N.D. Ill. July 31, 2007) (Nolan, Mag. J.) (rejecting without further discussion the plaintiff's "attempt to aggregate the awards among all of her claims in an effort to make the ratio appear smaller" and holding that "each claim must be viewed separately.") (citation omitted).

A small number of decisions from other circuits have addressed the issue more squarely. Of these, *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650 (E.D. Ky. 2009), is the most instructive. There, the plaintiff asserted several causes of action, including claims for civil conspiracy and fraud. *Id*. at 656. On the civil conspiracy claim, the jury awarded the plaintiff $10,000 in punitive damages and $100,000 in compensatory damages. On the fraud claim, the jury awarded an additional $10,000 in punitive damages but awarded no compensatory damages. *Id*. at 657. Given that no compensatory damages were awarded on the fraud claim, the court observed that the punitive damages awarded on that count would be excessive if the claim were viewed individually. The court therefore considered whether the compensatory damages on the fraud claim could be combined with the compensatory damages awarded on the civil conspiracy claim.

68

The court concluded that aggregation of the compensatory damage awards was appropriate. In arriving at this conclusion, the court noted that the *Gore* disparity inquiry requires comparing the punitive damage award with both actual harm and *potential* harm resulting from the defendant's conduct. *Id*. at 661 (citing *State Farm*, 538 U.S. at 424; *Gore*, 517 U.S. at 582; *TXO Prod. Corp. v. Alliance Res. Corp*., 509 U.S. 443, 460 (1993)). The court reasoned that if the inquiry is "not limited to compensatory damages that actually occurred in calculating the ratio, it follows that a court is not confined only to the compensatory damages under particular claims and instead can look at damages found by a jury on related claims." *Id*. at 661.

Of course, in *Fastenal*, the claims whose compensatory damages were combined both allowed recovery for punitive damages. Here, the question is whether aggregation of compensatory damages is appropriate where one of the claims allows for punitive damages and the others do not. However, several courts have held that compensatory damages may be aggregated under such circumstances, provided that the underlying claims are sufficiently related. *See, e.g.*, *Burton v. Zwicker & Associates, PSC*, 577 F. App'x 555, 564-65 (6th Cir. 2014) (aggregating backpay awarded on claims for racial discrimination, retaliation, and wrongful termination with emotional distress damages awarded on wrongful termination claim); *Bains LLC v. Arco Prod. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 775–76 (9th Cir. 2005) ("On the facts of this case, in determining the correct amount of punitive damages, the jury could properly consider not only the one dollar in nominal damages awarded for discrimination under § 1981, but also the $50,000 in compensatory damages awarded for breach of contract. The conduct was intertwined."); *Pollard v. E.I. DuPont De Nemours, Inc*., 412 F.3d 657, 668 (6th Cir. 2005) (upholding $2.5 million punitive damages award on claim for intentional infliction of emotional distress based on $950,000 in compensatory damages awarded on that claim as well as

back pay and front pay under Title VII claims); *but see JCB, Inc. v. Union Planters Bank, NA*, 539 F.3d 862 (8th Cir. 2008) (separately considering compensatory/punitive ratios for conversion and trespass claims because, "[a]lthough related, the wrongful acts leading to the Bank's trespass and conversion were not identical").

The court finds this line of authority persuasive. Accordingly, the court concludes that it is appropriate to combine the compensatory damages awarded on Saccameno's ICFA claim with those awarded on her FDCPA, RESPA, and breach of contract claims. The conduct underlying the claims is interrelated (though not, as Saccameno maintains, "indivisible") and the resulting harm had a cumulative effect. The relevant comparison, therefore, is between $3 million in punitive damages and $582,000 in compensatory damages. The resulting ratio of approximately 5:1 is well within the single-digit range suggested by the Supreme Court.

For completeness, the court considers the third option singled out above—comparing the $3 million in punitive damages to the $82,000 in compensatory damages awarded on Saccameno's ICFA claim. As noted, this results in a ratio of 37:1, which is significantly outside the single-digit range suggested by the Supreme Court. Nevertheless, it is worth noting that such a ratio is not necessarily unconstitutional. As previously noted, the Supreme Court has refused to fix any particular ratio above which a punitive damage award must be deemed unconstitutional. *See, e.g.*, *E.E.O.C.*, 707 F.3d at 839; *see also Mathias v. Accor Econ. Lodging, Inc*., 347 F.3d 672, 676 (7th Cir. 2003) (quoting *State Farm*, 538 U.S. at 426) ("The Supreme Court did not, however, lay down a 4–to–1 or single-digit-ratio rule—it said merely that 'there is a presumption against an award that has a 145–to–1 ratio,'—and it would be unreasonable to do so.") (citation omitted). And courts have upheld ratios comparable to or greater than 37:1. In *Mathias*, for example, the plaintiffs alleged that they had been bitten by bed bugs in one of the defendant's

70

hotels, and were each awarded punitive damages of $186,000 and compensatory damages of $5,000. The Seventh Circuit held that the 37:1 ratio of punitive to compensatory damages was constitutional. *Id*. at 677; *see also Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246, 248 (4th Cir. 2017) (upholding 98:1 ratio in suit under Fair Credit Reporting Act based on $600,000 in punitive damages and $6,128.39 in compensatory damages); *Kemp v. Am. Tel. & Tel. Co*., 393 F.3d 1354, 1365 (11th Cir. 2004) (upholding a 725:1 ratio in RICO suit based on $250,000 in punitive damages and $345 in compensatory damages); *Jeffries v. Wal-Mart Stores, Inc*., 15 F. App'x 252, 255 (6th Cir. 2001) (upholding ratio of 50:1 in suit alleging discrimination and retaliation based on $425,000 in punitive damages and $8,500 in compensatory damages).

These cases can no doubt be distinguished from Saccameno's in various ways. Chief among these is the fact that these cases involved relatively small compensatory damage awards. Courts have held that larger punitive/compensatory ratios are permissible where plaintiffs have recovered only modest compensatory damages, since adhering to a single-digit ratio in such cases would result in punitive damage awards too modest to have a significant deterrent effect. *See, e.g.*, *Cooper v. Casey*, 97 F.3d 914, 919–20 (7th Cir. 1996) ("The smaller the compensatory damages, the higher the ratio of punitive to compensatory damages has to be in order to fulfill the objectives of awarding punitive damages…. An award of punitive damages proportioned to the low compensatory damages that were awarded would have a very meager deterrent effect."). Courts have similarly recognized that "[w]here only small compensatory damages are awarded, a larger punitive sum may be warranted to give plaintiffs an incentive to sue." *Mathias*, 347 F.3d at 677; *see also Gavin v. AT & T Corp.*, 464 F.3d 634, 641 (7th Cir. 2006) ("The proper focus of analysis of the ratio itself is the adequacy of the combined award of compensatory and punitive

71

damages to motivate the prosecution of a meritorious claim. If compensatory damages are slight, a single-digit ratio is likely to be insufficient.").

In Saccameno's case, it might be argued, there is no justification for a such large ratio because she has been awarded more than $500,000 in compensatory damages. But this argument depends, once again, on whether Saccameno's compensatory damages are viewed separately or in the aggregate. If one considers the compensatory damages awarded only on her ICFA claim, hewing to, say, a 5:1 ratio would cap her punitive damages at roughly $500,000. Such an amount is not insignificant; but it is unclear whether it is substantial enough to have a meaningful deterrent effect on a corporation of Ocwen's size. If, on the other hand, Saccameno's compensatory damages are combined, as we have seen, the punitive/compensatory ratio falls within an acceptable range.

In any event, as explained above, the court concludes under the facts of this case that it is most sensible to aggregate Saccameno's compensatory damages for purposes of the *Gore* ratio analysis. The resulting 5:1 ratio between her punitive and compensatory damages is not unconstitutionally excessive. To the extent that concerns about the ratio spring from concerns about whether the defendant had notice that it could face a substantial punitive award, *Gore*, 517 U.S. at 574, the many investigations, reports, consent decrees and judgments against Ocwen for related misconduct could not have left it surprised that the jury found a substantial punitive award appropriate.

### 3. Sanctions for Comparable Misconduct

The third and final *Gore* guidepost requires the court "to compare the punitive damages in this case to the 'civil or criminal penalties that could be imposed for comparable misconduct.'" *AutoZone, Inc.*, 707 F.3d at 840 (quoting *Gore*, 517 U.S. at 583). Ocwen cites an

ICFA provision allowing the Attorney General or State's Attorney to request that a court "impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act." 815 Ill. Comp. Stat. Ann. 505/7(b). The $3 million punitive damage award may indeed appear excessive when compared with this figure. As Saccameno points out, however, section 505/7(b) further provides that where the court finds that the defendant acted with an intent to defraud, the $50,000 penalty applies to *each violation* of the statute. *Id.* True, it would still require a good many ICFA violations to reach a figure of $3 million. But there are other relevant sanctions (not mentioned by either of the parties) that might approach the amount of the punitive damage award in this case. For example, Illinois' Residential Mortgage License Act of 1987 (RMLA), 205 Ill. Comp. Stat. 635/1–1 *et seq.*, requires servicers and others in the residential mortgage lending industry to comply with applicable federal and state statutes and regulations (e.g., RESPA). *See* Ill. Admin. Code tit. 38, § 1050.870. The statute provides for fines of up to $25,000. *See* 205 Ill. Comp. Stat. 635/1–3(c), (e). More importantly, RMLA also allows Illinois' Department of Financial and Professional Regulation to suspend or revoke a loan servicer's license for violating the statute. 205 Ill. Comp. Stat. 635/4–5. The financial cost to Ocwen of losing its license to service loans in Illinois might well approach or even surpass $3 million. *See, e.g.*, *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003) (punitive damage award of $372,000 was not excessive where the defendant could not only be fined $2,500 under state statute but could also have lost its license to operate under municipal ordinance).[29]

---

[29] The notion that Ocwen might be sanctioned under RMLA is not fanciful. Indeed, the court takes judicial notice of the fact that, in 2017, the Illinois Department of Financial and Professional Regulation's Division of Banking issued a cease and desist order ("CDO") against Ocwen for violations of RMLA. *See* Order to Cease and Desist and Placing Licenses on Probation, *In the Matter of: Ocwen Loan Servicing, et al.*, 2017-MBR-CD-01 (Apr. 20, 2017),

In addition to statutory and other penalties, courts also look to punitive damage awards in other cases for purposes of the third *Gore* factor. *See, e.g.*, *Hendrickson v. Cooper*, 589 F.3d 887, 894 (7th Cir. 2009) ("As with our review of a compensatory damages award, it is useful to compare the challenged punitive damages award with other awards upheld in the past."). A comparison with punitive damage awards in other cases likewise suggests that the award in this case is within an acceptable range. *See, e.g.*, *McGinnis v. American Home Mortgage Servicing, Inc.*, 817 F.3d 1241 (11th Cir. 2016) (upholding $3 million punitive damage award based on loan servicer's attempts to collect a debt it erroneously believed plaintiff owed based on its mistaken accounting); *Hammer v. Residential Credit Solutions, Inc.*, No. 13 C 6397, 2015 WL 7776807 (N.D. Ill. Dec. 3, 2015) (upholding award of $1.5 million in punitive damages and $500,000 in compensatory damages based on an ICFA claim against loan servicer that refused to honor plaintiff's loan modification agreement with prior servicer). While neither of these cases is directly analogous to the present case, the Seventh Circuit has instructed that the judicial function here "is to police a range, not a point." *Mathias*, 347 F.3d at 678.

In short, consideration of the civil penalties available for comparable misconduct, and the amount of punitive damages awarded in other cases, further supports the conclusion that the jury's punitive damage award in this case is not unconstitutionally excessive.

---

https://idfpr.com/Banks/RESFIN/Discipline/2017/2017-MBR-CD-01.pdf. The determination was based on findings by the CFPB as well as a 2015 multistate examination that Ocwen had violated state and federal laws, including RESPA and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*., by, among other things, improperly calculating loan balances and misapplying borrower payments. CDO ¶¶ 17-18. The CDO also notes that it had received similar complaints from Illinois consumers that Ocwen's servicing records contained inaccurate information and payment discrepancies. *Id.* ¶ 19. The CDO was rescinded after Ocwen entered into a consent order under which it agreed, among other things, to develop an alternative servicing platform to REALServicing. *See* Consent Order, *In the Matter of: Ocwen Loan Servicing, LLC, et al.*, No. 2017-MBR-CD-01-b, 2017 WL 4785920 (Sept. 28, 2017).

**B.      Conclusion**

As explained above, none of the *Gore* factors suggests that the punitive damage award in this case runs afoul of the constitutional guarantee of due process: given Saccameno's financial vulnerability, the fact that Ocwen engaged in repeated misconduct over a period of eighteen months, and the evidence supporting a finding of deceptiveness on Ocwen's part, Ocwen's conduct is sufficiently reprehensible to justify the award; the ratio of punitive to compensatory damages is comfortably within the single-digit range routinely approved by courts; and the award is commensurate with civil sanctions and punitive damages that might potentially be imposed for comparable misconduct.

For these reasons, the court denies Ocwen's motion to amend the amount of the jury's punitive damage award.

## V.  Conclusion

For the foregoing reasons, the court denies Ocwen's renewed motion for judgment as a matter of law, ECF No. 314; Ocwen's motion for a new trial, ECF No. 312; and Ocwen's motion to amend, ECF No. 313.


Date: March 1, 2019                                    _____/s/_____

                                                                Joan B. Gottschall
                                                                United States District Judge