CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 19-1569

MONETTE E. SACCAMENO,

*Plaintiff-Appellee,*

*v.*

U.S. BANK NATIONAL ASSOCIATION, as trustee for C-BASS MORTGAGE LOAN ASSET-BACKED CERTIFICATES, Series 2007 RP1, and OCWEN LOAN SERVICING, LLC,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-01164 — **Joan B. Gottschall**, *Judge.*

———————————

ARGUED SEPTEMBER 16, 2019 — DECIDED NOVEMBER 27, 2019

———————————

Before BAUER, BRENNAN, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Chapter 13 bankruptcy is a promise to a debtor: if you comply with the bankruptcy plan, then you can get a fresh start. That promise went unfulfilled for Monette Saccameno. She had done everything that was required of her: she cured the delinquencies in her mortgage and made

42 monthly mortgage payments under the court's watchful eye. Near the end of her bankruptcy, she obtained statements from her mortgage servicer, Ocwen Loan Servicing, LLC, that she was paid up—that she was paid ahead even. The court granted her a discharge.

Ocwen, however, immediately began trying to collect money that it was not owed and threatening foreclosure. No problem, Saccameno thought, it must be a simple mistake. She sent Ocwen all the paperwork it could have needed to fix its records. When that did not work, she sent it again. Then she sent it a third and fourth time, with a request from an acquaintance, a lawyer, for an explanation why Ocwen thought she owed money. Ocwen did not explain. Ocwen did not care. Ocwen did not truly grasp how wrong its records were until almost four years later, two days into Saccameno's jury trial when its witness was testifying.

It is little wonder, then, that the jury awarded Saccameno substantial damages for the pain, frustration, and emotional torment Ocwen put her through. The jury ordered Ocwen to pay $500,000 in compensatory damages based on three causes of action that could not support punitive damages. A fourth claim, under the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1, did allow punitive damages, and for that claim the jury awarded them to the tune of $3,000,000, plus compensatory damages of an additional $82,000. Ocwen challenged this verdict on a variety of grounds, but the district court upheld the verdict in its entirety. On appeal, Ocwen has limited its arguments to the punitive damages award, which it contends was not authorized by Illinois law and is so large that it deprives the company of property without due process of law. We agree with the

district court that the jury was well within its rights to punish Ocwen. We must, however, conclude that the amount of the award is excessive. We therefore remand to the district court to amend the judgment.

## I. Background

Around 2009, Saccameno fell behind on her $135,000 home mortgage and her bank, U.S. Bank National Association (nominally a defendant but irrelevant for our purposes), began foreclosure proceedings. To keep her home, she sought the protection of the bankruptcy court and, in December 2009, began a Chapter 13 plan under which she was required to cure her default over 42 months while maintaining her ongoing monthly mortgage payments. *See* 11 U.S.C. § 1322(b)(5).

Saccameno first began having problems with Ocwen in October 2011, shortly after it acquired her previous servicer. Ocwen sent her a loan statement saying, inexplicably, that she owed $16,000 immediately. With her attorney's advice, Saccameno ignored the statement and continued making payments based on her plan. Her statements continued to fluctuate: her February 2013 statement said she owed about $7500, her March statement, $9000. A month later, Ocwen now owed *Saccameno* about $1000 in credit, and Ocwen told her she did not need to pay again until September. Still, Saccameno continued making payments through June, the last month of her plan. At that time the bankruptcy court issued a notice of final cure, Fed. R. Bankr. P. 3002.1, informing Ocwen that Saccameno had completed her payments. Ocwen never responded to the notice, and the court entered a discharge order on June 29, 2013. Saccameno's last statement pre-discharge showed that the credit in her favor had grown to $2800 and she was paying down her loan.

Within days, however, an Ocwen employee, whom Ocwen refers to only as "Marla," reviewed the discharge but mistakenly treated it as a dismissal. As far as Ocwen was concerned, then, the bankruptcy stay had been lifted and it could immediately start collecting Saccameno's debts. This might not have been a problem—for Saccameno of course did not have a debt anymore—but Marla's mistake was only the tip of the iceberg. Apparently, in March, Ocwen had manually set the due date for Saccameno's plan payments to September 2013, hence the credit. That manual setting took place in a bankruptcy module that overrode and hid Ocwen's active foreclosure module, which instead reflected that Saccameno had not made a single valid payment in 2013, as each check was being placed into a suspense account and not being applied to the loan. Marla's dismissal entry deactivated the bankruptcy module and reactivated the foreclosure one. If Marla had properly marked Saccameno's bankruptcy as a discharge, then someone in Ocwen's bankruptcy department would have reconciled the plan payments with the suspense accounts before closing both modules.

Instead, on July 6 and 9, Ocwen sent Saccameno two letters saying it had not heard from her since its non-existent recent communication about her "severely delinquent mortgage." The letters offered the contact information of governmental and non-profit services for people unable to make their home mortgage payments. They also warned Saccameno that failure to respond could result in fees from foreclosure, sale of the property, and eviction, and that this process could ruin her credit, making it hard for her even to find a new rental property. Saccameno understandably dubbed these the "you'll never rent in this town again" letters.

Before these letters arrived, Saccameno called Ocwen to ask about lowering her interest rate. An Ocwen employee said she was not eligible because she was several thousand dollars in default. Knowing this was a mistake, two weeks out from her discharge, Saccameno asked how to correct the records and was given a number where she could fax her documents. She did so a few days later, and with that paperwork Ocwen corrected Marla's mistake before July was over.

If only that were the end of this story. With the corrected records, Ocwen's bankruptcy department performed a reconciliation and recognized that Saccameno had made several payments in 2013, so her default was nowhere near as large as the employee had said. Nevertheless, it somehow determined that she had missed two payments during her bankruptcy, so she was still in default—albeit to a lesser extent—and the foreclosure module remained open. In August, Ocwen sent Saccameno a letter declaring that it had "waived" $1600 in fees (that had been discharged) and that it was missing two of her plan payments (which, even if true, would also have been discharged under the terms of the plan). Around this time Ocwen assigned Saccameno a "relationship manager," Anthony Gomes, who scheduled a call with Saccameno. He was not familiar with her file or the documents she had sent, and asked Saccameno to resend them. She did, and they never spoke again. Instead Saccameno would frequently call Ocwen's customer service line and each time was directed to a new, similarly unhelpful person.

While this was all going on, Saccameno remained optimistic and continued to make her monthly payments. Ocwen had accepted her payments for July and August 2013 but began rejecting them in September because each payment was not

enough to cure her supposed default. After a few months of rejection, more letters like those sent in July, and further futile phone calls, Saccameno recruited an acquaintance, an attorney named Susan Van Sky, to help. Van Sky wrote to Ocwen, explained how Saccameno had made all her payments during her bankruptcy, as confirmed by the court, and asked for an explanation how, then, Saccameno could be in default. She followed up with a phone call and an Ocwen representative insisted that the company never rejects payments and requested proof that it had done so. Van Sky followed directions and faxed 100 pages of Saccameno's paperwork to the number Ocwen had provided. Somehow this paperwork was routed to the wrong department and the receiving department refused to do anything with it. Van Sky continued to call Ocwen, also reaching new people each time. Some asked her to fax the same papers again, so she sent them once more.

Eventually, Ocwen sent Van Sky something back, though calling it a response would be generous. The form letter referred to the dates of Saccameno's bankruptcy but otherwise mentioned nothing about her loan and did not answer any of Van Sky's questions. Ocwen had not even updated the form with Saccameno's name. Instead it referred to another mortgagor. Attached was a spreadsheet that supposedly explained how Saccameno was behind in her payments; Van Sky, though, could not decipher the spreadsheet, and Ocwen did not elucidate. Exhausted from the lack of progress, and no longer having time to help, Van Sky dropped out and Saccameno hired counsel.

Ocwen, meanwhile, continued to reject Saccameno's payments. The erroneous default grew and grew as the underlying foreclosure action remained pending in the Circuit Court

of Cook County. Though the Circuit Court had stayed the case because of the bankruptcy, Ocwen was internally preparing to revive it and seek a judgment of foreclosure. Periodically, its experts appraised the property, and agents checked each month if Saccameno was still living in the home (and if they concluded she was not, they would have placed locks on the doors). Ocwen added the costs of these measures to Saccameno's debt. It also produced affidavits to support a request for judgment of foreclosure, including one prepared as early as July 2013, and gave them to its local law firm. That firm filed an appearance in the foreclosure proceeding in 2014 and told Ocwen, in January 2015, that it needed only one more document before it could move for judgment.

Perhaps part of the reason Ocwen never did move for judgment was this suit, filed the next month. As relevant to this appeal, Saccameno sought damages under four legal theories: breach of contract, for the refused payments; the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, for the false collection letters; the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601, for the inadequate responses to Saccameno and Van Sky's inquiries; and the ICFA. The ICFA claim related to Ocwen's false oral and written statements regarding Saccameno's default and its unfair practices in violation of consent decrees that Ocwen previously had entered with various regulatory bodies. These decrees addressed, among other things, its inadequate recordkeeping, misapplication of payments, and poor customer service. Among the steps Ocwen had consented to take was to track Chapter 13 plan payments accurately and to reconcile its accounts on discharge or dismissal.

Once Ocwen received the complaint, it overrode the fore-closure module again with the bankruptcy module. This had two effects. First, just a week after she filed the complaint, Ocwen sent Saccameno an offer to refinance her mortgage, deigning to grant her the "opportunity" to stay in her home. This offer would have lowered her interest rate and her monthly payment but increased her principal. Saccameno could afford her payments post-bankruptcy, though, and wanted to make progress toward owning her home outright. Ocwen sent another offer in July 2015, though Saccameno was even less pleased with this one. She viewed it as a "life sen-tence" because, though it would have lowered her interest rate, it would have increased her principal, reset her mortgage to last another thirty years, and ended with a balloon payment of nearly half the principal. Second, Ocwen inexplicably started accepting Saccameno's payments for March and April. She stopped sending them, on her attorney's advice. Little else happened regarding the loan, except that Ocwen voluntarily dismissed the state-court foreclosure case in March 2016.

The jury heard all of this at trial—as well as testimony re-garding the mental and emotional strain Saccameno went through because of Ocwen's continuous errors. Ocwen had promised the jury, in its opening statement, that it would ex-plain why it received only 40 payments during the bank-ruptcy. It never had the chance, though, as Saccameno's coun-sel diligently walked Ocwen's representative through its own records payment by payment. Just before lunch on the second day of trial, the representative counted to 42, confirming that Saccameno had made each payment. Ocwen never again ar-gued otherwise. It instead focused on Marla's mistake in July of 2013—the marking of dismissal instead of discharge. The jury evidently did not buy the story that Saccameno's years of

woeful treatment could be placed on the shoulders of a single, essentially anonymous, line employee. Notably, Ocwen did not produce Marla—did not even give her a last name. Its corporate representative admitted that it had not investigated Marla, had never checked to see if she—or anyone else—had done something similar before or since, and did not know even if Marla was still employed with the company (though the representative suspected not, because her name was not in the email directory).

The jury found in Saccameno's favor on all counts. By the parties' agreement, the verdict form included a single line for compensatory damages under the breach of contract, FDCPA, and RESPA claims and the jury wrote $500,000 on that line. Because only the ICFA claim could include punitive damages, and it requires that one prove economic damages before receiving other damages, *see* 815 ILCS 505/10a(a), Saccameno agreed to place that claim in its own section of the verdict form with a line each for economic, non-economic, and punitive damages. The parties further agreed that the ICFA damages would not be treated as a subset of the damages on the other three counts. For this claim, the jury awarded $12,000 in economic, $70,000 in non-economic, and $3,000,000 in punitive damages, resulting in a total award of $3,582,000.

Ocwen responded with three post-verdict motions. The first, a motion for new trial, objected to the admission of the consent decrees. The second, a request for judgment as a matter of law, challenged the sufficiency of the evidence on every count other than the FDCPA claim. As relevant here, it argued that the award of punitive damages was not supported by sufficient evidence. The third motion, to amend the judgment, argued that the punitive damage amount was excessive, in

violation of the Due Process Clause. Ocwen primarily sought to compare the $3,000,000 award to the $12,000 in economic damages the jury found. Saccameno instead urged the district court to compare the punitive award to the combined damages on all four counts.

The district court thoroughly considered and deflected Ocwen's barrage of arguments and upheld the verdict. On the punitive damages, the district court concluded that the jury reasonably found Ocwen's employees had been deliberately indifferent to the risk that Saccameno would be harmed, and Ocwen's management had notice of—and ratified—its employees conduct. On the constitutional question, the court decided that the proper comparator for the punitive damages award was the total amount awarded on all four counts, as they involved related conduct. That resulted in a punitive damages ratio of roughly 5:1, which the court concluded was not unconstitutionally high given the reprehensibility of Ocwen's conduct.

## II. Sufficiency of the Evidence

We address first Ocwen's argument that there was insufficient evidence for the jury to award punitive damages at all. We review the sufficiency of the evidence de novo and ask whether the record, viewed in the light most favorable to the prevailing party, can support the jury's verdict. *Parks v. Wells Fargo Home Mortg., Inc.*, 398 F.3d 937, 942 (7th Cir. 2005).

Under Illinois law, punitive damages may be awarded only if "the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is 'committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross

No. 19-1569                                                         11

negligence as to indicate a wanton disregard of the rights of others.'" *Slovinski v. Elliot*, 927 N.E.2d 1221, 1225 (Ill. 2010) (quoting *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 359 (Ill. 1978)). When the defendant is a corporation, like Ocwen, the plaintiff must demonstrate also that the corporation itself was complicit in its employees' tortious acts. *See Kemner v. Monsanto Co.*, 576 N.E.2d 1146, 1156 (Ill. App. Ct. 1991); *see also Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1145–46 (7th Cir. 1985). Ocwen contends that Saccameno's case failed in both respects.

The parties first accuse each other of waiving their arguments regarding corporate complicity, but both assertions are meritless. Saccameno contends that Ocwen cannot challenge the verdict because it did not object to the jury instructions. The instructions properly tracked Illinois law and Ocwen's arguments, so it is permitted to argue that the jury misapplied those instructions to the facts. *See Jabat, Inc. v. Smith*, 201 F.3d 852, 857 (7th Cir. 2000). Saccameno offers nothing else on this issue, so Ocwen responds that *she* has waived the chance to seek affirmance of the district court's decision. An appellee cannot waive an argument as easily as an appellant can, though. *See Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012). Even if an appellee forgoes a brief entirely, we may still affirm. *See Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 673 (7th Cir. 1998). We are especially unwilling to deem Saccameno's argument waived, as it goes to the validity of the jury's verdict, to which we are inclined to defer, *e.g.*, *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1018–19 (7th Cir. 2016).

On the merits, Ocwen argues that the evidence could support only a finding of negligence, not a "conscious and deliberate disregard" for Saccameno's rights. *Parks*, 398 F.3d at 942.

It continues to place most of the blame on what it calls "an isolated 'miscoding' error committed by a lone employee, identified as 'Marla.'"

Ocwen cannot pin this case on Marla. Her error was one among a host of others, and each error was compounded by Ocwen's obstinate refusal to correct them. If this case were truly Marla's fault, then Saccameno's troubles would have lasted a month—most of July 2013. That was how long it took for Saccameno to point Ocwen toward Marla's mistake, and for Ocwen to change the dismissal to a discharge. The real problems only began at that point though, as Ocwen falsely claimed that Saccameno had missed two plan payments for the first time in August and started improperly rejecting Saccameno's payments in September. Ocwen apparently did not discover the former until the second day of trial and likely would have continued the latter until it filed for foreclosure, had this lawsuit not gotten in the way.

Ocwen contends that the miscounting of payments was also a human error—though it does not identify a human. We are not sure how many human errors a company like Ocwen gets before a jury can reasonably infer a conscious disregard of a person's rights, but we are certain Ocwen passed it. The record is replete with evidence that Ocwen's servicing of Saccameno's loan was chaos from the moment Ocwen began working on the loan in 2011 to the day of the jury's verdict nearly seven years later. Saccameno's successful bankruptcy should have made things easier by resetting everything to zero—"fully current as of the date of the trustee's notice," the plan said. With her bankruptcy papers in hand, Saccameno repeatedly attempted to inform Ocwen that it had made an obvious mistake. This was not enough, though, and when

Saccameno and Van Sky sought to find out why, Ocwen did not explain. Instead it sent her a letter written to someone else.

Ocwen likens itself to the bank in *Cruthis v. Firstar Bank, N.A.*, 822 N.E.2d 454 (Ill. App. Ct. 2004), which illegally reversed payments into the plaintiffs' account at the behest of the payor. *Id.* at 458–59. Though this act was conversion, the court found punitive damages unjustified because the bank had credited the plaintiffs' account after being confronted. *Id.* at 465. On seeing their account had been emptied, the plaintiffs had inquired with a bank manager; that manager helped them to challenge the withdrawal and did his own internal investigation. *Id.* at 459. Initially, a vice president wrongly said the withdrawal had been fine, but within two months the bank had corrected the plaintiffs' account and waived all charges. *Id.* at 460. Ocwen, in contrast, never noticed most of its mistakes, even well into this case. Its "waiver" of fees was not an acceptance of responsibility but a result of the discharge. No helpful manager assisted Saccameno—though Ocwen tries to cast Gomes in this role, he is a pale imitation. He spoke with Saccameno once, knew nothing of her case, offered no assistance, and only requested that she send paperwork that Ocwen already had twice over.

Ocwen's comparison to *Parks v. Wells Fargo Home Mortgage* is even further afield. There, a mortgagee failed to pay taxes on a couple's home, allowing a tax scavenger to fraudulently obtain title. 398 F.3d at 939–40. In concluding that the defendant had not acted with conscious disregard of the Parks' rights, we emphasized that the company, on learning of its mistakes, "set out to make matters right, and it succeeded in doing so in relatively short order." *Id.* at 943. When the plaintiffs had called in, the company "immediately put two

researchers on the job to find out what could be going on";
those researchers discovered and explained exactly how the
taxes had gone unpaid, and the company succeeded in getting
the fraudulent deed vacated. *Id.* at 940. Ocwen, however, still
has offered no real explanation for any of the errors its em-
ployees made, and never acted to correct its mistakes. This
"unwilling[ness] to take steps to determine what occurred"
warranted punitive damages under the ICFA. *Dubey v. Pub.
Storage, Inc.*, 918 N.E.2d 265, 280 (Ill. App. Ct. 2009).

The utter lack of explanation also supports a finding of
corporate complicity. Illinois law insists on managerial in-
volvement before punitive damages may be awarded against
a corporation. *See Mattyasovszky v. W. Towns Bus Co.*, 330
N.E.2d 509, 512 (Ill. 1975) (listing four ways this complicity
can be demonstrated). Saccameno, however, interacted only
with line employees and never escalated her dispute. The dis-
trict court thus rightly recognized that the only plausible basis
on this record for corporate complicity is that "the principal
or a managerial agent of the principal ratified or approved the
act" of its employees. *Id.*; *Kemner*, 576 N.E.2d at 1156. Ratifica-
tion is governed by agency principles and is "the equivalent
of authorization, but it occurs after the fact, when a principal
gains knowledge of an unauthorized transaction but then re-
tains the benefits or otherwise takes a position inconsistent
with nonaffirmation." *Progress Printing Corp. v. Jane Byrne Po-
litical Comm.*, 601 N.E.2d 1055, 1067 (Ill. App. Ct. 1992).

As the district court recognized, Illinois law permits a
finding of ratification based on a corporation's litigation con-
duct, if that conduct is inconsistent with nonaffirmation. In
*Robinson v. Wieboldt Stores, Inc.*, 433 N.E.2d 1005 (Ill. App. Ct.
1982), a part-time security guard had falsely imprisoned a

woman on suspicion she had stolen a scarf, despite her receipt. *Id.* at 1007. The defendant's chief of security testified that a receipt alone was not a reason for a guard to conclude a person was not a thief, and initially denied that any guards were working on the day in question. *Id.* at 1009. On cross-examination, though, he revealed that the plaintiff's description of the guard matched that of a part-timer, who the corporation never produced. *Id.* at 1008. Based on this conduct, the court permitted the jury to consider an award of punitive damages against the corporation, as it had "continued to defend the actions of its agent throughout the course of th[e] litigation and … shown no attempt to alter its procedures." *Id.* at 1009. *Robinson*, though, does not stand for the proposition that defending a lawsuit alone ratifies employees' actions. So the court held in *Kennan v. Checker Taxi Co.*, 620 N.E.2d 1208 (Ill. App. Ct. 1993), in which the corporation "did not ignore plaintiff's complaint" that he had been beaten by one of its drivers. *Id.* at 1210, 1214. Instead, the company sent an investigator to speak with the plaintiff, its president directed that the driver's lease not be renewed, and by the time of trial, the driver and company were "no longer associated." *Id.* at 1214. These facts invalidated the punitive damages award. *Id.*

Though a corporation need not go as far as the Checker Taxi Company to avoid a finding that it ratified its employees conduct, it must do more than Ocwen did here. We start with Marla. Even if she *were* to blame, Ocwen's position regarding her could reasonably be seen as inconsistent with nonaffirmation. Much like the security director in *Robinson*, Ocwen's corporate representative knew nothing about Marla (besides her first name). The representative testified that she did not speak with Marla, did not know where Marla's office was, did not know how long Marla had been an Ocwen employee, and did

not know if she remained one to this day. The jury heard evidence that *no one* at Ocwen took any steps, whatsoever, to investigate how Marla's mistake—which according to Ocwen was all but the sole cause of Saccameno's woes—was made or how Ocwen would prevent it from happening again. Ocwen did not need to fire Marla to defeat the inference that it had ratified her actions, but it needed something from which the jury could have seen an "attempt to alter its procedures." *Robinson*, 433 N.E.2d at 1009.

Marla's mistake, though, was not the only problem. The jury's ratification finding was supported further by Ocwen's complete lack of insight into its other, unnamed employees' errors. Ocwen corrected Marla's mistake shortly after it occurred, and though Ocwen did not know why Marla had made it or take any steps to prevent it from recurring, the company at least acknowledged that it *was* a mistake (and apologized on Marla's behalf). In contrast, Ocwen went into this litigation—and the first day of trial—with the view that Saccameno had missed two payments during her bankruptcy. Once its misconception was corrected through the testimony of its own representative, Ocwen had no explanation for how this whole ordeal happened, let alone how it might be avoided in the future. The closest it got was to blame the miscount on Saccameno's first fax, in which she mistakenly said that she had sent three payments in May. (She sent them in March.) Ocwen's representative suspected that this comment caused researchers to limit the scope of their review to the time before May when counting the payments. Why they thought it notable that Saccameno owed two payments, when she had two months left on her plan at the time they stopped looking, eludes us. Still, the representative admitted that this

No. 19-1569    17

explanation justified only the letter in August, as no one else at Ocwen would have had any reason to limit themselves so.

The jury was not obligated to withhold punishment because Ocwen's acts were not purely harmful. Ocwen contends the erroneous credit toward Saccameno in the last few months of her bankruptcy demonstrates its employees were incompetent, not malicious. Saccameno ignored this false credit, though, and did not benefit from it; if she had believed Ocwen, and waited until September to pay her mortgage, she would have defaulted during her plan, risking the *real* dismissal of her bankruptcy. Ocwen next points to its offers of assistance as demonstrating good faith, but we agree with the district court that the jury could have found those aggravating, not mitigating. Ocwen had pushed Saccameno towards financial assistance, but as the district court explained, "Saccameno no longer needed financial assistance; she simply needed Ocwen to correct its records." The loan modification offers were even worse. Putting to one side their timing, the terms, especially of the second offer, were far from generous. Why would Saccameno, having then endured four years with Ocwen, want to chain herself to the company three decades more, only to owe it money at the end?

The jury, having little evidence to the contrary, concluded that Ocwen had accepted its employees' indifference to Saccameno. *Robinson*, 433 N.E.2d at 1009; *see also Dubey*, 918 N.E.2d at 280. Ocwen insisted it had not seen errors like these before, but its representative admitted it had never bothered to look. The jury was not required to accept Ocwen's bare assertion that this was a unique case—especially considering the consent decrees implying it was not—and could have

inferred that this is just how Ocwen does business. For that, Illinois law permits punitive damages.

### III. Due Process

We next turn to the amount of punitive damages awarded to Saccameno—$3,000,000. Ocwen contends that this award exceeds constitutional limits and we address its arguments on those terms. We remind litigants, though, that the Constitution is not the most relevant limit to a federal court when assessing punitive damages, as it comes into play "only after the assessment has been tested against statutory and common-law principles." *Perez v. Z Frank Oldsmobile, Inc.*, 223 F.3d 617, 625 (7th Cir. 2000); *see also Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 955 (7th Cir. 2018). The Constitution is the only federal restraint on a state court's award of punitive damages, so it takes center stage in Supreme Court review of state judgments. *Perez*, 223 F.3d at 625. A federal court, however, can (and should) reduce a punitive damages award sometime before it reaches the outermost limits of due process. *Id.*; *Payne v. Jones*, 711 F.3d 85, 97–100 (2d Cir. 2013).

Compensatory and punitive damages serve different purposes. Compensatory damages seek to make the plaintiff whole and to redress the wrongs committed against her, but punitive damages are retributive in nature and seek to deter wrongful acts in the first place. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). The risk of grossly excessive or arbitrary punishment, well beyond that necessary to deter, requires close scrutiny of the amounts of these awards. *Id.* at 416–17. We therefore conduct an "[e]xacting" de novo review of the jury's award, in which we consider three guideposts: the degree of reprehensibility, the disparity between the harm suffered and the damages awarded, and the

difference between the award and comparable civil penalties. *Id.* at 418; *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575–85 (1996); *Green v. Howser*, No. 18-2757, __ F.3d __, 2019 WL 5797158, at *6 (7th Cir. Nov. 7, 2019). Reviewing these guide-posts, we conclude that the $3,000,000 awarded here exceeds constitutional limits and must be reduced to $582,000.

## A. Reprehensibility

The first and most important guidepost is the reprehensi-bility of the defendant's conduct, which we judge based on five factors including whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indif-ference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved re-peated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419; *Green*, 2019 WL 5797158 at *6. The existence of any one factor may not always be enough to sus-tain a punitive damages award, but "the absence of all of them renders any award suspect." *Campbell*, 538 U.S. at 419. The dis-trict court considered these factors here, concluding that the first two factors were inapplicable, but that the last three were present. Though the parties challenge the district court's anal-ysis of all five factors, we largely agree with its reasoning, though not its result.

The district court rightly concluded that the first two fac-tors are irrelevant to this case. Saccameno argues otherwise by framing her depression, anxiety, and panic disorders as

physical injuries. "Mental deterioration, however, is a psychological rather than a physical problem." *Sanders v. Melvin*, 873 F.3d 957, 959 (7th Cir. 2017) (interpreting Prison Litigation Reform Act, 28 U.S.C. § 1915(g)). The first factor is intended to draw a line—however hard to police—between physical injuries and those that are essentially economic, even if those economic injuries cause distress. With that understanding, we agree that Saccameno did not identify any evidence that she suffered physical symptoms or that Ocwen should have been aware of a risk to her health. *Cf. McGinnis v. Am. Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1288–89 (11th Cir. 2018) (finding factors met because plaintiff's depression caused projectile vomiting and she had told her mortgage servicer she was suffering undue stress).

On the third factor, the district court concluded that Saccameno was highly vulnerable financially because she was just coming out of bankruptcy. Ocwen contends this was error, as it did not intentionally "exploit" her vulnerability. This argument is unconvincing both legally and factually. We have not required intentional exploitation to find that this factor weighs in favor of punitive damages. *See Green*, 2019 WL 5797158 at *6 (finding factor relevant because plaintiff was unemployed); *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 839 (7th Cir. 2013) (same for plaintiff who testified he needed his abusive job). Moreover, Ocwen's conduct would have been both different and less reprehensible had Saccameno not recently come out of bankruptcy. Ocwen sent the letters based on its belief that the bankruptcy court had dismissed Saccameno's case, reflecting her extreme vulnerability. Ocwen's representative also explained that it would have acted differently if the 2009 foreclosure were not pending, as Ocwen ordinarily starts with a formal demand letter before filing a complaint

and only then sends the "you'll never rent in this town again" letters. Though the evidence does not show that Ocwen mistreated Saccameno because she was in bankruptcy, and so does not favor a massive award, the close connection between her bankruptcy and the conduct in this case supports some award of punitive damages.[1]

The fourth factor is whether "the conduct involved repeated actions or was an isolated incident." *Campbell*, 538 U.S. at 419. Ocwen asks us to adopt the position of the Sixth Circuit that this factor refers exclusively to recidivism, *see Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 487 (6th Cir. 2007), and thus that the factor does not apply here. We again disagree legally and factually. We have consistently found this factor met in cases involving repeated acts against the same person. *See Rainey v. Taylor*, 941 F.3d 243, 254 (7th Cir. 2019) ("Taylor continued to grope and expose Rainey's most intimate body parts even after she protested, so his misconduct was both repetitious and malicious."); *Estate of Moreland v. Dieter*, 395 F.3d 747, 757 (7th Cir. 2005) ("The defendants' assault on Moreland was sustained rather than momentary, and involved a series of wrongful acts, not just a single blow …."). We agree with the Third Circuit that recidivism may often be more reprehensible than repeated acts against the same party, but that goes to the degree and not the relevance of the factor. *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 191 (3d Cir. 2007). In any event, the record contains evidence that Ocwen was a recidivist. The consent

---

[1] Ocwen also argues Saccameno is not vulnerable because she won such a large verdict. We reject the implication that a defendant's conduct is less reprehensible if it causes more harm.

decrees described how it had treated other customers as it did Saccameno, and that it had continued its ways despite repeated warnings from regulators. The number of opportunities Ocwen had to fix its mistakes is the core fact that justifies punishment in this case.

Finally, the last factor is whether the harm was "the result of intentional malice, trickery, or deceit, or mere accident." *Campbell*, 538 U.S. at 419. Ocwen continues to insist that its employees were only negligent. Like the district court, we think Ocwen's actions were not "mere accident." The evidence shows instead "reckless indifference," which we have found to suffice for this factor to be relevant. *Autozone*, 707 F.3d at 839. Certainly, it would be worse if Ocwen had preyed on Saccameno intentionally but Ocwen does not need to be the worst to be subject to punitive damages.

Ocwen's conduct was reprehensible, but not to an extreme degree. It caused no physical injuries and did not reflect any indifference to Saccameno's health or safety. Ocwen was, however, indifferent to her rights, including those rights that originated from her bankruptcy. No evidence supports that Ocwen was acting maliciously, though the number of squandered chances it had to correct its mistakes comes close. These factors then point toward a substantial punitive damages award, but not one even approaching the $3,000,000 awarded here. Such an award was deemed proper in *McGinnis v. American Home Mortgage Servicing, Inc.*, 901 F.3d 1282, a factually similar case, but there the jury found a specific intent to harm, and the Eleventh Circuit considered evidence supporting all five factors. *Id.* at 1288–91. Ocwen's conduct was less reprehensible than that in *McGinnis* and thus warrants a smaller punishment.

## B. Ratio

Ocwen's primary concern on appeal is with the second guidepost, the disparity between the harm to the plaintiff and the punitive damages awarded. *Campbell*, 538 U.S. at 424. This guidepost is often represented as a ratio between the compensatory and punitive damages awards. The Supreme Court, however, has been reluctant to provide strict rules regarding the calculation of this ratio and instead has offered some general points of guidance. *Id.* at 425. First, few awards exceeding a single-digit ratio "to a significant degree" will satisfy due process. *Id.* Second, the ratio is flexible. Higher ratios may be appropriate when there are only small damages, and conversely, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit." *Id.* Third, the ratio should not be confined to actual harm, but also can consider potential harm. *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 460–61 (1993).

Ocwen argues the district court wrongly inflated this ratio by looking to the entire compensatory award instead of just the $82,000 awarded under the ICFA. We agree, not because the district court was obligated to use a certain denominator but because the choice between available denominators—and their resulting ratios—reflecting the same underlying conduct and harm should not unduly influence whether a given award is constitutional.

The district court calculated its ratio by adding the compensatory damages awarded on all counts, resulting in a roughly 5:1 ratio, which the court approved because it was a single digit. In doing so, it recognized that several courts of appeals have implied or held that courts should calculate

punitive damages ratios claim-by-claim. *See, e.g., Quigley v. Winter*, 598 F.3d 938, 953–55 (8th Cir. 2010) (considering compensatory damages on one claim while ignoring a small additional award); *Dubey*, 918 N.E.2d at 279–82 (considering punitive damages on two claims separately); *see also Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1044 (9th Cir. 2003) (considering punitive damages on only one claim and ignoring other award that included statutory double damages); *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 82 n.9 (1st Cir. 2001) (finding it "appropriate" to consider ratio claim-by-claim but considering both ratios). The Eighth Circuit explained its rationale for this approach in *JCB, Inc. v. Union Planters Bank, NA*, 539 F.3d 862 (8th Cir. 2008). In that case, the two claims—trespass and conversion—"protect[ed] distinct legal rights" and were based on separate acts, so the two awards of punitive damages were considered separately as a matter of both state law and due process. *Id.* at 874–75. The district court here followed the corollary of this logic and aggregated the damages because Saccameno's four claims involved related conduct. *See Bains LLC v. Arco Prod. Co.*, 405 F.3d 764, 776 (9th Cir. 2005) (aggregating a compensatory award with nominal damages on separate claims because conduct was "intertwined"). In doing so, the court relied on *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650 (E.D. Ky. 2009), which reasoned that the related conduct addressed in other counts was like potential harm, which the Supreme Court has deemed a valid consideration. *Id.* at 660–61.

The *Fastenal* court started with the premise that "the award would be unconstitutionally excessive if the ratio is calculated on a claim-by-claim basis, but it would be appropriate under an aggregate basis." *Id.* at 660. No matter which denominator we use here, though, the actual award of $3,000,000

remains the same. More importantly, so does Ocwen's conduct and the harm it caused, and it is that conduct and harm we must assess against the amount awarded. Said another way, given the same conduct, an increased compensatory damages award leads to a decreased permissible ratio, and vice-versa. *Campbell*, 538 U.S. at 425; *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003); *Cooper v. Casey*, 97 F.3d 914, 919–20 (7th Cir. 1996). As the Second Circuit explained in *Payne v. Jones*, 711 F.3d 85, the ratio without regard to the amount "tells us little of value." *Id.* at 103. If the jury had awarded more compensation, then a small ratio of punitive damages might seem high; but if the jury had awarded less, a larger ratio becomes permissible. *Id.* Tellingly, most cases considering whether to aggregate damages reach the same result either way. *See Pollard v. E.I. DuPont De Nemours, Inc.*, 412 F.3d 657, 668 (6th Cir. 2005) (affirming); *Bains*, 405 F.3d at 776 (reversing); *Zimmerman*, 262 F.3d at 82 & n.9 (affirming). More tellingly, the sole exception among federal appellate decisions is *JCB*, which based its analysis on principles of state law distinguishing the different harms—the different conduct—that each claim represented. 539 F.3d at 874–76.

The disparity guidepost is not a mechanical rule. The court must calculate the ratio to frame its analysis, but the ratio itself does not decide whether the award is permissible. *See Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 799 (8th Cir. 2004) ("It is not that such a ratio violates the Constitution. Rather, the mathematics alerts the courts to the need for special justification."). The answer might be yes, despite a high ratio, if the probability of detection is low, the harms are primarily dignitary, or if there is a risk that limiting recovery to barely more than compensatory damages would allow a defendant to act with impunity. *Mathias*, 347 F.3d at 676–77. It might be

no, even with a low ratio, if the acts are not that reprehensible and the damage is easily or already accounted for. Rather than simply move numbers around on a verdict form to reach a single-digit ratio, courts should assess the purpose of punitive damages and the conduct at issue in order to evaluate the award. On the facts of this case, Ocwen's conduct, which overlaps all four claims, would be no more or less reprehensible or harmful if the jury had shifted $50,000 from the compensatory award on the other claims to the ICFA claim or if the verdict form had provided only one line for compensatory damages on all four claims.[2]

The district court recognized this problem. It noted that the 37:1 ratio without aggregation was high but thought it might still be constitutional. It did not go so far as to hold, in the alternative, that this ratio *was* constitutional, however, and it was right to hesitate. It listed several cases upholding even higher ratios on compensatory awards ranging from about $300 to $8500. Most notable is our decision in *Mathias v. Accor Economy Lodging*, where we upheld a 37:1 ratio on $5000 in compensatory damages. 347 F.3d 672. The compensatory damages in this case and *Mathias*, though, are quite different. Moreover, the acts in *Mathias* were incredibly reprehensible. The defendant motel company knew its rooms were infested to "farcical proportions" with bedbugs but refused to pay a small fee to have them exterminated; it instead told employees to call them ticks and avoid renting infested rooms (unless

---

[2] We express no opinion on whether the verdict form could have or should have been drafted differently absent the parties' agreement. The best verdict form for a given case is a question left to the broad discretion of the district court and is informed by the unique facts, legal issues, and other circumstances presented.

the motel was full). *Id.* at 674–75. On those facts, a modest punishment of $186,000 was constitutional, and the high ratio did not undermine that conclusion. *Id.* at 678. In contrast, the $3,000,000 here is not a modest award, and the $82,000 in compensatory damages for the ICFA claim are substantial enough that a huge multiplier was not needed to reflect harm that was "slight and at the same time difficult to quantify." *Id.* at 677. A single-digit punitive damages ratio relative to the $82,000 reflects an appropriate punishment on these facts.

The district court should have hesitated just as much before upholding a 5:1 ratio relative to the $582,000 compensatory award on all four claims. *Campbell* instructs that a "substantial" award merits a ratio closer to 1:1. 538 U.S. at 425. Ocwen correctly notes that courts have found awards of roughly this magnitude "substantial" under *Campbell* and imposed a 1:1 ratio. *See, e.g., Jones v. United Parcel Serv., Inc.,* 674 F.3d 1187, 1208 (10th Cir. 2012) ($630,000); *Bach v. First Union Nat. Bank,* 486 F.3d 150, 156 (6th Cir. 2007) ($400,000); *Williams,* 378 F.3d at 799 ($600,000). *But see Lompe v. Sunridge Ptrs., LLC,* 818 F.3d 1041, 1069 (10th Cir. 2016) (noting that other cases draw the line at roughly $1,000,000). What counts as substantial depends on the facts of the case, and an award of this size (or larger) might not mandate a 1:1 ratio on another set of facts. *See Rainey,* 941 F.3d at 255 (upholding 6:1 ratio relative to $1.13 million compensatory award because defendant's conduct was "truly egregious"). Here, though, $582,000 is a considerable compensatory award for the indifferent, not malicious, mistreatment of a single $135,000 mortgage. Moreover, nearly all this award reflects emotional distress damages that "already contain [a] punitive element." *Campbell,* 538 U.S. at 426. A ratio relative to this denominator, then, should not exceed 1:1.

### C. Civil Penalties

The final guidepost is the disparity between the award and "civil penalties authorized or imposed in comparable cases." *Campbell*, 538 U.S. at 428 (quoting *Gore*, 517 U.S. at 575). The district court identified two civil penalties to compare to the punitive damages award. The first was the $50,000 monetary penalty authorized by the ICFA, which can be calculated per offense if there is intent to defraud. 815 ILCS 505/7(b). Ocwen concedes that this penalty is appropriately considered but argues it cannot support a $3,000,000 award. We agree that Ocwen's actions are not so reprehensible that they might justify an award equal to the maximum penalty for 60 intentional violations. Notably, we see no evidence that Ocwen's actions in this case were either intentional or fraudulent, only indifferent. This aspect of the guidepost thus points to a lower award.

The second civil penalty the district court considered was the possibility that Ocwen could have its license to service mortgages suspended or revoked under the Illinois Residential Mortgage License Act (RMLA), 205 ILCS 635/4-5. The court noted that this was far from hypothetical—as Ocwen had its license placed on probation for, among other things, RESPA violations. Ocwen insists the court could not consider the possibility its license would be revoked both because it was based on the RESPA claim, and not the ICFA, and because comparing a punitive damages award to a major corporation losing its license would allow just about any amount of damages.

We do not think the district court erred in considering the possibility that Ocwen could lose its license. First of all, the ICFA too, allows, the attorney general to seek "revocation,

No. 19-1569                                                    29

forfeiture or suspension of any license … of any person to do business," 815 ILCS 505/7(a), and though that may give way here to the more specific provisions in the RMLA, *that* law allows revocation of licenses for violation of "any … law, rule or regulation of [Illinois] or the United States," 205 ILCS 635/4-5(a)(1), presumably including the ICFA as well as the RESPA. This does not mean, of course, that any punitive award that is less than the value of Ocwen's business license is per se constitutional—far from it. Illinois is not likely to take away Ocwen's business license for deceptively saying one customer owes a few thousand dollars on a $135,000 mortgage, no matter how unjustified the error. Like a criminal penalty, then, this sort of extreme equitable remedy has "less utility" when it is used to determine the amount of an award. *Campbell*, 538 U.S. at 428. Still, also like a criminal penalty, this weapon in Illinois's arsenal has "bearing on the seriousness with which a State views the wrongful action." *Id.* This seriousness would be exaggerated by comparing the award here with the loss of Ocwen's license but would be unduly minimized by limiting an award to only the $50,000 civil penalty.

### D. Remedy

Considering all the factors together, we are convinced that the maximum permissible punitive damages award is $582,000. An award of this size punishes Ocwen's atrocious recordkeeping and service of Saccameno's loan without equating its indifference to intentional malice. It reflects a 1:1 ratio relative to the large total compensatory award and a roughly 7:1 ratio relative to the $82,000 awarded on the ICFA claim alone, both of which are consistent with the Supreme Court's guidance in *Campbell*. It is equivalent to the maximum punishment for less than 12, not 60, intentional violations of

the ICFA, though it is also a miniscule amount compared to the value of Ocwen's business license.

The final issue the parties dispute is whether the Seventh Amendment mandates an offer of a new trial after determining the constitutional limit on the punitive damages award. We have previously said, without deciding the issue, that this offer of a new trial is "a matter of sound procedure, not constitutional law." *Beard*, 900 F.3d at 955. Ocwen insists that this holding was limited by the fact that no party had asked us to decide the constitutional question, and here it asks us to do so. Though we continue to emphasize that parties should focus first on procedural and statutory limits on punitive damages awards, *id.* at 955–56, we agree with every circuit to address this question that the constitutional limit of a punitive damage award is a question of law not within the province of the jury, and thus a court is empowered to decide the maximum permissible amount without offering a new trial. *See Lompe*, 818 F.3d at 1062; *Cortez v. Trans Union, LLC*, 617 F.3d 688, 716 (3d Cir. 2010); *Bisbal-Ramos v. City of Mayaguez*, 467 F.3d 16, 27 (1st Cir. 2006); *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1049–50 (8th Cir. 2002); *Leatherman Tool Grp. v. Cooper Indus.*, 285 F.3d 1146, 1151 (9th Cir. 2002); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1330–31 (11th Cir. 1999); *see also Cooper Indus. v. Leatherman Tool Grp.*, 532 U.S. 424, 437 (2001) ("[T]he level of punitive damages is not really a 'fact' 'tried' by the jury.").

## IV. Conclusion

We therefore remand for the district court to amend its judgment and reduce the punitive damages award to $582,000. Each party is to bear its own costs on appeal.